No. 19-4042

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

RALPH LEROY MENZIES,
*Petitioner/Appellant,*

*v.*

ROBERT POWELL,
Warden of the Utah State Prison,
*Respondent/Appellee.*

On appeal from a final judgment denying a petition for a writ of habeas corpus in the United States District Court for the District of Utah, Central Division, case no. 2:03-CV-00902, the Honorable Claire V. Eagan, presiding.

## BRIEF OF APPELLEE

ANDREW F. PETERSON
ERIN RILEY
AARON G. MURPHY
Assistant Solicitors General
Sean D. Reyes
Utah Attorney General
160 East 300 South, 6th Floor
P.O. Box 140854
Salt Lake City, UT 84114-0854
Telephone: (801) 366-0180

Oral Argument Requested

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... vi

STATEMENT OF RELATED APPEALS .............................................. 1

JURISDICTIONAL STATEMENT ...................................................... 1

ISSUES STATEMENT ......................................................................... 2

ARGUMENT SUMMARY.................................................................... 22

ARGUMENT ...................................................................................... 25

I.    FAIRMINDED JURISTS COULD AGREE WITH THE UTAH
      COURT'S RULING REJECTING MENZIES'S GUILT-PHASE
      INEFFECTIVE-ASSISTANCE CLAIMS. ..................................... 27

      A. Fairminded jurists could agree with the Utah court's ruling
         rejecting Menzies's ineffective assistance claim that counsel
         did not object on due process grounds to purported
         identifications by Larrabee.................................................... 28

         1. Fairminded jurists could agree that counsel were not
            ineffective for not raising due process objections to the
            photo array...................................................................... 28

         2. Fairminded jurists could agree that counsel were not
            ineffective for not raising due process objections to the
            in-person lineup. ............................................................. 32

         3. Fairminded jurists could agree that counsel were not
            ineffective for not raising due process objections to
            identifications of a car and coat........................................ 34

      B. Fairminded jurists could agree with the Utah court's ruling
         rejecting Menzies's ineffective assistance claim that counsel
         did not investigate the accounts of Larrabee and Brown. ....... 36

C. Fairminded jurists could agree with the Utah court's ruling
rejecting Menzies's ineffective assistance claim that counsel
did not investigate and impeach Walter Britton. ..................... 39

    1. Fairminded jurists could agree with the Utah court's
ruling rejecting Menzies's claim that counsel were
ineffective for not impeaching Britton with the fact that
the prosecution had promised to assist Britton in his
federal case. ....................................................................... 40

    2. Fairminded jurists could agree with the Utah court's
ruling rejecting Menzies's claim that counsel were
ineffective for not impeaching Britton with evidence that
he suffered from mental illness......................................... 42

    3. The district court correctly determined that Menzies's
claims concerning George Benitez are procedurally
defaulted. .......................................................................... 48

II. FAIRMINDED JURISTS COULD AGREE WITH THE UTAH
COURT'S RULING THAT TRIAL COUNSEL CONDUCTED A
SUFFICIENTLY COMPREHENSIVE MITIGATION
INVESTIGATION, AND PUT ON A SUFFICIENT
MITIGATION CASE, AND THAT MENZIES WAS NOT
PREJUDICED. .............................................................................. 49

A. Fairminded jurists could agree that counsel put on an
adequate mitigation case focused on Menzies's traumatic
childhood and its effect on his life......................................... 51

B. Fairminded jurists could agree that the mitigation
investigation began at least fourteen months before trial
when Dr. DeCaria—one of the central mitigation
witnesses—interviewed Menzies. ........................................... 58

C. Fairminded jurists could agree that there is no evidence of
sexual abuse and therefore counsel was not deficient and
Menzies was not prejudiced.................................................... 62

D. There was no evidence of organic brain damage for trial counsel to pursue, and even if there had been, the Utah court correctly concluded that it would have undermined the penalty-phase strategy of showing Menzies would change over time............................................................... 64

E. Menzies was not granted a COA on his *Martinez/Trevino* claim and the Court should disregard it; in any event, it is meritless................................................................................. 68

III. FAIRMINDED JURISTS COULD AGREE WITH THE UTAH COURT'S RULING THAT ADMITTING MENZIES'S PRISON FILE DID NOT VIOLATE THE FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION. ........................................... 72

IV. FAIRMINDED JURISTS COULD AGREE WITH THE UTAH COURT THAT ADMITTING MENZIES'S HISTORICAL PRISON FILE DID NOT VIOLATE HIS FIFTH AMENDMENT CONFRONTATION RIGHT........................................................ 78

V. FAIRMINDED JURISTS COULD AGREE THAT THE UTAH COURT DID NOT VIOLATE SUPREME COURT LAW BY AFFIRMING MENZIES'S SENTENCE SINCE NO CONSTITUTIONAL RULE PROHIBITED IT FROM CONSIDERING UNCHARGED PENALTY-PHASE AGGRAVATORS, BUT IT DID NOT DO SO EVEN IF THERE WAS SUCH A RULE, AND ANY ERROR WAS HARMLESS...... 84

VI. FAIRMINDED JURISTS COULD AGREE WITH THE UTAH COURT THAT MENZIES'S DEATH SENTENCE WAS NOT BASED ON UNCONSTITUTIONAL AGGRAVATORS AND THAT ANY ERROR WAS HARMLESS IN ANY EVENT. ........... 98

A. The heinousness aggravator did not taint Menzies's death sentence. ................................................................................. 98

1. Menzies lacks standing to challenge the constitutionality of Utah's statute because heinousness was not charged or applied as a statutory aggravator. ............................... 98

2.  Utah's heinousness aggravator is not unconstitutionally broad. ..............................................................................100

3.  Any error in applying the heinousness aggravator was harmless. ........................................................................102

B.  The pecuniary gain aggravator did not taint Menzies's death sentence....................................................................103

VII.FAIRMINDED JURISTS COULD AGREE WITH THE UTAH COURT'S RULING REJECTING MENZIES'S CLAIM THAT THE REASONABLE-DOUBT JURY INSTRUCTION LOWERED THE BURDEN OF PROOF......................................107

CONCLUSION ..................................................................................113

ORAL ARGUMENT .......................................................................114

CERTIFICATE OF COMPLIANCE WITH RULE 32(a).....................115

CERTIFICATE OF DIGITAL SUBMISSION ....................................115

ADDENDUM

Addendum A  —  *State v. Menzies*, 845 P.2d 220 (1992)

Addendum B  —  *State v. Menzies*, 889 P.2d 393 (1994)

Addendum C  —  *Menzies v. State*, 115 S.Ct. 910 (1995)

Addendum D  —  *Menzies v. Galetka,* 2006 UT 85, 150 P.3d 480

Addendum E  —  *Menzies v. State*, 2014 UT 40, 344 P.3d 581

Addendum F  —  *Menzies v. State*, 136 S.Ct. 55 (2015)

Addendum G  —  *Menzies v. Crowther*, 2019 WL 181359

Addendum H  —  Memorandum Decision, dated January 11, 2019

Addendum I  —  Opinion and Order, dated February 19, 2019

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A.L.A. v. West Valley City*, 26 F.3d 989 (10th Cir. 1994) .........................................46

*Black v. Workman*, 682 F.3d 880 (10th Cir. 2012).....................................................26

*Bland v. Sirmons*, 459 F.3d 999 (10th Cir. 2006) ....................................................3, 4

*Cage v. Louisiana*, 498 U.S. 39 (1990) .................................................................111

*Chandler v. Moore*, 240 F.3d 907 (11th Cir. 2001) ...................................................83

*Clemons v. Mississippi*, 494 U.S. 738 (1990)..........................................................94

*Coleman v. Thompson*, 501 U.S. 722 (1991) ..............................................................4

*Cullen v. Pinholster*, 563 U.S. 170 (2011) .............................................3, 26, 29, 93, 99

*Early v. Packer*, 537 U.S. 3 (2002) .....................................................................105

*Estelle v. Smith*, 451 U.S. 454 (1981)................................................................74, 76

*Fairchild v. Trammell*, 784 F.3d 702 (10th Cir. 2015) ...............................................70

*Frost v. Pryor*, 749 F.3d 1212 (10th Cir. 2014)............................................4, 42, 108

*Gardner v. Florida*, 430 U.S. 349 (1977) ...............................................................78

*Gardner v. Galetka*, 568 F.3d 862 (10th Cir. 2009) ..............................................52, 71

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ....................................................78, 100, 101

*Gonzalez v. Thaler*, 565 U.S. 134 (2012)................................................................69

*Gregg v. Georgia*, 428 U.S. 153 (1976) .................................................................78

*Harrington v. Richter*, 562 U.S. 86 (2011) .........................................26, 27, 47, 64, 78

*Idaho v. Wright*, 497 U.S. 805 (1990) ................................................................79, 82

*Kansas v. Carr*, 577 U.S. 108 (2016) ...................................................................90

*Kansas v. Marsh*, 548 U.S. 163 (2006) ..................................................................89

*Lowenfield v. Phelps*, 484 U.S. 231 (1988) ................................................................91, 92

*Maestas v. Lujan*, 351 F.3d 1001 (10th Cir. 2003) .......................................................5

*Martinez v. Ryan*, 566 U.S. 1 (2012) ...............................................................49, 68, 69

*McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992 (10th Cir. 2002) ..........................33

*Miller v. Mullin*, 354 F.3d 1288 (10th Cir. 2004) .........................................................4

*Miller-El v. Cockrell*, 537 U.S. 322 (2003)...........................................................46, 47

*Penry v. Lynaugh*, 492 U.S. 302 (1989)................................................................52, 66

*Rhode Island v. Innis*, 446 U.S. 291 (1980).................................................................76

*Rompilla v. Beard*, 545 U.S. 374 (2005)........................................................60, 61, 62

*Selsor v. Workman*, 644 F.3d 984 (10th Cir. 2011) ....................................................26

*Sochor v. Florida*, 504 U.S. 527 (1992) ......................................................................94

*Strickland v. Washington*, 466 U.S. 668 (1984) .........................................................59

*Stringer v. Black*, 503 U.S. 222 (1992)...............................................89, 90, 92, 93, 97

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) ......................................................110, 111

*Szabo v. Walls*, 313 F.3d 392 (7th Cir. 2002)............................................................83

*Thomas v. Gibson*, 218 F.3d 1213 (10th Cir. 2000) .....................................................4

*Tillman v. Cook*, 25 F. Supp. 2d 1245 (D. Utah 1998) ...........................................107

*Townsend v. Burke*, 334 U.S. 736 (1948)........................................................79, 80, 81

*Trevino v. Thaler*, 569 U.S. 413 (2013) ..............................................................68, 69

*United States v. Hall*, 843 F.3d 408 (10th Cit. 1988) ................................................59

*United States v. Petty*, 856 F.3d 1306 (10th Cir. 2017) ...........................................108

*Victor v. Nebraska*, 511 U.S. 1 (1994).........................................25, 107, 108, 110, 111

*Williams v. New York*, 337 U.S. 241 (1949) ........................................................79, 82

*Wright v. Van Patten*, 552 U.S. 120 (2008) ................................................................26

*Zant v. Stephens*, 462 U.S. 862 (1983)................................88, 104, 105, 106

## STATE CASES

*Menzies v. Galetka*, 150 P.3d 480 (Utah 2006) ......................................1, 21

*Menzies v. State*, 344 P.3d 581, *cert. denied*, 577 U.S. 834 (2015)....................*passim*

*State v. Holland*, 777 P.2d 1019 (Utah 1989) ...........................................103

*State v. Honie*, 57 P.3d 977 (2002) ....................................................103, 104

*State v. Matteri*, 225 P.2d 325 (Utah 1950) ...........................................112

*State v. Menzies*, 845 P.2d 220 (Utah 1992)........................................1, 21

*State v. Menzies*, 889 P.2d 393 (Utah 1994),
    *cert. denied*, 513 U.S. 1115 (1995) ...........................................*passim*

*State v. Parsons*, 781 P.2d 1275 (Utah 1989) .............................................82

*State v. Pierre*, 572 P.2d 1338 (Utah 1978)...............................................104

*State v. Rimmasch*, 775 P.2d 388 (Utah 1989) ..........................................46

*State v. Sanwick*, 713 P.2d 707 (Utah 1986)..............................................82

*State v. Shaffer*, 725 P.2d 1301 (Utah 1986) ...........................................104

*State v. Stewart*, 925 P.2d 598 (Utah App. 1996)......................................44

*State v. Taylor*, 818 P.2d 1030 (Utah 1991)...............................................82

*State v. Tillman*, 750 P.2d 546 (Utah 1987) .............................................107

*State v. Tuttle*, 780 P.2d 1203 (Utah 1989) ....................................100, 101

*State v. Wood*, 648 P.2d 71 (Utah 1982) ..................................100, 101, 103

*State v. Young*, 853 P.2d 327 (Utah 1993) ...................................90, 91, 99

## FEDERAL STATUTES

28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 2241 ...........................................................................................1

28 U.S.C. § 2253 ...........................................................................................1

28 U.S.C. § 2254 ....................................................................................*passim*

## STATE STATUTES

Utah Code Ann. § 76-3-202 .......................................................................88

Utah Code Ann. § 76-3-207 ...........................................85, 86, 88, 98, 99

Utah Code Ann. § 76-5-202 .................................................85, 86, 100

## FEDERAL RULES

10th Cir. R. 25.5 .......................................................................................115

Fed. R. App. P. 32 ....................................................................................115

## STATE RULES

Utah R. App. P. 23B..................................................................................70

Utah R. Evid. 608 ......................................................................................45

Utah R. Evid. 1101 ....................................................................................82

## STATEMENT OF RELATED APPEALS

There are no prior or related appeals in this Court. In separate appeals the Utah Supreme Court addressed multiple trial transcript errors, *State v. Menzies*, 845 P.2d 220, 229 (Utah 1992) (*Menzies I*), and affirmed Menzies's conviction and sentence. *State v. Menzies*, 889 P.2d 393 (Utah 1994) (*Menzies II*), *cert. denied*, 513 U.S. 1115 (1995). In state post-conviction proceedings, the Utah Supreme Court reversed denial of a motion to set aside summary judgment, *Menzies v. Galetka*, 150 P.3d 480 (Utah 2006) (*Menzies III*), and ultimately affirmed denial of post-conviction relief. *Menzies v. State*, 344 P.3d 581 (Utah 2015) (*Menzies IV*), *cert. denied*, 577 U.S. 834 (2015).

## JURISDICTIONAL STATEMENT

The district court denied Menzies a writ of habeas corpus. ECF163,164. It had jurisdiction under 28 U.S.C. sections 2241(a) & 2254.

This Court has jurisdiction over final orders in habeas cases when a court grants the petitioner a certificate of appealability (COA). 28 U.S.C. §§ 1291, 2253(c). The district court granted Menzies a COA on several claims, ECF163 at 153–55, and this Court expanded the COA. Doc.010110294512 at 1–2.

**ISSUES STATEMENT**

I.    Did the State court make any unreasonable findings of fact or unreasonably determine that Menzies had not established ineffective assistance of counsel at the guilt phase of his trial?

II.   Where Menzies complains only that more evidence should have been presented during the penalty phase, but concedes that the sentencing court heard evidence on all relevant topics and can only speculate that there would have been additional evidence to put on, did the State court unreasonably determine that trial counsel was not ineffective?

III.  Did the State court misapply Supreme Court precedent in ruling that admitting the prison file at the penalty phase did not violate Menzies's privilege against self-incrimination.

IV.   Did the State court unreasonably apply any Supreme Court precedent in ruling that admitting the prison file did not violate the confrontation clause?

V.    Eligibility for the death penalty occurs at the guilt phase in Utah, and no constitutional rule requires the charging of every aggravating circumstance that the sentencer relies on. Did the State court violate Supreme Court law by affirming Menzies's sentence because the sentencer did not rely on uncharged aggravators or alternatively because any error was harmless?

VI.   Where the sentencing judge did not apply the heinousness or pecuniary gain aggravators to Menzies's case, and where aggravators outweigh mitigators even without them, did the State court unreasonably apply Supreme Court law by affirming Menzies's sentence?

VII.  Did the State court unreasonably apply Supreme Court law by denying Menzies's challenge to the reasonable doubt definition that included all the material language required

by the Supreme Court?

## STANDARDS OF REVIEW.

**Exhausted claims:** When a claim was exhausted in State court, this court "review[s] the district court's legal analysis of the State court decision de novo." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006).

Menzies's petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the AEDPA, a federal habeas writ "shall not be granted with respect to any claim that was adjudicated on the merits in State court" unless the adjudication:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The district court recognized "this is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" ECF163 at 12 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). "[R]eview is limited to the record that was before the state court." *Id*. And "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Federal courts must "'presume that the factual findings of the state

court are correct' unless the petitioner presents clear and convincing evidence to the contrary." *Frost v. Pryor*, 749 F.3d 1212, 1215 (10th Cir. 2014) (citation omitted).

**Procedurally defaulted claims:** Some of Menzies's claims are procedurally defaulted. "[I]f a petitioner 'failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred' the claims are considered exhausted and procedurally defaulted for purposes of federal habeas relief." *Thomas v. Gibson*, 218 F.3d 1213, 1221 (10th Cir. 2000) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

When reviewing a decision that a claim is procedurally defaulted, this Court reviews the district court's legal conclusions de novo and its factual findings for clear error. *Bland*, 459 F.3d at 1010. If the district court based its factual findings entirely on the State record, this Court reviews that record independently. *Id*. Generally, a federal court may not review a procedurally defaulted claim. *Coleman*, 501 U.S. at 722–23. But "[i]n the interest of judicial economy" this Court need not address procedural default if the issue "may be more easily and succinctly affirmed on the merits." *Miller v. Mullin,* 354 F.3d 1288, 1297 (10th Cir. 2004) (citation omitted).

**Claims never raised below:** Menzies never raised in the district court below some claims or the supporting facts he now asserts on appeal. Generally, this Court does not consider issues not presented to the district court. *Maestas v. Lujan*, 351 F.3d 1001, 1016 (10th Cir. 2003).

## STATEMENT OF THE CASE

**The murder and trial.** On February 23, 1986, Maurine Hunsaker's husband, Jim, called the Gas-A-Mat where she worked. He could not reach her. He went to the station at about 10:10 p.m., but Maurine was not there. TR1155:983,985,1010,1012,1031–32.[1]

Police were called and they accompanied Jim home, arriving at 11:00 p.m. Five minutes later, Maurine telephoned Jim. She said, "They told me to tell you they robbed me and got me and that I am fine and they are going to let me go sometime tonight." She sounded very upset and scared. TR1155:986,1022–24.

An officer took the telephone and asked whether Maurine had been robbed. She said "Yes." The officer returned the telephone to Jim. Maurine asked Jim what she should do, then the line went dead. TR1155:987,1047–48.

_____

[1] The record is cited as follows: "TR___" refers to the trial record in the criminal case, no. 861908871. "PCR___" refers to the record in the post-conviction case, no. 950902713, later re-designated as 030106629. State appellate briefs are cited as State or Menzies' Br., the date the brief was filed, 00/00/00, and page number. Copies of these records were entered in the district court. Documents listed in the federal habeas case docket are referred to as "ECF___."

Two days later, a hiker discovered Maurine's body at Storm Mountain—a picnic and hiking area near Salt Lake City. Maurine had a gaping hole in her neck. She had marks on her wrists consistent with the use of handcuffs, suggesting someone had pulled her forward by her wrists. Something hard had scuffed bark off a tree near Maurine's body. One investigator opined someone tethered Maurine to the tree. TR1156:1305,1319–26;1157:1617,1751–52.

The medical examiner concluded that ligature strangulation caused Maurine's death, but having her throat slashed contributed. Anything from a standard pocket-knife to a hunting knife could have caused the wounds, including knives later identified as Menzies's. TR1157:1610–15,1637–38.

Menzies lived three or four blocks from the Gas-A-Mat and had been there previously. TR1156:1403.

About 8:00 p.m. the night Maurine disappeared, Troy Denter loaned Menzies his car. Menzies asked to keep it until about 10:00 p.m. Menzies wore a maroon and grey parka when he picked up the car. TR1156:1397–98,1409. Menzies later asked Denter if he could keep Denter's car until the next morning "because…he just had one more order of business to take care of." TR1156:1398–1400. Menzies returned the car at noon the next day. TR1156:1398,1401–1403.

When Denter later cleaned out his car, he found a box labeled "handcuffs" under the driver's seat. Denter had seen handcuffs in Menzies's apartment. TR1156:1404–08.

At about 9:00 a.m. the morning after Maurine disappeared, but the day before the hiker found her body, Tim Larrabee and his girlfriend, Beth Brown, arrived at Storm Mountain. Larrabee saw one other car parked in the lot when he arrived. When shown a photo of Denter's car at trial, Larrabee said it appeared like the car he saw on Storm Mountain. TR1155:1193–95;1156:1394.

Larrabee twice saw a man and woman walking together. Both times, they were walking away from him. They were within arm's reach of each other. The man had his coat draped over his right shoulder, concealing his right hand. Larrabee did not see their hands or whether their hands "were linked together." TR1155:1208,1221–22,1229–31. About ten minutes later, Larrabee heard a scream. Approximately fifteen to twenty minutes later, he saw the man walking alone toward the parking lot. TR1155:1197–98,1201–09.

When Larrabee first contacted police, he described the man he saw to within one inch and ten pounds of Menzies's height and weight. He accurately described Menzies's hair, facial hair, and glasses. He helped create a composite drawing so accurate that detectives were able to select Menzies's photograph as one of three from among two hundred jail inmates. *Menzies II*, 889 P.2d at 397.

Police showed a photo array to Larrabee shortly after the murder. Larrabee selected Menzies's picture as looking most like the man he saw at Storm Mountain. TR1155:1213;1156:1270,1332–38;1157:1685. In a line-up three months later, however, Larrabee identified someone other than Menzies. TR1156:1278.

Larrabee testified that Menzies's coat was like the one the man wore at Storm Mountain. TR1155:1203–04. Larrabee never saw the woman's face. He testified that the clothing found on Maurine's body appeared to match the clothing the woman wore. TR1155:1207.

The evening after Maurine disappeared, but before the hiker found her, police arrested Menzies on an unrelated burglary. When a booking officer asked for Menzies's belongings, Menzies's eyes widened, he straightened up, and stepped back "very quickly." Menzies looked down a hallway, spun around, and ran or quickly walked down the hallway. When an officer yelled to stop, Menzies ducked into a changing room. TR1156:1519–22,1548–50.

A pursuing officer found Menzies in the changing room "reaching around" to "pull on" his pants. Menzies said he was looking for a bathroom but never asked to use a bathroom during the rest of the one and a half hour booking process. TR1156:1551–52.

Later, a jail clothing officer found four identification cards in the same changing room Menzies had run to and put them in a desk drawer. TR1156:1551–52,1561–63,1566,1572–73. The evening after the hiker found Maurine's body, a different officer found the identification cards in the desk and recognized Maurine's driver license picture from a news report. TR1156:1572–74;1157:1731–32.

The Gas-A-Mat was missing about $116. After his arrest, Menzies telephoned Denter from jail. He asked Denter to retrieve $115 from Menzies's apartment and buy some things for Menzies' girlfriend, Nicole Arnold. Denter spent approximately $25. Arnold's mother later found approximately $90 hidden in an umbrella at Menzies's apartment. TR1155:1178;1156:1423–24,1477,1482–84;1157:1746.

Arnold's mother also found handcuffs in Menzies's coat. TR1156:1482. Approximately six months later, her husband found Maurine's social security card in Arnold's belongings. TR1156:1498,1506–1508.

Police compared green fibers found on Maurine's clothing to the green shag carpet in Menzies's apartment. Testing demonstrated the fibers were similar in color, diameter, cross-sectional shape, trilobal shape, and content (nylon); and all had a delustrant present. TR1157:1688–90,1892;1158:1965–74.

Police seized from Menzies's apartment a brown suede woman's purse Jim testified was Maurine's. Police also seized a buck knife. TR1155:989–90;1157:1743–47.

Police found Maurine's thumb print on the passenger window of Denter's car. TR1157:1779,1787–88.

Walter Britton, who was housed with Menzies in jail, testified at Menzies's preliminary hearing that Menzies admitted killing Maurine. Menzies told Britton that he murdered Maurine after robbing her because he did not want to leave a witness, and that slitting her throat was one of the biggest thrills of his life. Britton's preliminary hearing testimony was admitted at trial when Britton refused to testify. TR1158:2080–2126;1150:150–187.

The jury convicted Menzies of capital murder and aggravated kidnapping, but not of aggravated robbery. TR1160:2692–93;TR898–99. The jury found that the homicide was committed while Menzies was engaged in the commission of, an attempt to commit, or flight after committing, or attempting to commit robbery and aggravated kidnapping. TR1160:2693;TR898.

**The penalty-phase.** After Menzies waived a sentencing jury, the judge decided his sentence. TR1162:3248–3270. To support its case for a death sentence, the State relied on evidence produced during the guilt phase. The State

also relied on Menzies's other crimes to argue that he posed a continuing threat and could not be rehabilitated. TR1161:2719–24.

Carl McBrayer detailed the two times Menzies and a partner robbed him at the 7-Eleven where he worked. Around midnight on December 21, 1975, McBrayer was putting money into a bag with his back turned. Menzies's partner asked McBrayer how much money was in the bag. Menzies said, "It better be full." When McBrayer turned, he saw Menzies pointing a revolver at him. TR1161:2730–32. Menzies told McBrayer to empty the registers into the bag. Menzies then ordered McBrayer into a back room and warned him that, if he came out, he might be shot. After McBrayer thought a safe period had passed, he came out and called police. TR1161:2732–34.

Menzies and his partner again robbed McBrayer five days later. They ran into the store and told McBrayer, "You know what to do." TR1161:2734. Menzies decided McBrayer had to go with them this time. Menzies drove McBrayer out of town. When he stopped, he ordered McBrayer into a ditch. Menzies told McBrayer that, if he stuck his head out of the ditch, Menzies would blow his head off. After Menzies and his partner left, McBrayer found his way back to the road and called police from a service station. TR1161:2734–39.

In a later interview with police, Menzies laughed and joked about the robberies. TR1161:2773–74.

While serving time for those robberies, Menzies escaped. TR1161:2844–56. While on escape, Menzies robbed cab driver V.S. Lelaetafea. Menzies pointed a shotgun at Lelaetafea's head, threw a paper sack at him, and demanded his money. Lelaetafea gave Menzies all his fare money—about $76.00. Menzies asked if Lelaetafea had more; Lelaetafea responded he had a dollar in his wallet. Menzies took that too. TR1161:2786–90.

Because Lelaetafea believed Menzies planned to shoot him, he moved to grab the gun. Menzies turned the gun to Lelaetafea and fired, hitting Lelaetafea in the right arm. The gunshot put Lelaetafea in traction for five weeks, required five surgeries, and even at the time of trial ten years later, made it necessary for him to write with his left hand. TR1161:2791–96.

While awaiting trial on Maurine's murder, Menzies was under evaluation at the Utah State Hospital. Arnold smuggled a screwdriver into the hospital for Menzies. The blocks securing the hospital windows were screwed in. And a subsequent search uncovered a sharpened metal dust-pan handle under Menzies's mattress. TR1161:2809–37.

While in jail on the murder charges, Menzies told a jail officer he did not know the problems Menzies could cause and threatened to "take out" a guard or another inmate. TR1161:2867,2873–74,2878.

The State also presented Menzies's entire prison file. TR1161:2884–2900,State's Ex.8.

Defense counsel called Menzies's aunt and his sister to detail his family history. Among other things, they testified that (1) both of Menzies's stepfathers beat him, one almost daily; (2) one stepfather held Menzies's hand over an open flame; (3) one stepfather raped Menzies's mother in front of Menzies and his sister; (4) one beat Menzies and belittled him when Menzies could not slaughter a rabbit; (5) Menzies and his siblings had to hide in a neighbor's apartment from one stepfather's motorcycle gang associates; (6) one stepfather beat Menzies's pregnant mother so severely that her child was born "black and blue" and died five to ten minutes after birth; (7) one stepfather burned the family car when Menzies's mother tried to leave with the children; (8) Menzies's mother would drop her children off with a relative, then disappear for three to four days at a time; (9) Menzies's mother suffered from leukemia and diabetes and died when Menzies was only fourteen; (10) after their mother's death, their stepfather took everything in her estate for himself and did not provide for Menzies and his siblings; and (11) no other relatives provided for Menzies. TR1161:2905–52. Menzies's sister also testified that she and Menzies suffered many other things too humiliating for her to repeat. TR1161:2912.

Menzies's relatives described him as a giving and compassionate person whom they loved and would support if the court imposed a life sentence. His sister also testified that a death sentence would leave a tremendous void in her life. TR1161:2924–26,2948–49.

Menzies's sister provided the court with several documents, including Menzies's certificate from Alcoholics Anonymous and his high school diploma. She also produced some of Menzies's poems and some letters he wrote. In one letter, Menzies explained that he felt his family rejected him, that the feeling caused him to commit the 1975 robberies, and that he blamed only himself. TR1161:2927–32.

Defense counsel called an educational psychologist who testified that Menzies suffered from mental deficits that prevented him from responding to his surroundings appropriately. He also testified that, with appropriate treatment, Menzies could overcome his deficits and function normally. TR1161:2972–81.

Defense counsel called Michael DeCaria, Ph.D. Dr. DeCaria's testimony repeated and amplified Menzies's life history. He spoke of Menzies's "turbulent" family history, which included two "extremely" abusive stepfathers who hit Menzies with their fists and belt buckles. One stepfather confined Menzies and his sister to a room only large enough to hold a twin bed,

and she and Menzies lived on that bed for three or four years. Their punishments included being denied dinner and being kept home from school.

Menzies had a history of substance abuse that DeCaria explained resulted from Menzies trying to alter his consciousness to make the world a better place for himself. DeCaria testified Menzies's sister had significant responsibility to care for Menzies and their younger brother, but because the younger brother was sickly and required the most attention, Menzies was "left out." Menzies's sister described him as a forgotten child, and DeCaria concluded that Menzies had no caretaker while he was growing up. TR1161:3024–30.

DeCaria testified that childhood has everything to do with adolescent and adult behavior. He testified that people raised the way Menzies was raised will not develop a normal conscience. TR1161:3027–30.

Based on his testing and the background information, DeCaria diagnosed Menzies with three personality disorders: schizotypal personality, borderline personality, and anti-social personality disorder. On the last, DeCaria differentiated between those with narcissistic tendencies who deliberately violate others' rights because they believe they have superior rights, and those with low self-esteem who violate others' rights because theirs have never been respected. DeCaria concluded that Menzies fell into the latter. TR1161:3038;1162:3092–93.

DeCaria opined that Menzies's prior criminal behavior resulted from an abusive childhood that prevented him from developing a normal conscience, and from the lack of treatment for his various disorders even though a mental health professional recognized Menzies's needed treatment when he was thirteen. TR1161:3041–42;1162:3095–96.

But DeCaria also testified about factors suggesting Menzies's behavior would change. He testified that antisocial behavior tends to decline at age thirty; Menzies was twenty-nine at the time of trial. Menzies still wanted a positive relationship with the world and hoped that someone would care about him. DeCaria's testing demonstrated that Menzies suffered from depression, anxiety, and low self-esteem, which he considered strong motivators for Menzies to change. He also concluded Menzies had a potential college-student functioning level. TR1161:3032–36, 3040,3051.

Defense counsel called prison social worker Laddy Pruett. Pruett testified that Menzies's previous escape was from the minimum-security facility. TR1161:2984–86;1162:3225. He also testified about current prison security. Pruett posited that Menzies would fall into a security level that would put him in twenty-three-hour lock-down. TR1161:2990–95.

Pruett testified he had observed change in inmates serving long sentences, and nothing would prevent Menzies from making similar changes

TR1161:2998–99. Pruett also testified he had observed positive things about Menzies and Menzies's work in prison during his prior incarceration. He noted that Menzies took pride in his janitor job, a position of trust that Menzies could not have obtained without being discipline-free. Pruett also testified that Menzies took pride in his family. TR1161:2999,3003. Pruett testified that Menzies did not try to escape and did not fight during the period he worked with Menzies. He testified that Menzies had no discipline record for twenty-two months before being paroled. TR1161:3005–3009.

Defense counsel called Utah Board of Pardons Administrator Paul Sheffield. Sheffield testified about the factors the Board considered in determining whether to grant parole to inmates serving capital life-sentences. TR1162:3114–18.

Sheffield opined that the Board would likely impose natural life for a capital defendant whose criminal history began as a juvenile, and whose adult convictions included personal violence, escape from prison, violent crimes while on escape, capital homicide while on parole, and capital homicide committed while committing another felony. He opined that a bad childhood and good institutional behavior probably would not mitigate that decision. He opined that any prognosis for change might mitigate, but that the magnitude of

the crime could overcome that factor. He concluded that Menzies would likely receive a natural life sentence. TR1162:3119–20,3127.

Menzies read a letter. Among other things, he told the trial court, "I am truly innocent of the charges, even though the jury found me guilty." TR1162:3247–48.

The trial court extensively reviewed the penalty-phase evidence during its oral sentencing, identifying what it considered mitigating and aggravating, and what evidence had attributes of both. The court noted Menzies's extensive criminal history, which included thirty-eight juvenile referrals that followed an initial petition for parental neglect, the robberies, his escape and an attempted escape, and his crimes while on escape. The court discounted testimony about the likelihood Menzies would change. TR1162:3249–53.

As to the threat Menzies posed, the court noted that the parole board once found Menzies "much improv[ed]" and released him. Thirteen months later, Menzies committed thefts, and eighteen months later, he murdered Maurine. The court noted the screwdriver smuggled to Menzies, the sharpened dustpan handle found in his USH cell, and his threats at the jail. TR1162:3253–54.

 The trial court reasoned that a life-in-prison sentence provided no guarantee because the parole board could release Menzies regardless of recommendations not to, and because Menzies might escape. TR1162:3254.

The trial court considered Menzies's substance abuse. It recognized Menzies had done odd jobs, but never had a formal job and supported himself through criminal activity. TR1162:3253–54.

As to the murder circumstances, the trial court found Menzies's actions cold and calculated. It explained that (1) Maurine endured eleven to twelve hours of fear and anxiety with a promise to free her; (2) Maurine waited handcuffed without knowing what would happen; (3) Menzies used a ligature and, although Maurine managed one scream, there was no help; and (4) Menzies watched Maurine die, removed the handcuffs, and walked away. TR1162:3254–55.

The trial court noted that Menzies had scarred the lives of Maurine's family and friends, and of the two robbery victims. TR1162:3254-55.

The court recognized that Menzies's childhood consisted of abuse, death, no parenting, and instability, and that Menzies had never received the treatment or intervention he needed. TR1162:3254–65.

The trial court also considered psychological, presentence, and prison records and summarized their contents. It noted those records showed Menzies had several personality disorders, described him as manipulative, demonstrated his persistent failures at rehabilitation, noted his prior conduct demonstrated his risk for future violence, and pointed out his poor prognosis

for change. The court noted that Menzies had not changed for the judges who had handled his prior criminal and juvenile cases. But it also recognized that prison, prison psychological, and Board of Pardons records reported improved prognosis, described Menzies as a good worker making an honest effort, reported he had succeeded in work and education in prison, and noted he had mediated disputes between staff and inmates. TR1162:3255–65,3268.

The trial court noted Maurine's death was quick and without torture. The evidence supporting the underlying felonies was circumstantial. Menzies committed his crimes while suffering from schizotypal personality disorder, borderline personality disorder, and anti-social personality disorder, and while under extreme mental or emotional disturbance or dysfunction. Menzies did not harm the 7-Eleven robbery victim, but he did use a weapon both times, and he showed no remorse. Menzies committed the robbery of the cab driver while on escape and almost shot the cab driver's arm off. As to remorse for the murder, Menzies boasted that cutting Maurine's throat was the greatest thrill of his life. TR1162:3264–65.

The trial court concluded that the aggravating circumstances outweighed the mitigating circumstances, and that death was the appropriate sentence. TR1162:3268–70.

**The direct appeals.** The Utah Supreme Court reviewed Menzies's

judgment in two separate appeals. The first rejected Menzies's claim that transcription errors prevented meaningful appellate review, *Menzies I*, 845 P.2d 220. The second affirmed Menzies's conviction and sentence. *Menzies II*, 889 P.2d 393.

**Post-conviction review.** In state post-conviction proceedings, the Utah Supreme Court reversed denial of a post-judgment motion to set aside summary judgment. *Menzies III*, 150 P.3d 480. But after further litigation on remand, it ultimately affirmed denial of post-conviction relief. *Menzies IV*, 344 P.3 581.

**Federal Habeas:** Menzies first filed a federal petition for writ of habeas corpus seventeen years ago. ECF15. Sixteen years ago, the district court stayed the habeas proceedings pending Menzies's exhaustion of state post-conviction remedies. ECF41. The stay lasted more than ten years. ECF102. Nearly six years ago, Menzies filed his first amended petition, and later a second amended petition. ECF103,109. Following briefing on the petition, ECF123,127,130, and an unsuccessful successive *Rhines* motion to again stay his federal habeas proceedings, ECF139 (motion),148 (Order denying motion),158 (Order denying reconsideration motion), the district court denied habeas relief. ECF163,164.

## ARGUMENT SUMMARY

**I.** The district court correctly determined that Menzies had not proved that the Utah court contradicted or unreasonably applied Supreme Court law or relied on any unreasonable factual determination when it rejected his guilt-phase ineffective-assistance claims because (1) there was no clear identification, (2) the identification procedures were not unduly suggestive, (3) counsel acted reasonably in pointing out flaws in the testimony rather than seeking to suppress it, (4) there was no prejudice, and (5) for some of his claims, Menzies relied on evidence never presented in State court or raised in federal district court.

**II.** Menzies claims trial counsel was ineffective during the penalty phase for not putting on additional evidence of his traumatic childhood or any evidence he has organic brain damage. But he admits that counsel put on evidence in nearly all the same categories he proposes. His claim fails for that reason alone—merely adding color in habeas review to the case put on at trial will not justify habeas relief. Further, he has never actually produced any additional evidence or otherwise shown that more existed and was available to counsel. With nothing but speculation to offer, he cannot show that the Utah court unreasonably applied any Supreme Court precedent or relied on an unreasonable factual determination when it rejected his *Strickland* claims.

**III.** Menzies has not shown that admitting the prison file was error at all or that the Utah court's denial of his claim was an unreasonable application of clearly established federal law. He argues that admitting his prison file during the penalty phase violated his Fifth Amendment privilege against self-incrimination. But he never identified any specific statements in his prison file that he claims are incriminating, nor can he establish that the inquiries made of him by prison authorities many years before he committed aggravated murder constituted interrogation for Fifth Amendment purposes.

**IV.** Menzies has not established that the Utah court's decision upholding admission of the prison file was an unreasonable application of clearly established federal law. He complains that admitting his prison file violated his confrontation rights. But the Supreme Court has never held that the confrontation clause applies in penalty-phase proceedings. And his effort to reframe his claim as a due process violation fails because the Supreme Court has explicitly held that a sentencing court's consideration of the exact type of material his prison file contains is permissible under the due process clause. Indeed, his prison file was exactly the kind of information courts have always considered at sentencing.

**V.** The constitution requires that a death penalty statute meaningfully narrow the class of offenders who are eligible to be sentenced to death. In Utah,

eligibility is determined at the guilt phase, where the jury must find the defendant guilty of aggravated murder with at least one constitutional aggravating circumstance. The jury found Menzies eligible for the death penalty by convicting him beyond a reasonable doubt of capital murder with two statutory aggravators. Menzies complains that the sentencing judge weighed three uncharged statutory aggravators in his sentencing determination—heinousness, preventing a witness from testifying, and pecuniary gain. But since Menzies was already eligible for the death penalty by the time of sentencing, the constitution did not require those aggravators be charged and proved beyond a reasonable doubt. The Utah Supreme Court therefore did not violate or unreasonably apply Supreme Court law by affirming Menzies's sentence because (1) the sentencer was constitutionally permitted to consider uncharged aggravating circumstances, (2) the Utah court found the sentencing judge did not apply the statutory aggravators and Menzies complains about and Menzies has not shown this was an unreasonable finding of fact, and (3) any error was harmless in any event.

**VI.** Menzies claims his sentence rested on two unconstitutional aggravators—heinousness and pecuniary gain—and that the Utah Supreme Court's harmless error review did not searchingly weigh the remaining aggravators against the full case in mitigation. But Menzies has established

neither that the Utah court unreasonably found that the sentencing judge did not rely on those aggravators nor that it inadequately reweighed aggravators against mitigators.

**VII.** The district court correctly determined that Menzies had not proved that the Utah court contradicted or unreasonably applied Supreme Court law or relied on any unreasonable factual determination when it rejected his claim that the reasonable doubt jury instruction lowered the prosecution's burden of proof because the State court reasonably applied *Victor v. Nebraska*, 511 U.S. 1 (1994), and the instruction did not lower the prosecution's burden of proof.

## ARGUMENT

The Utah Supreme Court decided the merits of all of Menzies's challenges to his conviction and sentence that are properly before this Court.[2] To get habeas relief, then, Menzies had to show that the Utah court (1) contradicted or unreasonably applied "clearly established Federal law, as determined by the Supreme Court of the United States," or (2) based its decision "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d).

---

[2] Menzies has argued some defaulted claims in his brief on appeal, and those claims are not properly before the Court, as discussed below.

Menzies had to show that the Utah court's disposition "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter,* 562 U.S. 86, 103 (2011). He could not get federal habeas relief "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 102 (citation omitted). He had to show that the Supreme Court had clearly answered the federal question at issue contrary to the way the Utah court did. *See Wright v. Van Patten*, 552 U.S. 120, 124–26 (2008).

This standard is intentionally "difficult to meet" and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter,* 562 U.S. at 102. It is "exquisitely deferential." *Black v. Workman*, 682 F.3d 880, 891–93 (10th Cir. 2012). Menzies had to overcome that exquisite deference based on the evidence before the Utah courts. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Further, Menzies had to prove that any constitutional error had a "substantial and injurious effect" on the state criminal proceedings, meaning the federal courts find themselves in "grave doubt" or "virtual equipoise" about any error's harmlessness. *Selsor v. Workman*, 644 F.3d 984, 1027 (10th Cir. 2011) (citation omitted).

The district court properly denied habeas relief.

## I.

### Fairminded jurists could agree with the Utah court's ruling rejecting Menzies's guilt-phase ineffective-assistance claims.

Menzies alleges that his counsel were ineffective during his trial's guilt phase because his counsel did not (1) raise due process suggestiveness objections to several purported identifications, (2) interview Larrabee and Brown or otherwise investigate their accounts, or (3) investigate and present evidence undermining Britton's testimony. Some parts of this claim were exhausted in State court, some were procedurally defaulted, and some were never raised in the district court below.

For the exhausted ineffective-assistance claims, Menzies had to prove both that counsel were ineffective under *Strickland* and that the "state court's application of *Strickland* was unreasonable under §2254(d)." *Richter*, 562 U.S. at 105. "The standards created by *Strickland* and §2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Id.* (citations omitted). Menzies has not proved that the district court erred when it ruled he had not met these standards.

Menzies also has not proved that the district court erroneously denied relief on his defaulted claims. And this Court cannot grant relief on claims Menzies did not present to the district court.

### A. Fairminded jurists could agree with the Utah court's ruling rejecting Menzies's ineffective assistance claim that counsel did not object on due process grounds to purported identifications by Larrabee.

Menzies claims that his trial counsel were ineffective for not objecting on due process grounds to identifications he says Larrabee made, because, he claims, the identification procedures were suggestive.

### 1. Fairminded jurists could agree that counsel were not ineffective for not raising due process objections to the photo array.

Larrabee reported to police that he saw a man and woman near the area where Maurine's body was later found. A detective showed a photo array to Larrabee, but Larrabee did not initially pick anyone. After the first detective left, Larrabee asked a second detective if he could look at the photos again. Larrabee then picked Menzies's photo as looking the "most like" the man he had seen. TR1155:1213;1156:1332,1338.

Trial counsel objected on disclosure grounds—that the State had not told the defense that Menzies initially picked no one out of the array. The trial court overruled the objection. TR1156:1332–37.

The Utah Supreme Court held that "[t]rial counsel acted reasonably in pointing out the flaws in the testimony rather than seeking to suppress it on the ground that the police used unnecessarily suggestive tactics." *Menzies IV*, 344 P.3d at 619.

Menzies bases most of his argument on a 2014 declaration never presented in State court that the district court therefore could not consider. Br.Aplt.31 n.3; ECF163 at 89; ROA vol. VII at 23–31; *Pinholster*, 563 U.S. at 184.

The district court rejected Menzies's reliance on a declaration that he never submitted in State court. ECF163 at 89. It correctly ruled that its review was limited to the record before the State court. *Id*. It extensively reviewed the State court ruling and held that Menzies "failed to establish that the state court decision…was based upon an unreasonable determination of the facts or that it involved an unreasonable application of clearly established federal law." *Id*. Menzies has not established that the district court ruling was erroneous.

First, the Utah court rejected this claim because there was no true identification for counsel to object to as unreasonably suggestive. *Menzies IV*, 344 P.3d at 618. The best Larrabee could do was pick Menzies's photo as looking the "most like" the man he saw. Menzies points to no Supreme Court law conflicting with this holding.

Second, the Utah court ruled that even if it assumed Larrabee's testimony was identification testimony, Menzies's assertions did not support the conclusion that the identification procedures were unduly suggestive because some of his assertions affected only the weight of the identification testimony but were "irrelevant" to the question of whether the identification procedures

were suggestive. *Id.* It also found that some of the "indicia of suggestiveness cited by Mr. Menzies" had "no basis in the record." *Id.*

The Utah court held that the only fact "even potentially relevant to determining suggestiveness" was the claim that police did not tell Larrabee that the person he saw may or may not be in the photo array. *Id.* The Utah court held that this "lone fact" was not enough for the court "to conclude that trial counsel acted unreasonably in not seeking to suppress the identification as unnecessarily suggestive." *Id.* at 619.

The Utah court found that Menzies had offered no relevant evidence that the identification procedures were suggestive. *Id.* at 618. It reasoned that "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Id.* at 617 (quoting *Perry v. New Hampshire*, 565 U.S. 228, 238–39 (2012)). When determining whether a photo array is "impermissibly suggestive," the "main question is whether the photo array emphasized the defendant's photo over the others." *Id.* (citation omitted). The Utah court held that Menzies provided "no basis for the conclusion that trial counsel could have had the photo array suppressed." *Id.* It then held that trial counsel's decision to impeach Larrabee's eyewitness testimony rather than to seek suppression was reasonable. *Id.* at 619.

Menzies argues that before the photo array procedure, police told Larrabee the man responsible was in custody. But this conflicts with the facts found by the Utah court. It found that "at the time he picked Mr. Menzies's picture out of the photo array," Larrabee "did not know that the police had Mr. Menzies in custody. In fact, Mr. Larrabee learned that Mr. Menzies was in custody approximately three months later." *Id.* at 618. Menzies has not proved that that factual finding was unreasonable in light of the evidence presented in State court.

Next, Menzies asserts that "police led Larrabee to believe the suspect was in the photo array." Br.Aplt.21. But there was no evidence of this, and even the declaration from 2014, which the State court never saw and the district court could not consider, merely states that Larrabee "*assumed* that the photos we were shown included the man that was said to be in custody." ROA vol. VII at 26, ¶ 8 (emphasis added).

Menzies now speculates that the police showing Larrabee the photo array a second time "encouraged Larrabee to question his initial non-identification and simply pick the person that seemed the most like the man he had seen." Br.Aplt.21. But Larrabee never raised this claim in the district court. *See* ECF109. And it was Larrabee who asked if he could look at the photos again.

TR1156:1332. No words or actions by police encouraged Larrabee to question his initial non-identification.

### 2. Fairminded jurists could agree that counsel were not ineffective for not raising due process objections to the in-person lineup.

Larrabee identified someone other than Menzies at the in-person lineup. Menzies nevertheless argues that trial counsel should have objected to the line-up on due process suggestiveness grounds. The Utah court denied this claim, noting that "Mr. Larrabee could not identify the man he saw [at Storm Mountain] during a lineup." *Menzies IV,* 344 P.3d at 618.

The Utah court also held that Menzies's ineffective assistance claims related to both the photo array and the lineup failed because Menzies had not proved prejudice. This was so because he argued only that there was a good chance a motion to strike the identifications would have been granted and the result of the trial would have been different. This was insufficient because it "merely restate[d] the basic prejudice standard and provide[d] no analysis regarding why it would be the case." *Id.* at 619.

The district court ruled that Menzies had "failed to establish that the state court decision…was based upon an unreasonable determination of the facts or that it involved an unreasonable application of clearly established federal law." ECF163 at 89. Menzies has not established that ruling was erroneous.

Larrabee viewed a line-up where he picked number 5, who was not Menzies. The defense knew this. At trial, the prosecutor did not ask Larrabee about the lineup during his case-in-chief. Defense counsel, however, elicited testimony about Larrabee's misidentification. So on redirect, the prosecutor asked Larrabee about a conversation following the lineup procedure, where Larrabee asked whether "number 6" (Menzies) was the correct person. *Menzies II*, 889 P.2d at 400; TR1156:1277–78,1284–85. Because the prosecution had not informed the defense about the post-lineup conversation, counsel moved to strike the testimony. "The trial court granted the motion, struck the testimony, and instructed the jury to disregard it." *Menzies II*, 889 P.2d at 400. The court denied counsel's motion for a mistrial. *Id*.

Menzies now argues that the line-up was highly suggestive because Menzies "was wearing a shirt that was significantly darker in color than the identical shirts of all the other individuals in the lineup." Br.Aplt.22. But Menzies never asserted this in his federal petition. *See* ECF109 at 158–61. Generally, this Court "will not consider arguments raised for the first time on appeal." *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 999 (10th Cir. 2002). And despite Menzies's shirt appearing darker, Larrabee still did *not* pick Menzies.

When asked at trial why he picked number 5 in the lineup (not Menzies), Larrabee said that number 5 seemed to be the same build as the person he saw.

"Number 5 was overweight, and that stuck in my mind as…the best way for me to recognize him." TR1156:1285. Menzies claims that after the lineup, someone from the prosecutor's office told Larrabee that the suspect had either gained or lost 20 pounds. Br.Aplt.24. Menzies speculates that this could be why Larrabee later asked the prosecutor whether it was number 6 (Menzies). But again, Menzies never raised this in his federal petition. *See* ECF109. And speculation about why Larrabee may have felt he picked the wrong person does not establish that the lineup procedure was irregular or unduly suggestive.

Menzies also suggests that the photo array "contaminated the lineup." Br.Aplt.24. But again, Menzies never raised this claim in his federal petition. *See* ECF109.

### 3. Fairminded jurists could agree that counsel were not ineffective for not raising due process objections to identifications of a car and coat.

Menzies alleges that police set up suggestive identifications of the car he had borrowed and was driving when Maurine disappeared and a coat that police seized from his apartment. Br.Aplt.26. He again argues that counsel should have raised a due process suggestiveness objection. He has not proved a basis for habeas relief.

Menzies defaulted his claim about the car because he never raised it in the Utah Supreme Court. The district court could have denied this claim as defaulted, but it denied both claims on the merits.

Menzies claims that police brought Larrabee a coat, asked him to identify it, and that "Larrabee identified Mr. Menzies's coat as the coat carried by the male hiker at Storm Mountain." Br.Aplt.26. But the identification was not that clear. Larrabee testified that the coat that police showed him was "perhaps the coat that [he] had seen the male individual wearing." TR1156:1273. During cross-examination, Menzies's counsel got Larrabee to admit that his original description of the coat he saw differed from Menzies's coat. TR1156:1273, 1291–92. This admission allowed Menzies's counsel to impeach Larrabee's perception and memory.

The Utah Supreme court held that trial counsel acted reasonably in pointing out the flaws in Larrabee's testimony rather than seeking to suppress it on the ground that the police used unnecessarily suggestive tactics. *Menzies IV*, 344 P.3d at 619.

The district court ruled that "Larrabee's statements that the car in the police parking lot 'looked like the car [he] saw' at Storm Mountain and that the coat he was shown by police was 'perhaps the coat that [he] had seen the male

individual was wearing' did not render petitioner's trial fundamentally unfair." ECF163 at 89. Menzies has not established that this decision was erroneous.

## B. Fairminded jurists could agree with the Utah court's ruling rejecting Menzies's ineffective assistance claim that counsel did not investigate the accounts of Larrabee and Brown.

Menzies claims that trial counsel were ineffective for not investigating the accounts of Larrabee and Brown and presenting inconsistencies at trial. Br.Aplt.18. Menzies claims that despite indications in police reports that Larrabee and Brown were distracted when they saw the hikers at Storm Mountain, trial counsel performed ineffectively by not interviewing them before trial. But the only thing Menzies claims counsel could have learned was that Larrabee was distracted because he was engaged in sexual activity with Brown. *See id.*

The Utah court held that not eliciting "the specific reason that Mr. Larrabee and Ms. Brown were distracted was neither unreasonable nor prejudicial." *Menzies IV*, 344 P.3d at 617. The jury heard that Larrabee was focused on Brown. At trial, counsel elicited an admission that Larrabee's "attention was turned towards Ms. Brown during the time he saw the man and woman walking at Storm Mountain." *Id.*; TR1156:1222–23. Trial counsel cross-examined Larrabee and Brown and "highlighted for the jury the weaknesses of their testimony." *Menzies IV*, 344 P.3d at 617.

The Utah court held that Menzies did "not explain how the jury knowing that Mr. Larrabee's attention was directed at Ms. Brown *for the purpose of having sexual relations* would have changed the outcome in the case." *Id.* (emphasis in original).

In addition, the Utah court noted that in his declaration, Larrabee stated only that he and Ms. Brown were kissing. *Id.* If Larrabee was unwilling to admit over twenty-five years after the event that he went to Storm Mountain to engage in sexual actions beyond kissing, the court had no basis to presume that he would have admitted this information to trial counsel or a jury. *See id.*

The Utah court also pointed out that highlighting sexual activity might have backfired because it might have suggested that Larrabee was "more focused on the man at Storm Mountain than he might otherwise have been" for fear of being caught. *Id.* Menzies argues that this comment was a factual finding, and that it was objectively unreasonable. Br.Aplt.33.

But the district court ruled that the State court comment—that the jury might have believed Larrabee was more focused on the hiker because he was engaged in sexual activity—was not a factual determination. ECF163 at 85. It noted that "the prejudice inquiry is a 'mixed question of law and fact.'" *Id.* (quoting *Wood v. Carpenter*, 907 F.3d 1279 (10th Cir. 2018)). "The 'factual part of the mixed question' is whether the evidence had, in fact, been 'presented at

trial,' while the 'legal part' is related to the 'strength of the…evidence.'" *Id*. The district court ruled that the State court would have "made a factual error if it had concluded Larrabee's focus was not on Brown…but that is not what the state court found." *Id*. The State court's comment about what the jury might have concluded "relates to the 'legal part' of the prejudice analysis—the strength of the missing reason, and whether it would have affected the proceeding's outcome." *Id.* The district court therefore ruled that because "the factual determination [Menzies] claims is unreasonable is not a factual determination, § 2254(d)(2) is inapplicable…[and] federal habeas relief is not appropriate." *Id*.

Menzies argues that there is no difference between reaching a conclusion refuted by the record and holding that the jury might have reached a conclusion refuted by the record. Br.Aplt.35. But the Utah court did not reach a conclusion refuted by the record. Contrary to Menzies's assertions, the Utah court did not find that "the jury *would have* believed the opposite of the plain language in Larrabee's affidavit" or that "the jury *would* believe Larrabee was more focused on the hiker." Br.Aplt.35–36 (emphasis added). The court merely commented that there was a possibility that the jury "might" have concluded that Larrabee was so concerned about being caught that he was "more focused on the man at Storm Mountain than he might otherwise have been," a risk reasonable counsel

could seek to avoid. *Menzies IV*, 344 P.3d at 617. Even if this possibility contradicted Larrabee's declaration, jurors are not required to believe everything a witness says. Regardless of what Larrabee's declaration says, a jury "might" have believed something different.

Menzies has failed to establish that the decision of the district court was erroneous.

### C. Fairminded jurists could agree with the Utah court's ruling rejecting Menzies's ineffective assistance claim that counsel did not investigate and impeach Walter Britton.

Walter Britton was housed with Menzies at the jail and testified at Menzies's preliminary hearing that Menzies admitted killing Maurine because he robbed her and did not want to leave a witness and stated that slitting her throat was one of the biggest thrills of his life. Britton's preliminary hearing testimony was admitted at trial when Britton refused to testify. *Menzies IV*, 344 P.3d at 614;TR1158:2078–126;1150:150–87.

Menzies claims that trial counsel did not investigate and present evidence to undermine Britton's testimony. Br.Aplt.36. The Utah Supreme court denied this claim. It ruled that trial counsel had reasonably challenged Britton's testimony and that Menzies had not shown prejudice. *Menzies IV,* 344 P.3d at 613–16. Even without Britton's testimony there were "numerous pieces of evidence indicating that Mr. Menzies killed Ms. Hunsaker." *Id.* at 591.

The district court ruled that Menzies "failed to establish the state court's decision was an unreasonable application of *Strickland*." ECF163 at 95. "Clearly, even if counsel's investigation of Britton was deficient, based upon this record, [Menzies] cannot establish any prejudice whatsoever." *Id*.

1. **Fairminded jurists could agree with the Utah court's ruling rejecting Menzies's claim that counsel were ineffective for not impeaching Britton with the fact that the prosecution had promised to assist Britton in his federal case.**

Menzies claims that had counsel investigated, they "would have learned that Britton was trying to strike a deal in exchange for his testimony." Br.Aplt.37. He also claims that trial counsel should have impeached Britton's preliminary hearing testimony with "the fact that the prosecution had promised to assist Britton in his federal criminal case." *Id.*

The Utah court ruled that "[n]ot only did trial counsel investigate Mr. Britton's background, but they also used their findings to impeach his testimony." *Menzies IV*, 344 P.3d at 615. When trial counsel cross-examined Britton at the preliminary hearing, Britton admitted that he heard about the victim's abduction on the news, he watched the news more frequently after his first conversation with Menzies, and he did not report Menzies's statements for about a month. *Id.* at 614.

At trial, counsel also tried to discredit Britton's testimony by calling a jail officer who testified that jail employees and inmates discussed the details of the

murder. *Id*. Counsel told the jury that "Britton's testimony could have been derived from either the news or jail rumors." *Id*.

Trial counsel also called Britton's attorney, who testified that he based a sentence reduction motion on Britton's willingness to cooperate in Menzies's case. *Id*.;TR1159:2307–31. Britton's attorney testified that the prosecutor had appeared at Britton's sentence reduction hearing. TR1159:2316–17.[3] But Britton ultimately did not receive a sentence reduction in his federal case. *Menzies IV*, 344 P.3d at 614. Menzies's counsel "noted the possibility of Mr. Britton's bias and highlighted the fact that he refused to testify at trial after learning that he would receive no sentence reduction." *Id*.

The district court ruled that "any claimed failures to impeach at a preliminary hearing are 'of a wholly different character from failures to effectively impeach at a trial.'" ECF163 at 90 n.52 (quoting State post-conviction court, PC ROA at 15434). "The burden of proof at a preliminary hearing is so low that impeachment at that hearing as a practical matter is not effective nor worthwhile." *Id*.

_____

[3] The prosecutor testified at the sentence reduction hearing that Britton had appeared at Menzies's "preliminary hearing, that he had testified, and that to my knowledge he had testified truthfully based on what we knew, what we thought his testimony would be based on interviews and what we knew about the case." ECF163 at 37;TR1157:1821;1158:2018,2031.

The district court ruled that Menzies "failed to establish the state court's decision was an unreasonable application of *Strickland*." *Id*. at 95. "Clearly, even if counsel's investigation of Britton was deficient, based upon this record, [Menzies] cannot establish any prejudice whatsoever." *Id*.

Menzies has not shown that the district court was wrong.

**2.  Fairminded jurists could agree with the Utah court's ruling rejecting Menzies's claim that counsel were ineffective for not impeaching Britton with evidence that he suffered from mental illness.**

Menzies alleges that trial counsel were ineffective because they did not impeach Britton's preliminary hearing testimony with evidence that "Britton suffered from mental illness." Br.Aplt.37.

The Utah Supreme Court ruled that Menzies could not prove deficient performance because he did not show that trial counsel could have obtained the evidence through reasonable diligence. *Menzies IV*, 344 P.3d at 615. It also ruled that Menzies suffered no prejudice. *Id.* at 614. It found that all Menzies did was "make conclusory statements," which "are insufficient to raise a genuine issue of material fact regarding *Strickland* prejudice." *Id*. at 615.

The district court correctly ruled that "[w]here 'some fairminded jurists could possibly agree with the State court decision, then it was not unreasonable and the habeas corpus writ should be denied.'" ECF163 at 95 (quoting *Frost*, 749 F.3d at 1225).

Menzies based his claim "on a mental health evaluation of Mr. Britton conducted in Springfield, Missouri approximately five months before Mr. Menzies's preliminary hearing." *Menzies IV*, 344 P.3d at 614. Menzies's state post-conviction counsel obtained a copy of the evaluation report "in June 2011 under the Freedom of Information Act (FOIA)." *Id*. Menzies also claims that he told his counsel Britton was mentally ill, and that counsel also had a copy of a report written by Dr. Lebegue for a court-ordered competency evaluation. Br.Aplt.38.

The Utah court found that "[t]rial counsel's investigator testified that he served the federal court hearing Mr. Britton's case with a subpoena seeking Mr. Britton's psychological records, but received nothing back." *Menzies IV*, 344 P.3d at 615. Britton's attorney told Menzies's trial counsel that "the records were not public records and that he could not disclose confidential client information." *Id.* Menzies's trial counsel testified that the federal court hearing Britton's case "had the only copy of the Springfield report, that she was unsuccessful in procuring the report, and that Mr. Britton's attorney did not have a copy." *Id.*

The Utah court found that the "file Mr. Menzies alleges counsel should have used here was apparently held by a federal court that did not respond to the trial investigator's inquiries." *Id.* It ruled that Menzies's claim failed because

he had not shown that trial counsel could have obtained the Springfield report.
*Id.*

In 2011, Menzies's post-conviction counsel obtained the Springfield report from the Federal Bureau of Prisons through a FOIA request. *Id.* at 614,616. The Springfield report concluded that Britton suffered from no hallucinations, delusions, or illusions. PCR13410,13415. One evaluator found that Britton '"exaggerated and/or lied in order to present himself as a more interesting, valuable person to others' and that he had 'a marked disregard for the truth as indicated by his reported lies.'" *Menzies IV*, 344 P.3d at 614.

But Menzies identified no mental illness that trial counsel could have used to impeach Britton. A party seeking to use a mental disorder to impeach a witness must show both that the disorder (1) "affects the witness's ability to accurately perceive, recall, and relate events," and (2) "existed either at the time of the event…or at the time testimony is given." *State v. Stewart*, 925 P.2d 598, 600 (Utah App. 1996). Nothing in the Springfield report suggested Britton suffered from a mental illness that affected his "ability to accurately perceive, recall, and relate events." Rather, it concluded that he suffered from no hallucinations, delusions, or illusions. One evaluator believed Britton had lied about or exaggerated events in his life and relied on Britton's deceit as evidence

of Anti-Social Personality Disorder. But he did not conclude Britton lacked the "ability" to tell the truth. PCR 13412–18.

At most, the evaluation provides specific instances in which an evaluator concluded Britton had lied. Utah Rule of Evidence 608 prohibits impeaching a witness with extrinsic evidence of specific instances of lying. *See* E. Kimball & R. Boyce, UTAH EVIDENCE LAW 6-201 (2d ed. 2004).

Menzies argues that a report by Dr. Lebegue, "was the primary basis" for his claim, and that the State court failed to acknowledge that report.[4] Br.Aplt.40. But there was no actual report. Pursuant to a federal court order, Dr. Lebegue attempted to perform a competency evaluation of Britton. PC ROA Sealed vol. 4 at 0012501–02. Dr. Lebegue ultimately sent the court a letter explaining that his "examination was incomplete" because Britton "refused to continue speaking" with him. *Id*.

Menzies's trial counsel obtained a copy of Dr. Lebegue's letter before Menzies' trial. TR 1158:2008–09,1159:2319–20. When asked about psychological evaluations performed on Britton, Britton's attorney testified that in federal court, a psychological evaluation is a confidential document, that such a document contained confidential matters about his client, and he did not have

---

[4] Although Menzies says so now, there was no indication below that the Lebegue report was the "primary basis" for his claim.

Britton's permission to release that information. TR1159:2329–30. Similarly, even if Dr. Lebegue had been called to testify at Menzies's trial, he may not have been able to testify about Britton's medical information. "There is no dispute that confidential medical information is entitled to constitutional privacy protection." *A.L.A. v. West Valley City*, 26 F.3d 989, 990 (10th Cir. 1994). Certainly he could not have testified to the core of Menzies's current argument, that Britton was lying. *State v. Rimmasch*, 775 P.2d 388, 392 (Utah 1989).

Menzies argues that the trial court "explicitly ruled Lebegue could testify to the contents of his report." Br.Aplt.42. But the court merely ruled Britton's counsel could not testify about hearsay statements made by Dr. Lebegue when Dr. Lebegue was available.[5] TR 1159:2323–30. The trial court made no specific ruling about whether Dr. Lebegue's testimony would be admissible or whether it was privileged or in any other way inadmissible.

Menzies complains that the district court did not address his complaint that the State court did not acknowledge the Lebegue letter. He further claims that this lack of acknowledgment constituted an unreasonable determination of facts. Br.Aplt.40. In support, Menzies cites *Miller-El v. Cockrell*, 537 U.S. 322

---

[5] The court said: "Where Dr. Lebegue is available…he could have been subpoenaed, and that document possibly shown to him, and that would give the prosecution an opportunity to cross-examine him." TR1159:2324.

(2003). But *Miller-El* merely reversed denial of a COA. And a "COA determination is a separate proceeding, one distinct from the underlying merits." *Id.* at 342. And as even *Miller-El* recognized, "a state court need not make detailed findings addressing all the evidence before it." *Id.* at 347. That a State court decision did not mention a specific fact does not establish that its decision was based on an unreasonable determination of fact. "[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Richter*, 562 U.S. at 98. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id.* Although the Utah court did not mention Dr. Lebegue's letter, it correctly denied Menzies's claim. As the district court recognized, the Utah court decision was not unreasonable.

After reviewing the Lebegue report, the district court ruled that "it is clear that no mental illness was identified that could have been used at the time of the preliminary hearing to impeach Britton." ECF163 at 94. The district court found that "no public information existed at the time of the preliminary hearing to suggest Britton actually suffered from a mental illness that affected his ability

to accurately perceive, recall, and relate the events about which he was testifying." *Id.* Menzies has not shown that decision was erroneous.

### 3. The district court correctly determined that Menzies's claims concerning George Benitez are procedurally defaulted.

Menzies alleges that had trial counsel interviewed George Benitez, they would have discovered that Britton told Benitez he was "planning to fabricate his testimony against Menzies in order to obtain assistance on his own case." Br.Aplt.43. But Menzies defaulted this claim in State court. As the district court found, Benitez was not mentioned anywhere in Menzies's state petition. ECF163 at 78 n.46. The district court did not address the merits of this claim because Menzies was procedurally barred from raising anything to do with Benitez. ECF163 at 70 n.42,82. Menzies has not shown that the district court erred.

George Benitez was an inmate in the Salt Lake County jail in February and March of 1986 when Menzies and Britton were also there. ECF109 at 134. Benitez told law enforcement officers that Menzies confessed to him that he had killed a woman. *Id.* Benitez was not called as a witness at trial. *Id.* More than twenty-five years later, in 2014, Menzies provided a declaration signed by Benitez asserting that (1) the things he previously said about Menzies were not true, and (2) Britton told him he intended to fabricate the testimony he would give against Menzies. *Id.* at Ex. 57. But Benitez's 2014 declaration was never presented in State court, and therefore could not be considered by the federal

district court. Menzies argues that the district court erred by not excusing this default under *Martinez v. Ryan*, 566 U.S. 1 (2012), because his post-conviction counsel was ineffective for not interviewing Benitez. Br.Aplt.45. But as addressed below, *Martinez* does not apply in Utah.

Even if this claim could be considered, Menzies has not established that if trial counsel had interviewed Benitez before trial in 1988, he would have produced the same information he was willing to state in 2014. Benitez's declaration fails to assert that he would have been willing to admit, at the time of Menzies's trial, that he had lied to law enforcement officers. Menzies cannot establish that trial counsel was ineffective for not discovering in 1988 what Benitez stated in a declaration more than twenty-five years later.

****

The district court correctly determined that Menzies was not entitled to federal habeas relief on his claims of ineffective assistance of trial counsel at the guilt phase.

## II.

**Fairminded jurists could agree with the Utah court's ruling that trial counsel conducted a sufficiently comprehensive mitigation investigation, and put on a sufficient mitigation case, and that Menzies was not prejudiced.**

Menzies alleges that trial counsel's mitigation investigation was inadequate and his counsel did not learn of "most of the abuse and neglect

Menzies suffered as a child." Br.Aplt.56. As a result, Menzies claims, the mitigation case counsel put on was deficient and prejudicial. But to make these claims, Menzies understates or entirely overlooks the work counsel did and the evidence they put on and he vastly overstates the evidence he claims should have been presented.

The State court record is clear that trial counsel put on mitigation evidence in every category related to childhood trauma for which any evidence existed. The record is also clear that no evidence at all existed—in State proceedings or even now—of childhood sexual abuse or organic brain damage ("OBD"). And the two fact determinations Menzies claims are unreasonable— that the mitigation investigation began at least fourteen months before trial and that Menzies's father was unavailable at trial—are fully supported by the record and are in no way unreasonable.

Finally, Menzies also improperly invokes *Martinez/Trevino* in an attempt to supplement the trial record. But the fact is, his mitigation counsel ineffectiveness claim was exhausted and *Martinez/Trevino* do not apply to exhausted claims. Moreover, he was not granted a certificate of appealability on his post-conviction counsel ineffectiveness "claim" and the Court should entirely disregard his effort to argue that claim here. And finally, Menzies does

not articulate how or why *Martinez/Trevino* apply in Utah and his bald assertion that they do is inadequately briefed.

His mitigation ineffective-assistance claim rests entirely on the flawed assumption that more evidence of a bad childhood or brain damage is always better and will always result in a more favorable outcome at sentencing. The problem with this is that Menzies at most says counsel could have added more flesh to his mitigation case. That is not enough as a matter of law. And he assumes that some of it—abuse, family dysfunction, and OBD—are per se mitigating. That again is contrary to the law. At most, what Menzies claims "would only have added color," to what was already presented, and additional "specifics of his past would not likely have made a significant difference." *Gardner v. Galetka*, 568 F.3d 862, 881–82 (10th Cir. 2009).

Menzies has not met his burden to prove that the Utah Supreme Court's denial of this claim resulted from an unreasonable application of Supreme Court precedent or rested on an unreasonable determination of fact.

## A. Fairminded jurists could agree that counsel put on an adequate mitigation case focused on Menzies's traumatic childhood and its effect on his life.

The sentencing judge heard all about Menzies's unstable, abusive, and traumatic childhood. To meaningfully add to the mitigation case the court heard, Menzies needed to offer evidence different in kind, not just quantity.

*Gardner*, 568 F.3d. at 882. The law does not assume, as Menzies does, that piling on such evidence will always be helpful. In fact, more such evidence "may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *see also Gardner*, 568 F.3d. at 881 ("Additional evidence along these lines could have a double-edged effect.").[6]

Further, the record before the State court—the only record the federal courts may consider—has nothing concrete to support his claim. And even now, after more than thirty years of litigation, Menzies proffers nothing but speculation that more could have been found and that, had it been found, surely it would have been helpful. But that is a far cry from what must be proved in a federal habeas case, particularly given the deference owed to the State legal and factual determinations.

---

[6] The psychological literature is at best mixed on whether such evidence is helpful *at all*. A leading research study on capital juries reached "a counterintuitive finding that jurors are actually more likely to discount child abuse and alcohol abuse, or even use them against a defendant, than to use them as purely mitigating factors." Margaret C. Stevenson, et al., *Juror's Discussions of a Defendant's History of Child Abuse and Alcohol Abuse in Capital Sentencing Deliberations*, 16 PSYCHOL., PUB. POLICY & L. 32 (2010). Thus, far from always being obviously beneficial, evidence of childhood abuse and trauma can backfire. It must therefore be left to the strategic discretion of trial counsel to determine whether and how to use it.

As discussed above, trial counsel put on extensive evidence through lay witnesses and experts regarding Menzies's traumatic childhood. The Utah Supreme Court summarized the penalty-phase evidence, noting that the sentencing court was presented with:

> (1) extensive evidence of Mr. Menzies's social history and mental health, including physical, emotional and psychological abuse, as well as substance abuse; (2) evidence of Mr. Menzies's educational background in elementary and middle school; (3) evidence of Mr. Menzies's prior employment and prior incarcerations, including employment in prison; and (4) Mr. Menzies's rehabilitative potential, that he would likely never be released, and that he would be held under very restrictive conditions. Moreover, counsel presented evidence of how this background affected his mental health and psychological condition through multiple witnesses, including two mental health professionals—Dr. DeCaria and Dr. Wingleman. Counsel also called Mr. Menzies's sister and aunt to provide graphic descriptions of Mr. Menzies's home and social life and abuse.

*Menzies IV*, 344 P.3d at 628. After a lengthy analysis of the evidence, the Utah court held that "penalty-phase counsel's actions did not constitute ineffective assistance of counsel" and that, even if it were to accept any of Menzies's arguments, he failed to demonstrate prejudice. *Id*. at 630.

Though Menzies argued at length in his petition about a hodgepodge of mitigation witnesses and documents he claims counsel should have found and presented, even he admitted that the trial judge heard a "truncated version" of

this. ECF109 at 158. He therefore entirely undermines his mitigation claim. All it amounts to is that his counsel should have piled on cumulative evidence. But that does not prove that what counsel actually did was ineffective or that the Utah court's decision was unreasonable.

His appeal is more of the same. Menzies continues to press his vague allegations that counsel did not interview certain family members, including Menzies's father and stepparents, and that "[c]ounsel failed to obtain records and failed to review the records they did have." Br.Aplt.58–59,61–62. As well as allegations that counsel failed to find evidence that Menzies was sexually abused or that he had OBD. But these allegations are either entirely speculative or entirely lacking even in evidentiary support.

Most of these allegations derive from speculations and opinions offered in a 2010 affidavit by a "mitigation specialist." *See* Aff. of Marissa Sandall-Barrus; ROA vol. V at 130. For example, she asserts she tried to obtain complete copies of Menzies's educational records but that "they no longer exist" apart from what Menzies's trial counsel already had. *Id*. at 129. And although this specialist summarized what the existing records contained and provided her opinion that they constitute valuable evidence, the Utah court noted that "Mr. Menzies's own affidavit does not raise this issue" and the mitigation specialist's affidavit merely said that "a portion of them were missing and are no longer

available." *Menzies IV*, 344 P.3d at 626. But the records that did exist "give evidence only of a very poor track record of attendance—nothing else sustains the conclusion that the un-investigated records, if included, would have impacted the case in any way." *Id.*

The district court agreed and went even further, noting that "the specialist had no way to tell if a more complete record existed" at the time of trial and that, overall, "most of the information contained in the specialist's affidavit is nothing more than speculation." ECF163 at 133. In assessing the value of that speculation, the district court noted it was "only hearsay and/or conclusory allegations of what might have been found if further investigation had been conducted or that further investigation '**may** have provided more details.'" *Id.* at 133 n.91 (quoting the mitigation specialist's affidavit) (emphasis in original).

The Utah court also discussed some of the additional witnesses Menzies argued his counsel should have called to testify and found that "each of these witnesses was either inaccessible or would have been unhelpful, if not damaging, to Mr. Menzies's mitigation defense. For instance, his biological father was inaccessible because he had not been seen for twelve years." *Menzies IV*, 344 P.3d at 628.

Menzies asserted that this last finding—that his father was unavailable—was an unreasonable determination of fact, but the district court rejected that claim as well. "There is no evidence in the record to establish that either petitioner's father or stepfathers were actually available or willing to testify about their bad acts against petitioner at the time of trial." ECF163 at 139. And the district court also noted that, even now in the federal habeas case, "petitioner has not provided any evidence suggesting he knew where his father or his stepfathers were at the time of trial or how to contact them." *Id.*

Menzies provides no reason on appeal for this Court to disturb that finding. Where a potential witness had not been seen for twelve years at the time of trial and even his family did not know how to locate him, a state court's determination that the individual was unavailable was hardly unreasonable under AEPDA.

Finally, Menzies asserted that, "[a]s a result of counsel's failure to investigate, the trial court never heard…the impact the trauma he experienced had on the rest of his life," Br.Aplt.60, and that "appropriate and prepared experts" should have been put on who could have opined about the impact of his childhood trauma. Br.Aplt.54. But his claim is utterly devoid of any additional briefing or argument. And it is simply false. As detailed, counsel called relatives who described the trauma Menzies suffered. And Dr. DeCaria,

counsel's primary mental health mitigation expert, both detailed further the trauma *and* explained (1) how it affected the way Menzies interacted with the world, and (2) the hopeful prognosis for improvement.[7]

Simply adding more proof that Menzies's childhood was awful—a fact already accepted by the sentencing court—would not have changed the outcome. Not doing so was not deficient performance. And the judge did not sentence Menzies to death because he thought Menzies's childhood was just not bad enough; he sentenced Menzies to death because, however bad his childhood, Menzies was a dangerous, callous, violent person who repeatedly failed to reform when given the chance and who had a history of escape and prior crimes, including armed robbery, where he shot the victim and robbed him of the last dollar from his wallet. Finally graduating to aggravated murder—via kidnapping and later slitting Ms. Hunsaker's throat and leaving her to spend her last moments bleeding out through her neck in the woods— the trial judge appropriately determined that death was warranted based on the totality of Menzies's history and the crime itself.

---

[7] Menzies tried to bolster this claim through a lengthy argument premised on a 2015 affidavit from Victoria Reynolds, Ph.D., which was never submitted to the State courts. The district court disregarded it entirely, noting correctly that its "review is limited to the record that was before the state court" under *Pinholster*. ECF163 at 141. Menzies offers no argument why this was incorrect.

On this record, the Utah court's holding that "penalty-phase counsel's actions did not constitute ineffective assistance of counsel" was not unreasonable under AEDPA. *Menzies IV*, 344 P.3d at 630. Fairminded jurists could certainly agree that counsel presented sufficient background evidence and "additional evidence and witnesses were unnecessary." *Id.* at 628.

### B.   Fairminded jurists could agree that the mitigation investigation began at least fourteen months before trial when Dr. DeCaria — one of the central mitigation witnesses — interviewed Menzies.

The premise for Menzies's penalty phase ineffective-assistance claim is that counsel did not begin the mitigation investigation until after the guilt phase. Br.Aplt.56. But this claim suffers from two failings. First, it is entirely unsupported by the record. Second, it is legally irrelevant.

The Utah court resolved the factual predicate against Menzies, finding that "the evidence actually suggests that counsel *did* initiate the mitigation investigation before the guilt phase began, since Dr. DeCaria interviewed Mr. Menzies over fourteen months before trial." *Menzies IV*, 344 P.3d at 625. Menzies argues this was an unreasonable finding of fact, but his only basis for this argument is his continued insistence that the facts are other than what the Utah court determined instead of actually demonstrating why that finding was unreasonable.

For example, he continues to insist that "[t]his is a case where counsel did not *begin* to investigate until the guilt phase was over." Br.Aplt.55. But he does not dispute that Dr. DeCaria—one of the key mitigation witnesses on both Menzies's mental health and family history—interviewed Menzies fourteen months before trial began. It was certainly not unreasonable for the Utah court to conclude that the mitigation investigation began at least by that time.

And though Menzies admits that hiring experts is "helpful," he argues that they are only helpful "to the extent that counsel has conducted a thorough investigation and provided that information to those professionals." Br.Aplt.58. But this is a myopic view of an expert's role. Experts also help counsel unearth useful information by, for example, bringing their psychological expertise to bear on the case by interviewing the defendant and helping counsel craft a mitigation narrative. They also provide counsel actionable topics to investigate. None of this demonstrates that the Utah court's decision that the investigation began in a timely manner was unreasonable.

And as a matter of law, the Sixth Amendment does not guarantee that counsel will begin a mitigation investigation at a particular time. What counsel actually did or did not do is the critical question. *Strickland v. Washington*, 466 U.S. 668, 691 (1984); *see also United States v. Hall*, 843 F.3d 408, 413 (10th Cit. 1988) ("the *actual performance* of counsel" is the critical question (emphasis in

original)). The post-conviction court ruled that this claim failed because Menzies did not show how the timing of the investigation prejudiced the outcome of his case. The Utah court agreed. *Menzies IV*, 344 P.3d at 625.

And the district court observed that Menzies did not cite and the court was unaware of any Supreme Court decisions "that require counsel to interview all witnesses and complete all discovery prior to the second stage of trial." ECF163 at 137.

Menzies claims these were unreasonable legal conclusions but offers no explanation why or how he has satisfied his burden to prove they were unreasonable. He just repeatedly alleges that counsel should have investigated further and that counsel could not have made any kind of tactical decisions without undertaking the broad investigation he now demands. But again, this Court does not assess the claim anew. It only looks at whether the district court correctly ruled that Menzies had not met his AEDPA burden. Merely repeating what he thinks counsel could or should have done falls far short of pointing to any Supreme Court law that the Utah court overlooked when it rejected these claims or any evidence that the Utah court overlooked that rendered its factual determinations unreasonable.

And his heavy reliance on *Rompilla v. Beard*, 545 U.S. 374 (2005), for a general proposition that counsel must "conduct a thorough investigation" is

misplaced. Br.Aplt.54,56,59,61. In *Rompilla* the Supreme Court reversed a capital sentence because counsel failed "to examine the court file on Rompilla's prior conviction," which was the key aggravator used during the penalty-phase, and which counsel unequivocally knew the prosecutor intended to use. 545 U.S. at 383. "There is no question that defense counsel were on notice" of the file, that it "was a public document, readily available for the asking at the very courthouse where Rompilla was to be tried," and "that defense counsel did not look at any part of that file…until warned by the prosecution a second time." *Id*. at 383–84.

Nothing remotely similar to *Rompilla* happened here. Menzies points to no actual evidence of which counsel was obviously on notice. Moreover, in *Rompilla*, the Court found the failure to examine the file prejudicial because, had counsel examined it, "they would have found a range of mitigation leads *that no other source had opened up*." *Id*. at 390. But Menzies has pointed to no new "leads" counsel should have investigated. As discussed above, he conceded that the trial court heard a "truncated version" of the mitigation case he says should have been put on. And even now, he has no actual evidence, just speculation and baseless opinions from a mitigation expert who does not identify the sources of her opinions or the basis for her beliefs.

As the Court noted in *Rompilla*, "[q]uestioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there." *Id.* Menzies's claims are all of the needle/haystack variety. A mere hope that by additional digging maybe some additional cumulative evidence could have been unearthed does not tip the scale in any meaningful way. The question for *Strickland* purposes is never whether *more* could have been done because the answer to that is almost always yes. The question is whether what was actually done was *reasonable* under the circumstances. Here it most certainly was and Menzies has not demonstrated that the Utah court's conclusion that the investigation was undertaken in a timely manner was legally or factually unreasonable.

### C.  Fairminded jurists could agree that there is no evidence of sexual abuse and therefore counsel was not deficient and Menzies was not prejudiced.

Menzies's claim that counsel was constitutionally defective at the penalty phase because they "failed to learn" that Menzies "was sexually abused." Br.Aplt.56, is emblematic of everything that is wrong with his penalty-phase claims. Put simply: no evidence shows that Menzies suffered childhood sexual abuse. Every court to examine this claim has reached the same conclusion. Even now, after decades of constant litigation, Menzies himself has never claimed he

was sexually abused, nor has he ever filed an affidavit in any court making such a claim.

As the Utah court found, "there was no evidence of sexual molestation provided by any of the mental health professionals or Mr. Menzies's sister or aunt," and Menzies's own affidavit did "not raise this issue." *Menzies IV*, 344 P.3d at 626. Menzies does not dispute these facts; he just denies that they mean anything. He continues to assert that "it is unsurprising that there was no evidence of sexual abuse provided by the mental health professionals because counsel waited until the last minute to begin the investigation." Br.Aplt.57. But if trial counsel could so easily have produced evidence of childhood sexual abuse by looking a few months sooner, why can't habeas counsel produce it after decades?

Because once again, this allegation rests on the speculative opinion of his mitigation specialist, who writes: "During my mitigation investigation there was some information provided that indicated [Menzies] *may* have been molested by his step-mother." ROA vol. V at 130 (emphasis added). The Utah court correctly found this entirely insufficient, stating: "Other than this brief reference, there is nothing to indicate where this 'some information' came from or that a reasonable investigation would have uncovered such evidence." *Menzies IV*, 344 P.3d at 626. It therefore rejected this claim. *Id*. The district court

agreed, stating "petitioner submits absolutely no evidence to substantiate that he was sexually abused as a child." ECF163 at 134. Because of this total lack of evidence, the district court concluded that the Utah court's decision was not unreasonable.

On appeal, Menzies argues nothing more than the circular reasoning that his lack of evidence of sexual abuse proves that the mitigation investigation was inadequate because an adequate investigation would have uncovered evidence of sexual abuse. But that is little more than a fever dream that surely, somehow, if someone had just looked enough and talked to enough people they would have found some evidence of sexual abuse. Advocating for a fishing expedition doesn't prove that counsel would have caught any fish. And it's contrary to the law that allows counsel to channel where to spend their scarce time "and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107. Menzies failed to prove that the Utah court's denial of the sexual abuse claim for lack of evidence was unreasonable.

**D. There was no evidence of organic brain damage for trial counsel to pursue, and even if there had been, the Utah court correctly concluded that it would have undermined the penalty-phase strategy of showing Menzies would change over time.**

Menzies claims that counsel has a constitutional obligation to both investigate organic brain disorder ("OBD") *and* present evidence of it where it exists. He also tries to shoehorn his claim into *Rompilla* by arguing that counsel

was on notice "that Menzies's [sic] suffered from brain damage," Br.Aplt.63, and was therefore deficient for not hiring additional experts to assess his OBD.

But this claim fails for the same reasons his other penalty-phase claims fail: it does not account for the actual mix of evidence counsel had, nor does it account for the overall reasonable penalty-phase strategy, which was to present Menzies as someone capable of change and therefore worthy of a life sentence—a strategy fundamentally at odds with OBD evidence.

*Strickland* does not require counsel to pursue precise categories of investigation or particular strategies. It requires reasonableness, judged against the standards of the time and within the context of what was known—or reasonably knowable—by counsel.

The Utah court did not deny this claim for the reasons Menzies claims. It extensively analyzed Menzies's OBD claims. *Menzies IV*, 344 P.3d at 628–30. It denied the claims "because Mr. Menzies misunderstands what is required of counsel under the law, and because introducing evidence of OBD would likely have hurt, rather than helped, Mr. Menzies's case." *Id*. at 629. This eviscerates Menzies's claim because even if counsel had done all Menzies claims they should have—hired as many experts as required to get the best possible OBD evidence—it still would have been reasonable to not use it.

As the Supreme Court has recognized, evidence of OBD is a double-edged sword. "It may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." *Penry,* 492 U.S. at 324. This was especially true here, where Menzies's answer to the sociopath label was that sociopaths abate their violent behavior as they age. Counsel could reasonably avoid blaming Menzies's violence on a permanent condition that would not abate as he aged.

Which is exactly what the Utah court found. "Counsel need only raise mental illness/mental health concerns that are appropriate under a reasonable mitigation strategy." *Menzies IV,* 344 P3d at 629. Trial counsel called Dr. Douglas Wingleman, an educational psychologist, Dr. Michael DeCaria, a clinical psychologist, and Laddy Pruett, a prison social worker. *Id.* at 623. "Mr. Menzies's counsel used three different mental health professionals to evaluate any potential psychological issues." *Id.* at 626. They also hired a psychiatrist whom they declined to use after receiving his report because his testimony would have been that Menzies's "violent nature…was unlikely to change." *Id.* at 629. Evidence of permanent OBD would have been treated similarly—and reasonably so—even if counsel had an obligation to expend whatever resources were required to unearth it.

But that was not the sole reason the Utah court rejected his OBD claim. It also held that Menzies misunderstood what was required by counsel under the law. *Id.* It held that the hired experts found no supporting evidence for OBD. *Id.* Under these facts, counsel had no further obligation to continue expending resources on the issue. The district court agreed, including a lengthy quote of the Utah court's analysis, finding no fault with it. ECF163 at 139–40.

Menzies points to a single cryptic phrase buried on one page of his juvenile record that reads "functions below his ability level and was found to have minimal brain damage" and claims that single phrase should have altered the entire trajectory of the mitigation investigation. Br.Aplt.63. But this argument is raised for the first time in this appeal and is therefore unpreserved and barred from consideration here.[8]

Equally significant is that it took Menzies himself more than three decades to come up with this argument, yet he argues that his trial counsel should have found it immediately *and* altered the entire mitigation strategy based on it, even though none of their other trial experts corroborated it.

---

[8] Although Menzies included this language in a larger quote from the document in his statement of facts in his second amended petition, ECF109 at 52, he made no argument based on it and never referred to it in Claim 31. That is insufficient to preserve an argument for appeal.

Which is also why there was not an unreasonable application of *Rompilla* here. This single notation in a youth detention document from the early 1970s—which is not corroborated by any of Menzies's other voluminous prison or arrest records, or the numerous experts employed by trial counsel—simply did not put his trial counsel on notice of directly relevant evidence in the manner *Rompilla* requires.

And the mere existence of this language does not demonstrate that the Utah court was factually or legally unreasonable in concluding that there was no evidence of OBD, particularly when this argument was never raised before the Utah Supreme Court.

### E. Menzies was not granted a COA on his *Martinez/Trevino* claim and the Court should disregard it; in any event, it is meritless.

In his "Issue II" Menzies tries a sleight of hand by smuggling petition Claim 38—for which he *was not* granted a COA—into petition Claim 31, for which he was. Claim 38 alleged that the doctrine established in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), should apply in Utah to permit claims against post-conviction counsel to satisfy the *Coleman v. Thompson* cause requirement. *See* Br.Aplt.49–50 (all Menzies's record cites relating to his *Martinez/Trevino* argument are to his briefing on Claim 38). But the district court correctly denied Claim 38 and did not grant a COA. ECF163 at 147. This Court also denied a COA on Claim 38. Without a COA, the Court

should not hear the claim. *See Gonzalez v. Thaler*, 565 U.S. 134, 154 (2012) (the AEDPA's requirement that a COA indicate a specific constitutional issue "is a mandatory but nonjurisdictional rule"). The Court should therefore entirely disregard the *Martinez/Trevino* argument.

But it is inadequately briefed in any event. Menzies makes no argument as to how or why *Martinez/Trevino* applies in Utah. The *Martinez/Trevino* doctrine carved out a "limited qualification" to *Coleman*'s general proscription against considering post-conviction counsel ineffectiveness as a ground to hear defaulted claims. *Martinez*, 566 U.S. at 15. But only where the state's procedural rules "barred the defendant from raising [trial counsel-ineffectiveness] claims on direct appeal." *Id*. at 17. Or where the ability to bring trial counsel-ineffectiveness claims on direct appeal theoretically exists but the "structure and design of the [state's] system in actual operation…make it virtually impossible for an ineffective assistance claim to be presented on direct review." *Trevino*, 569 U.S. at 417 (internal quotations omitted).

The *Martinez/Trevino* doctrine only applies in the very limited circumstances where a trial IAC claim is prohibited—as a matter of law or practical reality—from being brought on direct appeal. Under those circumstances, failure to raise a trial IAC claim in the "initial-review collateral

proceeding" can constitute cause (but not prejudice) under *Coleman*'s longstanding cause and prejudice standard.

That is not the case in Utah, and Menzies makes no argument that it is. His complete failure to make a proper argument should result in summary denial of his claim.[9]

But even taken at face value, Menzies's claim on appeal is not a proper invocation of *Martinez/Trevino* because there is no question that his penalty-phase ineffective-assistance claim was exhausted in state court. *Martinez/Trevino* exists only to help overcome the procedural bar on *unexhausted* claims. What Menzies is really trying to do is use *Martinez/Trevino* to improperly expand the record to include evidence or legal theories he claims he came up with in his federal habeas case that cannot now be considered under *Pinholster*. And the additional "evidence" he hopes to bring in relates to the same subjects discussed ad nauseum above—"use of experts," "family and background," "mental

---

[9] It would fail on the merits even if he had made a proper argument. As discussed extensively below, Utah has always permitted trial counsel-ineffectiveness claims on direct appeal, and even adopted Rule 23B, Utah Rules of Appellate Procedure, on October 1, 1992, which allows for remand, an evidentiary hearing, and expansion of the appellate record. ECF109 at 280–309. That rule was available to Menzies and this Court has already held that a similar rule in Oklahoma takes a state's procedures outside of *Martinez/Trevino*. *See Fairchild v. Trammell*, 784 F.3d 702, 722 (10th Cir. 2015).

illness," "physical abuse"—and is just as redundant and cumulative as everything discussed above. Br.Aplt.50.

As discussed above, more of the same evidence of childhood neglect merely adds color and is insufficient to prove an ineffective-assistance claim. *Gardner*, 568 F.3d at 881. And it can even leave Menzies worse off by increasing the perception that Menzies is dangerous or that his "violence would [not] subside if ever released." *Id*.

The Court should ignore Menzies's *Martinez/Trevino* claim, even if he had gotten a COA on it.

****

Although Menzies concludes his penalty-phase ineffective assistance claims with a brief argument that prejudice must be assessed cumulatively, he has not shown any prejudice, so none accumulates.

The Utah court correctly held that trial counsel presented sufficient background evidence during the penalty phase. *Menzies IV*, 344 P.3d at 627. And although the ABA Guidelines are in no way the controlling or minimum requirements, the court noted that the Guidelines suggested counsel present eight categories of evidence. *Id.* It walked through those categories in great detail and held that "penalty-phase counsel presented evidence under each of these factors." *Id*. at 628. "[C]ounsel utilized multiple witnesses and

professionals to provide a proper mitigation defense." *Id.* And as a result, "counsel's actions did not constitute ineffective assistance of counsel." *Id.* at 630.

As the Utah court observed, Menzies's penalty-phase claims are, at most, merely that there was *additional* evidence under most of these factors that could have been raised. *Id.* at 628. But it held that "additional evidence and witnesses were unnecessary." *Id.* And in some cases, such evidence could have been harmful to the mitigation case. The district court found nothing meaningful to disagree with, let alone find unreasonable under AEDPA, and should be affirmed.

### III.

**Fairminded jurists could agree with the Utah court's ruling that admitting Menzies's prison file did not violate the Fifth Amendment right against self-incrimination.**

*Background.*

In his second-amended petition, Menzies alleged several claims relating to admitting State's penalty phase Exhibit 8 — his prison file at the penalty phase. Collectively, the two claims on appeal assert that admitting his prison file violated his right to be free from self-incrimination and his right to confront witnesses. The Utah court summarily denied these claims on direct appeal. *Menzies II*, 889 P.2d at 406 ("We find Menzies' other claims to be without merit.").

The prison "file consisted of about 360 pages generated between 1973 and 1986," ECF109 at 169, thus predating the murder at issue. The file included "a social history and old psychological evaluations," "numerous incident reports," and "chronological notes ('c-notes') from unidentified sources." *Id*. at 169–70.

As relevant here, Menzies alleged two basic complaints about the prison file: that it contained (1) "hearsay" repeated from either "other unknown documents" or "unadjudicated allegations of criminal conduct," and (2) "numerous statements made by [him] to prison authorities during disciplinary proceedings" that he claimed were made after signing a form that said his statements "could not be used against him in subsequent criminal proceedings." *Id*. at 169–70,179. The former founded his confrontation clause claim—discussed in Issue IV below—and the latter founded his self-incrimination claim. The district court correctly rejected both. ECF163 at 95–106.

Importantly, Menzies once again attempts to smuggle in a claim for which he was *not* granted a COA by dropping the claim numbers from his petition and merely referring to a generalized "Issue III." This issue conflates the psychological evaluations from State's Exhibit 8—the prison file—with other psychological evaluations in State's Exhibit 1D. The psychological evaluations in Exhibit 1D were the subject of Claim 19, for which he was denied a COA. ECF109 at 181.

Although Menzies's Issue III contains a single reference to "Penalty Phase Ex. 8" after its first sentence, every other reference to psychological evaluations is to Exhibit 1D. *See* Br.Aplt.68–71. This effort to swap Claim 19 for Claim 18 should not be countenanced and the Court should therefore disregard "Issue III" entirely because it argues only that the psychiatric reports in Exhibit 1D violated *Estelle v. Smith*, 451 U.S. 454 (1981), instead of State's Exhibit 8; his prison file. The district court, unlike Menzies now, was careful to distinguish between the two types of psychological evaluations. ECF163 at 105–106. And this Court should too.

Claim 18, relating to the prison file as a whole, argued that "the prison file also contains numerous statements made by Mr. Menzies to prison authorities during disciplinary proceedings" and that "[p]rior to making these statements, Mr. Menzies signed a form reflecting that anything he said in the disciplinary proceedings could not be used against him in subsequent criminal proceedings." ECF109 at 179.

The district court noted that, although Menzies "identified approximately 70 pages out of a 360-page exhibit" that he claims "violated his right against self-incrimination," ECF163 at 102, he did not "identify any specific statements made by him that he claims violated his Fifth Amendment rights." *Id.* at 104. He does no better on appeal. Indeed, Menzies completely abandons any argument

relating to Claim 18 and focuses his "Issue III" entirely on Claim 19, on which

no COA was granted.

This is probably because Claim 18 rested on a misstatement of the record.

He claimed that the form he signed before making any statements in the prison

file promised him nothing could be used against him "in subsequent criminal

proceedings." What the form actually said is:

> (1)   Nothing you say at this hearing about the act with
> which you are charged can be used against you in any
> criminal prosecution *for that act.*

> (2)   No evidence discovered by or at this hearing about the
> act with which you are charged can be used against
> you in any criminal prosecution *for that act.*

TR State Ex.8 at 221,231,238 (emphasis added). By ignoring the crucial language

of the form limiting the use immunity for his statements to criminal prosecution

"for that act," Menzies only underscored the overall weakness of his prison file

claim. In fact, the form implicitly told Menzies that his statements could be used

for *other* criminal prosecutions unrelated to the acts at issue when he gave his

statements. The penalty-phase hearing for his later murder conviction

obviously was not based on the acts being discussed at his disciplinary hearings

years earlier. And as the district court concluded, the material in the prison file

"is the exact type of evidence that a probation officer would have relied on had

a presentence report been prepared in this case." ECF163 at 106. The court

therefore found Menzies "failed to establish any constitutional error in the admission of these evaluations." *Id.* at 105.

Menzies addresses none of this in his Issue III, and the Court should therefore affirm the district court's denial of habeas relief on Claim 18.

But even apart from his total failure to brief an appealable issue, his reliance on *Estelle*, is misplaced. In *Estelle*, the opinion of the testifying psychiatrist resulted directly from the court-ordered competency evaluation in the capital case itself. 451 U.S. at 456–57. And he drew his conclusions "largely from respondent's account of the crime during their interview." *Id.* at 464.

It is doubtful that *Estelle* even applies here. Even if Menzies was in custody when his evaluations were performed, he was not "interrogated." Those who prepared the evaluations at issue could not have known that their questions would elicit responses relevant in a penalty hearing for a murder that would occur years later. Therefore, their questions did not constitute interrogation under *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) ("'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.").

And Menzies never raised a self-incrimination objection to admitting the prison file. *See* TR1162:3130–38. He raised this ground for the first time on appeal. Because he did not preserve his self-incrimination claim, the Utah court

could have reversed only for manifest or plain error. Since the application of *Estelle* to these facts is debatable, any error was certainly not obvious or prejudicial. Even if Menzies had raised an *Estelle* objection to admitting the prison file, that objection probably should have been overruled. It surely cannot have been so obvious to the trial judge that he should have sua sponte excluded the file on this ground.

Finally, Menzies's whole theory in Claim 18 contradicts his arguments of penalty phase counsel ineffectiveness, which claimed that, beyond the psychological evidence defense counsel put on, they should have put on *additional* psychological experts. Which of course makes all of the prison file psychological evaluations directly relevant anyway. Every conceivable version of Claim 18 is meritless.

The district court correctly ruled that the Utah court's rejection of this claim did not violate Supreme Court law since the prison file psychiatric evaluations "were not compiled as a result of petitioner's custody on the charges arising out of this case" and that Menzies "failed to establish any constitutional error" arising from their admission. ECF163 at 105. This Court should affirm.

## IV.

**Fairminded jurists could agree with the Utah court that admitting Menzies's historical prison file did not violate his Fifth Amendment confrontation right.**

Menzies relied on *Gregg v. Georgia*, 428 U.S. 153 (1976), *Gardner v. Florida*, 430 U.S. 349 (1977), and *Godfrey v. Georgia*, 446 U.S. 420 (1980), for the general proposition that sentencing discretion must not be arbitrary and capricious and that, therefore, he was entitled to "due process of law" at his sentencing. ECF109 at 168–71. But his petition also acknowledged that "*Gardner* did not explicitly address whether the right to confrontation applies in capital sentencing hearings" and therefore only argued by inference that due process "compels" the conclusion that the confrontation clause must also apply to sentencing hearings. *Id.* at 171.

Although the Utah court summarily denied this claim just as it did with his other prison file claim, *Menzies II*, 889 P.2d at 406, Menzies did not meet his burden to show that the Utah court contradicted or unreasonably applied Supreme Court authority. *Richter*, 562 U.S. at 98 (even absent an explanation from the state court, habeas petitioners must still show "there was no reasonable basis for the state court to deny relief"). As the district court noted, the Supreme Court recognizes that there is a long tradition of sentencing judges exercising "wide discretion in the sources and types of evidence used to assist" in sentencing, including "[o]ut-of-court affidavits" and judges' general knowledge

of their communities, including "the personalities and backgrounds of convicted offenders." *Williams v. New York*, 337 U.S. 241, 246 (1949); ECF163 at 96. If anything, the district court reasoned, "*Williams* makes it clear that the Confrontation Clause does not apply to capital sentencing proceedings." ECF163 at 96–97.

Menzies argued that *Williams* did not affect the confrontation clause question because the confrontation clause was not applied to the states until 1965. *Id.* at 97 n.54. But as the district court noted, even if that reading of *Williams* is correct, all it means is that "there is no Supreme Court precedent on this issue." *Id*. Either way, the district court correctly concluded that "there is no United States Supreme Court precedent that holds that the Confrontation Clause applies in capital sentencing hearings" and therefore "the state disposition is not contrary to, nor did it involve an unreasonable application of, clearly established federal law." *Id.* at 98.

On appeal, Menzies does not mount a serious challenge to the district court's reasoning—and in fact repeats his acknowledgement that "*Gardner* did not explicitly address whether the right to confrontation applies in capital sentencing hearings." Br.Aplt.75. Instead, he refocuses his argument.

On appeal he turns to *Townsend v. Burke*, 334 U.S. 736 (1948) and *Idaho v. Wright*, 497 U.S. 805 (1990)—cases not raised in his petition—to shift the

emphasis of his argument to the "relevance, reliability, or accuracy" of the prison file, which he claims violated his due process rights. Br.Aplt.76. He cites *Townsend* for the conclusory proposition that "[b]ecause [his] prison file was introduced in bulk, without any showing of relevance, reliability, or accuracy, his due process rights were violated." *Id.*

But *Townsend* stands for nothing of the kind—, and indeed illustrates why there is no due process problem here.

In *Townsend*, a defendant without counsel was "held incommunicado for a period of 40 hours between his arrest and his plea of guilty." 334 U.S. at 737–38. Only after the defendant pleaded did a police officer provide a factual recitation of the crime. *Id.* at 739. The court proceeded immediately to sentencing by asking the defendant only about his prior criminal offenses, during which the court was "facetious" with the defendant, particularly when the defendant tried to explain that his brother committed one of the purported crimes. *Id.* at 739–40. After this brief exchange, the court sentenced defendant to ten to twenty years in prison. *Id.* at 740.

In Townsend's federal habeas case, the record was clarified that one of the charges raised by the trial court had been dismissed and "on two other of the charges which the court recited against the defendant, he had also been found not guilty." *Id.* Given the attitude of the trial judge, the sole focus on

defendant's criminal history, and the "assumptions concerning his criminal record which were materially untrue," the Court held it was "not at liberty to assume that items given such emphasis by the sentencing court, did not influence the sentence." *Id.* at 740–41. "Such a result, whether caused by carelessness or design, is inconsistent with due process of law, and such a conviction cannot stand." *Id.* at 741.

But here the record is quite the opposite. Menzies has not established or even alleged that anything within the prison file is untrue. And the trial court placed no particular emphasis on the prison file, and in fact discounted its value substantially: "The court will admit it and will review it, [and] give it whatever weight the court feels it deserves, but…the facts of this case should essentially determine the nature of what the court should do." TR1162:3186.

But as shown above, here it was the facts of this crime, the in-court testimony about Menzies other crimes, and what all that said about the likelihood Menzies posed a threat of danger, that drove the trial judge's sentencing decision. And the court's statement that it would consider the file is a far cry from *Townsend* where the trial court focused on the defendant's previous (incorrect) criminal record to the exclusion of all other information.

*Wright* is not a sentencing case at all and therefore entirely irrelevant. The issue there was hearsay admitted during the guilt phase as an examining

physician repeating statements allegedly made to him by a two-and-a-half-year-old victim who had already been declared "not capable of communicating to the jury." *Wright*, 497 U.S. at 809. Thus, *Wright*'s discussion of the interplay between traditional hearsay rules and the confrontation clause simply does not address sentencing proceedings where the available Supreme Court authority has not applied the confrontation clause to a sentencing proceeding.

And again, the available authority suggests the opposite. The Supreme Court has long held that "different evidentiary rules govern[] trial and sentencing" and "there are sound practical reasons for the distinction." *Williams*, 337 U.S. at 246. And *Williams* explicitly refused to "draw a constitutional distinction as to the procedure for obtaining information where the death sentence is imposed." *Id*. at 251.

The prison file was clearly admissible under Utah law,[10] so the question is not one of admissibility but of whether the file itself rendered the sentencing

---

[10] *See State v. Sanwick*, 713 P.2d 707, 709 (Utah 1986) ("The rules of evidence in general, and the rules on hearsay exclusions in particular, are inapplicable in sentencing proceedings."); *State v. Parsons*, 781 P.2d 1275, 1282 (Utah 1989) ("Any evidence the court deems to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence." (internal quotations and citation omitted)); Utah R. Evid. 1101(c)(3) (rules of evidence, other than those governing privileges, do not apply in sentencing proceedings). This rule applies even in capital cases. *State v. Taylor*, 818 P.2d 1030, 1033 (Utah 1991).

proceeding so unreliable that it violated constitutional due process. All Menzies offers on that point is abstract speculation that it must have. But the record tells a different story. Menzies never pointed the State courts to anything in his prison file that was inaccurate, misleading, or unreliable. And he still hasn't here. The sentencing judge acknowledged that the prison file was of limited evidentiary value and did what sentencing judges have always done—gave it whatever weight the court thought it deserved within the context of the case. That is the very kind of broad consideration the Supreme Court upheld in *Williams* as appropriate under the due process clause.

The Supreme Court has never held that cross-examined testimony at a sentencing hearing is constitutionally required. But other federal courts have held that the Confrontation Clause does *not* apply to sentencing hearings, even in capital cases. *See Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2002) ("[T]he Supreme Court has held that the Confrontation Clause does not apply to capital sentencing."); *Chandler v. Moore*, 240 F.3d 907, 918 (11th Cir. 2001) (no confrontation clause violation because hearsay evidence is admissible in capital sentencing). Thus, without clear Supreme Court precedent, the Utah court's decision simply cannot have been unreasonable. The district court should therefore be affirmed.

## V.

**Fairminded jurists could agree that the Utah court did not violate Supreme Court law by affirming Menzies's sentence since no constitutional rule prohibited it from considering uncharged penalty-phase aggravators, but it did not do so even if there was such a rule, and any error was harmless.**

Menzies alleges that the sentencing judge improperly applied three uncharged statutory aggravators—"heinousness," "preventing a witness from testifying," and "pecuniary gain." Br.Aplt.78. He says that because the guilt-phase jury did not find those statutory aggravators beyond a reasonable doubt, they should not have been relied on at sentencing. *Id.*

Menzies has failed to show that the constitution prohibited the sentencing judge from considering uncharged penalty-phase aggravators, that the judge in fact applied challenged aggravators, or that any error in applying them was prejudicial.

*Further background.*

At sentencing, Utah's capital sentencing statute allowed the court to consider "the nature and circumstances of the crime," Menzies's "character, background, history, and mental and physical condition," Maurine "and the impact of the crime on [her] family and community," "any other facts in aggravation or mitigation of the penalty that the court considers relevant to the

sentence." Utah Code Ann. § 76-3-207(2)(a). The judge made extensive oral findings. Discussing the crime's nature, the court recognized that: (1) Menzies murdered Maurine during an aggravated kidnapping; (2) he murdered her for "pecuniary or other personal gain"; (3) he had a prior conviction for a felony involving use or threat of use of violence to a person; and (4) he committed the murder to prevent a person from testifying. He also referred to Utah Code section 76-5-202(q), which aggravates murder to capital murder when it is committed "in an especially heinous, atrocious, cruel manner demonstrated by serious bodily injury to the victim before death." TR1162:3249–50.

After considering all aggravating and mitigating circumstances, the judge concluded that the aggravating circumstances outweighed the mitigating circumstances. TR1162:3268. He concluded:

> [Menzies'] pattern of living has constantly and continually exposed many people to fear and harm. Regardless of where [Menzies] resides, it is unlikely the pattern will ever change. Consequently, this court, with the heaviest of hearts, makes the more difficult and trying decision that under the circumstances and beyond a reasonable doubt, the death penalty is the appropriate penalty, and the court so orders.

TR1162:3268–70.

On direct appeal, Menzies argued that the judge improperly considered heinousness, preventing a witness from testifying, and pecuniary gain as aggravating circumstances in fixing his sentence. On heinousness, Menzies

raised no objection in the trial court. The Utah court therefore considered whether there was plain error. It noted that in listing the aggravating factors it wanted the court to consider, the prosecutor stated that "one such factor was 'the brutal and heinous nature of the murder.'" *Menzies II*, 889 P.2d at 405. But the prosecutor did *not* refer the court to the 'heinous' provision in Utah Code section 76-5-202(1)(q). *Id.*

When the judge enumerated the aggravating and mitigating factors, it noted subpart (q). The Utah court said that while it would have been error for the court to find that subpart (q) had been satisfied by the facts here, it was not convinced that such an error occurred. *Id.* It noted that the judge could have "properly considered the nature and circumstances of the crime, including its brutality and what the prosecutor apparently referred to colloquially as heinousness, as an aggravating factor under section 76-3-207(2)." *Id.* Under this section, the court recognized, "the various facts of the crime that Menzies says do not rise to the level of constitutional and statutory heinousness could still have been considered." *Id.*

The Utah court found that the judge did not in fact rely on the statutory heinousness aggravator. *Id.* And the court decided alternatively that any error was harmless because even without that aggravator it could "still confidently conclude beyond a reasonable doubt that the remaining aggravating

circumstances and factors outweigh the mitigating factors and that the imposition of the death penalty was justified and appropriate." *Id.* (cleaned up).

In reviewing Menzies's habeas challenge to these rulings, the district court ruled that the Utah court did not unreasonably apply Supreme Court law, which requires only that a death penalty scheme narrow the class of death-eligible murderers and consider mitigating circumstances. ECF163 at 122. Since the Utah statute meaningfully narrowed the class at the guilt phase, and the aggravating and mitigating circumstances were weighed at sentencing, the State court violated no Supreme Court law. *Id.*

****

The Supreme Court imposes analytically distinct obligations on two separate phases of capital litigation. In the first phase, the jury finds the defendant *eligible* for the death penalty. Eligibility requires meaningful narrowing of the class of offenders to the most truly deserving, which is accomplished through proof beyond a reasonable doubt of at least one statutory and well-defined aggravating circumstance. In the second phase, the sentencer *selects* a defendant for the death penalty after he has already been found eligible. Selection requires the sentencer to consider all evidence in mitigation and issue a judgment that is particularized to the defendant, but it does not require charging or proof of any statutory aggravating circumstances but instead

proceeds on a very wide-ranging view of the circumstances and the defendant himself. *Zant v. Stephens*, 462 U.S. 862, 878–79 (1983).

In Utah, eligibility occurs at the guilt phase where the jury must find the defendant guilty of aggravated murder, including at least one statutory aggravating circumstance, such as robbery or aggravated kidnapping. Utah Code Ann. § 76-3-202. Selection occurs at sentencing, where the sentencer must find beyond a reasonable doubt that total aggravation outweighs total mitigation and that death is the appropriate sentence. Utah Code Ann. § 76-3-207.

Menzies points to aggravators the sentencing judge allegedly applied during the *selection* phase and criticizes application of those aggravators by reference to requirements the Supreme Court imposes on the *eligibility* phase. Thus, Menzies has everything backwards. Eligibility (guilt) requirements do not apply at selection (sentencing), but Menzies never acknowledges this distinction.

Menzies never points to any Supreme Court authority that requires proving selection-phase aggravating circumstances to have been charged and proved beyond a reasonable doubt during the eligibility phase. He drives right past that question to arrive at his argument "that application of an *invalid* aggravating circumstance violates the Eighth Amendment." Br.Aplt.78

(emphasis added); *see also id.* at 83 (arguing Utah court relied on "statutory aggravating circumstances that were legally invalid"). Without explanation, his entire argument proceeds as if uncharged selection-phase aggravators are necessarily invalid, and then relies on Supreme Court case law that disapproves of invalid penalty-phase aggravators. *See, e.g.*, *id.* at 79 (quoting *Stringer v. Black*, 503 U.S. 222, 243 (1992)).

Menzies's unsupported identity between uncharged statutory eligibility-phase aggravators and invalid selection-phase aggravating circumstances is a false premise undermining the entire argument. Menzies cites no Supreme Court case, and the Warden is aware of none, holding that the constitution entitles a defendant to charging and proof beyond a reasonable doubt in the eligibility-phase of all aggravating circumstances that weigh in the balance against mitigating circumstances at selection phase.

At the selection phase—sentencing in Utah and the point of Menzies's contest—so long as (1) aggravating circumstances were proved beyond a reasonable doubt during the eligibility phase and (2) "the sentencer is not precluded from considering relevant mitigating evidence," that is enough to satisfy the Eighth Amendment's narrowing function. *Kansas v. Marsh*, 548 U.S. 163, 171 (2006). After that, it is doubtful "whether it is even possible to apply a standard of proof to the mitigating-factor determination (the so-called 'selection

phase' of a capital-sentencing proceeding)." *Kansas v. Carr*, 577 U.S. 108, 119 (2016). That determination, the Supreme Court has said, is more a moral than factual one. *Id.*

In any event, the only example Menzies gives of improper reliance on aggravators in the case law is the use of a "*vague* aggravating factor employed for the purpose of determining whether a defendant is *eligible* for the death penalty." Br.Aplt.79 (quoting *Stringer*, 503 U.S. at 235) (emphasis added). But Menzies is neither challenging a *vague* aggravator nor his *eligibility* for the death penalty. His challenge instead is to *uncharged* aggravators allegedly used during the *selection* phase of capital sentencing. This confusion saturates Menzies's entire argument.

As a matter of State law, the Utah Supreme Court has expressly rejected the argument that a sentencing authority may not consider in the penalty phase aggravating circumstances that were not charged in the guilt phase. *State v. Young*, 853 P.2d 327, 352 (Utah 1993) (court properly allowed prosecutor to introduce evidence of additional aggravating circumstances that were not charged or proven in the guilt phase). As noted, the eligibility-phase jury found Menzies eligible for the death penalty when it found him guilty beyond a reasonable doubt of capital murder with robbery and aggravated kidnapping as aggravators. TR1160:2693.

Thus, contrary to Menzies's argument, not only does the Utah death penalty "scheme as a whole narrow the class of persons eligible for the death penalty," Br.Aplt.84, it did so in Menzies's case. And "[o]nce the initial narrowing of the class occurs at the guilt phase, the addition of the aggravating circumstance at the penalty-phase does not distort the narrowing function required by the Eighth Amendment." *Young*, 853 P.2d at 352.

To try and show a dispute with controlling Supreme Court case law, Menzies criticizes the "district court's reliance on *Lowenfield v. Phelps*, 484 U.S. 231 (1988)" which, Menzies argues, "did not address a circumstance where a statutory aggravator that was never charged or found by the jury was nonetheless relied upon by the sentencer in the penalty phase." Br.Aplt.84–85. So, according to Menzies, *Lowenfield* is inapposite. That alone is reason enough to disregard his argument—if it is irrelevant to the circumstances here, the State court's resolution of the aggravator claims did not directly contradict or unreasonably apply it. What's more, the district court cited *Lowenfield* because *Menzies himself relied on it.* ECF109 at 310. According to the district court, Utah's aggravators did not violate the requirement that aggravators genuinely narrow the class of death eligible persons, the precise requirement Menzies cited it for. ECF163 at 122.

And *Lowenfield* is more like this case than Menzies admits because in Utah, just like "Louisiana's statute, the constitutionally required narrowing function took place in the guilt phase of a capital murder trial." Br.Aplt.84 (citing *Lowenfield*, 484 U.S. at 246).

Menzies further notes that "*Lowenfield* did not involve a claim that a statutory aggravating factor was ambiguous," which he says further erodes *Lowenfield*'s relevance here. *Id.* at 85 n.13 (quoting *Stringer*, 503 U.S. at 236). But Menzies does not claim that his sentence rested on ambiguous aggravators either. He only claims that his sentence, based as it allegedly was on uncharged statutory aggravators, failed to perform the necessary narrowing function. Menzies's false equivalence between uncharged and invalid aggravators rears its tangled head once again.

And more to the point, Menzies cites no Supreme Court case that *does* apply to the challenged circumstances here—basing the selection for a death sentence for an already death-eligible defendant on uncharged specific aggravating circumstances that are used to narrow the death-eligible class. Without a violation of controlling Supreme Court law, AEDPA prohibits habeas relief. 28 U.S.C. § 2254(d).

Further, Menzies acknowledges that when aggravators are improperly considered at sentencing, that error is subject to harmless error review.

Br.Aplt.81–82. And he acknowledges that the Utah court ruled against him, in part, because any error was harmless. *Id.* at 82.

But Menzies argues that the Utah court's harmless error analysis both (1) unreasonably applied Supreme Court case law and (2) made an unreasonable determination of the facts. *Id.* 80–82. On the first, he says the court did not conduct the "thorough analysis of the remaining aggravating and mitigating evidence" he says it should have done after removing the allegedly improper aggravators from the equation. *Id.* at 82 (citing *Stringer*, 503 U.S. at 230). On the second, he says the court unreasonably found, in alleged contradiction to the record, that the sentencing court did not in fact rely on the heinousness aggravator. *Id.* 81.[11]

_____

[11] Menzies relies on an affidavit from the sentencing judge, proffered during State post-conviction proceedings, confirming that he "applied the heinousness factor." Br.Aplt.81 n.12. As Menzies acknowledges, the post-conviction court struck the affidavit from the record because it was inadmissible and the Utah Supreme Court affirmed that decision. *Menzies IV*, 344 P.3d at 630. It was therefore not before the State court, and the Court is therefore barred from considering it. *Pinholster*, 563 U.S. at 181. Menzies's reliance on the general admissibility in federal court of such affidavits, *see* Br.Aplt.81 n.12, does not trump AEDPA's and *Pinholster*'s rule specifically restricting the federal review of exhausted claims to the record before the State court. And Menzies did not argue previously that the declaration was admissible *despite* having been stricken from the State record; he entirely failed to disclose that it had been stricken. The Court should not consider his unpreserved arguments for admissibility.

Menzies argues that the weighing of an invalid aggravating circumstance at sentencing violates the Eighth Amendment. This argument is incomplete and misleading. First, Menzies has not shown that any *invalid* aggravator was used. Second, the mere reliance on an invalid aggravating circumstance does not conclude the constitutional inquiry: "the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review." *Clemons v. Mississippi,* 494 U.S. 738, 741 (1990); *accord Sochor v. Florida*, 504 U.S. 527, 532 (1992) (state appellate court may "either itself reweigh without the invalid aggravating factor or determine that weighing the invalid factor was harmless error" (citation omitted)). That's what the Utah court did.

Menzies nevertheless argues that it was unreasonable for the Utah court to hold that any error was harmless because it did not consider the errors in applying the "preventing a witness from testifying" or the "pecuniary gain" aggravators. But the court did consider them and found them to lack merit. *Menzies II*, 889 P.2d at 406. And when the issue was raised in State post-conviction, the Utah court again affirmed. *Menzies IV*, 344 P.3d at 630.

Menzies also fails to support his contention that the State court did not engage in the "thorough analysis of the remaining aggravating and mitigating

evidence" required by the Supreme Court. Br.Aplt.82. Even a cursory reading of *Menzies II* and *Menzies IV* shows that assertion to be false. The State court undertook an exhaustive review of the facts and circumstances of Menzies's case and his arguments, ultimately finding that a death sentence was appropriate. In *Menzies IV* especially, the Utah court spent fully nine pages of its opinion considering claims surrounding aggravation and mitigation evidence and counsel performance. *Menzies IV*, 344 P.3d at 622–630.

The Utah court had before it the judge's extensive analysis weighing the aggravators against mitigators. Those findings included, among other things: (1) guilt-phase aggravators found by the jury; (2) Menzies's extensive juvenile and adult criminal record, including multiple acts of violence against innocent victims; (3) unlikelihood of Menzies receiving effective treatment in prison; (4) lack of evidence that Menzies wanted to change; (5) Menzies's continuing threats to society, such as threats of retribution against accusers; (6) Menzies's extensive substance abuse; (7) Menzies's lack of stable employment; (8) Menzies's institutional risk, including possession of weapons and threats against inmates and staff; (9) Menzies's escape risk based on previous escape attempts; (10) Menzies's age at the time of the murder; (11) the fear and suffering Menzies caused the victim and her family, as well as previous victims; and (12) Menzies's personality disorders and previous failures to rehabilitate. Against

those aggravating circumstances, the judge found paltry mitigation, including: (1) an unstable childhood; (2) his mother's death at a young age; and (3) some progress during previous incarcerations—though the last was discounted because Menzies continued his criminal career after convincing the parole authorities of his progress. TR1162:3249–70.

And this record does not support Menzies's assertion that "no evidence" was "offered in support of" the three uncharged aggravators. Br.Aplt.78. For example, on the preventing a witness from testifying aggravator, Menzies admitted to Britton that he killed Maurine "to keep her from testifying against him and identifying him." TR1158:2085. As the prosecutor observed in closing argument, the pattern of Menzies's criminal history strongly corroborated this motive. TR1162:3201–02. And while Menzies complains in Issue VI about the pecuniary gain aggravator double-counting, he does not dispute that *what* it counted was the robbery—an archetypal pecuniary motive. Finally, the Utah court considered the record as a whole to support a "colloquial" description of Menzies's crimes as "heinous."

That extensive record justified the Utah court in ruling that any error in considering uncharged aggravators was harmless. Indeed, the aggravators Menzies says should not have counted all related to things the court would have considered in any event because they all related to the crime's circumstances.

Menzies may disagree about the relative weight of the total remaining aggravating and mitigating circumstances, but a reasonable jurist could agree that the State court's conclusions were in line with clearly established federal law. The court did not, as Menzies has it, "make the automatic assumption" that aggravators outweighed mitigators. Br.Aplt.82 (quoting *Stringer*, 503 U.S. at 230).

Menzies also complains that the Utah court did not appropriately reweigh the aggravation and mitigation after subtracting out the allegedly improper pecuniary gain and testimony prevention aggravators. But in his appellate brief in the post-conviction case, Menzies argued that the State speculated that the victim was killed to prevent her from testifying about the robbery and that the judge relied on this as an aggravating circumstance. Menzies Br. 9/14/92 at 163. Menzies also argued that the judge erroneously relied on the "pecuniary gain" aggravator. *Id*. at 165–66. Though the Utah court did not separately address these issues, it did consider and deny them with the statement: "We find Menzies's other claims to be without merit." *Menzies II*, 889 P.2d at 406.

This claim should be denied because Menzies cannot establish that the State court decision was an unreasonable application of clearly established federal law.

## VI.

**Fairminded jurists could agree with the Utah court that Menzies's death sentence was not based on unconstitutional aggravators and that any error was harmless in any event.**

Menzies argues, in addition to the heinousness aggravator being applied without charging and proof beyond a reasonable doubt, that the heinousness aggravator is "unconstitutional as applied in his case." Br.Aplt.86. And he argues that the trial judge's reliance on both the "pecuniary gain" and the robbery aggravators "resulted in an unconstitutional double-counting because the two factors are duplicative in this case." *Id.*

### A. The heinousness aggravator did not taint Menzies's death sentence.

#### 1. Menzies lacks standing to challenge the constitutionality of Utah's statute because heinousness was not charged or applied as a statutory aggravator.

Menzies argues that the judge relied on unconstitutional aggravating factors when imposing his sentence. He asserts that the heinousness aggravator is unconstitutionally broad as written, and that it fails to adequately narrow the class of murders which warrant the death sentence. Br.Aplt.86.

As noted, when the judge enumerated the aggravating and mitigating circumstances, he referenced Utah code section 76-3-207(2) subpart (q) (the heinousness aggravator). The Utah Supreme Court said that while it would have been error for the court to find that subpart (q) had been satisfied by the

facts here, it was not convinced that such an error occurred. *Menzies II*, 889 P.2d at 405.

But the Utah court recognized that the judge could have "properly considered the nature and circumstances of the crime, including its brutality and what the prosecutor apparently referred to colloquially as heinousness, as an aggravating factor under section 76-3-207(2)." *Id.* Under this section, "the various facts of the crime that Menzies says do not rise to the level of constitutional and statutory heinousness could still have been considered." *Id*. The prosecutor's colloquial use of the term "heinousness" was meant not as a legal term of art but as one adjective among many possible adjectives—such as ruthless, vicious, heartless, or wicked—that could have unobjectionably been used to describe Menzies's crimes. A court may properly allow the prosecutor to introduce evidence of additional aggravating circumstances that were not charged or proven in the guilt phase. *Young*, 853 P.2d at 352. That is what happened here.[12]

---

[12] Yet again, Menzies relies on the judge's declaration that he applied "the invalid aggravator," but he does so with only the tepid qualification that the declaration is "not binding on this Court." Br.Aplt.91 n.17. He fails to disclose why: the declaration was stricken from the State record and federal courts are therefore *prohibited* from considering it. *Pinholster*, 563 U.S. 170.

Menzies has no standing to challenge whether the statutory eligibility-phase aggravator of heinousness is unconstitutionally broad as written because heinousness was not charged or applied as applied in fixing his sentence.

### 2. Utah's heinousness aggravator is not unconstitutionally broad.

Even if Menzies had standing, he would not be entitled to relief because Utah's statutory heinousness aggravator is not unconstitutionally broad. Utah's statute sets out the following aggravating circumstance:

> The homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner, any of which must be demonstrated by physical torture, serious physical abuse, or serious bodily injury of the victim before death.

Utah Code Ann. § 76-5-202(1)(r) (formerly subsection (q)).

In his direct appeal Menzies argued that the trial judge and prosecutor failed to limit the construction of subsection (q) as required by *Godfrey*, 446 U.S. at 428 and *State v. Wood*, 648 P.2d 71, 78 (Utah 1982). *See* Menzies Br. 9/14/92 at 161. Menzies argued that reliance on subsection (q) and/or the "brutality" of the homicide as an aggravating factor violated the Eighth Amendment. *Id.*

Under the Eighth and Fourteenth Amendments, to serve as an aggravating factor, "the physical abuse must be qualitatively and quantitatively different and more culpable than that necessary to accomplish the murder." *State v. Tuttle*, 780 P.2d 1203, 1217 (Utah 1989). It must also "evidence a mental

state materially more depraved or culpable than that of most other murderers."
*Id*. (citing *Godfrey*, 446 U.S. at 431–33).[13]

Menzies did not object when the prosecutor referred to "the brutal and heinous nature of the murder." TR1162:3209,3250. Therefore, to prevail on appeal, Menzies had to demonstrate plain or manifest error. The trial judge could reasonably infer from the evidence that Menzies kidnaped Maurine, kept her all night, handcuffed her, pulled her about by the cuffs, and even tethered her to a tree. TR State's trial Exs.26, 30. Menzies also inflicted a ligature wound on Maurine's neck and then slashed her throat. Based on the "relatively mild amount of bleeding into the lungs," Maurine was only "beginning to die" when Menzies slashed her neck. TR1157:1620–21,1637. Based on all of this, the judge could reasonably conclude that Menzies's acts constituted serious physical abuse of a likely terrified and utterly helpless and vulnerable victim before her death. This was not a run-of-the-mine killing. Certainly, without a controlling statutory or judicial construction of the term, it would not have been obvious to him that Maurine suffered no serious physical abuse.

---

[13] *Tuttle* was issued after Menzies's sentencing date.

Thus, Menzies failed to meet his appellate burden to show a violation of the Eighth Amendment based on the sentencing judge's consideration of the crime circumstances.

### 3. Any error in applying the heinousness aggravator was harmless.

The Utah court also held that even if it were to assume that the sentencing court erred in considering the statutory heinousness guilt-phase aggravator, any "error was harmless because we 'can still confidently conclude beyond a reasonable doubt that the remaining aggravating circumstances and factors outweigh the mitigating factors and that the imposition of the death penalty was justified and appropriate.'" *Menzies II*, 889 P.2d at 405 (citations omitted). When the issue was raised in post-conviction, the Utah court again affirmed that "even if we were to accept his argument that the judge erred in applying a single aggravating factor, the aggravating factors together would still have supported a sentence of death." *Menzies IV*, 344 P.3d at 630.

Menzies complains without record support that the Utah "court considered only the evidence in aggravation before finding that the aggravators outweighed the mitigation." Br.Aplt.90–91. This is patently false. For one thing, the quoted statement itself referred to "the mitigating factors" that were outweighed by the aggravation, entirely undermining Menzies's argument that the Utah court based its conclusion "on the evidence in aggravation alone." *Id.*

at 90. For another, the Utah court had in front of it the sentencing judge's extensive findings on aggravation and mitigation, and nothing in the court's opinion suggests it disregarded them. Finally, the Utah court reviewed Menzies's case in mitigation a second time in *Menzies IV*, devoting seven full paragraphs to reciting it, and still considered the case in aggravation to outweigh mitigation. 344 P.3d at 622–23,630.

## B.  The pecuniary gain aggravator did not taint Menzies's death sentence.

Menzies argues that the sentencing judge's supposed reliance on the pecuniary gain aggravator duplicated the robbery factor. But again, Menzies did not object at the penalty phase, and any error was not plain. The prosecutor did not argue pecuniary gain as an aggravating factor, and it is not clear that the judge relied on the pecuniary gain factor.

Menzies's argument also misconstrues Utah law on weighing aggravators against mitigators. Utah does not compare aggravators and mitigators "in terms of the relative numbers" of each—as Menzies's double-counting claim presupposes—but considers "their respective substantiality and persuasiveness—their weight." *State v. Honie*, 57 P.3d 977, 994 (2002) (citing *Wood*, 648 P.2d at 83); *see also State v. Holland*, 777 P.2d 1019, 1027–28 (Utah 1989) (explaining "'weighing' of aggravating against mitigating circumstances" is not a "precise and logical" process like weighing "physical items that have mass

and can be compared on the pans of a scale"). Thus, consonant with *Zant*, 462 U.S. at 884, "a death sentence supported by multiple aggravating circumstances need not always be set aside if one aggravating factor is invalid." *Honie*, 57 P.3d at 994.

In *State v. Pierre,* the defendant claimed that a guilt phase jury instruction on pecuniary gain overlapped with the instruction given on killing in perpetration of robbery. 572 P.2d 1338 (Utah 1978). The Utah Supreme Court held that "[n]o error exists in having two instructions overlap in part." *Id*. at 1355. Similarly, in *State v. Shaffer*, the court held that although a defendant could not be convicted of aggravated robbery and first degree murder based on aggravated robbery, he could be convicted of aggravated robbery and first degree murder based on pecuniary gain. 725 P.2d 1301, 1313–14, 1313 n.3 (Utah 1986). It could not have been obvious to the trial court that it was committing error by following these precedents.

So when they weighed aggravating and mitigating circumstances, the judge and later the Utah Supreme Court did not "count" the pecuniary gain and robbery aggravators, doubly or otherwise, but considered their moral force and persuasiveness to whatever appropriate degree they merit in their totality. The Utah court would have made only one moral determination to the precise extent that the pecuniary gain aggravator overlapped with the robbery aggravator.

The State court weighed the aggravators against Menzies's mitigators, and nothing about that weighing process contradicted or unreasonably applied controlling Supreme Court precedent. Reasonable jurists could agree that this weighing process conformed to Supreme Court law.

Menzies disputes Utah's procedure by citing circuit court opinions that "held that aggravating factors are unconstitutionally duplicative when they are 'predicated upon the same acts.'" Br.Aplt.93 (citation omitted). But circuit court opinions "are off the table as far as § 2254(d) is concerned." *Early v. Packer*, 537 U.S. 3, 10 (2002). Menzies is not entitled to a writ by alleging tension between State law and circuit holdings where none of them show a violation of clearly established federal law as announced by the Supreme Court.

Menzies further attempts to show conflict with Supreme Court law by complaining that the allegedly duplicative pecuniary gain aggravator violates the constitutional principle set forth in *Zant* that "each aggravator 'must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of capital murder.'" Br.Aplt.92–93 (quoting 462 U.S. at 877).

But again, Menzies's claim challenges his penalty-phase, which in Utah is the selection-phase. The narrowing-phase—the one where his death eligibility

was determined—already happened at the guilt-phase. There, the jury made Menzies eligible for the death penalty by finding robbery and aggravated kidnapping beyond a reasonable doubt, eligibility which Menzies does not challenge. Even if the sentencing judge did apply the pecuniary gain aggravator as Menzies says, it remained the case that every aggravator that made Menzies eligible for the death penalty—robbery and aggravated kidnaping—had already been applied and did "genuinely narrow the class of persons eligible for the death penalty." *Id.* (citation omitted). The Constitution did "not require the [sentencer] to ignore other possible aggravating factors in the process of *selecting*, from among that class, those defendants who will actually be sentenced to death." *Zant*, 462 U.S. at 878 (emphasis added). "What is important at the *selection* stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Id.* at 879 (emphasis added). Menzies got that.

And even if any error occurred, it was harmless. The sentencing decision was driven by the magnitude of aggravating factors, especially the risk of future dangerousness Menzies posed, and the relative paucity of mitigating ones. Pecuniary gain hardly weighed at all in the sentencing decision. Thus, removing pecuniary gain from the balance would not return a different result. The sentencing judge appropriately weighed the mitigating and aggravating factors

"in the manner required by" federal law, and imposition of the death penalty

was justified and appropriate. *Menzies II,* 889 P.2d at 406.

### VII.

**Fairminded jurists could agree with the Utah court's ruling rejecting Menzies's claim that the reasonable-doubt jury instruction lowered the burden of proof.**

The Due Process Clause protects an accused against conviction except

upon proof beyond a reasonable doubt. Menzies claims that the reasonable

doubt jury instruction in his case lowered the prosecution's burden of proof.

The Utah Supreme court found this claim to be without merit. *Menzies II*, 889

P.2d at 406.[14] It also denied Menzies's claim that appellate counsel was

ineffective for not raising this claim. *Menzies IV*, 344 P.3d at 632–33.

The district court noted that "[a]s a general rule, improper jury

instructions do not form the basis for federal habeas corpus relief." ECF163 at

67 (citing *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)). The question on habeas "is

not whether an instruction was 'undesirable, erroneous, or even "universally

condemned," but whether it so infected the trial that the resulting conviction

---

[14] *See Menzies II,* 889 P.2d at 406 n.7. Shortly before Menzies's trial, the Utah Supreme Court considered an attack on a substantively identical instruction given in a capital case and unanimously concluded that the "defendant has not come close to a showing of a denial of due process." *State v. Tillman,* 750 P.2d 546, 573 (Utah 1987); *See also Tillman v. Cook*, 25 F. Supp. 2d 1245, 1252 (D. Utah 1998) (mere reference to "substantial doubt" is not "sufficient to render [an] instruction unconstitutional" (quoting *Victor v. Nebraska*, 511 U.S. 1, 20 (1994))).

violates due process. *Id.* at 68. While the Due Process Clause protects "against conviction except upon proof beyond a reasonable doubt, the United States Supreme Court has never held that any particular language must be used to define reasonable doubt." *Id.* It simply requires that "the court instruct[] the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt." *Id.* (quoting *Victor v. Nebraska,* 511 U.S. 1, 5 (1994)).[15]

Menzies refers to a dissent in the Utah court. The district court noted that dissent. *Id.* at 69 (citing *Menzies II,* 889 P.2d at 407. But it was the majority's application of Supreme Court precedent that controlled. The fact that one Utah justice dissented does not establish that the Utah court unreasonably applied clearly established federal law. "Where 'some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the habeas corpus writ should be denied.'" *Frost v. Pryor*, 749 F.3d 1212, 1225 (10th Cir. 2014).

---

[15] The district court also noted that this Court has held that "the trial court has considerable latitude in instructing juries on reasonable doubt." ECF163 at 68. *See United States v. Petty*, 856 F.3d 1306, 1309 (10th Cir. 2017) (citing *United States v. Conway*, 73 F.3d 975, 980 (10th Cir. 1995)).

The district court ruled there was "nothing within the instructions that in any way altered the state's burden to prove the defendant guilty beyond a reasonable doubt," and Menzies "failed to establish that the state court's determination of this claim was an unreasonable application of clearly established federal law." ECF163 at 69. Menzies has not shown that decision was erroneous.

And the instruction given in Menzies's case was correct as given. It did not allow for finding guilt on a degree of proof less than beyond a reasonable doubt. The instruction stated that "[a]ll presumptions of law, independent of evidence, are in favor of innocence, and a defendant is presumed innocent until he is proved guilty beyond a reasonable doubt. And in case of a reasonable doubt as to whether his guilt is satisfactorily shown, he is entitled to an acquittal." *Id.* at 68–69. It then elaborated:

> I have heretofore told you that the burden is upon the State to prove the defendant guilty beyond a reasonable doubt. Now by reasonable doubt is meant a doubt that is based on reason and one which is reasonable in view of all the evidence….
> If after an impartial consideration and comparison of all the evidence in the case you can candidly say that you are not satisfied of the defendant's guilt, you have a reasonable doubt…. A reasonable doubt must be a real, substantial doubt and not one that is merely possible or imaginary.

*Id.* at 69.

On appeal from denial of his post-conviction petition, Menzies asserted that appellate counsel was ineffective for omitting a challenge to the reasonable doubt jury instruction. The Utah court denied that challenge because the instruction conformed with instructions upheld in *Victor,* 511 U.S. at 19–20. *Menzies IV*, 344 P.3d at 632–33. Menzies fails to address *Victor*.

The Utah court explained that *Victor* approved an instruction contrasting "substantial doubt" with terms like "mere possibility" and "bare imagination." *Id.* at 633. That "comparison made it clear that 'substantial' is 'used in the sense of existence, rather than magnitude of the doubt.' This satisfied any concern that the jury would interpret the term 'substantial doubt' to overstate the doubt necessary to acquit." *Id.*

The Utah court held that, like *Victor,* the reasonable-doubt jury instruction in Menzies's case compared a '"substantial doubt' with those that are 'merely possible or imaginary,' in 'the sense of existence rather than magnitude of the doubt.'" *Id.* "Any challenge raising the constitutionality of the reasonable doubt instruction given in this case would have surely failed." *Id.* Menzies ignores this analysis and the Utah court's reasonable application of this clearly established federal law.

Relying on *Sullivan v. Louisiana*, Menzies argues that "failure to instruct on the proper reasonable doubt standard is structural error." Br.Aplt.95 (citing

508 U.S. 275 (1993)). Menzies then argues that language equating reasonable

doubt with "actual substantial doubt" violated the constitution because these

words "suggest a higher degree of doubt than is required for acquittal under

the reasonable-doubt standard." *Cage v. Louisiana*, 498 U.S. 39, 41 (1990).[16]

But unlike here, the instruction in *Cage* "equated a reasonable doubt with

a 'grave uncertainty' and an 'actual substantial doubt,' and stated that what was

required was a 'moral certainty' that the defendant was guilty." *Id.* The Supreme

Court held that when the words "substantial" and "grave" were "considered

with the reference to 'moral certainty,' rather than evidentiary certainty, it

becomes clear that a reasonable juror could have interpreted the instruction to

allow a finding of guilt based on a degree of proof below that required by the

Due Process Clause." *Id.*

The Utah court considered *Cage* and *Sullivan* and noted that the Supreme

Court clarified in *Victor* that "not all definitions of reasonable doubt that use the

words 'substantial doubt' are unconstitutional." *Menzies IV*, 344 P.3d at 633

(citing *Victor*, 511 U.S. at 19–20).

---

[16] As Menzies acknowledges, *Cage* was decided after Menzies's trial. Without
any supporting authority, Menzies argues that "*Cage* did not announce a new
rule, but simply applied existing precedent." Br.Aplt.97.

Menzies's instruction did not include the words "grave uncertainty" or "moral certainty," and it specifically instructed the jurors to consider all of the evidence. It also instructed that a "reasonable doubt must be a real, substantial doubt and not one that is merely possible or imaginary." This is the kind of qualifier the *Victor* Court held took the instruction outside the error found in *Cage*. And Menzies's jurors were asked to consider whether after a "comparison of all the evidence" they could "truthfully say that you have an abiding conviction of the defendant's guilt," and not base their decision on a "moral certainty."

Menzies cannot establish that any particular language must be used to define reasonable doubt, that the reasonable doubt instruction given in his case was erroneous, or that the Utah court unreasonably applied clearly established federal law.[17]

---

[17] Even if any error occurred, Menzies invited the error by proposing a reasonable doubt instruction identical in all material respects to the instruction actually given. *Compare* TR857 *with* TR950,960–61. Appellate courts typically will not grant relief on an invited error, but an appellate court will review "any palpable error in the record which might have prejudiced the defendant…even if invited by the defendant himself." *State v. Matteri*, 225 P.2d 325, 330–31 (Utah 1950).

## CONCLUSION

For these reasons, the Court should affirm denial of a writ of habeas corpus.

## ORAL ARGUMENT

Oral argument is warranted in this case.

Respectfully submitted on December 22, 2020.

SEAN D. REYES
Utah Attorney General


 /s/ Andrew F. Peterson
ANDREW F. PETERSON
Assistant Solicitor General
*Attorneys for Appellee*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of 25,000 words set in the Court's December 21, 2020 Order because it contains 24,881 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 13-point Book Antiqua font.

/s/ Andrew F. Peterson

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that: (1) all required privacy redactions have been made in compliance with 10th Cir. R. 25.5; (2) the ECF submission is an exact copy of the hard copies submitted to the court; and (3) the digital submissions have been scanned for viruses with the most recent version of Windows Defender Antivirus, Version 1.329.885.0, last updated on December 22, 2020, and according to the program are free of viruses.

/s/ Andrew F. Peterson

**CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2020, I electronically filed the foregoing Brief of Appellee using the court's CM/ECF system which will send notification of such filing to the following:

Jon M. Sands
Federal Public Defender
Lindsey Layer
Eric Zuckerman
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
lindsey_layer@fd.org
eric_zuckerman@fd.org

/s/ Andrew F. Peterson