No. 19-4042

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

RALPH LEROY MENZIES,
*Petitioner/Appellant,*

*v.*

ROBERT POWELL,
Warden of the Utah State Prison,
*Respondent/Appellee.*

On appeal from a final judgment denying a petition for a writ of habeas corpus in the United States District Court for the District of Utah, Central Division, case no. 2:03-CV-00902, the Honorable Claire V. Eagan, presiding.

## ADDENDUM TO BRIEF OF APPELLEE VOL I OF II

Addendum A

845 P.2d 220
Supreme Court of Utah.

STATE of Utah, Plaintiff and Appellee,

v.

Ralph Leroy MENZIES, Defendant and Appellant.

No. 880161.
|
March 11, 1992.

## Synopsis

Defendant was convicted in the Third District Court, Salt Lake County, Raymond S. Uno, J., of first-degree murder and aggravated kidnapping, and he was sentenced to death. Defendant appealed. The Supreme Court, Hall, C.J., held that: (1) fact that court reporter was not licensed in Utah did not preclude use of transcript she prepared on appeal, as reporter was "de facto" qualified and could work as a temporary reporter; (2) defendant failed to show any transcription errors which rendered record inadequate for appeal; and (3) use of transcript on appeal did not violate defendant's state or federal constitutional rights.

Affirmed.

Stewart, J., dissented.

## Attorneys and Law Firms

**\*223** R. Paul Van Dam, Charlene Barlow, Salt Lake City, for plaintiff and appellee.

Brooke C. Wells, Joan C. Watt, Richard G. Uday, Salt Lake City, for defendant and appellant.

## Opinion

HALL, Chief Justice:

Ralph Leroy Menzies appeals from the denial of his motion for a new trial. We affirm. The issue on appeal is whether the trial court abused its discretion in ruling that the record is sufficient for appellate review.

On March 8, 1988, after a jury trial, Menzies was convicted of first degree murder,[1] a capital offense, and aggravated kidnaping,[2] a first degree felony. He waived the right to a jury for the penalty phase of the proceedings, and the trial

court sentenced him to death. On May 26, 1988, he filed a docketing statement in this court, raising twenty-nine issues on appeal. The trial transcript was certified on September 5, 1988. In preparing his brief, Menzies observed that the record contained numerous transcription errors. On November 15, 1989, prior to submitting his brief, Menzies filed a "motion to set aside judgment and/or for a new trial" on the ground that transcription errors rendered the record inadequate for appeal. The trial court referred the matter to this court, and Menzies modified his motion to include claims concerning the qualifications of the court reporter.

1
    *See* Utah Code Ann. § 76–5–202.

2
    *See* Utah Code Ann. § 76–5–302.

We remanded the case to the trial court to conduct proceedings to correct the record, pursuant to rule 11(h) of the Rules of the Utah Supreme Court.[3] We also directed the trial court to rule on Menzies' motion for a new trial and to resolve all issues relating to the qualifications of the court reporter and the adequacy of the transcript.

3
    R.Utah S.Ct. 11(h) (1988). In 1990, the Rules of the Utah Supreme Court were amended. Similar procedures can presently be found in Utah Rule of Appellate Procedure 11(h).

On remand, several hearings were held in the trial court. It was established at these hearings that the court reporter, Ms. Tauni Lee, was not licensed in the state of Utah. However, evidence was presented that Lee attended Empire Business College in Santa Rosa, California, where she completed a twenty-month course in court reporting. In 1985, Lee passed the California certified shorthand reporter examination. She tested at a speed of 200 words per minute and received an overall score of 97 percent. From August 1985 through July 1987, she worked as a certified court reporter in municipal court in Sonoma County and in municipal and superior court in Marin County. During her tenure in California, Lee completed several transcripts that were used for appeals.

In July 1987, Lee moved to Utah. She stopped paying her California dues because she believed it was no longer necessary to retain her California certification. By reason of nonpayment of dues, her California certification lapsed. Lee, thinking that a national certification was all that was needed to work in Utah, applied for certification from the National Shorthand Reporters Association ("NSRA"). On the basis of

her California test scores, Lee obtained a national certification and began paying dues to the NSRA.

In January 1988, Lee was appointed court reporter in the Third Judicial District Court. The administrative office of the courts was aware that Lee was not licensed in Utah. However, on the basis of her qualifications and because she was the only applicant, the office determined that Lee could hold the position until June 1988, when the next Utah examination for certified reporters was scheduled. This determination was based on 🚩 Utah Code Ann. § 78–56–17, which provides for the appointment **\*224** of unlicensed court reporters on a temporary basis. [4] Lee reported Menzies' trial in February and March 1988.

[4]       *See infra* note 27 and accompanying text.

In preparing the transcript of Menzies' trial, Lee used a note reader and a proofreader. The note reader would transcribe Lee's shorthand notes and mark any portions of the transcript where she had difficulty reading the notes. Lee would then proofread the portions of the transcript that were marked. The proofreader read over the rest of the transcripts, looking for misspellings and similar errors. It was established in the hearings that certified reporters use note readers in preparing transcripts, and Lee's note reader was considered "excellent." However, it was common practice for the court reporter to proofread all the work prepared by a note reader.

In November 1990, the trial court denied Menzies' motion for a new trial based on Lee's licensure status. The court ruled that Lee was "de facto" qualified because of her "training, testing, and experience." The court also ruled that for a new trial to be granted on the basis of transcription errors, Menzies must show that the errors are uncorrectable and prejudicial. After this ruling, the parties continued in their attempts to correct the record.

As part of the procedures to correct the record, Lee read from her shorthand notes while representatives of both parties read from a copy of the original transcript. Discrepancies between the original version and Lee's notes were noted on this copy of the transcript. Because the process was conducted in California, this copy of the transcript is referred to as the "California version." In addition to the proofreading of the original transcript, several motions and stipulations were filed in an attempt to correct the record. However, in many instances, the parties were unable to agree on what

had occurred at trial, and therefore, the record could not be corrected through the procedures of rule 11(h).

Proceedings were also conducted to determine if the errors that existed in the record warrant a new trial. It was established that the trial judge, a member of the prosecutor's staff, and two lawyers representing Menzies had read the transcript from cover to cover. After this extensive review, the trial court concluded that none of the transcription errors were prejudicial. On February 20, 1991, the trial court issued its final ruling, denying Menzies' motion for a new trial on the ground that "the transcript is sufficiently accurate to afford defendant a full and fair review of his issues on appeal." The court also designated the California version of the transcript, as well as the original version of the transcript, as part of the record on appeal.

In the instant appeal, we review only issues concerning the adequacy of the transcript. We do not reach the merits of the conviction and sentence.

## I. STANDARD OF REVIEW

  The decision to grant a new trial pursuant to Utah Rule of Criminal Procedure 24 is a matter within the discretion of the trial court. Accordingly, we will not reverse a ruling denying a new trial "absent a clear abuse of that discretion." [5] Generally, we will not find abuse of discretion unless, given the applicable facts and law, the trial court's decision is unreasonable. [6] Indeed, granting the trial court deference is appropriate. The judge who presided over the trial is in a far better position to determine whether the record adequately reflects the proceedings.

[5]       *State v. Williams,* 712 P.2d 220, 222 (Utah 1985); *see also State v. James,* 819 P.2d 781, 793 (Utah 1991); *State v. Weaver,* 78 Utah 555, 6 P.2d 167, 169 (1931); 📒 *State v. Mellor,* 73 Utah 104, 272 P. 635, 639 (1928).

[6]       *See* 📒 *Crookston v. Fire Ins. Exch.,* 817 P.2d 789, 805 n. 19 (Utah 1991); 🚩 *Huston v. Lewis,* 818 P.2d 531, 534 (Utah 1991); *State v. Petersen,* 810 P.2d 421, 424 (Utah 1991); 🚩 *State v. Ramirez,* 817 P.2d 774, 781–82 n. 3 (Utah 1991).

We also note that in appeals from trials where a sentence of death is imposed, the scope of appellate review is expanded. "This Court will review errors raised and briefed on appeal in death penalty cases, even though no proper objection was made **\*225** at trial, but will reverse a conviction based upon such errors only if they meet the manifest and prejudicial error standard." [7] In addition, we have the prerogative to notice plain errors that are apparent on the face of the record even if the appellant does not complain of the error on appeal. [8] To be considered plain or manifest error, an error must be both harmful and obvious. [9]

7

> State v. Tillman, 750 P.2d 546, 553 (Utah 1987). Although Tillman is a plurality opinion, all five justices concurred in the portion of the opinion which delineates the appropriate scope of review. Id. at 552–53, 577, 582, 583, 591.

8

> Id. at 552–53.

9

> See State v. Eldredge, 773 P.2d 29, 35 (Utah), cert. denied, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989); see also State v. Holland, 777 P.2d 1019, 1026 n. 3 (Utah 1989).

## II. QUALIFICATIONS OF THE COURT REPORTER

At the trial level, Menzies argued that because Lee was not licensed in Utah, the transcript she prepared could not be used on appeal. The trial court rejected this argument, ruling that Lee's licensure status did not affect the validity of the transcript because Lee was "de facto" qualified. On appeal, Menzies claims that this ruling constitutes abuse of discretion.

Menzies' argument is based on Utah Code Ann. § 78–56–15, [10] which provides that "no person may be appointed to the position of shorthand reporter nor act in that capacity ... unless he has received a certificate from the Division of Occupational and Professional Licensing," and on Utah Code Ann. § 76–3–206(2) and Utah Rule of Criminal Procedure 26(10), which provide for mandatory review of the "entire record" in every case in which a sentence of death is imposed. Menzies asserts that these statutes and rule 26(10) implicitly provide that only a transcript prepared by a certified reporter may be used to review a capital case. In the alternative, he argues that even if the transcript can be used, the presumption that the record is correct, provided in Utah Code Ann. § 78–

56–6, should not apply to a transcript that was not prepared by a certified reporter. [11]

10

> Menzies also cites a similar provision in Utah Rule of Appellate Procedure 11(e). However, this rule was not in effect at the time Menzies was tried, and no analogous language exists in the Rules of the Utah Supreme Court. See R.Utah S.Ct. 11.

11

> Utah Code Ann. § 78–56–6 provides, "A transcript of a reporter's notes, written in longhand or typewritten, certified by him as being a correct transcript of evidence and proceedings, is prima facie a correct statement of such evidence and proceeding."

However, section 78–56–15, section 76–3–206(2), and rule 26(10) neither prohibit the use of transcripts prepared by an uncertified reporter nor revoke the presumption of correctness for transcripts prepared by uncertified reporters. Furthermore, although section 78–56–15 requires a Utah license for the position of court reporter, section 78–56–17 provides for unlicensed court reporters under certain conditions. [12] The rules of statutory construction require that these sections be read together, harmonizing their provisions so that neither section negates a part of the other. [13] Given this rule of construction, section 78–56–15 cannot be read as a total prohibition against the use of transcripts prepared by uncertified reporters. Nor can this section be read as providing that transcripts prepared by uncertified reporters are not entitled to the presumption of correctness. Therefore, Menzies' statutory argument is not compelling.

12

> See infra note 27 and accompanying text. Rule 3–304 of the Code of Judicial Administration also provides for the appointment of unlicensed reporters under conditions where certified shorthand reporters are not available.

13

> Jerz v. Salt Lake County, 822 P.2d 770, 773 (Utah 1991); Murray City v. Hall, 663 P.2d 1314, 1318 (Utah 1983); Millett v. Clark Clinic Corp., 609 P.2d 934, 936 (Utah 1980).

In any event, the trial court's ruling was not based on statutory construction, but on the finding that Lee was de facto qualified to report the case. Utah, along with many other jurisdictions, has adopted **\*226** the de facto officials doctrine. [14] Under this doctrine, persons who are technically ineligible for a

public office may be considered de facto officials if they assume official authority under color of a valid appointment and public acquiescence in the authority. [15] In the interest of justice, the actions of a de facto official are considered valid as to third persons and the public. [16] Utah courts have relied on this doctrine to uphold the actions of administrative committees even though one of their members failed to meet the statutory requirements to sit on the committee; [17] the actions of district judges sitting on the supreme court; [18] and the actions of a county attorney even though the attorney had never posted a required bond. [19] Other jurisdictions have applied the de facto doctrine to myriad actions taken by various public officials, [20] including actions of de facto court reporters. [21]

14   *Vance v. Fordham,* 671 P.2d 124, 130–31 (Utah), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

15   *Vance,* 671 P.2d at 130–31 & n. 5; *see also State v. Gambrell,* 814 P.2d 1136, 1139 (Utah Ct.App.1991). The de facto doctrine discussed in *Vance* may also apply in situations where there is not an appointment under color of law. *Vance,* 671 P.2d at 130–31 & n. 5.

16   *Vance,* 671 P.2d at 130–31 & n. 5; *see also Gambrell,* 814 P.2d at 1139.

17   *Vance,* 671 P.2d at 130–31 & n. 5.

18   *In re Thompson's Estate,* 72 Utah 17, 269 P. 103, 128 (1927).

19   *Gambrell,* 814 P.2d at 1139.

20   *See, e.g., In re Bunker Hill Urban Renewal Project 1B,* 389 P.2d 538, 552 (upheld actions of redevelopment agency though one of its members ineligible because not resident of proper city), *cert. denied,* 379 U.S. 28, 85 S.Ct. 190, 13 L.Ed.2d 173 (1964); *People v. Montoya,* 44 Colo.App. 234, 616 P.2d 156, 162 (1980) (upheld action of special prosecutor who was ineligible because member of attorney general's office); *Olathe Hospital*

*Found., Inc. v. Extendicare, Inc.,* 217 Kan. 546, 539 P.2d 1, 12 (1975) (upheld action of appeals panel though some of panel members' terms had expired); *Marshall v. Keller,* 10 Ohio St.2d 85, 226 N.E.2d 743, 745 (1967) (upheld actions of industrial commission though some members ineligible); *People v. Jackson,* 163 A.D.2d 489, 558 N.Y.S.2d 590, 590 (1990) (upheld conviction though prosecuting attorney not member of any bar); *see also Hussey v. Smith,* 99 U.S. 20, 24, 25 L.Ed. 314 (1878); *State v. Carroll,* 38 Conn. 449, 471–72 (1871).

21   *Batye v. State,* 599 S.W.2d 231, 234 (Mo.Ct.App.1980); *Stacy v. Wagers,* 264 S.W.2d 299, 302 (Ky.Ct.App.1959); *Harris County v. Hunt,* 388 S.W.2d 459, 465 (Tex.Civ.App.1965).

The circumstances of the instant case clearly fall within this doctrine. Lee assumed authority as a court reporter under color of a valid appointment, and the public acquiesced in her authority. Indeed, throughout her tenure as a court reporter, her eligibility for the position was not questioned. Furthermore, the trial court found that on the basis of her "training, testing, and experience," Lee was qualified to transcribe Menzies' trial, and Lee believed that she had the certification necessary for the position. Clearly, the trial court did not abuse its discretion in ruling that Lee was de facto qualified to report the case. As a de facto reporter, any transcript which Lee prepared is entitled to the same treatment as a transcript prepared by a court reporter whose eligibility for the position is not questioned.

 Menzies does not contend that the de facto doctrine should not apply to court reporters; rather, he argues that the trial court erred in finding that Lee possessed the qualifications for the position. In support of this assertion, Menzies points to evidence produced at the hearings which tends to show that Lee did not possess the qualifications of a court reporter under Utah Code Ann. § 78–56–16. [22] Specifically, he asserts that evidence was presented showing that Lee lacked the requisite skill and was of bad moral character. However, the existence of conflicting evidence is not sufficient to set aside a trial court's finding. [23] A trial court's factual findings will **\*227** not be disturbed unless an appellate court, giving deference to the trial court's superior position to assess credibility, nevertheless concludes that the finding is clearly erroneous. [24]

22

🚩 Utah Code Ann. § 78–56–16 establishes the requirements for court reporters and provides, "Any citizen of the United States at least 18 years of age, of good moral character, who possesses a high degree of skill and ability in the art of shorthand reporting, and who passes a satisfactory examination as provided in this chapter, is entitled to a certificate...."

23

*See State v. Goodman,* 763 P.2d 786, 788 (Utah 1988); 🚩 *State v. Walker,* 743 P.2d 191, 193 (Utah 1987).

24

*See Goodman,* 763 P.2d at 788; 🚩 *Walker,* 743 P.2d at 193.

In the instant case, there was sufficient evidence concerning Lee's training, testing, and experience to support the trial judge's determination that Lee was qualified. Indeed, it was established that if Lee had kept her California certification current, she could have obtained a Utah license without taking the Utah test. [25] It appears, therefore, that if Lee had understood the need and requirements for a Utah license, she could have obtained the appropriate certification as easily as she obtained the national certification. Furthermore, the trial court had sufficient information from the testimony and the court's dealing with Lee to make a determination as to her "moral character."

25

Utah Code Ann. § 58–1–12 provides, "The division may issue a license without examination to a person who has been licensed in any state, district, or territory of the United States or in any foreign country, whose education, experience, and examination requirements are, or were at the time the license was issued, equal to those of this state."

In addition to the de facto doctrine, another ground supports the trial court's ruling that the transcript may be used and is entitled to the presumption of correctness. It is clear that, as a matter of law, Lee was a temporary reporter and therefore had the statutory authority to report the case pursuant to 🚩 Utah Code Ann. § 78–56–17. Although the trial court did not base its ruling on 🚩 section 78–56–17, we may uphold a trial court's ruling on any proper ground. [26]

26

*See* Utah R.Crim.P. 30; *see also Buehner Block Co. v. UWC Assoc.,* 752 P.2d 892, 895 (Utah 1988); *City Elec. v. Industrial Indem. Co.,* 683 P.2d 1053, 1060 (Utah 1984).

🚩 Section 78–56–17 provides:

If any regularly appointed certified shorthand reporter is disabled from performing his duty or is removed from his position, the judge of the court in which that certified shorthand reporter has been appointed may appoint any substitute he deems competent to act during such temporary disability of the regular reporter and until his successor is appointed. The temporary appointment shall continue only until the next regular examination for certified shorthand reporters held by the Division of Occupational and Professional Licensing.

The administrative office of the courts determined that despite the fact that Lee did not have a Utah license, she could work as a temporary reporter pursuant to this section. This determination is undoubtedly correct. The plain language of the statute establishes that a "temporary substitute" does not have to meet the requirements of a "regularly appointed certified shorthand reporter," but only needs to be deemed competent by the trial judge. [27] In the instant case, the record clearly establishes that both the trial judge and the administrative office of the courts found that Lee was qualified for the position. Moreover, it was established that Lee was the only applicant for the position, and she reported Menzies' case between the time she was hired and the time of the "next regular examination for certified shorthand reporters."

27

When the terms of a statute are plain, we construe the statute in accord with its usual and accepted meaning. *See, e.g., Brinkerhoff v. Forsyth,* 779 P.2d 685, 686 (Utah 1989); *Utah County v. Orem City,* 699 P.2d 707, 709 (Utah 1985). Indeed, apart from the plain language stating that a temporary reporter

need only be "deemed competent," the provision that a temporary reporter may hold the position only until the next scheduled test supports the interpretation that an uncertified reporter may work as a temporary reporter.

Menzies argues that 🚩 section 78–56–17 cannot apply in this case because the record does not show that Lee's predecessor was "disabled" or "removed from his position." However, the record reveals that there was a vacancy. The precise reason for the vacancy has no bearing on Lee's status as a temporary reporter. Clearly, the former court reporter must have been either "disabled" or "removed" for the vacancy to exist. Therefore, Lee had the statutory authority to report Menzies' case, and pursuant to 🚩 **\*228** section 78–56–17, the transcript may be used on appeal and is entitled to the presumption of correctness.

Menzies also argues that Lee's use of a note reader precludes the use of the transcript on appeal or, alternatively, prevents the transcript from being presumed correct. As noted above, however, it was established that certified court reporters use note readers and that the note reader Lee used was considered "excellent." While Lee did not initially proofread the entire transcript, a general procedure when using a note reader, she did read over all her notes during the proceedings to correct the record. Given these facts, there is no basis for the assertion that Menzies is entitled to a new trial because Lee used a note reader to assist in the preparation of the transcript.

We therefore conclude that the trial court did not abuse its discretion in ruling that Menzies is not entitled to a new trial by reason of Lee's licensure status and that the transcript Lee prepared is entitled to the presumption of correctness.

### III. TRANSCRIPTION ERRORS

Menzies claims that he is entitled to a new trial on the ground that transcription errors rendered the record inadequate for appeal. Specifically, he argues that the trial judge erred in ruling that a new trial will not be granted unless it is shown that the transcription errors prejudiced Menzies' appeal. In the alternative, Menzies claims that the trial court erred in ruling that none of the transcription errors are prejudicial.

*A. Requirement of Prejudice*

Menzies' first argument, that he is not required to show prejudice, is based on Lee's licensure status and the fact that there are numerous transcription errors in the record. As held above, Lee meets the requirements of both a de facto reporter and a temporary reporter; therefore, the instant transcript is to be treated as any other transcript certified on appeal. Furthermore, while it is true that the record contains transcription errors, the mere existence of such errors does not mandate a new trial. The clear weight of authority requires a showing of prejudice to overturn a conviction on the basis of transcription errors. [28] Indeed, this court has followed such an approach. [29]

28    *See, e.g., Edwards v. United States,* 374 F.2d 24, 26 (10th Cir.1966); 📄 *Stirone v. United States,* 341 F.2d 253, 255 (3d Cir.), *cert. denied,* 381 U.S. 902, 85 S.Ct. 1446, 14 L.Ed.2d 284 (1965); *United States v. Sigal,* 341 F.2d 837, 850 (3d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); 📄 *Addison v. United States,* 317 F.2d 808, 810 (5th Cir.1963), *cert. denied,* 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d 605 (1964); 🚩 *People v. Chessman,* 52 Cal.2d 467, 341 P.2d 679, 690–92, *cert. denied,* 361 U.S. 925, 80 S.Ct. 296, 4 L.Ed.2d 241 (1959); 📄 *People v. Feigin,* 174 Cal.App.2d 553, 345 P.2d 273, 281 (1959); 📄 *State v. Perry,* 136 Wis.2d 92, 401 N.W.2d 748, 752 (1987); *see also* Edward L. Raymond, Jr., Annotation, *Court Reporter—Dead or Disabled,* 57 A.L.R.4th 1049, 1061 (1987); Seldon R. Shapiro, Annotation, *Court Reporting—Omissions,* 12 A.L.R.Fed. 584, 586 (1972).

29    📄 *State v. Taylor,* 664 P.2d 439, 445–47 (Utah 1983); *see also* 📄 *Emig v. Hayward,* 703 P.2d 1043, 1048–49 (Utah 1985); *Whetton v. Turner,* 28 Utah 2d 47, 497 P.2d 856, 858 (1972), *cert. denied,* 414 U.S. 862, 94 S.Ct. 81, 38 L.Ed.2d 112 (1973); Utah R.Crim.P. 30.

In *State v. Taylor,* [30] we reversed a conviction on the ground that omissions in the transcript rendered the record inadequate for appeal. In so holding, we did not simply note that the transcript did not accurately reflect the proceedings. Rather, we emphasized that extensive omissions in the voir dire of jurors who were challenged for cause and whose

recorded answers illustrated prejudice prevented review of the defendant's claim that the trial court erred in not dismissing the jurors, [31] a claim that could have resulted in reversal. [32] We hold, therefore, that the trial court did not abuse its discretion in ruling that Menzies must show that his appeal is prejudiced by the transcription errors in order to be granted a new trial.



30   664 P.2d 439.

31   *Id.* at 445–47.

32   *Id.* at 447; *State v. Bailey,* 605 P.2d 765, 768 (Utah 1980); *State v. Moore,* 562 P.2d 629, 631 (Utah 1977).

***229** *B. Errors Claimed to be Prejudicial*

Menzies' second argument, that many of the transcription errors are prejudicial, focuses on general errors that occurred in portions of the transcript relating to voir dire and the admission of the preliminary testimony of Walter Britton. In addition, Menzies cites specific errors relating to the transcription of numbers, the penalty phase, and the swearing in of witnesses. In a related claim, he argues that he is prejudiced because the transcription errors prevent an adequate review of the record for plain error.

However, a review of the record reveals that none of the cited errors are prejudicial. The errors are obvious in nature and reconcilable when viewed in the context of the relevant passage or by referring to documentary evidence, and none have any bearing upon issues raised on appeal. Furthermore, it is possible to cure any conceivably prejudicial errors without retrying the case. This can be seen by addressing Menzies' claims separately.

1. Voir Dire
Menzies advances several claims of error relating to the voir dire portion of the transcript. Specifically, Menzies asserts that (1) some of the prospective jurors' responses to questions are unintelligible and/or do not make sense, (2) the note reader "made up" admonitions, questions, and answers, and (3) questions and answers are omitted from the transcript. Because of these errors, Menzies argues that neither version

of the transcript can be used to review appellate issues relating to voir dire.

Voir dire in the instant case was extensive. It lasted approximately one week, and thirty-one jurors were dismissed for cause. There was a general voir dire, during which prospective jurors were questioned as a group, followed by individual voir dire. The individual voir dire was primarily concerned with capital punishment. Menzies' original docketing statement raised two claims relating to voir dire. He asserted that the court committed reversible error by refusing to excuse certain jurors who were challenged for cause and abused its discretion by rehabilitating prospective jurors. Objections made at trial preserved these issues.

Before examining Menzies' specific claims, it is important to note that it is not necessary to examine the voir dire of every prospective juror. In order for mistakes in the transcript to prejudice Menzies' appeal, the error must occur in the voir dire of a juror who either sat on the case or was challenged for cause and not dismissed.

The jurors who sat on the panel are easily identifiable from the jury list, the polling of the jury after the conviction, and a second voir dire that took place late in the trial after one of the jurors received prejudicial information from an anonymous phone call. Likewise, it is possible to determine which jurors were challenged for cause and not dismissed. At the end of voir dire, defense counsel, in order to preserve her objections for appeal, stated that eight jurors were challenged for cause and not dismissed. Review of the transcript confirms the fact that eight jurors were challenged for cause and not dismissed.

(a) *Answers unintelligible.*
Several of Menzies' unintelligible or inappropriate answers cites involve voir dire of pertinent jurors. However, a review of the transcript reveals that the jurors' responses are readily reconcilable and/or nonprejudicial.

It is true that some of the jurors' answers are inarticulate. [33] However, this ***230** may well be attributable to the jurors, not to the reporter. In any event, in each instance, one is able to ascertain that the juror is appropriately responding to the question posed. Difficulties with the answers can generally be reconciled by viewing the answer in the context of the question, and in each instance, it is possible to understand the juror's response. Furthermore, a vast majority of errors cited by Menzies relate to capital punishment. However, the jurors

did not sit for the penalty phase of the proceedings. These questions are not highly relevant to an appeal of Menzies' conviction, and therefore, slight confusion surrounding these questions is not prejudicial. In addition, there are only one to four errors in a given juror's voir dire, and the voir dire questions are redundant. [34] The prejudicial effect of **231** a transcription error in a voir dire question is diminished where the same basic information is sought in another question. [35] Given these facts, the instances of inarticulate answers are not prejudicial.

33    The following are examples of alleged transcript errors cited by Menzies:

> A JUROR: MY NAME IS KATHLEEN WINN. I WORK FOR FIRST INTERSTATE BANK IN THE SPECIALIZED DEPARTMENT.
> ....
> THE COURT: WHAT RELATIONSHIP SHOULD THERE BE, IF ANY, BETWEEN WHAT THE VICTIM SUFFERED AND WHAT THAT PERSON THAT CAUSED THAT SHOULD SUFFER?
> A JUROR: AGAIN, IT'S BACK TO MY FEELINGS. IF THE INDIVIDUAL PREMEDITATEDLY OR PLANNED IT OUT THOROUGHLY AND KNEW EXACTLY WHAT HE OR SHE WAS DOING, WHICH TO ME WOULD BE A DIFFICULT THING FOR THAT INDIVIDUAL TO DO, IF THAT INDIVIDUAL WAS PROVEN THAT THEY DID DO THAT, THEN THAT RELATIONSHIP PROBABLY SHOULD BE DEATH PENALTY. BUT IF THE INDIVIDUAL DID NOT, WHICH MY FEELING, I GUESS. THAT THERE IS A DIFFICULT RELATIONSHIP THERE BETWEEN WHAT THE VICTIM SUFFERED VERSUS—THERE IS A LOT OF MENTAL SUFFERING, OBVIOUSLY, FROM—I WOULD HOPE FROM THE PERPETRATOR'S SIDE, AND THAT WOULD, TO ME, BE AN IMMENSE LOAD TO HANDLE.

34    The following is a list of the individual voir dire questions:

> (1) HOW DO YOU FEEL ABOUT THE DEATH PENALTY?
> (2) WHY?

> (3) HAVE YOU EVER SHARED WITH ANYONE ELSE YOUR FEELINGS ON THE DEATH PENALTY?
> (4) WITH WHOM?
> (5) HAVE YOUR VIEWS ON THE DEATH PENALTY EVER CHANGED?
> (6) ARE YOU PRESENTLY IRREVOCABLY COMMITTED TO WHAT PENALTY A PERSON CONVICTED OF FIRST DEGREE MURDER SHOULD RECEIVE?
> (7) SHOULD THIS TRIAL ENTER A PENALTY PHASE, WOULD YOU FOLLOW THE COURT'S INSTRUCTIONS AND VOTE FOR THE PENALTY ONLY IF THE STATE HAS PROVED BEYOND A REASONABLE DOUBT THAT THE AGGRAVATING CIRCUMSTANCES OUTWEIGH THE MITIGATING CIRCUMSTANCES AND THAT THE DEATH PENALTY IS THE ONLY APPROPRIATE PENALTY?
> (8) DO YOU BELIEVE THAT ALL PERSONS CONVICTED OF FIRST DEGREE MURDER SHOULD BE PUT TO DEATH?
> (9) UNDER WHAT CIRCUMSTANCE DO YOU FEEL PUTTING SOMEONE TO DEATH IS WARRANTED?
> (10) DO YOU BELIEVE THE DEATH PENALTY IS ORDINARILY PROPER PUNISHMENT FOR THE CRIME OF FIRST DEGREE MURDER?
> (11) IF THE JURY SHOULD CONVICT MR. MENZIES OF FIRST DEGREE MURDER, WOULD YOU BE ABLE TO CONSIDER VOTING FOR A SENTENCE LESS THAN DEATH?
> (12) IS LIFE IN PRISON A SEVERE PENALTY IN YOUR OPINION?
> (13) WHAT DO YOU UNDERSTAND A LIFE TERM IN PRISON TO MEAN?
> (14) WOULD YOU VOTE FOR THE DEATH SENTENCE IN ORDER TO INSURE THAT NO RELEASE FROM PRISON EVER OCCURRED?
> (15) HOW DO YOU FEEL ABOUT OUR CURRENT SYSTEM OF RELEASING CONVICTED PERSONS FROM PRISON ON PAROLE AFTER APPROVAL FROM THE BOARD OF PARDONS?

(16) DO YOU BELIEVE THAT A LIFE SENTENCE COULD ACCOMPLISH THE SAME GOAL OF PREVENTING REPEATED CRIMINAL ACTIVITY IN THE SAME WAY AS THE DEATH PENALTY?

(17) DO YOU SEE ANY CONFLICTS BETWEEN THE DEATH PENALTY AND THE TEACHINGS OF YOUR RELIGION?

(18) WHAT RELATIONSHIP SHOULD THERE BE, IF ANY, BETWEEN WHAT THE VICTIM SUFFERED AND WHAT THE PERSON THAT CAUSED THAT SHOULD SUFFER?

(19) ARE YOU WILLING TO CONSIDER EVIDENCE WHICH MITIGATES IN FAVOR OF A DEFENDANT AND A LIFE SENTENCE SHOULD THIS TRIAL ENTER A PENALTY PHASE?

(20) IF A PERSON WERE TO BE CONVICTED OF FIRST DEGREE MURDER, WHAT INFORMATION WOULD YOU THEN LIKE TO KNOW BEFORE MAKING A DECISION AS TO A PENALTY?

(21) DO YOU BELIEVE A PERSON CAN CHANGE AND BECOME BETTER OVER TIME?

(22) HOW DO YOU FEEL ABOUT THE PSYCHIATRIC PROFESSION?

(23) CAN SOCIAL WORKERS OR PSYCHOLOGISTS HELP PEOPLE CHANGE?

(24) DOES THE FACT THAT QUESTIONS CONCERNING THE DEATH PENALTY HAVE BEEN ASKED RAISE DOUBTS IN YOUR MIND AS TO THE INNOCENCE OR GUILT OF MR. MENZIES?

(25) DO YOU HAVE ANY CONCERNS THAT YOU MIGHT BE CRITICIZED FOR NOT IMPOSING A DEATH PENALTY?

(26) WHAT WOULD YOUR FEELINGS BE ABOUT SERVING ON A JURY WHOSE FUNCTION IS TO TRY A FIRST DEGREE MURDER CASE WHERE IF THE PERSON IS CONVICTED, YOU WILL HAVE TO CONSIDER IMPOSITION OF A DEATH SENTENCE?

[35] *See generally State v. Miller,* 727 P.2d 203, 206 (Utah 1986); *State v. Larocco,* 665 P.2d 1272, 1273 (Utah 1983); *State v. Sessions,* 645 P.2d 643, 647 (Utah 1982) (all holding no error in refusing to grant instruction if point is covered in another instruction).

(b) *Note reader "made up" admonitions, questions, and answers.*

(i) Admonitions. The court reporter did not record some of the judge's admonitions. Instead, she often used asterisks to represent admonitions throughout the transcript. However, Menzies, in his original docketing statement, did not raise the claim that the jurors were subject to improper influences or acted in an improper manner. Many of the judge's admonitions were properly recorded. Furthermore, near the end of the trial, after one juror was exposed to prejudicial information, the trial judge conducted a second individual interrogation of each juror, inquiring whether any of them had been subjected to any outside influence. The record, therefore, is adequate to review any claim relating to admonitions and jury misconduct.

(ii) Questions. There is an indication that either the note reader or Lee failed to record each question as it was asked and simply repeated the question asked of previous jurors. This is apparent because an error in a question concerning capital punishment was repeated throughout the transcript. [36] Beginning with the third prospective juror, each juror was asked, "DO YOU BELIEVE THAT A LIFE SENTENCE COULD ACCOMPLISH THE SAME *GOAL OF REPEATED CRIMINAL ACTIVITY* IN THE SAME WAY AS THE DEATH PENALTY?" The first and second jurors were asked if life imprisonment could accomplish the goal of *preventing* repeated criminal activity. However, no juror appears to have been confused by the question. When a juror's answer involved more than yes or no, it was clear that the juror understood the question. Neither the defense nor the prosecution challenged the propriety or the content of the question. Furthermore, the prospective jurors were given a list of the questions and could read along as the judge asked them. Given these facts, it is likely that the jurors were asked the correct question.

[36] Menzies' contention that some voir dire questions have not been recorded is addressed *infra* notes 40–48 and accompanying text.

Even assuming that this mistake cannot be reconciled, it is not prejudicial. The question is one directed toward capital punishment and is therefore not directly at issue in the case. This is particularly true in this instance, where confusion

occurs only if jurors' answers are limited to yes or no. In addition, there are other appropriate questions which cover the same basic issue. [37] This error, therefore, does not prejudice Menzies' appeal.

[37]      Examples include:
IS LIFE IN PRISON A SEVERE PENALTY IN YOUR OPINION?
WHAT DO YOU UNDERSTAND A LIFE TERM IN PRISON TO MEAN?
WOULD YOU VOTE FOR THE DEATH PENALTY IN ORDER TO INSURE THAT NO RELEASE FROM PRISON EVER OCCURRED?
HOW DO YOU FEEL ABOUT OUR CURRENT SYSTEM OF RELEASING CONVICTED PERSONS FROM PRISON ON PAROLE AFTER APPROVAL FROM THE BOARD OF PARDONS?

(iii) Answers. Close examination of the pertinent prospective juror responses does not reveal any instances where the note reader "made up" actual juror answers. There are a few discrepancies between the original transcript and the court reporter's notes. However, these discrepancies are minor in nature and do not bear upon the substance of the prospective juror's response, [38] and again, a vast majority of these discrepancies occur in questions concerning capital punishment. Given these facts, the discrepancies are not prejudicial.

[38]      A representative example of such a discrepancy is the following: The original transcript reads, "MY WIFE'S NAME IS DOREEN. SHE IS AN ACCOUNTING CLERK WITH EVERETT MEDICAL CENTER," while the court reporter's notes read "University Medical Center."

**\*232**   (c) *Omissions.*

Menzies asserts that the transcript lacks voir dire questions and answers. In support of this contention, he cites to portions of the transcript which deal with individual voir dire. By reason of the fact that the same questions were asked of each juror, it is possible to reconstruct the list of individual voir dire questions and compare the list with the testimony of the pertinent prospective jurors. [39] Such an approach reveals that in voir dire of two pertinent jurors, the transcript does not contain a question asked of all other pertinent jurors. [40] The

individual voir dire questions were read from a prepared list; therefore, it is likely that these questions were asked but not recorded.

[39]      *See supra* note 34.

[40]      The transcription of Spencer Morgan's and Jack Wall's voir dire does not contain question nine, "UNDER WHAT CIRCUMSTANCE DO YOU FEEL PUTTING SOMEONE TO DEATH IS WARRANTED?" Menzies claims that the attorneys, in argument concerning cause, referred to questions that are not found in the transcript. However, his cites do not support this contention.

In arguing that these omissions require a new trial, Menzies relies on *State v. Taylor.* [41] As discussed above, in *Taylor* we ordered a new trial because omissions in the voir dire portion of the transcript rendered the record inadequate for appeal. [42] In reaching this conclusion, we noted that the omissions were extensive, the answers in the record indicated that jurors harbored prejudice, and the omissions occurred in portions of the transcript that directly related to issues on appeal. [43] In the instant case, only one question asked of two jurors was omitted, other questions cover the same basic information, [44] and the question concerns capital punishment and is therefore not directly at issue in the case. Given these circumstances, these omissions are not prejudicial, and the instant case is clearly distinguishable from *Taylor.*

[41]      664 P.2d 439 (Utah 1983).

[42]      *Id.* at 447.

[43]      *Id.* at 445–47.

[44]      Some examples of similar questions are the following:
(10) DO YOU BELIEVE THE DEATH PENALTY IS ORDINARILY PROPER PUNISHMENT FOR THE CRIME OF FIRST DEGREE MURDER?
(11) IF THE JURY SHOULD CONVICT MR. MENZIES OF FIRST DEGREE MURDER, WOULD YOU BE ABLE TO CONSIDER VOTING FOR A SENTENCE LESS THAN DEATH?

(19) ARE YOU WILLING TO CONSIDER EVIDENCE WHICH MITIGATES IN FAVOR OF A DEFENDANT AND A LIFE SENTENCE SHOULD THIS TRIAL ENTER A PENALTY PHASE?

(20) IF A PERSON WERE TO BE CONVICTED OF FIRST DEGREE MURDER, WHAT INFORMATION WOULD YOU THEN LIKE TO KNOW BEFORE MAKING A DECISION AS TO A PENALTY?

Although not cited by Menzies, the following omission in the general voir dire is also worth notice:

THE COURT: HAVE YOU OR MEMBERS OF YOUR FAMILY OR CLOSE PERSONAL FRIENDS EVER BEEN A VICTIM OF A CRIME OF A SIMILAR NATURE AS THOSE WHICH ARE INVOLVED IN THIS CASE? ...

....

THE COURT: DON JACKSON. WOULD THE FACT THAT YOUR NEXT–DOOR NEIGHBOR OR THAT POLICE OFFICER WAS KILLED PREVENT YOU FROM SITTING IN ON THIS CASE AND TRYING THIS CASE ON ITS MERITS?

A JUROR: LAST WEEK I WAS ROBBED IN MY BUSINESS.

THE COURT: DO YOU FEEL YOU CAN LISTEN TO THE EVIDENCE AND THE EVIDENCE ALONE TO REACH A FAIR AND IMPARTIAL VERDICT?

A JUROR: PROBABLY.

THE COURT: OKAY. ANYONE ELSE?

It is clear from this colloquy that there is a gap in the transcript.

Don Jackson was dismissed for cause due to poor hearing. Therefore, the fact that portions of his responses are missing is of no concern. Rather, the difficulty **\*233** is that it is not possible to tell from this portion of the transcript whether the gap incorporates testimony of other jurors. Nonetheless, this gap is not prejudicial.

As noted above, it is possible to identify jurors who were challenged for cause and not dismissed. [45] In the arguments concerning whether these jurors should have been dismissed

for cause, there was no mention of any concerns stemming from their prior experience with violent crime. It is clear, therefore, that Menzies did not object to any juror on any basis related to the missing testimony. In addition, when problems arose in the general voir dire, the jurors were questioned further on the subject in individual voir dire. None of the pertinent jurors were questioned concerning prior experience with violent crime. Thus, the record indicates that the pertinent jurors' testimony did not raise questions concerning their experience with violent crime. Furthermore, although there were no other questions dealing directly with past experience with violent crime, several other questions dealt with the presumption of innocence and prospective jurors' prejudice against criminal defendants. [46] Given these facts, this omission is distinguishable from the omissions in *Taylor* and does not prejudice Menzies' case on appeal. [47]

45    *See supra* section III.B.1.

46    During the general voir dire, the jurors were repeatedly asked if they could "LISTEN TO THE EVIDENCE AND THE EVIDENCE ALONE AND REACH A FAIR AND IMPARTIAL VERDICT." In addition, in the individual voir dire, the jurors were asked if "THE FACT THAT QUESTIONS CONCERNING THE DEATH PENALTY HAVE BEEN ASKED RAISE DOUBTS IN YOUR MIND AS TO THE INNOCENCE OR GUILT OF MR. MENZIES."

47    Omissions present different problems of determining prejudice than other transcript errors. Often, it is not possible to tell how much testimony is missing, and therefore, it is not possible to determine if an appealable issue arose in the unrecorded portion of the proceeding. In dealing with the prejudicial effect of transcript omissions in noncapital cases, courts have focused on whether the omission impacted issues that had been preserved at the trial level and raised on appeal. *See* *Taylor,* 664 P.2d at 445; Seldon R. Shapiro, Annotation, *Court Reporting—Omissions,* 12 A.L.R.Fed. 584, 586 (1987). Such an approach may not be appropriate in capital cases, where we often review errors raised for the first time on appeal. *State v. Holland,* 777 P.2d 1019, 1026 (Utah 1989). In addition, we have "the sua sponte prerogative ... to notice, consider, and

correct [plain] error which is not ... assigned on appeal, but is palpably apparent on the face of the record." *State v. Tillman,* 750 P.2d 546, 552–53 (Utah 1987) (footnote omitted).

There is always a slight possibility that plain error occurred in a portion of the missing transcript. However, this court has never ordered a new trial based on the mere possibility that absent an error, a different result could have occurred. Rather, we will reverse if there is a reasonable likelihood that the error affected the outcome of the proceedings, *State v. Verde,* 770 P.2d 116, 120 (Utah 1989), or when the error affects a federal constitutional right, if there is a reasonable doubt that the error affected the outcome of the proceeding, *State v. Tuttle,* 780 P.2d 1203, 1213 (Utah 1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990). A criminal defendant in a capital case does not have a constitutional right to an independent review of the record for plain error. *See Tillman,* 750 P.2d at 552–53 (independent review of record not mandatory). Therefore, since no objection was made at trial on the basis of this testimony and this omission was not cited by Menzies in this appeal, the omission cannot be the basis for a new trial unless there is a reasonable likelihood that a manifest and palpable error occurred in the missing portion of the transcript. That standard has not been met.

The record is adequate to provide Menzies with a full and fair review of any claim relating to jury selection.

2. Britton Issue

Menzies claims that he is prejudiced by the numerous transcript errors in portions of the record relating to the admission of the preliminary hearing testimony of Walter Britton. Britton was imprisoned in the Salt Lake County jail at the same time as Menzies. At Menzies' preliminary hearing, Britton testified that Menzies had confessed to the murder. However, Britton refused to testify at trial on the ground that he feared reprisals from other inmates. The trial court ruled that Britton was unavailable under Utah Rule of Evidence 804, and his preliminary hearing testimony was read to the jury. In his docketing statement, Menzies asserts that he was denied his right of confrontation due to the fact that he was not able to cross-examine **\*234** Britton on information learned subsequent to the preliminary hearing and the fact that a subpoena served on the State's counsel was quashed. Menzies also claims that the trial court erred in ruling that Britton was unavailable.

The factual basis for these claims is provided through the testimony of Mr. Savage, Britton's attorney. Savage testified at a pretrial hearing and during trial. His testimony concerned Britton's competence and a rule 35 hearing in federal court. In the rule 35 hearing, it was argued that because Britton cooperated in the State's case against Menzies, his federal sentence should be reviewed. One of the prosecuting attorneys testified briefly in this hearing. During the trial, Menzies subpoenaed the prosecutor to testify regarding his participation in the federal hearing. The only other relevant testimony is the reading of the preliminary hearing transcript and Britton's pretrial hearing testimony concerning why he would not testify at trial. Menzies cites more than sixty errors relating to this portion of the transcript. Virtually all of them relate to insignificant grammatical or spelling problems or to mistranscriptions where the actual sense of the testimony is obvious. None of the cited errors prejudice Menzies' ability to pursue his claims on appeal. Nor is there any error significant enough to interfere with an independent review of the trial court's decision.

(a) *Testimony.*

In the relevant testimony, there are instances of discrepancies between the court reporter's notes and the original transcript [48] and instances of inarticulate statements. [49] However, these errors are reconcilable when read in context and/or have no relevance to appellate issues. Nevertheless, Menzies points to this portion of the transcript to illustrate his claim that the transcript prejudices his ability to appeal. Specifically, he claims that confusion in the transcript concerning whether Savage first discussed a rule 35 hearing with prosecutors before or after Menzies' preliminary hearing prejudices his ability to raise issues regarding Britton's motive for testifying in the preliminary hearing. [50]

[48]   The following occurred during the hearing testimony of Britton: "Q. YOU HAVE MAILING PRIVILEGES, DON'T YOU?
A. YES, MA'AM, I DO. Q. YOU ALSO HAVE TELEVISION [court reporter's notes read "telephone"] PRIVILEGES, DON'T YOU?
A. YES, MA'AM, I DO." Although there is a discrepancy in the transcript, the important

information, that Britton had access to news reports concerning the murder, is present in the transcript.

49

Britton also stated:

NO, MA'AM, IT'S NOT. IF I MAY TAKE AND INTERRUPT FOR A MINUTE. *I HAVE TAKEN PLACES ON THE RECORD* THAT I WILL NOT TESTIFY IN THIS HEARING, AND I HAVE LISTENED TO BOTH OF YOU. YOU HAVE TOOK AND PLACED MY LIFE IN DANGER, NOT DIRECTLY BECAUSE OF RALPH MENZIES, BUT BECAUSE OF TESTIFYING IN ITSELF IN THE ENVIRONMENT I LIVE IN, AND I WILL NOT AND I REPEAT WILL NOT SAY ANYTHING MORE BECAUSE IT IS FOR MY OWN HEALTH.

(Emphasis added.) Even assuming that the difficulty with this statement is the result of transcription errors and not the result of Britton's own misstatements, the essential information is preserved for the record.

50

There is also some confusion concerning the date of the second contact between Savage and the prosecutors. Savage's testimony concerning the second contact was as follows:

"Q. WHAT'S THE DATE. A. 7–3–86 [court reporter's notes read "7–30–86"]. Q. WAS THIS PRIOR TO THE RULE 35 HEARING? A. YES, JUST A FEW DAYS." Although there is confusion as to the exact date of this contact, it is clear that it occurred shortly before the rule 35 hearing and after the preliminary hearing. In any event, the exact date of this second contact has no relevance to any appellate issue.

It is true that conflicting dates are given concerning this conversation. In a proffer of proof made to the court, a prosecutor claimed that if Savage testified, he would state that the first time he had contact with the prosecuting attorneys was on May 26, after the preliminary hearing. Savage, in fact, testified that he first had contact with the prosecutors on May 2, prior to the preliminary hearing. Read in context, this conflict is clearly not the result of a transcription error but rather the result of the attorney's confusion as to what evidence Savage would provide. Indeed, confusion as to whether the first discussion occurred before or after the preliminary hearing was **\*235** one of the reasons the trial judge allowed Savage to testify at the hearing. Therefore,

it is clear not only that there is no prejudicial error in the transcript, but also that the transcript supports Menzies' claim that Britton had a motive to testify falsely.

(b) *Argument.*

The vast majority of the errors which Menzies cites do not deal with testimony but rather with arguments held outside the presence of the jury. In fact, of the sixty cited errors, more than fifty deal with argument. It appears that the reporter had more difficulty transcribing argument, where the discussions were more heated. [51]

51

*See infra* note 55.

Errors in transcribing arguments made outside the presence of the jury are of less significance than errors in other portions of the transcript. This is because these arguments are relevant to appeals only in reviewing trial court rulings, reviewing proffers of evidence, and determining what issues were raised in the trial court. In the instant case, Menzies does not cite any errors in the trial court's rulings, and there is no indication that the court's rulings were incorrectly transcribed. Likewise, there are no references to the record or other indications, other than the one instance discussed above, that an error occurred in the transcription of a proffer of evidence. All of the cited errors relate only to whether a particular argument concerning the admission of testimony was not raised at trial and therefore should be reviewed under a plain error standard. [52]

52

*See supra* notes 7–9 and accompanying text.

The errors that occurred in the arguments are similar to the errors that occurred throughout the transcript. There are discrepancies between the original transcript and the court reporter's notes, [53] instances where the attorney's arguments are inarticulate, [54] and instances where there is confusion concerning who is speaking. [55] However, because it is only necessary to determine what issues were being raised, problems with one or two words or statements are more readily reconcilable than errors occurring in other portions of the transcript. This is particularly true in the instant case, where there were three separate arguments concerning the admission of the preliminary hearing testimony. In each hearing, many of the same issues were raised. Given the rather extensive argument, there is no difficulty in determining what issues were presented to the trial court.

53    An example occurred in arguments over whether a prosecuting attorney would have to testify and then be recused from the case. The prosecuting attorney stated: "IT'S RIDICULOUS. IT REALLY IS. I CAN'T USE ANY OTHER WORDS, JUST NOT LEGITIMATE TO SAY, 'HEY, OUGHT TO BE RECUSED [reporter's notes read "REDUCED"].' " It is clear from the context that recused is the correct term. Furthermore, the extensive argument on this point leaves no doubt as to what the parties' positions were on this subject.

54    An example is a statement by Menzies' counsel: "SO WE WOULD FURTHER HAVE FIRST OF ALL INDICATED TO THE COURT THAT HE WAS NOT UNAVAILABLE." The meaning of this statement is clear.

55    In one instance, the court reporter's notes did not identify who was speaking and the note reader inserted the names of the speakers. This type of problem is unusual and may be related to the contentious nature of the argument. However, read in context it is possible to tell who is actually speaking. In any event, understanding this specific exchange is not necessary to determine what issues were being raised:

> IN YOUR SITUATION, YOURS WAS AN ARGUMENTATIVE ADVOCACY ROLE OR ACTIVE ROLE ON BEHALF OF A PARTICULAR CLIENT WHOSE CREDIBILITY IS IN QUESTION. THEY ARE TWO—ENTIRELY DIFFERENT THINGS, RICK, AND I CAN CERTAINLY PROVIDE YOU WITH THE CASES THAT—IN WHICH COUNSEL HAVE BEEN PLACED IN THAT POSITION, AND YOU CAN SEE WHAT THOSE ARE.
> [Note reader inserts "MR. JONES:"] BUT THAT'S THE ENTIRE PURPOSE FOR YOUR RIGHT. EVERYBODY WOULD BECOME A WITNESS WHO INTERVIEWS ANYONE UNDER THOSE CIRCUMSTANCES. [Possible change of speaker not indicated in transcript.] THESE TWO SITUATIONS ARE ENTIRELY DIFFERENT. AND YOUR CREDIBILITY BECOMES AT ISSUE. MS. WELLS: MR. JONES—[added by note reader].

> MR. JONES: OH, GOD, THIS IS ABSURD.
> MS. WELLS: YOUR LAUGHING IS INTERRUPTING.

**\*236**   Menzies, however, points to a specific error in this portion of the transcript as illustrative of how the transcript prejudices his case on appeal. In a hearing held before trial, there was some confusion concerning what rule of evidence the attorneys were arguing. It appears from the context of the hearing that the attorneys were discussing rule 804(a). However, regardless of what rule was being argued, Menzies is not prejudiced by this confusion. The purpose of the hearing was to establish if Britton must be brought into court to determine if he would not testify. The court ruled in favor of Menzies. Therefore, any error in the transcription of this hearing does not impact Menzies' appeal.

None of the errors relating to the admission of Britton's preliminary hearing testimony are prejudicial.

3. Specific Errors

A section of Menzies' brief is devoted to establishing that specific transcription errors prejudice his ability to raise particular claims on appeal. Specific errors which deal with voir dire or the admission of Britton's preliminary hearing testimony have been addressed above. The remaining errors deal with the transcription of numbers, the penalty phase, and the swearing of witnesses. However, when these errors are viewed in the context of the testimony and in the context of the specific appellate issue, it is clear that they are not prejudicial. Indeed, this section is particularly illustrative of how minor transcription errors and discrepancies will generally have very little impact on appeal.

(a) *Numbers.*

Throughout the transcript, it appears that the court reporter had particular difficulty in transcribing numbers. Therefore, there is often confusion concerning addresses, distances, and dates. Menzies claims that these errors prejudice his ability to raise claims concerning the admission of identification cards belonging to the victim, the identification of Menzies as a man seen near the location where the victim's body was found, sufficiency of the evidence to convict Menzies of robbery and kidnaping, and an unspecified claim regarding statements Menzies made to police officers. Each claim will be addressed separately.

(i) Admission of identification cards. During the trial, the victim's social security card, found among Menzies' possessions, and three other identification cards belonging to the victim, found at the Salt Lake County jail, were admitted into evidence. Menzies objected at trial to the admission of all the cards. However, in his docketing statement he claims only that the court erred in the admission of the social security card on the ground that it contained inadmissible hearsay. In this appeal, he claims that discrepancies concerning dates and a stipulation prejudice his ability to pursue claims concerning the admission of these cards.

At the time of the murder and prior to his arrest, Menzies was living with Nicole Arnold. After Menzies' arrest but before trial, Arnold met and married Rodney Duffy. When Duffy was moving Arnold's possessions into his house, he found the victim's social security card. He took the card to Arnold's mother, Janet Franks, who phoned the police. The police arrived and took possession of the card. This all occurred on the same day the card was found.

At trial, the State called the victim's husband, who identified the social security card, Duffy, Franks, and the police officer who took possession of the card. In cross-examination of Franks, Menzies emphasized that Franks was confused as to the year she received the social security card. The discrepancy which Menzies claims prejudices his appeal occurred during this questioning.

Menzies' counsel asked, "WAS THE CARD GIVEN TO YOU SOMETIME IN 1986 [court reporter's notes read "1987"], BEING SEVERAL MONTHS AGO, OR WAS IT GIVEN TO YOU IN 1987 [court reporter's notes read "1986"], UP TO A YEAR AND SOME MONTHS AGO?" This line of questioning continued until Franks stated that she had no idea what year she received the social security card.

**\*237** This discrepancy is not prejudicial. The context of the sentence itself establishes the correct dates. The transcript clearly contains the information the question was designed to elicit—that the witness did not remember what year she received the social security card. The police officer who took custody of the card testified that he received the card in 1986. Furthermore, the error does not relate to Menzies' claim that the card contains inadmissible hearsay.

The discrepancy relating to the admission of the other identification cards is similarly insignificant. During Menzies' booking process, he suddenly broke away from the jailers and ran into a dressing room. He was alone in the dressing room for several seconds. Later that day, a jail employee, Jay Smith, found three identification cards belonging to the victim in a hamper in the dressing room. Not realizing the significance of the cards, Smith placed them in a drawer in the room. A few days later, a jailer, Officer Valdez, recovered the cards.

At trial, the State called the jailers who booked Menzies into jail, Smith, and Valdez. Menzies' attorney asked Valdez how he was sure he found the cards after February 24, the date Menzies was booked into jail. Valdez testified that he could refer to his work schedule, particularly the type of duties which he performed, to help him remember the approximate date on which he recovered the cards. The discrepancy which Menzies claims prejudices his appeal occurred in the follow-up questions: "Q. DID YOU WORK ON THE 26TH [court reporter's notes read "22nd"] OF FEBRUARY? A. NO, MA'AM." Menzies claims that this discrepancy makes it impossible to determine if Valdez discovered the cards before or after Menzies was booked.

However, given Valdez's testimony that he remembered the approximate date on which he found the cards by recalling the type of duties he performed that day, the exact dates on which Valdez did not work are not highly relevant. The transcript clearly establishes that Valdez testified that he found the card after the 24th. Smith testified that he found the card on the 24th. Furthermore, Menzies did not ask the trial judge not to admit the cards because Valdez found them before Menzies was booked. Nor was any such argument made to the jury. Finally, even assuming that a transcription error prejudices Menzies' ability to raise claims concerning the admission of the cards found at the jail, this should not result in a new trial. Given the strong evidence of guilt and the admission of the victim's other identification cards, any error in the admission of these cards would be harmless.

Menzies' claims that a discrepancy in a stipulation as to how long the booking process lasted is prejudicial. He contends that a shorter booking process would establish that he did not have time to hide the cards in the hamper. However, no such argument was ever raised at trial. The testimony of several jailers established that Menzies was alone in the dressing room for a few seconds. The length of the booking process does not impact on the length of time Menzies was alone in the dressing room. In any event, it is clear from the transcript that the stipulation in question does not purport to establish what time the booking process was completed.

(ii) Identification of Menzies. Tim Larabee was at Storm Mountain, where the victim's body was found, during the time the victim was missing and before her body was discovered. He testified that he twice saw a man and a woman walking together, heard a scream, and then saw the man leave alone. At trial, Larabee identified the man as Menzies.

In the transcript, there is a discrepancy concerning whether Larabee first saw the man and the woman from a distance of twenty or fifty yards. However, this discrepancy is easily reconcilable. When asked the same question on cross-examination, Larabee stated that the distance was fifty yards. In any event, the distance from which Larabee first viewed the man is not particularly relevant. Larabee did not see the man's face until he saw the man for the third time.

**\*238** There is also a discrepancy concerning the date on which a composite drawing was prepared from Larabee's description. This discrepancy, however, is resolved by comparing the testimony of Larabee and the police officer who prepared the drawing. No motion was ever made to suppress the identification, and no claim concerning the identification was presented in Menzies' docketing statement.

(iii) Insufficient evidence of kidnaping and robbery. At trial and in his docketing statement, Menzies maintains that there was insufficient evidence to convict him of kidnaping and robbery, the convictions used to elevate the homicide to first degree murder. Menzies claims that a discrepancy concerning the amount of money taken from the gas station prejudices this claim. However, the discrepancy did not occur in the testimony but rather in the State's closing argument. The prosecutor stated, "THAT FINAL AUDIT DETERMINED THAT THERE WAS SOMEWHERE BETWEEN $115 [court reporter's notes read "$114"] AND $116 MISSING.... AND IT WAS CERTAINLY A FIGURE REMARKABLY CLOSE TO THE $115 WHICH MR. DENTER TESTIFIED TO WHEN HE SAID HE REMOVED THAT AMOUNT CONCEALED IN AN UMBRELLA AT THE DEFENDANT'S RESIDENCE." Because this discrepancy does not concern evidence but rather the prosecutor's closing argument and because there was confusion in the evidence concerning the exact amount of money at issue, this discrepancy is not prejudicial.

(iv) Menzies' statement to the police. The State called Officer Thompson, who testified about an interview he had with Menzies concerning Menzies' whereabouts the night the victim disappeared. Thompson testified that Menzies told him

that on the night in question, he picked up a woman who was hitchhiking. Menzies and the hitchhiker drove around for a while and talked, and then he took the hitchhiker to his house. At approximately 2:30 a.m., Arnold, Menzies' girlfriend, phoned from a trailer park and asked Menzies to take her home. Menzies and the hitchhiker picked up Arnold and returned to Menzies' house, where Arnold and the hitchhiker had a fight. Menzies and the hitchhiker left the house, drove around, and got stuck in the mud. The hitchhiker left Menzies at this point, and Menzies returned home to Arnold.

Menzies claims that he is prejudiced by discrepancies in the date on which the interview took place, the location where he picked up the hitchhiker, and the location where the car got stuck in the mud. However, he does not identify what claim these discrepancies prejudice. Menzies did not object to the admission of this evidence.[56] In fact, during cross-examination, Menzies' counsel attempted to bolster Menzies' story. Given the fact that this evidence supported Menzies' case, an erroneous ruling admitting this evidence cannot be prejudicial. Furthermore, this evidence conflicts with other evidence which supports the jury's verdict. Therefore, an appellate court would not consider this evidence in ruling on an insufficient evidence claim.[57] Thus, no transcription error in this portion of the transcript could possibly prejudice Menzies' appeal.

56    Menzies objected and moved for a mistrial on the ground that Thompson testified that the next day, Menzies went to the parole office. However, Menzies does not claim that transcription errors prejudice his ability to pursue this claim.

57    *See, e.g., State v. Warden,* 813 P.2d 1146, 1150 (Utah 1991).

In any event, the relevant content of this testimony is preserved in the transcript. The exact date on which the interview took place is insignificant, and from the context of the testimony, it is clear that the interview took place between February 23 and February 29. On cross-examination, it was established that Menzies picked up the hitchhiker at a location near Mark's Lounge, a club where the victim had a membership. The location in which Menzies claims to have been stuck in the mud is of no consequence. The relevant information—that Menzies has an explanation for **\*239** the mud found on and in the car—is in the transcript.

(b) *Penalty phase.*

Menzies asserts that transcription errors in the penalty phase prejudice his ability to claim that the death penalty was improperly imposed, a claim that Menzies raises in his docketing statement. However, the errors Menzies cites are either reconcilable or inconsequential. The transcript is thus sufficient for this court to review the penalty phase and determine if the " ' sentence resulted from prejudice or arbitrary action or was disproportionate.' " [58]

58

🔖 *State v. Holland,* 777 P.2d 1019, 1026 (Utah 1989) (quoting 🔖 *State v. Pierre,* 572 P.2d 1338, 1345 (Utah 1977)).

A discrepancy occurred in transcribing the testimony concerning the qualifications of a defense expert witness. There is confusion as to whether the witness based a pilot study on one or one hundred patients. It would seem clear that a pilot study would be based on more than one patient. However, even assuming the error cannot be reconciled, it is insignificant. The discrepancy involves only one question, and the questioning concerning the witness's qualification was extensive, covering over nine transcript pages. The record clearly establishes that the witness was qualified to testify as an expert.

There are also discrepancies in the testimony concerning Menzies' I.Q. percentile. However, other portions of the record indicate that Menzies was functioning in the "average range of intellectual functioning." Testimony concerning a diagnosis contained in a psychological evaluation Menzies underwent as a juvenile is unintelligible. However, the transcript can be reconciled by referring to the evaluation, which was entered into evidence. In any event, the important information—that Menzies' expert witness's opinion differs from the opinion expressed in the evaluation—is present in the record.

While there are other errors in the penalty phase, the basic information Menzies offered at trial is present in the record and adequate to review his claims.

(c) *Swearing in of witnesses.*

Menzies claims that because the court reporter used asterisks to represent the swearing in of witnesses, it is impossible to tell if the witnesses were sworn. [59] However, the use of symbols to represent redundant occurrences such as the swearing in of a witness is simply a method of shorthand. Although Menzies cites to the transcript to support his claim, both the transcript and the court record indicate that the witnesses were properly sworn. Furthermore, there was no claim at trial or in the docketing statement relating to the swearing of witnesses.

59

Menzies also claims that the names of three witnesses who the court reporter indicated were sworn when the exclusionary rule was invoked are not included in the transcript. However, Menzies' cite does not support this contention.

It is evident from the record that none of the errors cited by Menzies as prejudicial substantially affect his ability to appeal his conviction or sentence.

4. Plain Error

Menzies also claims that he is prejudiced because the transcription errors prevent appellate counsel or the supreme court from adequately reviewing the record for plain error. Implicit in this argument is the assertion that because it is so difficult to determine how transcription errors affect a review for plain error, Menzies should not be required to establish which transcription error prejudices such a review. This assertion is without merit.

The only added difficulty in determining whether a mistake in the transcript prejudices a claim of plain error, as opposed to an error that has been properly preserved, is determining what appellate issue the transcription error impacts. However, unless the transcript is so inarticulate that it is impossible to tell what evidence is being offered or what issue is being argued, it is always possible to determine what appellate claims a transcription error impacts by viewing the error in the context of the **\*240** relevant passage. This is particularly true in case of plain error, where the error must be both harmful and obvious. [60]

60

*See supra* notes 7–9 and accompanying text.

It is true that a record could be so severely affected by transcription errors that it would be impossible to ascertain what arguments are being made or what evidence is being offered. However, a review of the entire record reveals no instance where it is impossible to determine what conceivable appellate issues are impacted by specific errors. Since transcription errors of such a magnitude that might render significant portions of the record inarticulate would be

obvious in nature, it is clear that the condition of the record does not prevent review for plain error.

Indeed, there is only one instance where due to a transcription error, plain error might have occurred. During the testimony of the medical examiner, a juror fainted. The transcript reads as follows:

DR. SWEENEY, DID YOU FIND ANYTHING ELSE DURING YOUR INTERNAL EXAMINATION?

THE COURT: LETS CALL A RECESS HERE. JUST A MOMENT.

HAVE THEM TAKE THE JUROR OUT. ONE JUROR FAINTED.

(TAKING THE JUROR OUT.)

MR. JONES: JUDGE WITH REFERENCE TO WHICH EXHIBIT IS IT? IT'S THE IDENTIFICATION OF MAUREEN HUNSAKER. THE DEFENSE APPARENTLY OBJECTED ON THE GROUNDS THEY FELT THERE WAS MORE FOUNDATION REQUIRED....

MS. WELLS: EXCUSE ME, JUST A MINUTE, I DIDN'T MEAN TO INTERRUPT, BUT THE DEFENDANT IS NOT HERE.... HE NEEDS TO BE PRESENT YOUR HONOR....

MR. JONES: WE CAN MAKE THE ARGUMENT, AGAIN.... I JUST THOUGHT MAYBE WE CAN RESOLVE THIS, SOME OF THIS STUFF.

THE COURT: WHAT PARTICULARLY HAPPENED DURING THE JURORS—DURING THE COURSE OF THE TRIAL. RICK WOULD BE A LITTLE MORE SUBTLE OR SOPHISTICATED.

WE WILL RECESS UNTIL 2:00 P.M.

(RECESS UNTIL 2:00 P.M.)

After the recess, the juror who fainted was brought into court and explained that she fainted due to the nature of the testimony and the fact that she had not eaten. She also stated that she had eaten lunch, remembered the medical examiner's testimony, and was able to continue.

It is clear that an omission occurred in this portion of the transcript. It is also clear that some discussion was held at this

point. Nonetheless, any prejudice Menzies suffers because of this error can be cured.

All of the medical examiner's testimony is present in the record. Also, the court's discussion with the juror who fainted is properly recorded. [61] Therefore, the error only impacts a discussion held outside the presence of the jury. Although the court's statement is unintelligible, the statements of the prosecutor indicate that no ruling was made and the issues discussed were reargued later in the proceedings. Therefore, it would appear that Menzies suffered no prejudice from this omission. Indeed, there is no contention that anything of significance occurred at this point in the proceedings.

[61]      The record is sufficient to review any claim concerning the effect one juror's fainting had on the other members of the jury. *See supra* section III.B.1(b)(i) (relating to the omission of admonitions).

In any event, it is possible to cure the fact that some of the arguments are missing without ordering a new trial. All that is necessary to insure that Menzies in not prejudiced by this omission is to review any claim that could have conceivably been raised at this point as though it had been properly preserved. [62]

[62]      *See supra* notes 7–9 and accompanying text.

Given the fact that no prejudicial transcription error has been identified, the trial court did not abuse its discretion in ruling that the transcript was adequate for an appeal. The record is sufficient to proceed **\*241** with an appeal on the merits. If, in the context of discussing specific appellate issues, Menzies can demonstrate that a transcription error prejudices his case, it would be proper to grant him a new trial at that time. However, absent an indication that errors prejudice his ability to raise or identify appellate issues, the existence of transcription errors alone does not justify a new trial.

## IV. CONSTITUTIONAL CLAIMS

Menzies argues that several provisions of the state and federal constitutions prohibit the use of either transcript on appeal.

Specifically, he claims that the use of the transcripts interferes with his ability to appeal his death sentence and therefore violates his right to be free from cruel and unusual punishment

under the eighth amendment of the federal constitution and his right to due process of law under the fourteenth amendment of the federal constitution. It is true that the eighth and fourteenth amendments require states which impose capital punishment to develop a sentencing scheme that genuinely narrows the class of persons upon whom the death penalty can be imposed and provides a meaningful basis for distinguishing the cases in which an individual is sentenced to death. [63] It is also true that in states such as Utah, where the fact finder weighs aggravating and mitigating factors in the decision to impose the death penalty, a "meaningful appellate review" of the penalty phase has been held to be an essential component of the sentencing scheme. [64] However, since none of the transcription errors prejudice Menzies' appeal, use of the transcripts does not deprive him of a "meaningful appellate review." Accordingly, use of the transcripts on appeal will not violate his rights under the eighth amendment or the due process clause of the fourteenth amendment.

63
    *Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976); *Furman v. Georgia,* 408 U.S. 238, 293–95, 92 S.Ct. 2726, 2754–55, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring); *State v. Wood,* 648 P.2d 71, 77 (Utah 1981), *cert. denied,* 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982).

64
    *Parker v. Dugger,* 498 U.S. 308, 111 S.Ct. 731, 739, 112 L.Ed.2d 812 (1991).

In a separate argument, Menzies claims that the transcription errors limit his ability to appeal and therefore the use of the transcripts will deprive him of his right to equal protection under the fourteenth amendment of the federal constitution. Utah law affords persons sentenced to death the right to an appeal and the right to the use of a transcript on appeal. [65] The right of appeal is a fundamental right. Therefore, Menzies has a federal constitutional right under the equal protection clause of the fourteenth amendment to the use of a transcript. [66] However, there is no constitutional right to a perfect transcript. Rather, criminal defendants have the right to a "record of sufficient completeness to permit proper consideration of [their] claims." [67] As noted above, the transcription errors in the instant case do not prevent "proper consideration of [Menzies'] claims." Therefore, use of the transcripts does not violate equal protection.

65
    *See* Utah Const. art. I, § 12; Utah Code Ann. § 76–3–206(2).

66
    *See, e.g., Griffin v. Illinois,* 351 U.S. 12, 18–19, 76 S.Ct. 585, 590–91, 100 L.Ed. 891 (1958); *Dowd v. United States,* 340 U.S. 206, 208–10, 71 S.Ct. 262, 263–64, 95 L.Ed. 215 (1951).

67
    *Draper v. Washington,* 372 U.S. 487, 499, 83 S.Ct. 774, 780–81, 9 L.Ed.2d 899 (1963).

Menzies argues that the condition of the transcripts prevents defense counsel from adequately reviewing the record and therefore denies Menzies' sixth amendment right to assistance of counsel. It has already been determined that the transcription errors do not interfere with appellate counsel's review of the record. Therefore, this claim also fails.

In addition to claims under the federal constitution, Menzies also argues that the use of the transcripts will violate numerous provisions of the state constitution. However, at no time in the proceeding has Menzies provided any analysis for this assertion, other than arguing that in certain **\*242** circumstances state constitutions may provide greater protections to criminal defendants than the federal constitution. Therefore, these claims will not be addressed. As we have previously stated, "[T]he mere mention of a claim of error ... is not necessarily enough, even in death cases, to require that we engage in a full-blown analysis of the claim. Unless the error is manifest on the record, not only must it be raised, but an argument must be briefed." [68]

68
    *State v. Lafferty,* 749 P.2d 1239, 1247 n. 5 (Utah 1988) (habeas corpus granted on other grounds in *Lafferty v. Cook,* 949 F.2d 1546 (10th Cir.1991)).

Menzies' final claim is based on the assertion that the prosecutor supplemented the record without his knowledge or consent. He claims that this violated several provisions of the federal constitution. However, the State has stipulated to the removal of the prosecutor's comments. Therefore, the ex parte supplementation of the record is harmless and does not constitute grounds for a new trial. [69]

69

*See* *State v. Tuttle,* 780 P.2d 1203, 1213 (Utah 1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990).

We conclude that the trial court did not abuse its discretion in denying the motion for a new trial. We therefore order Menzies to proceed with the appeal on the merits. As noted above, in the appeal on the merits Menzies may attempt to demonstrate how certain transcription errors prejudice his appeal. Furthermore, due to the omission which occurred during the medical examiner's testimony, we will review any claim that conceivably could have been raised at that point as though it was properly preserved. Other than this

one instance, the transcription errors do not impact Menzies' appeal.

Affirmed.

HOWE, Associate C.J., and DURHAM and ZIMMERMAN, JJ., concur.

STEWART, J., dissents.

**All Citations**

845 P.2d 220

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# Addendum B

KeyCite Red Flag - Severe Negative Treatment
Superseded by Constitutional Amendment as Stated in   Rutherford v.
Talisker Canyons Finance, Co., LLC,   Utah,   June 27, 2019

KeyCite Overruling Risk - Negative Treatment
Overruling Risk   Crawford v. Washington,   U.S.Wash.,   March 8, 2004

889 P.2d 393
Supreme Court of Utah.

STATE of Utah, Plaintiff and Appellee,

v.

Ralph LeRoy MENZIES, Defendant and Appellant.

No. 880161.
|
March 29, 1994.
|
Rehearing Denied July 20, 1994.

**Synopsis**

Defendant was convicted in the District Court, Salt Lake County, Raymond S. Uno, J., of capital murder and he was sentenced to death. Defendant appealed. The Supreme Court, Zimmerman, C.J., held that: (1) to prevail on claim of error based on failure to remove juror for cause, defendant must demonstrate prejudice; (2) even if trial court erred in failing to remove prospective jurors whom defendant found objectionable, error was harmless; (3) preliminary hearing testimony of defendant's cell mate was admissible under former testimony exception to hearsay rule; and (4) failure of trial judge to make written findings during penalty phase that prior bad acts evidenced by material found in defendant's prison file had been proven beyond a reasonable doubt was harmless error.

Affirmed.

Stewart, Associate C.J., filed a concurring and dissenting opinion.

**Attorneys and Law Firms**

**\*396**  R. Paul Van Dam, Atty. Gen., J. Frederic Voros, Jr., Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Brooke C. Wells, Joan C. Watt, Richard G. Uday, Salt Lake City, for defendant and appellant.

**Opinion**

ZIMMERMAN, Chief Justice:

Ralph LeRoy Menzies appeals his 1988 jury conviction for capital murder and the trial court's subsequent imposition of the death penalty. Menzies raises numerous claims of error in the guilt and penalty phases of his trial, including (i) failure to remove five jurors for cause; (ii) failure to grant a mistrial following "surprise" testimony; (iii) admission of preliminary hearing testimony of a jailhouse informant; (iv) consideration of a heinousness aggravating circumstance during the penalty phase; (v) admission of victim impact evidence during the penalty phase; and (vi) use of the incorrect standard in sentencing Menzies to death. We affirm the conviction and sentence.

As background, we recite those facts that are largely undisputed. At approximately 9:50 p.m. on Sunday, February 23, 1986, Salt Lake County Sheriff's deputies were dispatched to the Gas-A-Mat station located at 3995 West 4700 South. The deputies found customers waiting to pay, but the cashier's booth empty and the door locked. The station attendant, Maurine Hunsaker, was missing, although her coat was still in the booth and a radio was playing. A preliminary accounting indicated that approximately $70 in cash was missing from the register. [1]

[1]   An area manager for Gas-A-Mat later conducted a more thorough accounting and determined that approximately $116 in cash was missing.

At approximately 11:05 that same night, Maurine telephoned her husband, Jim, at their home. Deputy Scott Gamble was with Jim at the time. Maurine told her husband that she had been robbed and kidnapped, but that her abductor(s) intended to release her sometime that night. Deputy Gamble also spoke with Maurine, and she again indicated that a robbery had occurred. However, Deputy Gamble was unable to get a clear answer regarding the kidnapping. Maurine also refused, or was unable, to answer Gamble's question regarding her location. When Jim again spoke with his wife, she asked him what she should do. The line then went dead.

At approximately 5 p.m. on Tuesday, February 25, 1986, a hiker discovered Maurine Hunsaker's body at the Storm Mountain picnic area in Big Cottonwood Canyon. She had been strangled and her throat cut. Her purse, which had not been found at the gas station, was not with the body or in

the immediate area. That same evening, a jailer at the Salt Lake County Jail found several identification cards belonging to Maurine Hunsaker in a desk drawer in one of the jail's changing rooms. He recognized the picture on the driver's license as a woman reported missing the night before on television news.

Detectives later determined how the cards got into the drawer. Menzies had been booked into the jail on unrelated charges at approximately 6:40 p.m. on Monday, February 24, 1986. He left the booking area for a short time without supervision and was found in a changing room. Shortly thereafter, Maurine Hunsaker's identification cards were found in a clothing hamper in that room. Unaware of the kidnapping, the officer who found the cards placed them in the desk drawer where the jailer found them Tuesday night.

Also on Tuesday evening, a high school student named Tim Larrabee was watching the news and learned that a hiker had discovered a woman's body at Storm Mountain. On Wednesday, Larrabee notified deputies that he and his girlfriend, Beth Brown, had skipped school on Monday, February 24th, and were at Storm Mountain. Larrabee had **\*397** noticed a full-sized, two-door, late-1960s model, cream-colored automobile in the parking lot. He said that the vehicle was similar in appearance to a 1968 Buick Riviera. Larrabee and Brown also saw a man and woman at the site but saw nothing unusual happening between the two. They later heard a short scream, but Larrabee thought that the woman had slipped or had been frightened by an animal. Approximately fifteen minutes later, Larrabee saw the man walking alone. Neither Larrabee nor Brown saw the woman again.

Larrabee described the suspect as a white male, 25-30 years of age, 6'1″ tall, with a medium build (approximately 170 pounds), black, curly hair, prominent sideburns and a mustache, and wearing wire-rimmed glasses. A detective created a composite drawing of a possible suspect based on this description. After learning that Maurine's identification cards had been found at the jail, sheriff's detectives compared the composite drawing with the photographs of more than two hundred inmates who had been booked into the facility from February 23rd through the 25th. Three photographs were chosen as possible matches, including that of defendant Menzies.

Detective Jerry Thompson questioned Menzies regarding the Hunsaker homicide. Menzies said that on Sunday, February

23rd, he borrowed a car from Troy Denter and picked up a young woman on State Street that evening. He told the detective that while with this woman, he picked up his girlfriend, Nicole Arnold, and drove around until the two women began to argue. Menzies reportedly dropped off Nicole and then left the unidentified woman somewhere around 7200 West and 2400 South. According to Menzies, he then went home, where he talked with Nicole.

On February 28th, detectives questioned Denter. He told them he loaned his cream-colored 1974 Chevrolet to Menzies on Sunday, February 23rd, sometime in the afternoon. He said that Menzies did not return the car until the afternoon of Monday, February 24th. Detectives then took Larrabee and Brown to the jail parking lot, where they identified Denter's car as the one they saw at Storm Mountain. They were also shown a photospread consisting of six photographs. Larrabee indicated that Menzies appeared to be the man he saw at Storm Mountain. Several months later, however, Larrabee did not correctly identify Menzies in a lineup.

Detectives found Maurine Hunsaker's fingerprint in Denter's car and located her purse in Menzies' apartment. Menzies was charged with first degree murder, a capital offense. *See* 📙 Utah Code Ann. § 76-5-202.[2] After the charges were filed, Walter Britton, Menzies' cell mate, contacted detectives about the homicide. Britton said that on February 27th, Menzies told him that he killed Hunsaker to prevent her from testifying against him.

2

> The current version of 📙 section 76-5-202 substitutes the term "aggravated murder" for murder in the first degree.

Following a month-long trial, a jury convicted Menzies of capital homicide and aggravated kidnapping. After Menzies waived the jury in the penalty phase, the trial judge sentenced him to death. Menzies then moved for a new trial, arguing that errors in recording and transcribing made the record inadequate for purposes of appellate review. The trial court denied the motion, and this court affirmed, ordering Menzies to proceed with the appeal on the merits. *State v. Menzies,* 845 P.2d 220 (Utah 1992). We now address Menzies' contentions.

Menzies' first issue on appeal deals with the jury selection process. He claims that the trial court should have removed four jurors for cause because of their attitudes regarding the death penalty and a fifth because that juror was unable to be impartial during the guilt phase of the trial. Menzies removed

all five by peremptory challenge. He now asserts that the trial court committed reversible error by forcing defense counsel to use a peremptory strike to remove potential jurors when the trial court should have removed those jurors for cause. Menzies makes no attempt to demonstrate that the forced use of any of these peremptory challenges was harmful. Instead, he relies **\*398** on the automatic reversal rule of *Crawford v. Manning,* 542 P.2d 1091 (Utah 1975), and its progeny. Under these cases, reversal is required whenever a party is compelled "to exercise a peremptory challenge to remove a panel member who should have been stricken for cause." *State v. Bishop,* 753 P.2d 439, 451 (Utah 1988); *see also Crawford,* 542 P.2d at 1093.

  The State, on the other hand, asks us to overturn the *Crawford* line of cases and follow the approach utilized by a majority of the states and upheld by the federal courts. Those following the majority approach "reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988). "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the [Constitution] was violated." *Id.* (citing *Hopt v. Utah,* 120 U.S. 430, 436, 7 S.Ct. 614, 616, 30 L.Ed. 708 (1887)). To prevail on a claim of error based on the failure to remove a juror for cause, a defendant must demonstrate prejudice, *viz.,* show that a member of the jury was partial or incompetent. *See id.,* 487 U.S. at 89, 108 S.Ct. at 2278. We agree with the State and overrule *Crawford* and its progeny.

We note at the outset that *Crawford* 's per se rule is a relatively recent development in Utah law. Utah case law dating back to territorial times did not presume prejudice when a trial court erroneously failed to remove a prospective juror for cause and forced a party to use a peremptory challenge. For example, in *People v. Hopt,* 4 Utah 247, 9 P. 407 (1886), *aff'd,* 120 U.S. 430, 442, 7 S.Ct. 614, 620, 30 L.Ed. 708 (1887), an early death penalty case, the defendant complained that he was prejudiced because the court had failed to excuse three jurors for cause. The defendant did not exhaust all of his peremptory challenges, and one of the three challenged jurors sat on the jury. On appeal, this court held:

[A] perfect answer to the point raised is that of the three jurors challenged two were not sworn. One was challenged peremptorily by the defendant, and one by the people. Whether, therefore, the challenges were properly denied or not, they did not sit as jurors; the defendant was not prejudiced by the ruling.

*Id.* 9 P. at 408; *see also Van Wagoner v. Union Pac. R.R.,* 112 Utah 189, 186 P.2d 293, 298-99 (1947); *State v. Cano,* 64 Utah 87, 228 P. 563, 568 (1924); *State v. Thorne,* 41 Utah 414, 126 P. 286, 291 (1912). As for the challenged juror who actually sat, this court recognized that the defendant still had peremptory challenges remaining and held that until the defendant exhausted his peremptory challenges he could not complain about the composition of the jury. *Hopt,* 9 P. at 408; *see also State v. Wetzel,* 868 P.2d 64, 66-67 (1993); *State v. Wood,* 868 P.2d 70, 76 (1993).

*Hopt* remained the rule in Utah until our 1975 *Crawford* decision. In *Crawford,* a civil case, the plaintiffs exercised one of their three allotted peremptory challenges to remove a panelist whom the trial court should have removed for cause. Although six of eight jurors would have been sufficient to return a verdict and the jury unanimously found against the plaintiffs, this court refused to conclude that the error was harmless. *Crawford,* 542 P.2d at 1093. In reversing the jury verdict, Justice Ellett asserted, "By exercising one of their peremptory challenges upon this prospective juror, plaintiffs had only two remaining. The juror which remained because the plaintiffs had no challenge to remove him may have been a hawk amid seven doves and imposed his will upon them." *Id.* Interestingly, Justice Ellett made this assertion even though the plaintiffs did not complain that any of the jurors who sat were biased or prejudiced against them.

  Those asking us to overturn prior precedent have a substantial burden of persuasion. *See State v. Hansen,* 734 P.2d 421, 427 (Utah 1986). This burden is mandated by the doctrine of stare decisis. In *State v. Thurman,* 846 P.2d 1256 (Utah 1993), we discussed stare decisis in the context of multiple

panels of the court of appeals and emphasized the importance of its observance:

> **\*399** This doctrine, under which the first decision by a court on a particular question of law governs later decisions by the same court, is a cornerstone of the Anglo-American jurisprudence that is crucial to the predictability of the law and the fairness of adjudication.

*Id.* at 1269.

In *Thurman,* we made it clear that the doctrine applies as between different panels of the court of appeals. *Id.*[3] Certainly the doctrine also applies to a court of last resort, such as a state supreme court. Nevertheless, we wish to make clear that the doctrine is neither mechanical nor rigid as it relates to courts of last resort. *See* 🔖 *Staker v. Ainsworth,* 785 P.2d 417, 423-24 (Utah 1990); 🔖 *American Fork City v. Crosgrove,* 701 P.2d 1069, 1071-75 (Utah 1985).

[3]   We note that the doctrine of stare decisis, as it applies to a court of appeals, has two facets. Vertical stare decisis, the first of these two facets, compels a court to follow strictly the decisions rendered by a higher court. *See* 🔖 *Jaffree v. Board of School Comm'rs,* 459 U.S. 1314, 1316, 103 S.Ct. 842, 843, 74 L.Ed.2d 924 (Powell, Circuit Justice 1983); *In re Marriage of Thorlin,* 155 Ariz. 357, 362, 746 P.2d 929, 934 (Ct.App.1987). Under this mandate, lower courts are obliged to follow the holding of a higher court, as well as any "judicial dicta" that may be announced by the higher court. *See Lewis v. Sava,* 602 F.Supp. 571, 573 (D.C.N.Y.1984); *Fogerty v. State,* 187 Cal.App.3d 224, 231 Cal.Rptr. 810, 815 (1986); *Ex parte Harrison,* 741 S.W.2d 607, 608-09 (Tex.Ct.App.1987). *See generally* Robert E. Keeton, *Venturing To Do Justice: Reforming Private Law* 25-38 (1969); 21 C.J.S. *Courts* § 142, at 169-70 (1990). Horizontal stare decisis, the second facet, requires that a court of appeals follow its own prior decisions. This doctrine applies with equal force to courts comprised of multiple panels, requiring each panel to observe the prior decisions of another. 🔖 *State v. Thurman,* 846 P.2d 1256, 1269 (Utah 1993). Horizontal stare decisis does not, however, require that a panel adhere to its own or another panel's prior decisions with the same inflexibility as does vertical stare decisis. *See* 🔖 *Opsal v. United Servs. Auto Ass'n,* 2 Cal.App.4th 1197, 10 Cal.Rptr.2d 352, 356 (1991); *State v. Dungan,* 149 Ariz. 357, 361, 718 P.2d 1010, 1014 (1986). Instead, although it may not do so lightly, a panel may overrule its own or another panel's decision where "the decision is clearly erroneous or conditions have changed so as to render the prior decision inapplicable." *Dungan,* 149 Ariz. at 361, 718 P.2d at 1014.

The general American doctrine as applied to courts of last resort is that a court is not inexorably bound by its own precedents but will follow the rule of law which it has established in earlier cases, unless clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.

John Hanna, *The Role of Precedent in Judicial Decision,* 2 Vill.L.Rev. 367, 367 (1957); *see also* 🔖 *Francis v. Southern Pac. R.R.,* 333 U.S. 445, 471, 68 S.Ct. 611, 623, 92 L.Ed. 798 (1948) (Black, J., dissenting) ("When precedent and precedent alone is all the argument that can be made to support a court-fashioned rule, it is time for the rule's creator to destroy it."). Although we do not do so lightly, we believe that now is the proper time to overrule *Crawford.* Because we are departing from a prior precedent that has been followed for approximately twenty years, it is incumbent on us to explain why we overrule it. *Cf.* 🔖 *Hansen,* 734 P.2d at 427.

We note that *Crawford* is not the most weighty of precedents. First, in establishing *Crawford* 's per se rule, Justice Ellett not only failed to explain why he was abandoning the long-established *Hopt* rule, *see* 🔖 *Monell v. Department of Social Servs. of New York,* 436 U.S. 658, 695, 98 S.Ct. 2018, 2038, 56 L.Ed.2d 611 (1978), but failed to cite that line of cases altogether. Because the briefs in *Crawford* addressed the issue only tangentially and never cited the *Hopt* line of cases, it seems likely that Justice Ellett and the rest of the court did not even realize that they were departing from well-established Utah precedent. *See* 20 Am.Jur.2d *Courts* § 193 (1965) ("[S]tare decisis effect of case is substantially

diminished by the fact that the legal point therein was decided without argument.").

Second, Justice Ellett established the per se rule with little analysis and without reference to authority. In other situations where we have established presumptions of harm, we have carefully discussed the reasons for taking such an unusual step. *See, e.g., State v. Crowley,* 766 P.2d 1069, 1071-72 (Utah 1988) (closure of trial to friends and relatives of accused); *State v. Knight,* 734 P.2d 913, 920-22 (Utah 1987) (prosecutor's failure to **\*400** disclose materials sought by defense); *State v. Cloud,* 722 P.2d 750, 752-54 (Utah 1986) (gruesome photographs).

Third, in addition to *Crawford* 's lack of acknowledgement of authority and its weak analytical underpinnings, this court has concluded that its per se rule does not work very well. *See* 20 Am.Jur.2d *Courts* § 187 (1965). This conclusion is evidenced by our straining to find that no error has occurred, thus avoiding *Crawford* 's mechanical reversal requirement. *See, e.g.,* 🚩 *Wood,* 868 P.2d at 80 (holding "trial judge was at the very limit of his discretion" in refusing to remove prospective jurors for cause); 🚩 *Bishop,* 753 P.2d at 451-55 (same). We think that candor in the law would be better served by abandoning *Crawford* rather than straining against its requirement by upholding trial courts' questionable for-cause determinations.

We conclude that even if the trial court erred in failing to remove those prospective jurors whom Menzies found objectionable, that error was harmless. *See* Utah R.Crim.P. 30(a). Menzies has not asserted that he faced a partial or biased jury during the guilt phase of his trial or that the jury was made more likely to convict as a result of "death qualifying" the jury. *Cf.* *State v. Young,* 853 P.2d 327, 342, 386-95, 414-17 (Utah 1993). Furthermore, while the bulk of Menzies' objections to potential jurors revolved around those individuals' views on the death penalty, the penalty phase was tried to the court rather than to the jury.

Menzies next claims that the trial court erred in denying his motion for a mistrial following "surprise" testimony by Tim Larrabee, the high school student who saw a man and a woman at the Storm Mountain picnic area the day of the homicide. This claim of surprise arose from a lineup conducted by the sheriff's office in which Larrabee identified someone other than Menzies as the individual he saw at Storm

Mountain. At trial, the prosecutor did not ask Larrabee about the lineup during his case-in-chief. On cross-examination, however, Larrabee's "misidentification" was brought out by the defense. On redirect, the prosecutor asked Larrabee about a conversation the two of them had while walking back to the prosecutor's office after the lineup. Larrabee testified that during the walk, he asked the prosecutor whether "number 6" was the correct person. Number six was Menzies.

Because the prosecution had never informed defense counsel about the post-lineup conversation, defense counsel moved to strike the testimony "concerning [Larrabee's] equivocation of the lineup selection" and requested that the court admonish the jury not to consider that testimony. The trial court granted the motion, struck the testimony, and instructed the jury to disregard it. Later that day, the defense moved for a mistrial, but the motion was denied. Menzies now claims that the trial judge erred in denying the motion for mistrial.

Menzies' argument is twofold. First, he claims that the State violated rule 16 of the Utah Rules of Criminal Procedure in failing to disclose Larrabee's post-lineup statement. Second, Menzies claims that this failure to disclose the conversation violated his right to due process under the federal constitution because the post-lineup statement was critical to the prosecution's case. Because of our disposition of the rule 16 question, we need not indulge in a separate due-process analysis.

Under our decision in *Knight,* when a prosecutor undertakes to respond voluntarily to discovery requests from the defense, the prosecutor either must produce "all of the material requested or must explicitly identify those portions of the request with respect to which no responsive material will be provided." 🚩 734 P.2d at 916-17. This obligation is ongoing and is justified as a guard against misleading the defense by an incomplete prosecutorial response to discovery. If a violation of this duty is found, the **\*401** trial court may fashion a remedy under rule 16(g). [4]

[4]     Rule 16(g) provides:

If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may

enter such other order as it deems just under the circumstances.

A complaint that the trial court failed to order a requested remedy or that the remedy ordered was insufficient to obviate the harm resulting from the violation is reviewed under an abuse-of-discretion standard. *Id.* at 918-19. The trial court's discretion in fashioning a remedy for a violation is not abused unless prejudice sufficient to result in a reversal of the conviction occurred due to the discovery violation. *Id.*

In the present case, the trial court found that the State had failed to disclose requested information. For purposes of our analysis today, we accept that ruling as correct. Defense counsel asked the trial judge to strike the testimony of Larrabee regarding the post-lineup discussion with the prosecutor. The trial judge granted that motion and admonished the jury to disregard the testimony. Later in the day, defense counsel requested the further remedy of a mistrial. The judge denied that request. To conclude that an abuse of discretion occurred, we must find that unacceptable prejudice to Menzies remained after the testimony was stricken. This we cannot do.

We generally presume that a jury will follow the instructions given it. *State v. Burk,* 839 P.2d 880, 883-84 (Utah Ct.App.1992) (citing *State v. Hodges,* 30 Utah 2d 367, 517 P.2d 1322, 1324 (1974)), *cert. denied,* 853 P.2d 897 (Utah 1993). Here, the testimony consisted of a very brief series of questions and answers. The court promptly ordered the colloquy stricken and admonished the jury to ignore it. Considering the ambiguous nature of the testimony and the fact that it was not vivid or graphic, there is no reason to believe that the jury would be uniquely unable to follow the court's instructions and ignore the testimony. As such, the remedy ordered was entirely sufficient to cure the discovery violation.

Even if we were to assume that for some reason this testimony were of such a dramatic nature that the jury was likely to consider it despite the court's instructions, we still find no harm. When Larrabee first contacted the sheriff's office, he described a suspect within one inch in height and ten pounds in weight of Menzies. He accurately described Menzies' hair, facial hair, and glasses and helped create a composite drawing that was so accurate that detectives were able to select Menzies' photograph from among those of 200 inmates. Larrabee also accurately described and identified Denter's car. There was other substantial evidence linking Menzies to the homicide, including the victim's fingerprint in Denter's car. In

light of all this, the fact that on redirect Larrabee mentioned that he had some notion that Menzies was the person he should have picked in the lineup is hardly pivotal to Menzies' conviction. We conclude that it is extraordinarily unlikely that any prejudice that might have survived the striking of Larrabee's testimony had any effect on the jury, and certainly not an effect that would rise to the level necessary to require reversal. The trial court did not abuse its discretion in refusing the motion for a mistrial.

Menzies next asserts that the trial court erred in allowing the preliminary hearing testimony of Walter Britton to be read to the jury. Britton, who had shared a cell with Menzies at the Salt Lake County Jail, testified at the preliminary hearing that Menzies told him he killed Maurine Hunsaker. At the time of trial, however, Britton refused to testify despite a finding of contempt by the court. The court thus ruled that Britton was "unavailable" as defined in rule 804(a)(2) of the Utah Rules of Evidence, [5] making the **\*402** transcript of his preliminary hearing testimony admissible under that rule. The defense moved to suppress the transcript, but the motion was denied.

[5]     Rule 804 of the Utah Rules of Evidence provides in pertinent part:
        (a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant:
        ...;
        (2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so;
        ....
        A declarant is not unavailable as a witness if the ... refusal ... is due to the procurement or wrongdoing of the proponent of the declarant's statement for the purpose of preventing the witness from attending or testifying.
        (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
        (1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with the law in the course of the same or another proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Utah R.Evid. 804.

Menzies now argues that the admission of Britton's preliminary hearing testimony violated his right to confrontation under the Sixth Amendment of the United States Constitution. Specifically, he claims that the trial court erred in finding Britton unavailable because the prosecution did not make a good faith effort to procure Britton's testimony. Menzies further claims that even if Britton was actually unavailable, the preliminary hearing testimony should not have been admitted because the defense did not have the opportunity to properly develop the testimony it wanted brought out at trial during cross-examination, a prerequisite to admissibility under the Confrontation Clause. In response, the State asserts that because Britton was physically present at trial, the Confrontation Clause was not implicated.

Although Britton's testimony was admissible under rule 804, we have recognized that the "admission of certain evidence could be justified under a hearsay exception [to the rules], yet still violate the defendant's constitutional right of confrontation." *State v. Webb,* 779 P.2d 1108, 1111-12 (Utah 1989) (separate opinion of Zimmerman, J.); *State v. Anderson,* 612 P.2d 778, 785 n. 31 (Utah 1980). As a result, we must determine whether admission of Britton's testimony has impinged on the values embodied in the Confrontation Clause to such a degree as to rise to the level of a constitutional violation. *Webb,* 779 P.2d at 1112 (separate opinion of Zimmerman, J.).

In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United States Supreme Court articulated a two-pronged test for determining the admissibility of hearsay when a hearsay declarant is not present for cross-examination at trial. First, there must be a showing of "unavailability." *Id.* at 66, 100 S.Ct. at 2539. Second, if the declarant is unavailable, the statement at issue is "admissible only if it bears adequate indicia of reliability." *Id.; see State v. Brooks,* 638 P.2d 537, 539 (Utah 1981) (adopting two-pronged test established in *Roberts* ).

Addressing the first prong of the test, constitutional unavailability is found only when it is "practically impossible to produce the witness in court." *Webb,* 779 P.2d at 1113 (separate opinion of Zimmerman, J.); *see State v. White,* 671 P.2d 191, 193 (Utah 1983); *State v. Chapman,* 655

P.2d 1119, 1122 (Utah 1982); *State v. Case,* 752 P.2d 356, 358 (Utah Ct.App.), *cert. denied,* 765 P.2d 1277 (Utah 1987). Unavailability will not be found merely because "the witness would be uncomfortable on the stand or ... testifying would be stressful." *Webb,* 779 P.2d at 1113 (separate opinion of Zimmerman, J.). In short, every reasonable effort must be made to produce the witness. *Id.* (separate opinion of Zimmerman, J.). Here, the record indicates that Britton was physically present at trial, pursuant to a court order, and repeatedly refused to testify despite the judge's order to do so. We conclude that every reasonable effort was made to produce Britton at trial, and the trial court correctly concluded that Britton was unavailable.

In the second step of our Confrontation Clause analysis, we must determine whether Britton's preliminary hearing testimony bore sufficient indicia of reliability to warrant its admission at trial. Menzies admits that preliminary hearing testimony usually meets the reliability standard, *Brooks,* 638 P.2d at 540, but argues that the prior testimony at issue here was unreliable because **\*403** (i) Britton was a jailhouse informant whose testimony was inherently suspect as he stood to benefit from the testimony; (ii) his mental competence was at issue and Menzies was not aware of this until after the preliminary hearing; and (iii) defense counsel did not have the opportunity to examine Britton at the preliminary hearing regarding his subsequent convictions. The State asserts that the testimony was reliable because Britton's testimony was given under oath before a judge and Menzies was represented by counsel who had the opportunity to cross-examine Britton.

We agree with the State. The critical issue of reliability relates to the preliminary hearing testimony, not to Britton's potential testimony at trial. The defense contends that its cross-examination of Britton would have been *more* effective at trial because of events that occurred after the preliminary hearing and information that became known after that time. While that assertion may be true, as we have recognized previously, "The Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " *State v. Seale,* 853 P.2d 862, 873 (Utah) (quoting *United States v. Owens,* 484 U.S. 554, 559, 108 S.Ct. 838, 842, 98 L.Ed.2d 951 (1988)), *cert. denied,* --- U.S. ----, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993).

Here, the transcript of the preliminary hearing shows that the defense had the opportunity for an effective cross-examination of Britton. While we agree that new evidence obtained after the hearing may have aided an attack on Britton's credibility on cross-examination, the preliminary hearing transcript indicates that the issue was well-explored. Defense counsel brought out Britton's criminal history, including pending charges against him, as well as the fact that Britton might receive more favorable treatment by the courts because of his cooperation with law enforcement officials. Furthermore, the defense introduced extrinsic evidence related to Britton's credibility at trial and might have introduced other credibility-related evidence as well. For example, the trial transcript indicates that Britton had been incarcerated in a mental health section of the county jail before the preliminary hearing was held.

Reviewing the preliminary hearing testimony as a whole, we find it contains sufficient indicia of reliability to warrant its admission at trial. We therefore conclude that the requirements of the Confrontation Clause have been met.

Although not argued below, Menzies now contends that the trial court committed plain error by not excluding portions of Britton's testimony under rule 403 of the Utah Rules of Evidence. Specifically, Menzies claims that he was unfairly prejudiced by Britton's testimony to the effect that Menzies had said cutting Maurine Hunsaker's throat was "one of the biggest thrills that he'd had." In addition, Menzies argues that Britton's testimony that Menzies laughed about the homicide should also have been excluded.

We first note that the defense waived the rule 403 issue by failing to interpose an objection to these statements at trial. As a result, Menzies is entitled to appellate review only if he can show that the trial court committed "plain error." *State v. Eldredge,* 773 P.2d 29, 35 (Utah), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989); *State v. Verde,* 770 P.2d 116, 121 (Utah 1989). To find plain error, Menzies must establish three elements: (i) An error occurred; (ii) the error was obvious; and (iii) the error was harmful. *State v. Dunn,* 850 P.2d 1201, 1208 (Utah 1993); *see Verde,* 770 P.2d at 122. If any one of these elements is missing, there can be no finding of plain error. *Dunn,* 850 P.2d at 1209.

Here, we dispose of Menzies' challenge under the first element. Rule 403 requires that proffered evidence be excluded when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Utah R.Evid. 403. Such a weighing should result in exclusion when the evidence would have " 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, on an emotional one.' " *State v. Maurer,* 770 P.2d 981, 984 (Utah 1989) (quoting Fed.R.Evid. 403 advisory **\*404** committee's note). To find that an error has been made in admitting evidence in the face of a rule 403 objection, we must conclude that the trial court abused its discretion in permitting the challenged evidence to be received. Specifically, we must find that the ruling in favor of admissibility was beyond the limits of reasonability. *State v. Hamilton,* 827 P.2d 232, 239-40 (Utah 1992).

Our review of the transcript does not lead us to the conclusion that the trial court exceeded the bounds of its discretion in admitting the two challenged statements. While we agree that Britton's testimony is inflammatory, we do not conclude that it reaches the level of mandatory exclusion. *Cf. Maurer,* 770 P.2d at 984-86 (analyzing letter written by murderer to victim's father); *Bishop,* 753 P.2d at 476-77 (plurality opinion of Hall, C.J.) (discussing gruesome photographs); *id.* at 493 (opinion of Zimmerman, J.) (same); *Cloud,* 722 P.2d at 752-53 (same); *State v. Garcia,* 663 P.2d 60, 64-65 (Utah 1983) (same). We think that the defense has taken the statement regarding Menzies' thrill at cutting someone's throat out of context and has placed undue emphasis on it here:

A Yes, sir. I asked him why he killed her-I asked him why he shot her, because I did not know how she was killed.

Q What did he say?

A He stated that he didn't shoot her, that he cut her throat.

Q Did you ask him anything else?

A Not upon that night. It wasn't until the next morning, I believe, that we talked further.

Q In that initial conversation, did he give you any more details regarding the murder?

A No, sir, not really. It wasn't until after we had spoken again, which was the next morning, that he really went into details on it.

Q Where did that second conversation take place the next morning?

A That second conversation took place in the same place, there in the tier.

Q And how did that conversation come about?

A That conversation came about upon our awakening, and he started talking to me. And he'd asked me if I had ever cut anybody's throat before.

Q What did you say to that?

A I said yes, sir, I have.

Q What did he say next?

A And he said it was one of the biggest thrills that he'd had.

As for the statement about Menzies' laughing when he spoke of the homicide, we note that this statement was elicited during cross-examination by the defense. Furthermore, this statement was made in response to questions regarding possible confrontations between Britton and Menzies at the county jail; there was no reference to the Hunsaker homicide itself during the exchange. In fact, the homicide itself had not been mentioned by defense counsel for approximately ten transcript pages before the statement. We find no merit to the claim of plain error.

Menzies argues that in the penalty phase of the trial, the judge improperly considered heinousness as an aggravating circumstance and, therefore, he is entitled to a new penalty phase. Because the objection was not raised at trial, we again must consider whether there was plain error.

The Utah Code provides that the death penalty may be sought when

> [t]he homicide was committed in an especially heinous, atrocious, cruel, or exceptionally depraved manner, any of which must be demonstrated by physical torture, serious physical abuse, or serious bodily injury of the victim before death.

Utah Code Ann. § 76-5-202(1)(q). In *State v. Tuttle*, 780 P.2d 1203, 1217 (Utah 1989), *cert. denied*, 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990), decided after this case was tried, we said that for subpart (q) to pass federal constitutional muster under the Supreme Court's decision in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), "the physical abuse must be qualitatively and quantitatively different and more **\*405** culpable than that necessary to accomplish the murder." Menzies now argues that the circumstances surrounding the homicide with which he was charged did not rise to the level of heinousness required by the United States Constitution as construed in *Tuttle*.

In its closing argument, the State listed the aggravating factors it wanted the court to consider and stated that one such factor was "the brutal and heinous nature of the murder." The prosecutor, however, did not refer the court to the "heinous" provision in section 76-5-202(1)(q) of the Code. When the trial court enumerated the aggravating and mitigating factors at the time of sentencing, it noted subpart (q). While we think that it would have been error for the court to consider subpart (q) satisfied by the facts of this case and to use that finding as an aggravating factor, we are not convinced that such an error occurred. The trial judge was certainly aware of our previous decisions limiting capital murders deemed ruthless and brutal to those "involving an aggravated battery or torture." *State v. Wood*, 648 P.2d 71, 86 (Utah 1981) (construing and applying *Godfrey* ), *cert. denied*, 459 U.S. 988, 103 S.Ct. 341, 74 L.Ed.2d 383 (1982). While we are uncomfortable with the trial judge's references to subpart (q), we have no solid reason to believe that the judge thought this was an appropriate situation for reliance on the heinousness factor listed in 76-5-202(1)(q).

Furthermore, we note that the judge could have properly considered the nature and circumstances of the crime, including its brutality and what the prosecutor apparently referred to colloquially as heinousness, as an aggravating factor under section 76-3-207(2). In this guise, the various facts of the crime that Menzies says do not rise to the level of constitutional and statutory heinousness could still have been considered. Therefore, even if we were to assume that the court erred in considering heinousness, we think that the error was harmless because we "can still confidently conclude beyond a reasonable doubt that the remaining aggravating

circumstances and factors outweigh the mitigating factors and that the imposition of the death penalty was justified and appropriate." *State v. Archuleta,* 850 P.2d 1232, 1248 (Utah), *cert. denied,* 510 U.S. 979, 114 S.Ct. 476, 126 L.Ed.2d 427 (1993).

Menzies next argues that the trial court erred by relying on victim impact evidence during the penalty phase in violation of article I, section 9 of the Utah Constitution. Because Menzies did not object to the victim impact evidence at trial, we must consider this claim under a plain-error analysis. *Eldredge,* 773 P.2d at 35. Again, to find plain error, we must find that (i) an error occurred, (ii) the error was obvious, and (iii) the error was harmful. *Dunn,* 850 P.2d at 1208.

Menzies claims that at the time of the sentencing phase, the United States Supreme Court's decision in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), prevented the consideration of victim impact evidence as a violation of the Eighth Amendment of the United States Constitution. Because the trial judge should have been aware of this ruling, Menzies argues that an obvious error occurred when the evidence was considered during sentencing.

We do not agree. In *Booth,* the Court's concern appeared to be based on the fact that victim impact evidence created "a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." 482 U.S. at 503, 107 S.Ct. at 2533. With no jury sitting during the penalty phase, we do not think that *Booth* 's application to this case should have been obvious to the trial judge. *Cf. State v. Rimmasch,* 775 P.2d 388, 407 (Utah 1989) ("Erroneous admissions of evidence are not as critical in a bench trial as where a jury is involved...."). [6]

[6]    In concluding that the trial court did not commit plain error in admitting victim impact evidence, we do not decide whether victim impact evidence is admissible under the Utah Constitution. *See State v. Carter,* 888 P.2d 629, 654 n. 38 (Utah 1995). Furthermore, in light of the fact that we recently held for the first time that section 76-2-207 of the Code prohibits the introduction of victim impact evidence, *id.* at 651-52, we cannot conclude that the trial court committed plain error when it admitted the evidence at issue here in a trial held

before our recent pronouncement. *State v. Dunn,* 850 P.2d 1201, 1208-09 (Utah 1993).

**\*406** Finally, Menzies argues that the trial court failed to apply the standard set forth in *Wood,* 648 P.2d at 83-84, in imposing the death penalty. There, we held that in order to impose the death penalty, the sentencing body must find beyond a reasonable doubt that the substantiality or persuasiveness of the aggravating factors outweighs that of the mitigating factors, and must then conclude, also beyond a reasonable doubt, that the death penalty is appropriate. *Id.*

Menzies asserts that the trial court failed to properly weigh the aggravating and mitigating factors and then incorrectly concluded that the death penalty was appropriate. We do not agree. The first prong of *Wood* requires that the sentencing body find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. 648 P.2d at 83-84. While we realize that the trial judge recited a number of factors during the sentencing proceeding, the record indicates that he weighed those factors in the manner required by *Wood:*

> The court has, to the best of the court's ability, weighed and evaluated the mitigating circumstances and the aggravating circumstances. And the conclusion the court has reached is that based on the aggravating and mitigating circumstances, the court concludes that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt.

In addition, *Wood* requires that the sentencing body find that the death penalty is the appropriate penalty beyond a reasonable doubt. 648 P.2d at 84. Again, the record indicates that the trial judge properly applied the law:

> Consequently, this court, with the heaviest of hearts, makes the more difficult and trying decision that under the circumstances and beyond a reasonable doubt, the death penalty is

the appropriate penalty, and the court
so orders.

We therefore find no merit to Menzies' claim that the trial
judge applied an inappropriate standard when he sentenced
Menzies to death.

Menzies also points out that the trial judge did not make
written findings that the prior bad acts evidenced by material
found in his prison file had been proven beyond a reasonable
doubt, as required by our decision in 🚩 *State v. Lafferty,*
749 P.2d 1239 (Utah 1988), *habeas corpus granted on
other grounds,* 🚩 *Lafferty v. Cook,* 949 F.2d 1546 (10th
Cir.1992). While we have required written findings regarding
unadjudicated bad acts if the sentence is determined by a
judge, we have not said that such findings are constitutionally
required and that a failure to make such findings mandates
reversal. 🚩 *Id.* at 1260 n. 16. Rather, we can look to
the other evidence before the trial court to be certain that
the death sentence would have been imposed even without
the improper evidence. *Id.* Reviewing the record before
us, we think that the error was harmless. The prior bad
acts referred to are quite minor when compared to the
other evidence of aggravating circumstances. We conclude
that the facts indicate "beyond a reasonable doubt that the
remaining aggravating circumstances and factors outweigh
the mitigating factors and that the imposition of the death
penalty was justified and appropriate," despite the trial court's
consideration of the prison file. *See Archuleta,* 850 P.2d at
1248. Therefore, any error was harmless. *See* 🚩 *Lafferty,* 749
P.2d at 1261 (citing *State v. Hackford,* 737 P.2d 200, 204-05
& n. 3 (Utah 1987)).

We find Menzies' other claims to be without merit. [7] Based
on the foregoing, we affirm **\*407** the jury's verdict and the
trial court's subsequent sentence.

[7]    In his dissenting opinion, Justice Stewart takes
aim at the majority's failure to address each of
defendant's forty-four claims of error. We note that
the sheer number of errors alleged is no measure of
the merits of those claims. The majority has dealt
with those claims of error that are deserving of
attention.

Justice Stewart also asserts that the trial court's
instruction on the State's burden of proof was

undeniably in error, citing 🚩 *State v. Johnson,*
774 P.2d 1141, 1147-48 (Utah 1989) (Stewart, J.,
concurring in the result, joined by Zimmerman
and Durham, JJ.), and *State v. Ireland,* 773
P.2d 1375, 1380 (Utah 1989). In his *Johnson*
opinion, decided after this case was tried,
when faced with an instruction in all pertinent
respects identical to the instruction at issue
here, Justice Stewart concluded that although the
instruction was incorrect, it did "not rise to the
level of reversible error." 🚩 774 P.2d at 1147
(Stewart, J., concurring in the result, joined by
Zimmerman & Durham, JJ.).

More importantly, however, we note that the
instant instruction was proper under legal
principles in place at the time it was given.
Two months before Menzies went to trial, this
court approved a reasonable doubt instruction
substantively identical to the one at issue here
in 🚩 *State v. Tillman,* 750 P.2d 546, 572-73
(Utah 1987). It was not until one year after
Menzies' trial that we expressed in *Johnson* and
*Ireland* our disapproval of the "weighty affairs"
and "possible or imaginary" language. Despite
Justice Stewart's suggestion to the contrary, this
change in the law is not entitled to retroactive
application under our holding in 🚩 *State v.
Norton,* 675 P.2d 577 (Utah 1983), *overruled on
other grounds,* 🚩 *State v. Hansen,* 734 P.2d 421,
427 (Utah 1986). In *Norton,* we recognized that
"when this Court established a new rule of law
on an essential element of a crime, a criminal
defendant whose direct appeal was pending was
entitled to the benefit of the new rule for the
resolution of his appeal." *Id.* at 583. We went on
to emphasize, however, that the

automatic rule of retroactivity as to nonfinal
judgments only applies to significant changes
of rules *that are not expressly declared to be
prospective in operation.* This qualification is
necessary to prevent automatic retroactivity
from displacing the traditional rule that a new
rule of criminal procedure which constitutes
"a clear break from the past" will sometimes
be nonretroactive.

*Id.* at 584 (emphasis added) (citing 🚩 *United
States v. Johnson,* 457 U.S. 537, 549, 102 S.Ct.

2579, 2586, 73 L.Ed.2d 202 (1982)). In *Ireland,* we did indicate that the change in the beyond-a-reasonable-doubt-instruction law was *not* to be retroactive. Specifically, the *Ireland* court's declaration that trial courts are to discontinue use of the "weighty affairs" and "possible or imaginary" language was made in the exercise of this court's supervisory power over lower courts. 773 P.2d at 1380. This is a clear indication that we would strike down only *future* verdicts based on the offending language. We reemphasized our intention to do so in 🏴 *Johnson,* 774 P.2d at 1147 (Stewart, J., concurring in the result, joined by Zimmerman & Durham, JJ.). Because the invocation of our supervisory powers in *Ireland* demonstrates a commitment on the part of this court to prospectively prohibit the use of the offending language, the *Ireland/Johnson* rule is not entitled to retroactive application under our holding in 🚩 *Norton,* 675 P.2d at 584.

HOWE and DURHAM, JJ., and BENCH, Court of Appeals Judge, concur.

STEWART, Associate Chief Justice, concurring in part and dissenting in part:

I concur in that part of the majority opinion that overturns the rule requiring reversal when a party has been compelled to exercise a peremptory challenge to remove a juror who should have been removed for cause. I emphasize, however, that if a trial judge errs in not striking a juror on a for-cause challenge and a defendant then expends a peremptory challenge to remove that juror, reversal may still be required if the defendant can demonstrate actual prejudice in having lost the peremptory challenge. Concededly, it will be much more difficult to establish reversible error under this rule, but the cost of reversing a conviction for an error of the trial judge that is corrected by a peremptory challenge with no demonstrable prejudice to the defendant is too great, if not irrational.

I dissent from the result and note that this case has been mishandled from the beginning. First, the transcript of the trial and penalty phase contains a multitude of errors, and portions of that transcript may be missing. This caused Menzies to challenge the sufficiency of the record for appellate review. *State v. Menzies,* 845 P.2d 220, 224 (Utah 1992). The Court, however, rejected Menzies' assertion that the record was unreliable and held that the errors in the transcript were not prejudicial, although accuracy of the transcript was at best problematic. *Id.* I thought then that the case should have been retried, and I dissented from the Court's opinion.

Defendant now asserts forty-four claims of error on appeal. The majority decides to address only six and summarily dismisses the remaining thirty-eight on the unexamined, conclusory assertion that they are all without merit. Although some of the issues lack sufficient merit to require discussion, some of them raise substantial claims that should be addressed. For example, the trial court's instruction on the State's burden of proof was undeniably in error. It violated the clear ruling of this Court in 🏴 *State v. Johnson,* 774 P.2d 1141, 1147-48 (Utah 1989) (Stewart, J., concurring in the result, joined by Durham and Zimmerman, JJ.). *See State v. Ireland,* 773 P.2d 1375, 1380 (Utah 1989); 🚩 *Cage v. Louisiana,* 498 U.S. 39, 41, 111 S.Ct. 328, 329, 112 L.Ed.2d 339 (1990) (per curiam) (United States Supreme Court adopted similar position and held that erroneous reasonable **\*408** doubt instruction in that case required reversal of conviction).

The majority now addresses the issue in a footnote. It erroneously concludes that the correct rule with respect to a reasonable doubt instruction is not entitled to retroactive application. Contrary to the majority opinion, it is well-established law that a judicial opinion changing a rule of criminal law is automatically applied retroactively to criminal cases pending on direct appeal. 🚩 *State v. Norton,* 675 P.2d 577, 583 (Utah 1983), *overruled on other grounds,* 🏴 *State v. Hansen,* 734 P.2d 421 (Utah 1986); 🏴 *State v. Belgard,* 615 P.2d 1274, 1275 (Utah 1980). The majority asserts that our rulings on the reasonable doubt instruction in *Ireland* and *Johnson* should not be applied retroactively to this case because " 'the automatic rule of retroactivity as to nonfinal judgments only applies to significant changes of rules that are not expressly declared to be prospective in operation.' " 🚩 *Norton,* 675 P.2d at 584. The majority asserts that a proper reasonable doubt instruction is a significant change that represents a "clear break with the past." 🏴 *Id.* at 583. That assertion is incorrect. A proper reasonable doubt instruction has always meant "beyond" a reasonable doubt and has meant that for a very long time.

Furthermore, neither *Ireland* nor *Johnson* "expressly declared" that they are to be applied prospectively only. The majority states that *Ireland* indicated an intent by the Court that the change in the reasonable doubt instruction was only to be applied prospectively. The language in *Ireland* that the majority refers to, however, was not in any way related to prospective or retroactive application of the decision. The Court stated that it had "concerns" with the potential effects of the instruction and that the instruction should no longer be given. As stated by the majority, a decision is automatically applied retroactively to nonfinal judgments unless we *expressly declare* otherwise. The language in *Ireland* cited by the majority does not even cite to *Norton* or any of our other cases on retroactivity. *See, e.g.,* 🏴 *Belgard,* 615 P.2d at 1275. That language hardly qualifies as an "express declaration" of prospective application. Neither does *Johnson* expressly declare that the new rule has only prospective application.

Next, I submit that it was error for the trial court to admit defendant's prison record in bulk. Due process requires that evidence submitted in the penalty phase of a capital homicide case have some degree of relevance and reliability. *State v. Brown,* 607 P.2d 261, 270 (Utah 1980) (opinion of Wilkins, J., with Maughan, J., concurring in this part of the opinion, and Stewart, J., concurring in the judgment); *see also* 🚩 *State v. Johnson,* 856 P.2d 1064, 1071 (Utah 1993). The trial court did not evaluate either the reliability or the relevance of any of the evidence contained in the file. Although the trial judge, not a jury, imposed the death penalty, there is no way of knowing what impact, if any, the documents in that file may have had. Truth be told, judges may also be influenced by improper evidence, and at least in a death case where findings are not required, the state ought not submit, and the judge ought not admit, a whole raft of evidence, all or part of which should not be admitted.

Undoubtedly, there are also other issues that should be addressed. Nowhere is the integrity of the law more important than when a person's life is at stake. To preserve that integrity, we have gone the extra mile in death cases and addressed and decided issues even though no proper objection was made at trial when an error was manifest and prejudicial. ❓ *State v. Wood,* 648 P.2d 71, 77 (Utah 1982). Now, however, the Court summarily disposes of over thirty allegations of error with the summary statement that they are "without merit."

HALL, J., does not participate herein; BENCH, Court of Appeals Judge, sat.

**All Citations**

889 P.2d 393

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Addendum C

115 S.Ct. 910
Supreme Court of the United States

Ralph Leroy MENZIES, petitioner,

v.

UTAH.

No. 94-6471.
|
Jan. 17, 1995.

**Synopsis**

Case below, 🚩 🔺 889 P.2d 393.

**Opinion**

Petition for writ of certiorari to the Supreme Court of Utah denied.

**All Citations**

513 U.S. 1115, 115 S.Ct. 910 (Mem), 130 L.Ed.2d 792, 63 USLW 3538

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Addendum D

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   Honie v. State,   Utah,   May 30, 2014

150 P.3d 480
Supreme Court of Utah.

Ralph Leroy MENZIES, Plaintiff and Appellant,

v.

Hank GALETKA, Utah State Prison
Warden, Defendant and Appellee.

No. 20040289.
|
Dec. 15, 2006.

**Synopsis**

**Background:** After convictions and sentences, including death penalty, for capital murder and aggravated kidnapping were affirmed on direct appeal, 889 P.2d 393, defendant filed petition for post-conviction relief. The Third District Court, West Valley Department, Pat B. Brian, J., entered default judgment in State's favor, and dismissed petition, and then denied defendant's subsequent motion to set aside default judgment. Defendant appealed.

**Holdings:** The Supreme Court, Durham, C.J., held that:

motion to set aside default judgment was timely filed;

rule governing motion to set aside default judgment based on claim of excusable neglect did not apply to capital defendant's motion based on claim of ineffective assistance of counsel and gross negligence of counsel;

defendant was not precluded from seeking relief from default judgment based on claim of ineffective assistance of counsel under catch-all provision of rule;

defendant was entitled to relief from default judgment based on claim of ineffective assistance of post-conviction counsel;

defendant was entitled to relief from default judgment based on claim that counsel was grossly negligent;

defendant did not intentionally acquiesce to delay in prosecution of post-conviction petition, as grounds for denying motion to set aside default judgment;

defendant established meritorious defense, as grounds for motion; and

State was not entitled to discovery of post-conviction counsel's work product unless it met test for such disclosure under *Salt Lake Legal Defender Ass'n v. Uno*.

Reversed and remanded.

Wilkins, Associate C.J., concurred in result, with opinion.

**Attorneys and Law Firms**

**\*488** Elizabeth Hunt, Salt Lake City, for plaintiff.

**\*489** Mark L. Shurtleff, Atty. Gen., Thomas Brunker, Erin Riley, Asst. Attys. Gen., Salt Lake City, for defendant.

**Opinion**

DURHAM, Chief Justice:

¶ 1 In this case, Ralph Leroy Menzies, a death row inmate, appeals from the district court's dismissal of his petition for post-conviction relief. Menzies filed a claim for post-conviction relief in 1995, after having previously exhausted his grounds for direct appeal. On March 3, 1998, attorney Edward K. Brass was appointed by the district court to represent Menzies. From that date until his withdrawal on September 9, 2003, Brass willfully disregarded nearly every aspect of Menzies' case. As a result, the court imposed discovery sanctions, granted summary judgment in favor of the State, and ultimately dismissed Menzies' petition for post-conviction relief.

¶ 2 Following the dismissal of Menzies' case, Brass withdrew and new counsel was appointed. Menzies then moved to set aside the district court's dismissal of his petition for post-conviction relief pursuant to rule 60(b) of the Utah Rules of Civil Procedure. Menzies' 60(b) motion was primarily based on claims that Brass' actions were grossly negligent and amounted to ineffective assistance of counsel. The district court denied Menzies' motion (the 60(b) ruling). Menzies now requests that we reverse the district court's 60(b) ruling. Menzies also challenges a discovery order that

the district court entered pursuant to an evidentiary hearing held on Menzies' 60(b) motion, arguing that the district court improperly compelled Menzies to disclose privileged work product. We hold that the district court erred in denying Menzies relief under rule 60(b)(6) of the Utah Rules of Civil Procedure and that the discovery order entered by the district court did not comply with the standard for the discovery of attorney work product set forth in *Salt Lake Legal Defender Ass'n v. Uno,* 932 P.2d 589 (Utah 1997).

## BACKGROUND

¶ 3 Before reciting the facts in this case, it is necessary to discuss our review of the district court's factual findings. We have reviewed the factual findings contained in the district court's 60(b) ruling for clear error, as is our practice when reviewing issues of fact. *Chen v. Stewart,* 2005 UT 68, ¶ 1 n. 1, 123 P.3d 416. However, our review of the record in this case indicates that the district court clearly erred in numerous factual findings that were crucial to its decision. We therefore decline to recite the facts in a manner consistent with the district court's ruling and instead recite them in accordance with our review of the record. *Id.*

¶ 4 The facts pertinent to this appeal arise from Menzies' lengthy post-conviction litigation, particularly the representation he received from attorney Edward K. Brass between February 1998 and September 2003. We begin our synopsis with some background information on the initial criminal proceedings. On March 8, 1988, Menzies was found guilty of first degree murder and aggravated kidnapping. Menzies waived his right to a jury for the penalty phase of his trial and was subsequently sentenced to death by the district court. Following his sentencing, Menzies filed a motion for a new trial, which was denied. Menzies appealed to this court, which affirmed the district court's denial of the motion and directed Menzies to proceed with his direct appeal on the merits. *State v. Menzies,* 845 P.2d 220, 242 (Utah 1992). Menzies did so, arguing that numerous prejudicial errors had occurred at trial. We ultimately denied all of Menzies' claims, affirming the jury's guilty verdict as well as the district court's imposition of the death penalty. *State v. Menzies,* 889 P.2d 393, 406–07 (Utah 1994), *cert. denied,* 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995).

## I. THE INITIAL POST–CONVICTION PROCEEDINGS

¶ 5 On April 20, 1995, Menzies filed a petition for post-conviction relief; he amended his petition on May 2, 1995. [1] In his **\*490** amended petition, Menzies asserted seventy-three separate claims for relief, including claims that his trial counsel had provided ineffective assistance. On November 13, 1995, the State moved to dismiss the first seventy-one claims, arguing that the Utah Supreme Court had previously rejected them. However, the State's motion did not address Menzies' ineffective assistance claims.

1    Attorney Mary C. Corporon was Menzies' counsel of record when post-conviction proceedings were initiated on April 20, 1995. Ms. Corporon was joined by co-counsel Alan L. Sullivan, Matthew M. Durham, and Todd M. Shaughnessy on May 2, 1995. Together, these four attorneys represented Menzies pro bono in all post-conviction proceedings until Brass was appointed on February 13, 1998.

¶ 6 On December 13, 1995, the State moved the district court for permission to conduct discovery by serving interrogatories on Menzies and deposing him, his original trial counsel, and other witnesses. Menzies opposed the motion, asserting that any discovery should be tailored to avoid breaching attorney-client and constitutional privileges. On February 7, 1996, Menzies moved the district court to direct the State to provide attorney fees as well as funds for both expert witnesses and an investigation of his claims of innocence, including a potential alibi that was allegedly not investigated by trial counsel in Menzies' underlying criminal case. Menzies indicated that the motion would be supported by the affidavit of a private investigator to be filed with the court.

¶ 7 On April 3, 1996, the district court entered an order deferring ruling on the State's motion to dismiss until after an evidentiary hearing could be held on the ineffective assistance of counsel claims. The court also set a timetable for the State and Menzies to file responsive memoranda to their respective motions. The court held another hearing regarding the State's motion for discovery and Menzies' motion for attorney fees and investigatory funds on May 6, 1996. On June 12, 1996, the district court ordered that the State be allowed to conduct limited discovery and that Menzies be awarded $2,000 to pay for an alibi investigation. In this order, the district court

Appellate Case: 19-4042     Document: 98-2     Date Filed: 12/22/2020     Page: 42

found that Menzies had partially waived his attorney-client privilege as to the records of his defense counsel, the Salt Lake Legal Defender Association (LDA), by claiming ineffective assistance of trial counsel in his post-conviction petition. The court also found that in order to prevent Menzies' right of habeas corpus from being unlawfully suspended, it was necessary to provide Menzies with funds to investigate his claims, specifically his claims regarding an uninvestigated alibi defense. The court deferred ruling on Menzies' request for attorney fees until an evidentiary hearing could be held. The State filed an interlocutory appeal from this order.

¶ 8 On May 17, 1996, the State served its first set of interrogatories on Menzies. On June 7, 1996, the State also served the LDA attorneys who had represented Menzies during his criminal trial with subpoenas duces tecum to have their depositions taken and requests to produce all documents relating to their representation of Menzies. On June 19, 1996, LDA intervened and filed a motion for redetermination and clarification of the district court's order granting discovery. LDA argued that Menzies had not waived the attorney-client privilege and that even if he had, the waiver was limited by the subject matter of Menzies' claims and the right against self incrimination. LDA also moved the district court for a protective order preventing the discovery of privileged attorney-client information from current or former LDA attorneys. Finally, LDA requested that the district court stay the depositions and discovery procedures pending the resolution of its motions.

¶ 9 On July 8, 1996, the State filed a motion requesting that the district court compel Menzies to respond to the interrogatories that the State had served him on May 17. On July 9, 1996, LDA filed a motion requesting that the court either quash the subpoenas duces tecum the State had served on its attorneys or issue a protective order limiting the production of privileged LDA documents relating to Menzies' criminal trial. On July 10, 1996, Menzies also moved for a protective order, asking that the LDA attorneys not be deposed and that he be relieved from having to respond to the State's interrogatories. Menzies argued that there was inadequate time to review the documents **\*491** requested by the State to determine privilege issues. Menzies also noted that the State had not yet paid the $2,000 in investigative funds ordered by the district court and that he could not fully answer the State's interrogatories until the alibi investigation was completed. In addition, Menzies moved to stay the proceedings pending the State's appeal from the district court's interlocutory order regarding investigative funds to the Utah Supreme Court.

¶ 10 The district court conducted a hearing regarding LDA's July 8 motion on July 16, 1996. At the hearing, the court stayed all motions pending the State's interlocutory appeal and gave the State until July 19, 1996, to respond to Menzies' motions. The court also stayed the depositions of the LDA attorneys, which had been scheduled for July 18, 1996, and stated that they were to be rescheduled pending a hearing on the various motions on August 6, 1996. During the interim, the court ordered LDA to produce the non-privileged information that the State had requested and to prepare a privilege log as to the rest. Finally, the court ordered the State to pay Menzies the $2,000 in investigative funds as required by its prior order. The State did indeed provide Menzies with a check for $2,000 on July 19, 1996, reserving the right to challenge the district court's order requiring payment and to seek repayment from Menzies if the order was vacated.

¶ 11 Prior to the July 16 hearing, the State had prepared a proposed order regarding the discovery of LDA documents; the State amended its proposed order in light of the July 16 hearing and provided it to Menzies and LDA on July 22, 1996. On July 29, 1996, Menzies moved to extend the time for responding to the State's proposed order and to strike the August 6 hearing because he had not received a copy of the transcript from the July 16 hearing and thus could not properly object to the State's proposed order. The district court granted Menzies' motion on both counts. On August 6, 1996, LDA filed a memorandum, joined by Menzies, objecting to the State's proposed order.

¶ 12 On August 23, 1996, the State moved the district court for leave to take Menzies' deposition. On September 3, 1996, Menzies filed motions for a protective order and to stay all discovery. Menzies argued that the State had impermissibly made its payment of the $2,000 in investigative funds conditional on its right to seek repayment if the district court's order was overturned. Menzies asserted that this condition made it impossible for him to spend the funds because he was indigent and did not have the means to repay the funds in the event the State later sought to recover them. According to Menzies, he could not proceed with discovery —through answering interrogatories and being deposed— unless the investigative funds were made available and an investigation was completed.

¶ 13 On September 9, 1996, the State filed memoranda responding to Menzies' motions and LDA's objection to the State's proposed discovery order. The district court held a

hearing regarding both issues. It ruled that the proposed order was sufficient as written and that any objections to the discoverable materials in LDA's possession could be handled through in-camera reviews by the court. Accordingly, the court executed the State's proposed discovery order. With regard to Menzies' motions, the court denied both of them but ordered that the $2,000 in investigative funds be paid to Menzies with no restrictions. Finally, the court granted the State's motion to depose Menzies and to compel him to answer his interrogatories before October 9, 1996. On October 15, 1996, LDA filed its privilege log with the district court. On October 22, 1996, the State moved for sanctions, asking that the district court strike Menzies' ineffective assistance of counsel claims because Menzies had failed to answer the State's interrogatories by October 9, as directed by the court.

¶ 14 On November 1, 1996, Menzies petitioned this court to allow him to appeal from the district court's June 12 order regarding the provision of investigative funds and also filed a motion to stay the post-conviction proceedings in the district court pending our decision. We denied the motion to stay without prejudice on November 18, 1996. After the State filed a motion to dismiss and a memorandum in opposition, Menzies withdrew his petition. Menzies then petitioned **\*492** this court for a writ of extraordinary relief, again requesting that this court review the district court's June 12 order to determine the adequacy of the investigative funds. According to Menzies, the amount of investigative funds awarded by the district court was not sufficient to conduct an adequate investigation; Menzies' private investigator suggested in his affidavit that a reasonable estimate would be at least $8,250. He stated that he had identified twenty-six areas of investigation, "each extensive and critical to a determination of guilt," that had not been adequately investigated during the guilt phase of Menzies' trial.

¶ 15 On January 2, 1997, we consolidated this petition with several other cases involving similar issues under the caption *Menzies v. Galetka*. On January 23, 1997, this court denied Menzies' petition for extraordinary relief, concluding that the preliminary conditions necessary for the grant of a writ under rule 65B of the Utah Rules of Civil Procedure did not exist. However, we also stated that if Menzies challenged the adequacy of the investigative funds in the district court and the court denied him the relief requested, he could then petition this court for interlocutory relief, in which case we would address the adequacy issue in connection with the disposition of the other consolidated cases.

¶ 16 On January 31, 1997, this court issued its decision in the related case of *Salt Lake Legal Defender Ass'n v. Uno,* 932 P.2d 589 (Utah 1997), wherein LDA had petitioned this court for extraordinary relief from the district court's September 16 order. *Id.* at 589. In that case, we clarified the procedures courts should follow when applying the work product doctrine to privileged documents sought in discovery. *Id.* at 590–91. We granted LDA's petition, vacated the district court's September 16 order regarding the production of LDA documents, and ordered the district court to supervise discovery in accordance with the standards set forth in our opinion. *Id.* at 591.

¶ 17 On January 10, 1997, Menzies filed his answers to the State's first set of interrogatories. The State subsequently withdrew its motion for sanctions. On February 3, 1997, Menzies filed with the district court a motion to increase the funds available for investigation fees to at least $8,250, based on the private investigator's affidavit. The State opposed the motion. The district court heard the issue on February 24, 1997, and it denied Menzies' request for additional funds, ordered Menzies to use an in-state investigator, and again reserved ruling on Menzies' request for attorney fees until after an evidentiary hearing.

## II. POST–CONVICTION LEGISLATION AND MR. BRASS' APPOINTMENT

¶ 18 Meanwhile, in proceedings before this court involving the district court's order awarding Menzies' investigative fees, the State had filed a motion suggesting that the issue may be moot given the recent passage of House Bill 60, enacting Part 2 of the Post–Conviction Remedies Act, Capital Sentence Cases, which governs the appointment and payment of counsel in post-conviction death penalty proceedings. Utah Code Ann. §§ 78–35a–201 to –202 (2002). We granted the State's motion on April 28, 1997, noting that the parties had agreed to voluntarily stay proceedings in the district court until after July 1, 1997, the date on which the new legislation and associated rules went into effect.[2] After the new legislation became effective, both parties sought to have the district court appoint new counsel qualified under rule 8 of the Utah Rules of Criminal Procedure, as required by the newly enacted  Utah Code section 78–35a–202(2)(a). On October 1, 1997, the State notified Menzies' counsel that the Utah Division of Finance **\*493** had implemented

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 44

rules that might allow Menzies to receive payment from the state for attorney fees and litigation expenses. In a letter to the State dated October 13, 1997, Menzies' counsel stated that she did not feel comfortable applying for compensation under the provisions adopted by the Utah Division of Finance because Menzies' pro bono team had not been appointed by the court and did not meet the requirements of rule 8, as required by  section 78–35a–202(2)(a). Menzies' counsel further represented her belief that the case could not proceed until an attorney meeting the rule 8 requirements, who was willing to represent Menzies, could be located.

2

> The pertinent legislation is contained in  Utah Code section 78–35a–202 (2002). Under this section, counsel appointed to represent an indigent petitioner must be "qualified to represent defendants in death penalty cases as required by Rule 8 of the Utah Rules of Criminal Procedure."
>
>  *Id.* § 78–35a–202(2)(a). In addition, this section specifies that compensation for counsel and litigation expenses are to be paid from state funds by the Division of Finance pursuant to administrative rules adopted under the Utah Administrative Rulemaking Act.  *Id.* § 78–35a–202(2)(c); *see also* Utah Admin. Code r. 25–14 (2001) (setting forth current payment scheme for attorney fees and litigation expenses in post-conviction death penalty cases).

¶ 19 On October 27, 1997, the State requested that the district court appoint new counsel qualified under rule 8 to represent Menzies. Menzies' counsel also filed a motion arguing that his pro bono team collectively did not met the rule 8 requirements and asking the court to appoint new counsel. The district court held a hearing on the State's motion on November 3, 1997, and determined that "[n]ew counsel must be appointed." The court ordered Menzies' counsel to prepare and submit a list of attorneys qualified under the new rule 8 who would be willing to accept the appointment, along with affidavits regarding the attorneys' backgrounds and qualifications. Pursuant to this order, Menzies' counsel submitted a report to the district court on November 12, 1997, identifying thirteen attorneys whom she believed were qualified to represent Menzies. Of these thirteen, five were unable to take the case because of undisclosed conflicts. Menzies' counsel sent a letter to the remaining eight attorneys inviting them to represent Menzies, but had received no responses as of November 12. No affidavits were included with the November 12 report.

¶ 20 Kenneth R. Brown, one of the attorneys identified in the November 12 report and contacted by Menzies' counsel, filed an affidavit with the district court on December 3, 1997. In his affidavit, Brown stated that he was unwilling to represent Menzies for a host of reasons. At the time, the Utah State Department of Finance Regulations placed a $25,000 cap on compensation for attorneys representing plaintiffs in post-conviction death penalty cases which included investigation and expert witness fees. According to Brown, Menzies had uninvestigated claims of actual innocence that Brown estimated would cost $25,000 to properly investigate. In addition, Brown stated that no mitigation investigation had been conducted in the underlying trial and one would be necessary in order to properly litigate Menzies' post-conviction claims. Such an investigation "would cost well in excess of $25,000." Under these circumstances, Brown believed that the funds available to any attorney undertaking Menzies' representation would be "grossly inadequate" because the necessary investigation alone would cost nearly three times the total amount authorized by the state. Therefore, Brown felt that any attorney representing Menzies would be placed "in an immediate ethical conflict" because he or she "would be forced to choose between receiving compensation ... and conducting no reasonable investigation whatsoever, or alternatively, throwing all of [the funds] into a still-inadequate investigation, and going without any compensation." [3] Accordingly, Brown declined to represent Menzies.

3

> The current regulations contain a tiered system for the payment of attorney fees, which compensates counsel according to the procedural stage of the post-conviction proceedings reached. *See* Utah Admin. Code r. 25–14–4. Under this system, the maximum amount of compensation an attorney may receive for representing a petitioner in a post-conviction death penalty case is $37,500. *Id.* Under these rules, the Division of Finance will also "pay reasonable litigation expenses not to exceed a total of $20,000 in any one case for court-approved investigators, expert witnesses, and consultants." Utah Admin. Code r. 25–14–5. While these regulations provide more funding for post-conviction death penalty proceedings than their predecessors, we note the potential disability that the statutory cap may impose. If Mr. Brown's affidavit is correct regarding the funds needed to secure Menzies a proper post-conviction

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 45

proceeding, it may be the case that this statutory scheme imposes a crippling burden on Menzies. However, at this stage in the litigation, the record is incomplete, and the issue is not before the court. On remand, Menzies' current counsel must determine what investigation is needed and present any challenge to the statutory cap to the district court to rule on as a factual matter, subject to adversary testing.

**\*494** ¶ 21 On December 16, 1997, the State filed a second motion requesting that the district court appoint rule 8 qualified counsel for Menzies. In its motion, the State indicated that the only attorney contacted by Menzies' counsel who had responded was Brown and he had declined to represent Menzies. The State argued that "[i]n order to proceed with this action a Rule 8 qualified attorney must be appointed by the Court to represent the petitioner's interests." The State also stated that "[f]urther delay in making the appointment of counsel is not in the best interest of the petitioner who has alleged, among other claims, his 'actual innocence.' " On December 23, 1997, Menzies' counsel filed a supplemental report to update the district court regarding her search for rule 8 qualified counsel. In the report, Menzies' counsel indicated that she had received replies to her letter soliciting a rule 8 qualified attorney for Menzies from four of the eight recipients. Each of these attorneys had declined to represent Menzies, most for the same reasons as Brown. Menzies' counsel further stated that the attorneys she had contacted constituted all of the potentially qualifying attorneys of whom she was aware.

¶ 22 On January 29, 1998, the district court held a second hearing regarding the appointment of rule 8 qualified counsel. The court ordered Menzies' counsel to continue trying to contact attorneys to represent Menzies and gave her until February 5 to do so. On February 4, 1998, pursuant to a request from the district court judge's clerk, Menzies' counsel submitted a letter to the district court indicating the eight attorneys who had been contacted and their responses. The letter indicated that four of the attorneys had responded in the negative and the other four had still not responded.

¶ 23 On February 3, 1998, attorney Edward K. Brass sent a letter to Menzies' counsel stating that he would be interested in representing Menzies if they were still seeking counsel. On February 13, 1998, at yet another hearing regarding the appointment of rule 8 qualified counsel, Menzies' counsel told the court about Brass' letter. The court contacted Brass, he appeared and agreed to represent Menzies, and the district

court approved the appointment. It does not appear that the district court ever actually conducted an inquiry into whether Brass was qualified to represent Menzies under rule 8. On March 3, 1998, the court entered an order appointing Brass to represent Menzies in all proceedings before the court. Menzies' pro bono team subsequently withdrew their representation but remained available to consult with Brass. In the 60(b) ruling, the district court stated that "Mr. Brass believed he was appointed for the sole purpose of representing Petitioner at the evidentiary hearing." While Brass' affidavit does contain a statement to this effect, nothing else in the record indicates that his representation was limited in such a manner. The letter Brass sent to Menzies' counsel simply stated that Brass was willing to take the case. At the hearing at which Brass was appointed, the district court did not set any limit on his representation. Also, the district court's order appointing Brass, which he signed, actually states that "Edward K. Brass is appointed to represent Mr. Menzies in *all* proceedings before this court" (emphasis added). Most telling, at an evidentiary hearing held on January 16, 2004, Brass himself stated that his representation of Menzies was not limited in any way. Nor would a limitation on Brass' representation have been appropriate given that the district court and counsel for both parties had just conducted a four-month search for rule 8 qualified counsel and Brass was the only attorney willing to take the case. Any limitation would also have run counter to the post-conviction regulatory framework. Under the Utah Administrative Code,

> [a]ll appointed counsel, by accepting the court appointment to represent an indigent client sentenced to death and by presenting a Request for Payment to the Division of Finance, agree to provide *all* reasonable and necessary post-conviction legal services for the client, including timely filing an action under the provisions of Title 78, Chapter 35a, Post–Conviction Remedies Act and representing the client in *all legal proceedings conducted thereafter* including, if requested by the client, an appeal to the Utah Supreme Court.

Utah Admin. Code r. 25–14–3 (emphasis added). The record indicates that Brass requested **\*495** and received from the

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 46

Division of Finance an initial appointment fee of $5,000 pursuant to rule 25–14–4(1) of the Utah Administrative Code.

### III. BRASS' REPRESENTATION

¶ 24 Brass served as Menzies' counsel from February 13, 1998, when the district court appointed him, until he withdrew on September 9, 2003. To say that Brass did little to represent Menzies during this five-and-a-half-year period would be an understatement. In fact, Brass' representation in this case was deplorable. Our review of the record indicates that Brass not only failed to provide Menzies with any meaningful representation, but in fact willfully disregarded nearly every aspect of this case. In effect, Brass defaulted Menzies' entire post-conviction proceeding, resulting in the dismissal of Menzies' case.

¶ 25 To begin with, Brass communicated with Menzies only sparingly throughout his representation. He discussed the issues in the case at length with Menzies only once—for one to two hours during an initial meeting—and thereafter rarely spoke with his client, appearing to deliberately avoid any communication. Menzies consistently attempted to contact Brass by telephone to discuss various aspects of the case. Brass' office rarely answered Menzies' calls, frequently refused to accept collect calls from the prison,[4] and even hung up when they realized it was Menzies calling. This practice was conducted pursuant to Brass' instructions. Even when the staff accepted Menzies' phone calls and took messages, Brass seldom returned them. Telephone records indicate that Menzies attempted to call Brass' office literally hundreds of times but actually spoke with Brass or a member of his staff only on a handful of occasions.

[4]    Menzies' telephone access is limited by the prison, and he has been denied telephone access at various times during this litigation. Moreover, the prison phone system requires Menzies to call his attorneys collect.

¶ 26 Menzies also tried to communicate with Brass through letters and cards. In these letters, Menzies repeatedly pleaded with Brass to contact and update him on the status of his case. Brass did not keep Menzies informed about the procedural posture or progress of the case, nor did he send Menzies copies of any of the documents filed by the State, even though Menzies requested that he do so multiple times. In his communications with Brass, Menzies consistently maintained

his innocence and frequently asked Brass and his staff to make sure that the case was progressing. In particular, Menzies wanted Brass to conduct alibi and mitigation investigations, repeatedly expressing concern that delaying the investigation of these matters would be harmful to his case. In its 60(b) ruling, the district court made much of the fact that Menzies told Brass in several letters that he had full confidence in him and to take whatever time was needed. According to the district court, Menzies "was aware of circumstances that called into question the quality of Mr. Brass' representation and the progress of his case," and "despite his concerns with Mr. Brass' representation and the lack of progress in his case, [Menzies] intentionally acquiesced in the delay of his case by keeping Mr. Brass as his attorney." However, a careful reading of the record shows that Brass—when Menzies was able to communicate with him—and several other attorneys and staff members who were affiliated with Brass, repeatedly told Menzies to have faith in Brass' representation and that Brass would do a good job. Moreover, Brass himself has indicated that Menzies asked him to resolve the case without delay. Thus, a more accurate reading of the record is that Menzies kept Brass as his attorney because he was not fully aware of the status of his case, and he was continually reassured that Brass was taking care of things.

¶ 27 Brass never conducted or hired anyone to conduct an investigation, notwithstanding Menzies' requests and the fact that the record indicates that extensive investigation on these subjects was needed in order to properly litigate Menzies' claims. After he was appointed, Brass received a letter from Menzies' prior counsel informing him that she had $2,000 in investigative funds previously awarded by the court in her possession. However, Brass never sought or **\*496** obtained these funds from her;[5] the record also indicates that Brass did not consult Menzies' pro bono team about the case. Nor did Brass ever challenge the adequacy of the funds or request any additional funds from the Division of Finance. In fact, the only funding Brass ever requested or received in connection with his representation of Menzies was his initial $5,000 appointment fee.

[5]    When the State learned that Brass had never obtained these funds, it moved to have the money refunded; the district court granted the State's motion on March 31, 2004.

¶ 28 Brass' representation of Menzies before the district court was equally deficient. Shortly after Brass was appointed, the district court held a scheduling conference to establish

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 47

cutoff dates for Menzies to file a second amended petition for post-conviction relief, for discovery, and for the parties to file dispositive motions. A scheduling order was then entered giving Menzies until April 16, 1998, to file his second amended petition. However, Brass failed to file a petition by that date. On July 15, 1998, the district court modified the prior scheduling order and gave Menzies until August 17, 1998, to file his petition. On July 22, 1998, the court held another scheduling conference wherein it modified several other cutoff dates and also ordered LDA to produce all relevant documents by November 9, 1998. Brass again failed to file Menzies' second amended petition by the modified deadline. On August 31, 1998, Brass finally filed a two-page second amended petition, which did little more than re-state the arguments that had been made in the first amended petition filed by Menzies' pro bono counsel on May 2, 1995.

¶ 29 On September 25, 1998, the State filed both its answer to and a motion to dismiss Menzies' second amended petition. As in its original motion to dismiss, the State argued that all of Menzies' claims except those relating to ineffective assistance of trial counsel should be dismissed because they had either been raised on direct appeal or could have been raised on direct appeal. Brass did not file a brief opposing the State's motion. On October 8, 1998, the State moved the court to extend the discovery deadline from October 15 to December 15, citing a need to review an index of all LDA documents relating to the underlying criminal trial in order to complete discovery. The court granted this motion on October 29.

¶ 30 On November 24, 1998, the State provided notice that it intended to depose Menzies on December 10. However, on December 9, Brass cancelled the deposition. On December 22, the district court held a hearing on the State's motion to dismiss. The court granted the State's unopposed motion and ordered that the first seventy-one claims for post-conviction relief asserted in Menzies' amended petition be dismissed. On that same day, the State filed a motion to compel Menzies' deposition; the court ordered Menzies to respond by January 4, 1999. Brass never filed a response.

¶ 31 On February 2, 1999, Menzies, the State, and LDA moved the court to vacate, amend, and clarify the discovery order of September 16, 1996, to conform to this court's decision in *Salt Lake Legal Defender Ass'n v. Uno*, 932 P.2d 589 (Utah 1997). The court did so on February 4, issuing an order addressing all of the previous discovery-based motions filed by the parties. The court ordered LDA to produce all documents not protected by the work product doctrine and to

prepare an index of all remaining documents. LDA filed its privilege log with the court on April 9, 1999.

¶ 32 On June 11, the district court entered an order granting the State's motion to compel Menzies' deposition, noting that the motion was unopposed. On July 19, the district court extended the discovery cutoff date, ordering that the parties complete discovery by December 31, 1999. On September 2, 1999, the State filed a motion for permission to schedule Menzies' deposition. The court granted the motion, and following several cancellations due to conflicts in the parties' schedules, Menzies' deposition was scheduled for November 5, 1999. On November 4, Brass again called counsel for the State and told them that it would be inappropriate for Menzies to be deposed before an alibi investigation could be conducted. Brass apparently made this assertion notwithstanding the fact that he had made no effort to conduct such an investigation. Menzies' deposition, however, **\*497** proceeded as scheduled. Brass did not attend but instead sent Julie George, an attorney who was neither rule 8 qualified nor familiar with the case in any way. When George arrived at the prison, Menzies did not know who she was and was not even aware that the deposition was scheduled. Nonetheless, Menzies participated in the deposition, answering certain questions and refusing to answer others on George's advice. The deposition was finally terminated when Menzies, acting on George's advice, asserted his right under the Fifth Amendment to refuse to answer questions about his communications with the attorneys who represented him in his criminal trial.

¶ 33 On December 3, 1999, the State filed a second motion to compel Menzies' deposition. In its motion, the State requested that the court instruct Menzies on the extent of the Fifth Amendment privilege, order Menzies to answer all questions not protected by the privilege, and impose sanctions precluding Menzies from introducing evidence in the event Menzies refused to answer. On December 23, 1999, the State moved to strike the discovery deadline due to the delays. Brass failed to file a response to either of the State's motions, and the court subsequently granted both of them. The State rescheduled Menzies' deposition for June 1, 2000, and completed deposing Menzies on that date. Brass represented Menzies at the deposition, again asserting a blanket objection to the deposition.

¶ 34 On October 9, 2000, the State filed a motion seeking permission to serve Menzies with additional interrogatories. Once again, Brass did not file any response to the State's

motion. On December 4, 2000, the court granted the State's motion, and an order to this effect was entered on December 20, 2000. On December 18, 2000, the State served Menzies with a document production request and a second set of interrogatories. When Menzies did not timely respond, the State notified Brass on January 24 via hand-delivered letter that it would move for an order compelling discovery if it did not receive the outstanding discovery by February 9, 2001. Brass did not respond to the letter and did not provide the State with any of the requested discovery. Consequently, on February 15, 2001, the State moved the court to compel Menzies' discovery responses. Brass again filed no response to the State's motion to compel. On March 28, 2001, the district court granted the State's motion to compel and ordered Menzies to immediately provide the requested discovery. In its order, the court stated, "The extensive period since discovery began has provided [Menzies] with ample opportunity to investigate his claims; consequently, [Menzies] should have the information to answer the outstanding discovery readily available."

¶ 35 Despite the court's order, Brass did not provide the State with any of the requested discovery. Brass likewise did not inform Menzies of his failures to comply with discovery and did not send Menzies copies of any of the State's discovery requests. Indeed, at an evidentiary hearing held before the district court, Brass acknowledged that Menzies did not have personal knowledge of any of the discovery issues at a time that he could have done anything about them. In fact, Menzies did not even know that Brass had defaulted on the various discovery motions until August 12, 2003. Brass has since stated that he did not respond to any of the State's discovery requests because he had not done any investigation and therefore had no information to provide. Brass has also acknowledged that he could have informed the district court that he did not comply with discovery because of his failure to investigate and could have requested more time in order to do so. He did neither of these things.

¶ 36 On April 19, 2001, the State moved for sanctions pursuant to rule 37 of the Utah Rules of Civil Procedure, requesting that the court prohibit Menzies from introducing any evidence to support his claims beyond what was already in the record. In its motion, the State argued that sanctions were warranted because Menzies had willfully refused to respond to discovery requests and had purposely delayed the proceedings. Once again, Brass failed to respond. Brass did not inform Menzies that the State had moved for sanctions and did not provide Menzies with a copy of the State's motion. Nor

did he communicate with the district court regarding  **\*498** the reasons for his discovery failures. On June 27, 2001, the district court granted the State's motion, thereby prohibiting Menzies from introducing any further evidence to support his claims. Brass did not tell Menzies about the court order or explain to Menzies that he could no longer investigate his claims.

¶ 37 On October 29, 2001, the State moved for summary judgment. The State sought to dismiss Menzies' entire post-conviction petition, arguing that because Menzies could not introduce any further evidence to support his claims, the State was entitled to a judgment as a matter of law on the existing record. Brass made no effort to defeat the State's motion; he has subsequently stated that he did not even review the record to attempt to find disputed material facts. Brass has also testified that he was not in a position to know whether the facts were in dispute because he had not investigated Menzies' claims. Again, Brass failed to respond to the State's summary judgment motion. He likewise did not contact the court to ask for more time or to inform the court as to why the facts were not in dispute. Nor did Brass inform Menzies about the State's motion or send Menzies a copy of it. On December 7, 2001, the district court granted the State's summary judgment motion. An order to this effect was entered on January 11, 2002, dismissing Menzies' petition in its entirety with prejudice.

¶ 38 On January 23, 2002, Brass spoke with Menzies on the telephone. Menzies asserts that Brass told him the State was trying to get a summary judgment, but not to worry about it because there was a discovery stay in place for the State. If Brass said this, it was an outright lie; the record reflects that no discovery stay was ever imposed, and the State's summary judgment motion had already been granted due to Brass' failures to comply with discovery. In any event, Brass did not communicate with Menzies for nearly a year following this conversation, even though Menzies repeatedly tried to contact him both by telephone and through letters. At no point did Brass inform Menzies that his case had actually been dismissed.

¶ 39 On February 11, 2002, Brass filed a notice of appeal with the district court indicating that he was appealing the summary judgment to the Utah Supreme Court. However, Brass did not file a docketing statement within the time required by rule 9 of the Utah Rules of Appellate Procedure, and this court dismissed the appeal. We then allowed Menzies to avoid the dismissal by filing a transcript request; Brass

indicated that no transcript was required. We set a briefing schedule, but Brass never filed an appellate brief even though we twice granted him additional time to do so. The State filed a motion to dismiss the appeal, and Brass failed to respond. We dismissed Menzies' appeal on November 21, 2002, but indicated that if a brief were filed within ten days we would reinstate the appeal. Brass never filed a brief, so we entered a notice of decision dismissing Menzies' appeal on December 19, 2002. Brass did not inform Menzies of any of these developments.

¶ 40 While the faulty appeal was proceeding in this court, Brass filed with the district court a motion to set aside the summary judgment pursuant to rule 60(b) of the Utah Rules of Civil Procedure on April 11, 2002. This motion was not accompanied by a memorandum but stated that "[t]he specific grounds for this motion shall be set forth in a subsequent memorandum." Brass never filed a supporting memorandum.

¶ 41 On December 30, 2002, nearly a year after the case had been dismissed, Brass finally sent a letter to Menzies informing him about the summary judgment. In the letter, Brass stated, "The Attorney General's office has managed to obtain a summary judgment in your writ based upon our alleged failures to comply with certain discovery requests on their part. This is my responsibility and not yours. I am doing what is necessary to have this set aside." Menzies received this letter on January 2, 2003. Menzies wrote a reply letter to Brass that same day. He expressed that he did not know what discovery requests Brass was referring to and asked Brass to contact him as soon as possible to explain why the summary judgment had been entered. Following Menzies' letter, Brass made no contact with Menzies for nearly two **\*499** months. On January 10, 2003, the State requested permission from the district court to file a late response to Menzies' unsupported motion to set aside. Again, Brass filed no responsive memoranda, and the State filed a notice to submit the matter for decision on January 29, 2003. Before the district court could rule on the matter, however, Judge Lewis was assigned to the case. Brass promptly notified the State of a potential conflict; Judge Lewis had performed Brass' wedding. On March 6, 2003, Judge Lewis recused herself from the case, and the case was subsequently reassigned to Judge Brian.

¶ 42 Brass finally visited with Menzies at the prison on March 5, 2003. At the meeting, Brass informed Menzies that he was going to need a new lawyer, although he did not tell Menzies that he was going to withdraw or give Menzies

any impression that he was going to stop representing him. Brass also told Menzies once again that he was doing what was necessary to set aside the summary judgment. Brass did not discuss the procedural history of the case with Menzies, explain his various defaults that led to summary judgment, or tell Menzies that he had defaulted the appeal and failed to file a memorandum supporting the motion to set aside.

¶ 43 In June of 2003, Menzies' current counsel, attorney Elizabeth Hunt, attended a capital litigation seminar. While attending the seminar, Hunt was asked to check on Utah's death row cases to ensure that nothing "was falling through the cracks." On July 21, 2003, Hunt contacted Thomas Brunker, the State's counsel of record in this case. Brunker informed Hunt about Menzies' case, and Hunt promptly contacted Menzies and began researching and preparing to represent him. On August 12, 2003, Hunt showed Menzies the case dockets and explained the procedural posture of the case. This was the first time that Menzies had knowledge that Brass had defaulted during the discovery process, that the summary judgment had been imposed due to these defaults, and that Brass had defaulted in the appeal. On that same day, Hunt filed an appearance as Menzies' counsel, a motion to appoint rule 8 qualified counsel, and a memorandum supporting the 60(b) motion to set aside the summary judgment that Brass had filed over a year earlier. In the memorandum supporting the 60(b) motion, the bulk of Menzies' argument focused on the errors made by Brass that led to summary judgment.

¶ 44 On August 29, 2003, the State filed a memorandum opposing the 60(b) motion. On September 9, 2003, Brass withdrew as counsel. He has subsequently admitted that while he may technically meet the requirements of rule 8, he "do [es] not understand the complex procedural rules governing capital cases in state and federal post-conviction" proceedings, and that he "cannot adequately represent a capital defendant in post-conviction cases." The 60(b) motion was argued before the district court on September 22, 2003, and the matter was taken under advisement. On November 6, 2003, Hunt was formally appointed to represent Menzies. On November 7, the district court scheduled an evidentiary hearing for December 15, 2003, in order to obtain evidence relating to communications between Brass and Menzies during the period of Brass' representation. The State moved for permission to conduct discovery in preparation for the evidentiary hearing, and Menzies opposed the motion. On December 4, 2003, the district court entered an order allowing both parties to conduct discovery in preparation for the evidentiary hearing and continued the hearing until January

15, 2004. The State subsequently requested that Menzies produce all documents relating to communications with his prior post-conviction counsel—both Brass and the pro bono team that had first represented him. The State's theory appears to have been that the evidence pertaining to the pro bono team was relevant to Brass' diligence, for if their investigation had been damaging or unfruitful, it would explain Brass' failure to investigate.

¶ 45 Menzies objected to the State's request, arguing that the material the State sought was protected work product. The disputed materials appear to have been documents created by the private investigator for Menzies' prior pro bono counsel based on his preliminary investigation. He filed an index **\*500** of withheld documents that he requested the judge to review in-camera, and moved for a protective order and for permission to file the protected documents under seal. In his motions, Menzies asked the district court to follow the standard for the discovery of attorney work product set forth in *Salt Lake Legal Defender Ass'n v. Uno,* 932 P.2d 589 (Utah 1997). At a hearing held on January 7, 2003, the district court denied Menzies' motions, ordered Menzies to produce all the documents that had previously been withheld, and allowed the State to make working copies of the disputed documents but ordered them not to disseminate the information to any third parties. The evidentiary hearing proceeded as planned on January 15. Menzies again objected when the State began referring to the disputed documents. The court took the matter under advisement and reviewed *Uno* as well as the disputed documents over the evening recess. When the court reconvened the next day, it ruled that the disputed documents were inadmissible. It also ordered the State not to make any copies of the documents and to destroy the copies it already possessed at the conclusion of the hearing. The court indicated that if the State wished to question witnesses based on the materials, it should discuss the matter at side bar along with Menzies' counsel, "and then the questioning will proceed on a question-and-an-opportunity-to-object basis for each question." Following the evidentiary hearing, Menzies filed a proposed order relating to the destruction of the documents the district court had ruled inadmissible at the evidentiary hearing. The State objected to Menzies' proposed order, arguing that it went beyond the scope of the court's instructions, and filed its own proposed order.

¶ 46 On February 26, 2003, the court issued its 60(b) ruling. The court analyzed Menzies' claims under four separate subsections of rule 60(b): 60(b)(1) and 60(b)(4) through (6). The court found that Brass' representation clearly constituted

ineffective assistance of counsel, stating that Brass' actions "were inexplicable failures to follow rudimentary procedural requirements and comply with court-ordered deadlines." According to the court, Brass' "inaction appears to have been willful and deliberate rather than the result of ignorance or carelessness." While the court held that Menzies should not be held accountable for Brass' failures, it held that Menzies could be held accountable for his own failures. According to the district court, Menzies "must still exercise that level of diligence that a reasonably prudent person in his circumstances would exercise." The court found that "a reasonably prudent person in [Menzies'] circumstances would have, at a minimum, contacted the court about his concerns" and "would have dismissed Brass as counsel of record." The court thus held that Menzies had acted unreasonably under the circumstances and denied his motion for 60(b) relief.

¶ 47 On April 5, 2004, the district court issued its order regarding the destruction of the documents that had been held inadmissible at the January 15 evidentiary hearing. The court ordered the State to destroy all the documents that had been on Menzies' index of withheld documents unless any of the documents had already been in its possession or were provided to the State from another source. In addition, the court ordered the State not to disseminate the information contained in the documents or investigate matters learned of from its review of the documents.

¶ 48 On April 22, 2004, Menzies filed a notice of appeal with the district court indicating that he would seek review of the court's denial of 60(b) relief as well as the order regarding the destruction of the inadmissible documents. Menzies' appeal is now before this court. We have jurisdiction pursuant to Utah Code Ann. § 78–2–2(3)(i) (2002).

### POST–APPEAL MATTERS

¶ 49 Before addressing the merits of Menzies' appeal, we must first dispose of two additional procedural matters that arose after Menzies' appeal was filed with this court. Each party has filed with this court a motion regarding issues that are extraneous to the substantive issues on appeal. We first address the motion filed by the State and then the motion filed by Menzies.

**\*501** ¶ 50 Following Menzies' record designation, the State moved to strike certain transcripts that it contended were not part of the record considered by the district court in

ruling on the rule 60(b) motion. We conditionally granted the State's motion, requiring Menzies' counsel to file an affidavit indicating whether the transcripts were referenced during the rule 60(b) proceedings and explaining the transcripts' relevance to those proceedings. After both the affidavit and the briefing in this matter were filed, the State renewed its motion, requesting that we strike from the record transcripts that were not before the district court as well as Menzies' arguments relying on the challenged transcripts.

¶ 51 We have reviewed Menzies' citations to the challenged transcripts and conclude that the State's arguments are without merit and irrelevant. Contrary to the State's assertions, several of the transcripts challenged by the State are not even referenced in Menzies' briefing. Moreover, some of the transcripts actually were before the district court during the rule 60(b) proceedings. Most importantly, every factual proposition for which Menzies cites the challenged transcripts is supported by citations to other portions of the record that were before the district court during the rule 60(b) proceedings. We therefore deny the State's motion to strike the portions of Menzies' argument that rely on the challenged transcripts. We note that we have not relied on those transcripts that were not before the district court for any portion of this opinion, as we generally do not consider new evidence on appeal.

¶ 52 After oral argument, Menzies' counsel filed a letter styled as supplemental authority—the third she has filed since we took this matter under advisement—as well as a motion requesting that we take judicial notice of letters and oral statements made by counsel for the State in two other proceedings. [6] Menzies' counsel also made a vague request that we require the State's counsel to provide "all relevant information" related to the other proceedings. According to Menzies, the State has taken a position in these other proceedings that is counter to the State's argument in this case. Namely, the state argued that criminal defendants should not engage in ex parte communications with the court but then claimed that Menzies is negligent for not contacting the district court to notify it of Brass' errors. Because this information is irrelevant to our decision, we deny Menzies' motion.

[6] We note that the information Menzies attempts to provide is not supplemental authority as considered by rule 24(j) of the Utah Rules of Appellate Procedure but is extra-record evidence, which we typically do not consider on appeal. *Low v. Bonacci*, 788 P.2d 512, 513 (Utah 1990).

¶ 53 Before addressing the merits of this case, we pause to comment on the litigation the parties have engaged in regarding the two matters discussed above. The voluminous record in this case covers twenty years of litigation, both during the trial stage and post-conviction phase. The briefing in this case is also extensive and includes a multitude of legal arguments as well as references to portions of the record relating to the entire twenty-year history of the case. Resolving a case such as this is a time-intensive task. Yet the parties chose to add to that task by filing the two motions discussed above, each of which also involved extensive briefing. In fact, the briefing on these two motions alone far exceeds the quantity of briefing we frequently receive on entire cases. We do not consider such voluminous briefing on extraneous issues to be a particularly good use of judicial resources. We therefore admonish both the parties in this case and parties appearing before us in the future to constrain their litigiousness to issues both relevant and material to the matters before this court.

## STANDARD OF REVIEW

¶ 54 The majority of Menzies' arguments on appeal deal with the district court's 60(b) ruling. A district court has broad discretion to rule on a motion to set aside a default judgment under rule 60(b) of the Utah Rules of Civil Procedure. *See Lund v. Brown*, 2000 UT 75, ¶ 9, 11 P.3d 277; *Russell v. Martell*, 681 P.2d 1193, 1194 (Utah 1984); *State Dep't of Soc. Servs. v. Musselman*, 667 P.2d 1053, 1055 (Utah 1983). Thus, we review a district court's denial of a 60(b) motion **\*502** under an abuse of discretion standard of review. *Russell*, 681 P.2d at 1194. However, we have emphasized that "the [district] court's discretion is not unlimited." *Lund*, 2000 UT 75, ¶ 9, 11 P.3d 277. It is well established that 60(b) motions should be liberally granted because of the equitable nature of the rule. *Id.* ¶ 10. Therefore, a district court should exercise its discretion in favor of granting relief so that controversies can be decided on the merits rather than on technicalities. *See id.; Musselman*, 667 P.2d at 1055–56. Accordingly, it is an abuse of discretion for a district court to deny a 60(b) motion to set aside a default judgment if there is a reasonable justification for the moving party's failure and

the party requested 60(b) relief in a timely fashion. *Lund,* 2000 UT 75, ¶ 11, 11 P.3d 277.

¶ 55 In addition, a district court's ruling on a motion to set aside a default judgment "must be based on adequate findings of fact and on the law." *Id.* ¶ 9 (citation and internal quotation marks omitted). We review a district court's findings of fact under a clear error standard of review. *Chen v. Stewart,* 2005 UT 68, ¶ 1 n. 1, 123 P.3d 416. We review a district court's conclusions of law for correctness, affording the trial court no deference. *Richins v. Delbert Chipman & Sons Co.,* 817 P.2d 382, 385 (Utah Ct.App.1991) (reviewing district court's conclusions of law in context of a 60(b) motion for correctness). If a district court's ruling on a 60(b) motion is based on clearly erroneous factual findings or flawed legal conclusions, the district court has likely abused its discretion.

*See* *Lund,* 2000 UT 75, ¶ 9, 11 P.3d 277.

¶ 56 Here, the substantive issue underlying the district court's 60(b) ruling was Menzies' claim that Brass provided ineffective assistance of counsel. A claim of ineffective assistance of counsel presents a mixed question of law and fact. *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Traditionally, this court has reviewed a lower court's factual findings for clear error, but has reviewed the application of the ineffective assistance standard to the facts for correctness-even when the claim is initially heard by the district court, *see* *Wickham v. Galetka,* 2002 UT 72, ¶¶ 7, 19, 61 P.3d 978 (analyzing ineffective assistance of counsel issue as question of law even where trial court had already rejected the claim), or is remanded to the district court for an evidentiary hearing, *see* *State v. Lovell,* 1999 UT 40, ¶ 22, 984 P.2d 382 ("Having remanded this case for an evidentiary hearing on the conflict [of interest] issue under Rule 23B of the Utah Rules of Appellate Procedure, we defer to the trial court's findings of fact but treat the conflict issue as a question of law.").

¶ 57 However, this court has not yet evaluated the appropriate standard of review for ineffective assistance of counsel claims under the test we set forth in *State v. Pena,* 869 P.2d 932, 938–39 (Utah 1994), and modified in *State v. Levin,* 2006 UT 50, ¶ 25, 144 P.3d 1096. Accordingly, we take this opportunity to reevaluate whether correctness is the proper standard of review.

¶ 58 Under *Levin,* we consider three factors to determine whether we should give some deference to a district court's application of a specific legal doctrine to the facts:

(1) the degree of variety and complexity in the facts to which the legal rule is to be applied; (2) the degree to which a trial court's application of the legal rule relies on "facts" observed by the trial judge, "such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts;" and (3) other "policy reasons that weigh for or against granting discretion to trial courts."

*Id.* (citation omitted). While the first factor, the variability of the facts, would favor granting deference to the district court, the second and third factors weigh heavily against it. Ineffective assistance of counsel claims are a unique species of claim that are frequently raised for the first time on appeal and are regularly decided based on the record. Even when we remand for an evidentiary hearing under rule 23B of the Utah Rules of Appellate Procedure, we rely on the facts found and placed in the record and do **\*503** not defer to the district court's ultimate legal decision. *Lovell,* 1999 UT 40, ¶ 22, 984 P.2d 382. Therefore, the trial court's direct observations do not generally play a role in determining whether a defendant received effective assistance of counsel and it is unnecessary to grant deference to the district court in the minority of cases where an ineffective assistance of counsel claim is first raised before that court. Accordingly, we review for correctness the trial court's application of the law to the facts, but we will overturn the district court's findings of fact only if they are clearly erroneous.

¶ 59 Finally, Menzies' appeal of the district court's order regarding the destruction of the documents ruled inadmissible at the evidentiary hearing held on January 16, 2004, deals with an issue of discovery. We review a district court's ruling on a discovery issue for abuse of discretion. *Green v. Louder,* 2001 UT 62, ¶ 37, 29 P.3d 638.

## ANALYSIS

¶ 60 On appeal, Menzies raises the following arguments: (1) the district court erred in denying him relief under rule 60(b) of the Utah Rules of Civil Procedure; (2) the district court's ruling that Menzies was negligent for failing to either dismiss Brass or notify the court of Brass' failures is premised on clearly erroneous findings of fact; (3) by holding Menzies

liable for failing to either dismiss Brass or notify the court of Brass' failures, the district court allowed an inadvertent waiver of Menzies' fundamental rights; (4) the district court's order regarding the destruction of privileged documents ruled inadmissible at the evidentiary hearing held on January 16, 2004, did not cure the court's violation of the standard set forth in *Salt Lake Legal Defender Ass'n v. Uno,* 932 P.2d 589 (Utah 1997); and (5) this court should invoke its equitable and supervisory power over habeas corpus cases to ensure that justice is done.

¶ 61 We hold that the district court's 60(b) ruling constituted an abuse of discretion because Menzies is entitled to relief under rule 60(b)(6) due to Brass' ineffective assistance of counsel and gross negligence. [7] We have already noted our disagreement with the district court's factual findings, so we do not address Menzies' second argument at length. However, we agree with Menzies that the district court abused its discretion by finding that it would be inequitable to grant Menzies relief because he was negligent for not contacting the court and for keeping Brass as his attorney. Because the district court relied on these findings to dispose of several of Menzies' 60(b) arguments, we address this issue in our 60(b) discussion. Finally, we hold that the district court erred in its application of *Uno* and that its order regarding the destruction of privileged documents in the State's possession must be supplemented.

[7]
Because our ruling under rule 60(b)(6) is dispositive of Menzies' 60(b) arguments, we do not address the arguments raised under any other portion of that rule. Because our holding under 60(b)(6) grants Menzies his requested relief, we likewise do not address his argument that a post-conviction petitioner cannot waive the right to post-conviction review through misconduct. We do note, however, that a court must conduct a waiver analysis before allowing an indigent death row petitioner to waive his or her right to counsel in post-conviction proceedings. *See* Utah Code Ann. § 78–35a–202(2)(a) (2002).

¶ 62 While the issues before us deal only with Menzies' 60(b) motion, we must not lose sight of the fact that the case before us is a post-conviction petition seeking habeas corpus relief from a death penalty sentence. A post-conviction proceeding is a proceeding of constitutional importance, over which the judiciary has supervisory responsibilities due to our constitutional role. In discharging this role, we must recognize the stakes involved in post-conviction proceedings, take appropriate steps to satisfy ourselves of the reliability of convictions and death sentences, and ensure that a petitioner's fundamental rights are adequately protected. [8] As this court has previously noted, "[T]he law should not be so blind and unreasoning that where an injustice has resulted the [plaintiff] should be without remedy." **\*504** *Martinez v. Smith,* 602 P.2d 700, 702 (Utah 1979). With this framework in mind, we address the merits of Menzies' claims.

[8]
For an analysis of the framework underlying post-conviction habeas corpus petitions, *see* *Hurst v. Cook,* 777 P.2d 1029, 1032–36 (Utah 1989).

## I. THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING MENZIES' 60(b) MOTION

¶ 63 On appeal, Menzies argues that the district court abused its discretion by denying his motion to set aside Brass' defaults under multiple provisions of rule 60(b) of the Utah Rules of Civil Procedure. Specifically, Menzies claims that he is entitled to relief under rule 60(b)(1) and 60(b)(4) through (6). The pertinent portions of rule 60(b) state as follows:

On motion and upon such terms as are just, the court may in the furtherance of justice relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; ... (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time and for reason[ ] (1), ... not more than 3 months after the judgment, order, or proceeding was entered or taken.... The procedure for obtaining any relief

from a judgment shall be by motion as prescribed in these rules or by an independent action.

Rule 60(b) is an equitable rule designed to balance the competing interests of finality and fairness. *See* Lund v. Brown, 2000 UT 75, ¶ 10, 11 P.3d 277; *Laub v. S. Cent. Utah Tel. Ass'n.,* 657 P.2d 1304, 1306 (Utah 1982). In balancing these competing interests, the district court must consider all of the attendant circumstances. *See* Katz v. Pierce, 732 P.2d 92, 93 n. 2 (Utah 1986); *Heath v. Mower,* 597 P.2d 855, 858 (Utah 1979); *Olsen v. Cummings,* 565 P.2d 1123, 1124 (Utah 1977). Because of the equitable nature of the rule, a district court has broad discretion to rule on a 60(b) motion. *Lund,* 2000 UT 75, ¶¶ 9–10, 11 P.3d 277. However, this discretion is tempered by the fact that the rule is designed to be remedial and must be liberally applied. *Id.* ¶ 10; *see also* Cmty. Dental Servs. v. Tani, 282 F.3d 1164, 1169–70 (9th Cir.2002) (discussing rule 60(b)(6) of the Federal Rules of Civil Procedure). "[J]udgment by default is an extreme measure and a case should, whenever possible, be decided on the merits." *Tani,* 282 F.3d at 1170 (citation and internal quotation marks omitted); *see also* State Dept. of Soc. Servs. v. Musselman, 667 P.2d 1053, 1055 (Utah 1983) (same). Accordingly, a district court "should be generally indulgent toward" vacating default judgments, *Katz,* 732 P.2d at 93, and must "incline towards granting relief in a doubtful case to the end that the party may have a hearing." *Lund,* 2000 UT 75, ¶ 10, 11 P.3d 277 (citations and internal quotation marks omitted). Thus, "it is quite uniformly regarded as an abuse of discretion to refuse to vacate a default judgment where there is a reasonable justification or excuse for the ... failure ... and timely application is made to set it aside." *Id.* ¶ 11 (citations and internal quotation marks omitted).

¶ 64 In general, a movant is entitled to have a default judgment set aside under 60(b) if (1) the motion is timely; (2) there is a basis for granting relief under one of the subsections of 60(b); and (3) the movant has alleged a meritorious defense. *See* Erickson v. Schenkers Int'l Forwarders, Inc., 882 P.2d 1147, 1149 (Utah 1994); Musselman, 667 P.2d at 1055–56. These considerations should be addressed in a serial manner. *See* Erickson, 882 P.2d at 1149. In other words, there is no need to consider whether there is a basis for setting aside a default judgment if the motion was not made in a timely manner, and no need to consider whether there is a meritorious defense if there are not grounds for relief. *See id.; see also* Musselman, 667 P.2d at 1056 ("[I]t is unnecessary, and moreover inappropriate, to even consider the issue of meritorious defenses unless the court is satisfied that a sufficient excuse has been shown."). Accordingly, in determining whether the district court abused its discretion in denying Menzies' 60(b) motion, we consider these elements in turn.

**\*505 A. Menzies' 60(b) Motion Was Timely**

¶ 65 The first question we must consider is whether Menzies' 60(b) motion was timely. A motion under 60(b) must "be made within a reasonable time and for reason[ ] (1) ... not more than 3 months after the judgment ... was entered." Utah R. Civ. P. 60(b). In cases where subsection (b)(1) applies, a movant may not attempt to circumvent the three-month filing period by relying on another subsection. *Russell v. Martell,* 681 P.2d 1193, 1195 (Utah 1984); *Laub v. S. Cent. Utah Tel. Ass'n.,* 657 P.2d 1304, 1308 (Utah 1982); *Richins v. Delbert Chipman & Sons Co.,* 817 P.2d 382, 387 (Utah Ct.App.1991). Under rule 60(b), a reasonable time "depends upon the facts of each case, considering such factors as the interest in finality, the reason for the delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to other parties." *Gillmor v. Wright,* 850 P.2d 431, 435 (Utah 1993) (citations and internal quotation marks omitted). In general, the moving party satisfies the reasonable time requirement if she shows "that she acted diligently once the basis for relief became available, and that the delay in seeking relief did not cause undue hardship to the opposing party." Workman v. Nagle Constr., Inc., 802 P.2d 749, 752 (Utah Ct.App.1990) (citation and internal quotation marks omitted).

¶ 66 In the case before us, the district court's judgment dismissing Menzies' case was entered on January 11, 2002. Brass filed Menzies' 60(b) motion exactly three months later, on April 11, 2002. This motion was not accompanied by a supporting memorandum, but instead stated that "[t]he specific grounds for this motion shall be set forth in a subsequent memorandum." However, Brass never filed a subsequent memorandum, and the 60(b) motion was not supported until Hunt entered her appearance and filed a

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 55

supporting memorandum on August 12, 2003. Thus, sixteen months elapsed between the time Brass filed the 60(b) motion and the time that motion was properly briefed. Our task is to determine whether Menzies' 60(b) motion was timely filed under these circumstances.

¶ 67 The State argues that Menzies' 60(b) motion was insufficient under the Utah rules governing motion practice and was therefore untimely. The State argues that the motion did not meet rule 7(b)(1) of the Utah Rules of Civil Procedure, which states that "[a] motion shall be in writing and state succinctly and with particularity the relief sought and the grounds for the relief sought." The State also argues that Menzies' motion was required to "be accompanied by a memorandum of points and authorities ... relied on in support of the motion." Utah Code J.D. Admin. 4–501(1)(A) (repealed 2003). As the State correctly notes, Menzies' 60(b) motion filed on April 11, 2002, did not meet either of these requirements. The State asserts that Menzies therefore did not file a proper motion until nineteen months after the district court entered judgment, when Hunt filed the supporting memorandum. According to the State, this renders Menzies' 60(b) motion untimely.

¶ 68 The problem with the State's argument is that the State fails to distinguish between a motion that is properly supported for purposes of the particularity requirement and a motion that is timely filed for purposes of avoiding the limitations provisions of 60(b). Both rule 7 and rule 4–501 are designed to "promote the policies of (1) mitigating prejudice to opposing parties by allowing that party to respond to the motion ... and (2) assuring that a court can be apprised of the basis of a motion and rule upon it with a proper understanding." *See* Holmes Dev., LLC v. Cook, 2002 UT 38, ¶ 58, 48 P.3d 895 (discussing requirements for motions to amend). If a party fails to "comply with Utah's formal motion practice rules," a district court may, within its discretion, deny the motion on the grounds that it is insufficient. *Id.* ¶ 59. However, sufficiency is not a logically necessary component of timeliness. A party can timely move the court for relief despite the fact that its motion may be insufficient because, for example, it lacks particularity. In such a situation, the court has the discretion, consistent with the policy concerns noted above, either to deny the motion as being insufficient or to allow the party to supplement the originally insufficient motion. In the case before us, the **\*506** district court chose the latter option, holding that Menzies' 60(b) motion was timely filed and that Menzies should be

allowed to supplement the motion under the circumstances. The district court was entirely within its discretion to do so.

¶ 69 We hold that Menzies' 60(b) motion was timely filed. Menzies not only complied with the three-month limitation contained in rule 60(b), but also moved the district court to set aside the default judgment within a reasonable time under the circumstances. Although the motion was not supported until sixteen months later, this delay was due to Brass' deficient representation and the fact that he was misleading Menzies about the status of the case. Menzies was not fully aware of the grounds for relief until August 2003, when Hunt finally informed him of Brass' failures. At that point, Hunt promptly filed a supporting memorandum on Menzies' behalf, and the State had adequate opportunity to oppose Menzies' motion. Moreover, the State acquiesced in the delay during the entire sixteen months. The State never challenged Menzies' motion on the basis of particularity but instead waited nine months and then requested permission to file a late response. The district court never ruled on the State's request, and the State did not raise the issue again. Under these circumstances, the factors militate in favor of Menzies. *See Gillmor*, 850 P.2d at 435 (In assessing whether a movant requested 60(b) relief within a reasonable time, the court considers "such factors as the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to other parties." (citations and internal quotation marks omitted)). Accordingly, we hold that Menzies' 60(b) motion was timely filed and proceed to address the asserted grounds for relief.

### B. Menzies Is Entitled to Relief Under Rule 60(b)(6)

¶ 70 The second issue we address in our 60(b) analysis is whether Menzies is entitled to relief under any of the subsections of rule 60(b). As noted above, Menzies argues that he is entitled to relief under multiple subsections of rule 60(b). However, the asserted grounds for Menzies' requests for relief are the same in each instance, namely, Brass' deficient representation. Therefore, our initial task is to determine which subsection of rule 60(b) applies to Menzies' arguments. *See Richins v. Delbert Chipman & Sons Co.*, 817 P.2d 382, 385 (Utah Ct.App.1991); *Russell v. Martell*, 681 P.2d 1193, 1195 (Utah 1984). We hold that rule 60(b)(6) applies to Menzies' arguments and therefore do not address Menzies' arguments under the other asserted subsections of rule 60(b).

¶ 71 Rule 60(b)(6) is the "catch-all" provision of rule 60(b). It provides that a party may be relieved from a judgment for "any *other* reason justifying relief from the operation of the judgment." Utah R. Civ. P. 60(b)(6) (emphasis added). Because rule 60(b)(6) is meant to operate as a residuary clause, it may not be relied upon if the asserted grounds for relief fall within any other subsection of rule 60(b). *See Cmty. Dental Servs. v. Tani,* 282 F.3d 1164, 1168 (9th Cir.2002); *Russell,* 681 P.2d at 1195; *Laub v. S. Cent. Utah Tel. Ass'n.,* 657 P.2d 1304, 1306–07 (Utah 1982). In other words, the grounds for relief under 60(b)(6) are exclusive of the grounds for relief allowed under other subsections. *See Russell,* 681 P.2d at 1195; *Tani,* 282 F.3d at 1168 & n. 8. Furthermore, relief under rule 60(b)(6) is meant to be the exception rather than the rule; we have previously held that it should be "sparingly invoked" and used "only in unusual and exceptional circumstances." *Laub,* 657 P.2d at 1307–08 (internal quotation marks omitted); *see also Pioneer Inv. Servs. Co. v. Brunswick Assocs.,* 507 U.S. 380, 393, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (remarking that under rule 60(b)(6) of the Federal Rules of Civil Procedure, a party must show "extraordinary circumstances"); *Tani,* 282 F.3d at 1168 (same).

¶ 72 Menzies argues that there are exceptional circumstances warranting relief under rule 60(b)(6) because Brass rendered ineffective assistance of counsel and was grossly negligent. While we have not yet had occasion to consider whether conduct such as Brass' warrants relief under 60(b)(6), we have previously examined attorney conduct **\*507** in the context of rule 60(b)(1). Under rule 60(b)(1), a party may obtain relief from a judgment if he or she can demonstrate "mistake, inadvertence, surprise, or excusable neglect." Utah R. Civ. P. 60(b)(1). A judgment entered due to attorney misconduct may be set aside under this subsection only if the conduct is *excusable. See Mini Spas v. Indus. Comm'n,* 733 P.2d 130, 132 (Utah 1987). In other words, if the attorney exercised "due diligence," defined as conduct that is consistent with the manner in which a reasonably prudent attorney under similar circumstances would have acted, a judgment may be set aside under 60(b)(1). *Id.* Thus, in *Lund* we held that a default judgment should be set aside because it had been entered due to a "good faith, legitimate" legal interpretation that turned out to be erroneous. 2000 UT 75, ¶¶ 16–19, 11 P.3d 277.

¶ 73 However, the conduct alleged by Menzies here— ineffective assistance of counsel and gross negligence— is a far cry from the "excusable neglect" that warrants relief under 60(b)(1). Menzies does not allege that Brass exercised due diligence or that his failures were due to a good faith interpretation of the law. Rather, Menzies argues that Brass' performance was exceptionally deficient in that he willfully failed to comply with his most basic obligations and consistently misled Menzies about the status of his case. As the district court noted, Brass' "inaction appears to have been willful and deliberate rather than the result of ignorance or carelessness." In other words, Menzies argues that Brass' conduct was *inexcusable,* a proposition with which the district court agreed and which the State concedes on appeal. Menzies' allegations amount to "an extraordinary situation which cannot fairly or logically be classified as mere 'neglect.' " *Pioneer Inv. Servs. Co.,* 507 U.S. at 394 (quoting *Klapprott v. United States,* 335 U.S. 601, 613, 69 S.Ct. 384, 93 L.Ed. 266 (1949)). Accordingly, Menzies' asserted grounds for relief cannot be addressed by rule 60(b)(1).

¶ 74 While the district court found that the conduct alleged by Menzies did not fit the criteria of rule 60(b)(1), it also found that it could not grant Menzies relief under 60(b)(6) because it had already considered the conduct under 60(b)(1). This is a misapplication of the law. The rule is that 60(b)(6) cannot be relied upon if the *grounds* for relief fall within another subsection, not that 60(b)(6) does not apply if the court has already *considered* another ground. *See Laub v. S. Cent. Utah Tel. Ass'n,* 657 P.2d at 1306–08. Having concluded that Brass' conduct was too egregious and exceptional to be encompassed by rule 60(b)(1), the district court should have proceeded to consider Menzies' arguments under rule 60(b)(6) instead of concluding that 60(b)(6) could apply only if "extraordinary circumstances [we]re *also* present" (emphasis added).

¶ 75 We therefore draw a distinction between willful or grossly negligent attorney conduct and conduct that amounts to mere negligence or inadvertence. While the latter types of conduct are addressed by rule 60(b)(1), conduct such as that alleged by Menzies is clearly beyond the scope of that subsection and is more properly addressed under 60(b)(6). As the Utah Court of Appeals has noted, "Rule 60(b)(6) is 'sufficiently broad' to permit a court to set aside a judgment for ineffective assistance of counsel." *In re A.G.,* 2001 UT App 87, ¶ 9 n. 3, 27 P.3d 562 (quoting *Stewart*

*v. Sullivan,* 29 Utah 2d 156, 506 P.2d 74, 76 (1973)). Our decision is also consistent with the decisions of the majority of federal courts of appeal that have considered this issue. *See, e.g.,* **⚑** *Tani,* 282 F.3d at 1169 ("[W]here the client has demonstrated gross negligence on the part of his counsel, a default judgment against the client may be set aside pursuant to Rule 60(b)(6)."); **⚑** *Virginia Info. Sys. Corp. v. Wang Labs, Inc.,* 932 F.2d 338, 342 (4th Cir.1991) ( "[A]ttorney malfeasance which actively misleads a client or is comparably culpable might successfully ground a Rule 60(b) motion."); **⚑** *Carter v. Albert Einstein Med. Ctr.,* 804 F.2d 805, 806, 808 (3d Cir.1986) (reversing denial of a rule 60(b)(6) motion based on attorney's "blatant disregard for explicit [court] orders"); **⚑** *L.P. Steuart, Inc. v. Matthews,* 329 F.2d 234, 235 (D.C.Cir.1964) (stating that rule 60(b)(6) "is broad enough to permit relief when ... personal problems of counsel cause him grossly **\*508** to neglect a diligent client's case and mislead the client").

¶ 76 Before addressing the merits of Menzies' arguments under rule 60(b)(6), we pause to address an argument raised by the State that is relevant to the distinction we have drawn above. The State argues that Menzies must be held accountable for Brass' failures through principles of agency and therefore Menzies cannot obtain relief under 60(b). The State's position is certainly true as a general proposition: an attorney's negligence is ordinarily attributable to the client because an attorney acts as an agent for her client. **⚑** *Tani,* 282 F.3d at 1168; *see also Russell,* 681 P.2d at 1195 (holding that attorney's neglect was "attributable to [the client] through principles of agency"). Under the American representative system of litigation, a party voluntarily chooses her attorney and therefore is generally bound by the acts or omissions of his or her attorney. *See* **⚑** *Pioneer Inv. Servs. Co.,* 507 U.S. at 396–97, 113 S.Ct. 1489. Under this rule, a court considering whether to set aside a default judgment under rule 60(b)(1) must generally determine whether the actions of both a party *and* his or her counsel are excusable in assessing whether all the surrounding circumstances warrant equitable relief. **⚑** *Id.* at 397, 113 S.Ct. 1489.

¶ 77 The situation is vastly different, however, when an attorney willfully disregards a client's interests, acts in a grossly negligent fashion, or renders ineffective assistance of counsel. When relief is sought on these grounds under rule 60(b)(6), the client is seeking relief on the basis that

his or her attorney "display[ed] neglect so gross that it is inexcusable." **⚑** *Tani,* 282 F.3d at 1168 (internal quotation marks omitted). In such circumstances, the attorney is not acting on behalf of the client but is blatantly disregarding his or her representative capacity and subverting the client's interests. Therefore, "an unknowing client should not be held liable on the basis of a default judgment resulting from an attorney's grossly negligent conduct, and ... sanctions should be imposed on the lawyer, rather than the faultless client." [9] **⚑** *Id.* at 1169. To hold otherwise would be to ignore the remedial and equitable nature of rule 60(b). **⚑** *Id.* at 1169–70. Rule 60(b)(6) is designed to remedy a judgment when exceptional circumstances are present, and it would defeat the purpose of the rule if a client could not obtain relief under that subsection because he or she was held responsible for egregious lawyer misconduct. "When an attorney is grossly negligent ... the judicial system loses credibility as well as the appearance of fairness, if the result is that an innocent party is forced to suffer drastic consequences." **⚑** *Id.* at 1170. Furthermore, the justification for imputing the acts and omissions of counsel to his or her client are not present here; Brass was appointed by the district court pursuant to **?** Utah Code section 78–35a–202(2)(a) (2002), which does not entitle Menzies to make a voluntary choice with regard to his counsel. [10] *See, e.g.,* **⚑** *Tani,* 282 F.3d at 1168 (noting that a lawyer's negligence is ordinarily attributable to the client because the client is "presumed to have voluntarily chosen the lawyer as his representative and agent"). Nor does it appear that Menzies had a choice, for the record indicates that Brass was appointed by the court after a fruitless four-month search yielded no other attorney willing and able to represent Menzies. Accordingly, Menzies' request for rule 60(b) relief cannot be defeated on the basis that he is accountable for Brass' conduct. With this distinction clarified, we now address Menzies' request for rule 60(b)(6) relief, beginning with his arguments **\*509** that Brass rendered ineffective assistance of counsel.

9

This is not to say that a client seeking 60(b)(6) relief cannot be held responsible for his or her own actions. Rule 60(b)(6) "is intended to encompass errors or actions beyond the petitioner's control." **⚑** *Tani,* 282 F.3d at 1170 n. 11. To the extent that a party seeking relief under rule 60(b)(6) is at fault for the default judgment, the district court may, within its discretion, determine that it would

be inequitable to grant relief based on all of the surrounding circumstances.

10    We also note that Menzies is statutorily entitled to appointed counsel under  Utah Code section 78–35a–202(2)(a) (2002). Where a litigant is statutorily entitled to counsel, the litigant cannot be held liable for the negligence of his or her attorney. *T.S. v. State,* 2003 UT 54, ¶ 11, 82 P.3d 1104. Holding otherwise would "impermissibly undermine[ ] her right to counsel." *Id.*

1. Menzies is entitled to relief under rule 60(b)(6) because Brass rendered ineffective assistance of counsel

¶ 78   As discussed above, egregious lawyer misconduct constitutes an exceptional circumstance that may allow a litigant relief from a default judgment under rule 60(b)(6). Menzies argues that Brass' actions in this case amount to ineffective assistance of counsel and thus he is entitled to relief under rule 60(b)(6). Before addressing whether Brass' actions qualify as ineffective assistance of counsel, however, we must determine whether Menzies has a right to the effective assistance of counsel. Menzies advances three arguments on this point: (1) he has a statutory right to the effective assistance of counsel pursuant to Utah Code section 78–35a–202 (2002); (2) he has a right to the effective assistance of counsel under the Utah Constitution; and (3) he has a right to the effective assistance of counsel under the United States Constitution.

¶ 79   Several sections of the Utah Code are relevant to Menzies' first argument. Section 78–35a–202(1) provides that "[a] person who has been sentenced to death and whose conviction and sentence has been affirmed on appeal shall be advised in open court, on the record ... of the provisions of this chapter allowing challenges to the conviction and death sentence and the appointment of counsel for indigent defendants." In addition, section 78–35a–202(2)(a) states as follows:

> If a defendant requests the court to appoint counsel, the court shall determine whether the defendant is indigent.... If the court finds that the defendant is indigent, it shall promptly appoint counsel who is qualified to represent defendants in death penalty

cases as required by Rule 8 of the Utah Rules of Criminal Procedure.

Finally, section 78–35a–202(2)(b) provides that "[a] defendant who wishes to reject the offer of counsel shall be advised on the record by the court of the consequences of the rejection before the court may accept the rejection."

¶ 80   In *T.S. v. State,* 2003 UT 54, 82 P.3d 1104, we considered an argument very similar to that made by Menzies, albeit in the context of a proceeding to terminate parental rights. In that case, the petitioner's parental rights had been terminated, and her appointed counsel had failed to file an appeal within thirty days, as required by rule 4(a) of the Utah Rules of Appellate Procedure. *Id.* ¶¶ 1–3. The petitioner moved to file an overdue notice of appeal, arguing that the failure should be excused due to "excusable neglect or good cause" under rule 4(e) of the Utah Rules of Appellate Procedure. *Id.* ¶ 1. The district court denied the motion, and the Utah Court of Appeals affirmed, relying on the principle that a party is accountable for her attorney's neglectful conduct. *Id.* ¶¶ 4–5.

¶ 81   On certiorari review, we reversed the court of appeals, holding that "rule 4(e)'s 'good cause' exception ... includes within its reach the unusual circumstance where a person who is entitled to appointed counsel under [the Utah Code] does not receive effective counsel." *Id.* ¶ 9. Citing Utah Code section 78–3a–913(1)(a) (1999)—which contains language that is strikingly similar to section 78–35a–202(1)(a)— we stated that "[t]he legislature has expressly codified a parent's right to be represented by counsel at every stage of a termination proceeding." *Id.* ¶ 7. We noted that "the statute would be meaningless or illusory if it guaranteed only ineffective assistance of counsel. The legislature's omission of 'effective' should not be read to suggest an intent to provide only ineffective assistance of counsel." *Id.* (internal quotation marks omitted).

¶ 82   Our analysis in *T.S.* is equally applicable to the case before us. "[B]y extending the right to appointed counsel to [death penalty defendants in post-conviction cases], our legislature has expressly recognized that [these] proceedings are unlike the traditional civil case." *Id.* ¶ 6. This intent is consistent with our habeas corpus jurisprudence and with the underlying nature and policy of post-conviction death penalty proceedings. Given the high stakes inherent in such proceedings—life and liberty—providing a petitioner the

procedural safeguard of appointed counsel is an important step in **\*510** assuring that the underlying criminal conviction was accurate. We refuse merely to pay lip service to this legislatively created protection by holding that a petitioner in a post-conviction death penalty proceeding is only entitled to ineffective assistance of appointed counsel. Therefore, we hold that Menzies has a statutory right to effective assistance of counsel under ⬜ Utah Code section 78–35a–202.

¶ 83 The State makes two arguments regarding ⬜ section 78–35a–202. The State first asserts that we should not establish a statutory right to the effective assistance of counsel because, by providing that appointed counsel must meet the qualifications of rule 8, the legislature has presumptively established the boundaries of counsel's obligations in post-conviction cases. This argument drastically oversimplifies the intent and import of rule 8. Consistent with ⬜ section 78–35a–202(2)(a), rule 8 requires a court to appoint counsel to represent indigent petitioners in post-conviction proceedings challenging a death sentence. Utah R. Crim P. 8(e). The subsections of rule 8(e) contain qualifications that an appointed attorney in such cases must meet.[11] *See* Utah R. Crim P. 8(e)(1)-(5). However, these subsections contain no provisions regarding appointed counsel's *obligations* in post-conviction death penalty proceedings. In fact, rule 8(f) expressly states that "[m]ere noncompliance with this rule ... shall not of itself be grounds for establishing that appointed counsel ineffectively represented the defendant." Therefore, the rule clearly contemplates that the standards for ineffective assistance of counsel in post-conviction death penalty cases are found elsewhere. Nor could such gaps in the statutes and rules applicable to post-conviction death penalty proceedings presumptively limit this court's constitutional authority over such cases. As the United States Supreme Court has stated, "When faced with such gaps in the habeas statute, we have looked first to the considerations underlying our habeas jurisprudence, and then determined whether the proposed rule would advance or inhibit these considerations by weighing the marginal costs and benefits of its application on collateral review." ⬜ *O'Neal v. McAninch,* 513 U.S. 432, 445, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (citation and internal quotation marks omitted).

11     This case illustrates an ironic deficiency in the operation of rule 8. Brass, who apparently met all of the rule's technical requirements, was nonetheless unqualified to serve as counsel in this capital case, as reflected by his performance and by his admissions that he did "not understand the complex procedural rules governing capital cases in state and federal post-conviction" proceedings and that he "cannot adequately represent a capital defendant in post-conviction cases." Thus, rule 8 obviously creates a minimum standard, but does not ensure qualification.

¶ 84 The State also argues that "writing an effective assistance requirement into section [78–35a–202] would make capital post-conviction litigation interminable and end the finality of death sentences." It is true that there is a general judicial policy favoring the finality of judgments. *See* 🚩 *Hurst,* 777 P.2d at 1035. However, "[a]s important as finality is, it does not have a higher value than constitutional guarantees of liberty." *Id.* We would be remiss in our constitutional role if we were to allow finality to trump the interests at stake in post-conviction death penalty proceedings. *See* 🚩 *id.* at 1033 (discussing the judiciary's constitutional supervisory power over extraordinary writs). Moreover, Utah's post-conviction legislation and associated rules contain appropriate limitations to assist courts in streamlining post-conviction review in death penalty cases. *See, e.g.,* ⬜ Utah Code Ann. § 78–35a–106 (2002) (discussing various grounds under which relief may be precluded); Utah R. Civ. P. 65C (containing procedural provisions governing the progression of post-conviction litigation). We are confident that the judiciary, relying on this framework as well as the common law, can properly advance post-conviction death penalty litigation while ensuring that petitioners receive the protections to which they are legally entitled. Because we conclude that Menzies has a statutory right to the effective assistance of counsel under ⬜ section 78–35a–202(2)(a), we do not address his federal and state constitutional claims. We do, however, note that the United States Supreme Court has previously declined to recognize a federal constitutional right to the effective assistance of counsel in state post-conviction proceedings. **\*511** ⬜ *Coleman v. Thompson,* 501 U.S. 722, 755–57, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). While we have not yet considered whether such a right exists under the Utah Constitution, there is no need to do so in this case because of the statutory right provided by ⬜ section 78–35a–202. We do not foreclose the possibility that an indigent death row inmate may have a right to the effective assistance of counsel under the Utah Constitution, but that question must wait for another day.

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 60

¶ 85 Having established that Menzies has a statutory right to the effective assistance of counsel, we now address whether he has demonstrated that Brass' performance was ineffective. The analytical framework for assessing ineffective assistance of counsel was originally developed by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In the federal context, the right to the effective assistance of counsel is premised on a defendant's right to counsel under the Sixth Amendment to the United States Constitution. *Id.* at 687, 104 S.Ct. 2052. As the Supreme Court has noted, this right is designed to ensure that criminal defendants receive a fair and reliable proceeding before life or liberty are taken. *Id.* at 686, 104 S.Ct. 2052; *see also Roe v. Flores–Ortega,* 528 U.S. 470, 482, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (noting that "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair [proceeding]" (citation and internal quotation marks omitted)). This fairness is "derive[d] from the adversarial nature of our justice system, which is premised on the 'well-tested principle that truth—as well as fairness—is best discovered by powerful statements on both sides of the question.' " *United States v. Collins,* 430 F.3d 1260, 1264 (10th Cir.2005) (quoting *Penson v. Ohio,* 488 U.S. 75, 84, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988)); *see also Strickland,* 466 U.S. at 688, 104 S.Ct. 2052 (recognizing "the law's presumption that counsel will fulfill the role in the adversary process that the [Sixth] Amendment envisions"). The right to the effective assistance of counsel therefore ensures the fairness and reliability of proceedings by requiring counsel to adequately discharge his or her role in the adversary process. *See, e.g., Flores–Ortega,* 528 U.S. at 482, 120 S.Ct. 1029 (discussing how the *Strickland* test requires a litigant to "show[ ] how specific errors of counsel undermined the reliability of the [proceedings]" (citation and internal quotation marks omitted)); *Strickland,* 466 U.S. at 691–92, 104 S.Ct. 2052 ("The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding."). Thus, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052.

¶ 86 The State argues that we should not rely on the Supreme Court's Sixth Amendment jurisprudence in assessing Menzies' statutory right to effective assistance of counsel. However, this court has long relied upon the *Strickland* test to assess ineffective assistance of counsel claims. *See Bundy v. Deland,* 763 P.2d 803, 805 (Utah 1988). We can discern no reason why a statutory right to effective assistance of counsel should be premised on something different from that of the constitutional right: ensuring that the proceeding is reliable and fair by requiring a properly functioning adversarial process. *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052. Menzies is no less entitled to a proceeding that meets these standards when counsel is required by statute than he would be if counsel were required by the Constitution. The underlying concern is the same in each instance: when an indigent litigant has a legal right to counsel, counsel must render effective assistance in order to give effect to the litigant's right. *See T.S.,* 2003 UT 54, ¶ 11, 82 P.3d 1104. We therefore use *Strickland* to evaluate Menzies' claim.

¶ 87 The *Strickland* test for assessing whether an attorney's performance amounted to the ineffective assistance of counsel is two-part: (1) whether counsel's performance was deficient in that it "fell **\*512** below an objective standard of reasonableness"; and (2) whether counsel's performance was prejudicial in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688–89, 694, 104 S.Ct. 2052. If a litigant meets both parts of this test, then the proceeding is inherently unreliable and the result cannot stand. *See Bell v. Cone,* 535 U.S. 685, 695, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). We examine each part of the *Strickland* test in turn.

a. Brass' performance falls below an objective standard of reasonableness

¶ 88 Our first inquiry under the *Strickland* test is whether Brass' performance was unreasonably deficient. This issue is not disputed. Though the district court did not engage in a thorough *Strickland* analysis, it stated in its 60(b) ruling that Brass' actions "were inexplicable failures to follow rudimentary procedural guidelines and comply with court-ordered deadlines" and that "the ineffective assistance

of counsel exceeds any neglectful conduct that could be deemed 'excusable.' " The State does not contest this finding on appeal, but instead concedes that Brass' performance was deficient. We nevertheless discuss the first part of the *Strickland* analysis in order to clarify Utah's standards for the performance of counsel in post-conviction death penalty proceedings.

¶ 89 Under *Strickland,* an attorney's performance must be objectively reasonable, with reasonableness measured by "prevailing professional norms." 466 U.S. at 688, 104 S.Ct. 2052. However, "judicial scrutiny of counsel's performance must be highly deferential" because "it is all too easy for a court, examining counsel's [performance] after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689, 104 S.Ct. 2052. Therefore, the court must "eliminate the distorting effects of hindsight ... and ... evaluate the conduct from counsel's perspective at the time." *Id.* This requires that the court "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* In order to overcome this presumption, the litigant must demonstrate that the challenged actions cannot be considered sound strategy under the circumstances. *Id.*

¶ 90 Menzies requests that we consult the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (ABA Death Penalty Guidelines) in addressing whether Brass' representation was reasonable under the circumstances. Courts frequently rely on the professional standards established by the ABA when determining the relevant professional norms under the first prong of the *Strickland* analysis. *See, e.g., Rompilla v. Beard,* 545 U.S. 374, 375, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (citing the ABA Death Penalty Guidelines and stating that "[w]e long have referred [to these ABA Standards] as guides to determining what is reasonable" (second alteration in original) (citations and internal quotation marks omitted)); *Florida v. Nixon,* 543 U.S. 175, 191, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) (citing ABA Death Penalty Guidelines in addressing ineffective assistance under *Strickland* ); *Canaan v. McBride,* 395 F.3d 376, 384 (7th Cir.2005) ("We follow the [Supreme] Court's lead ... by looking first to the [ABA Death Penalty Guidelines].") . Indeed, the Supreme Court referred to the ABA Death Penalty Guidelines in *Strickland* itself, noting that the guidelines reflect "[p]revailing norms of practice."

466 U.S. at 688, 104 S.Ct. 2052. While the ABA standards are not determinative of whether counsel's performance was ineffective and courts should examine counsel's conduct in light of all the contemporary circumstances, *id.* at 688–89, 104 S.Ct. 2052, they do represent "well-defined norms" that provide guidance to courts. *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Because Utah's post-conviction rules do not currently contain any provisions regarding counsel's performance in post-conviction death penalty proceedings, and because it is traditionally the duty of the courts to supervise **\*513** the performance of counsel,[12] we rely on the ABA Death Penalty Guidelines to the extent they are relevant to our decision.

12      While Utah's current post-conviction legislation and rules do not contain any standards for the performance of post-conviction counsel, rule 25–14–6 of the Utah Administrative Code clearly contemplates that the court may order the withdrawal of counsel due to "counsel's improper conduct." Utah Admin. Code r. 25–14–6(2) (2001).

¶ 91 ABA Death Penalty Guideline 10.15.1 specifically details the duties of post-conviction counsel. This guideline imposes on post-conviction counsel the duty to "fully discharge the ongoing obligations imposed by these guidelines." ABA Death Penalty Guideline 10.15.1(E) (2003). One of these obligations is the duty to "maintain close contact with the client regarding litigation developments." Guideline 10.15.1(E)(1). This duty is discussed in depth in guideline 10.5, which states that counsel "should maintain close contact with the client," guideline 10.5(A) (2003), including discussing with the client "the progress of and prospects for the factual investigation, and what assistance the client might provide," guideline 10.5(C)(1). Counsel should also keep the client informed of "litigation developments," guideline 10.15.1(E)(1), including "litigation deadlines and the projected schedule of case-related events," guideline 10.5(C)(6). The commentary to guideline 10.5 makes clear that counsel is obligated "at every stage of the case to keep the client informed of developments and progress in the case" and that "the failure to maintain such a relationship is professionally irresponsible." Guideline 10.5 cmt.

¶ 92 In addition to the duty to communicate, guideline 10.15.1 also imposes on counsel the duty "to continue an aggressive investigation of all aspects of the case." Guideline 10.15.1(E) (4). Likewise, guideline 10.7 provides that "[c]ounsel at

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." Guideline 10.7(A). As the commentary to guideline 10.7 notes, counsel has a "duty to take seriously the possibility of the client's innocence, to scrutinize carefully the quality of the state's case, and to investigate and re-investigate all possible defenses." Guideline 10.7 cmt. The duty to investigate extends to the penalty phase, and counsel has a "duty to investigate and present mitigating evidence." Guideline 10.7 cmt.; *see also* 🔖 *Williams v. Taylor,* 529 U.S. 362, 395–96, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (holding that counsel was ineffective for failing to uncover and present mitigating evidence). These "parallel tracks" of investigation also apply in post-conviction proceedings, where post-conviction counsel has a duty to investigate "the facts underlying the conviction and sentence, as well as such items as trial counsel's performance." ABA Death Penalty Guideline 10.15.1 cmt. Counsel also has a duty to investigate the client in order "to discover mitigation that was not presented previously [and] also to identify mental health claims." Guideline 10.15.1 cmt.

¶ 93 Finally, guideline 10.15.1 provides that "[p]ost-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation." In addition, guideline 10.8 provides that "[c]ounsel at every stage of the case, exercising professional judgment," must "consider all legal claims potentially available" and "thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted." Guideline 10.8(A)(1)-(2) (2003). [13]

13    We do not read this guideline to require or encourage the litigation of issues that are clearly procedurally barred, although we recognize that whether an issue is so precluded must often be explored and raised by counsel.

¶ 94 In the case before us, Brass' ineffective representation went far beyond a failure to comply with the ABA Death Penalty Guidelines. During the five and a half years that Brass represented Menzies, Brass provided Menzies with virtually no representation and willfully disregarded nearly every aspect of Menzies' case. Brass did not communicate with Menzies about the status or progress of his case, repeatedly refusing Menzies' telephone calls and failing to respond **\*514** to Menzies' written correspondence. These actions kept Menzies in the dark about the procedural posture of his case. Indeed, Brass did not inform Menzies that his case had been dismissed until nearly a year after summary judgment was entered, and Menzies was not aware of Brass' repeated discovery defaults and the resulting sanctions until Hunt began representing him. Moreover, Brass purposely misled Menzies to believe that the summary judgment was not a problem, informing Menzies that he was doing what was necessary to have it set aside, despite the fact that he never filed a memorandum supporting the rule 60(b) motion and defaulted in Menzies' appeal from the summary judgment several times.

¶ 95 In addition, Brass never conducted any investigation, despite the availability of investigative funds, a voluminous record indicating that investigation was necessary in order to develop Menzies' claims, and his own awareness of that necessity. During the course of Brass' representation, Menzies repeatedly asked Brass to investigate issues pertaining to both actual innocence and ineffective assistance of trial counsel. Brass disregarded Menzies' requests and then sat by as the State served discovery on Menzies because Brass had developed no factual bases for Menzies claims. Brass never informed the court that he could not respond to the State's discovery requests because he had not developed the case and never objected when sanctions were imposed that effectively precluded Menzies from pursuing his claims. Nor did Brass litigate the issues that were present in the case when he undertook Menzies' representation. The second amended petition Brass filed on Menzies' behalf was little more than a repetition of the claims that had been asserted in the first amended petition filed three years earlier, and Brass did not oppose the State's motion to dismiss most of Menzies' asserted claims. In short, Brass gradually defaulted Menzies' post-conviction case away and never informed Menzies that he was doing so.

¶ 96 There is no question that Brass' actions under these circumstances constitute ineffective assistance of counsel. While counsel's actions are normally entitled to a presumption of reasonableness, Brass' willful disregard for Menzies' case cannot possibly be construed as sound strategy. *See* 🔖 *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *see also* 🔖 *Flores–Ortega,* 528 U.S. at 477, 120 S.Ct. 1029 (holding that "a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable" because such a failure "cannot be considered a strategic decision; filing ... is a purely ministerial task, and the failure to file reflects

inattention to the defendant's wishes"). Brass' representation falls far "below an objective standard of reasonableness," *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, and therefore Menzies has satisfied the first prong of the *Strickland* test.

    b. Brass' conduct rendered the post-conviction proceedings unreliable, thereby prejudicing Menzies' case

¶ 97 Our second inquiry under the *Strickland* test is whether Brass' actions prejudiced Menzies' case. Under this portion of the analysis, a litigant is required to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Judicial proceedings are normally entitled to "a strong presumption of reliability," and therefore a litigant must overcome this presumption by demonstrating that counsel's errors rendered the proceeding unreliable. *Flores–Ortega,* 528 U.S. at 482, 120 S.Ct. 1029 (citations and internal quotation marks omitted).

¶ 98 However, if a litigant is constructively denied the assistance of counsel in a proceeding in which he or she is entitled to counsel, the adversary process itself is rendered inherently unreliable, and prejudice is legally presumed. *See id.* at 483, 120 S.Ct. 1029; *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052. A litigant can be constructively denied counsel in several ways. For example, a constructive denial of counsel occurs if counsel completely fails to subject the opposition's case to meaningful adversarial testing. **\*515** *See Bell,* 535 U.S. at 696, 122 S.Ct. 1843; *Collins,* 430 F.3d at 1265; *Turrentine v. Mullin,* 390 F.3d 1181, 1208 (10th Cir.2004). In *Turrentine,* the Tenth Circuit stated this occurs "where the evidence overwhelmingly establishe[s] that [the] attorney abandoned the required duty of loyalty to his client, and where counsel acted with reckless disregard for his client's best interests and, at times, apparently with the intention to weaken his client's case." 390 F.3d at 1208 (second alteration in original) (citation and internal quotation marks omitted). In *Collins,* the Tenth Circuit expanded upon this reasoning and held that an attorney failed to subject the opposition's case to meaningful adversarial testing— despite not recklessly disregarding his client's interests— because he did not argue his client's position at a competency hearing due to a pending motion to withdraw. 430 F.3d

at 1265. The court noted that the proceeding was inherently unreliable because counsel had "not engage[d] his legal skills in advocating [his client's] position." *Id.* at 1266.

¶ 99 Constructive denials of counsel have also been found where, due to counsel's deficient performance, a proceeding itself is forfeited. *See Flores–Ortega,* 528 U.S. at 483–84, 120 S.Ct. 1029. A "denial of the entire judicial proceeding itself, which a [litigant] wanted at the time and to which he had a right, ... demands a presumption of prejudice" because the litigant has been entirely denied the adversary process. *Id.* at 483, 120 S.Ct. 1029. Because no presumption of reliability can be accorded "to judicial proceedings that never took place," a forfeiture due to counsel's deficient representation renders the proceedings inherently unreliable. *Id.*

¶ 100 Whether a litigant is required to show actual prejudice or whether prejudice is instead presumed "turns on the magnitude of the deprivation of the right to effective assistance of counsel." *Id.* at 482, 120 S.Ct. 1029. In this case, Brass' abdication of his duties was of sufficient magnitude to presume prejudice and meets both of the exceptions discussed above. First, Brass completely failed to provide meaningful adversarial testing because he took no actions to develop Menzies' case and did not respond to any of the State's various motions. Brass not only acted with reckless disregard for Menzies' case, but he willfully disregarded nearly every aspect of it. Second, Brass' actions effectively forfeited the entire post-conviction proceeding itself. Brass never responded to the State's repeated discovery requests and never informed Menzies or the court of his failures or the reasons for them. The result is that discovery sanctions were imposed preventing Menzies from doing anything to establish his grounds for relief. After the discovery sanctions were imposed, there were no disputed issues of material fact because no facts had been introduced to support Menzies' claims, and the district court granted summary judgment in favor of the State. In summary, Brass' performance not only failed to subject the State's case to the crucible of meaningful adversary testing but also resulted in the denial of the post-conviction proceeding itself. Under these circumstances, Brass' actions were clearly prejudicial. Accordingly, Menzies is entitled to relief under rule 60(b)(6).

2. Menzies is entitled to relief under rule 60(b)(6) because Brass' actions were grossly negligent

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 64

¶ 101 In addition to arguing that he is entitled to relief under rule 60(b)(6) due to Brass' ineffective assistance of counsel, Menzies also argues that he is entitled to relief on the independent ground that Brass' actions were grossly negligent and therefore constitute exceptional circumstances under 60(b)(6). As discussed above, both grounds constitute exceptional circumstances that warrant relief under 60(b)(6). While a litigant must have a right to the effective assistance of counsel in order to seek relief on that ground, relief under 60(b)(6) may also be sought where a lawyer's performance is grossly negligent and therefore not excusable under rule 60(b)(1). See Cmty. Dental Servs. v. Tani, 282 F.3d 1164, 1170 n. 11 (9th Cir.2002).

¶ 102 While it dealt with this issue in a purely civil context, Tani is remarkably similar to the case at bar. There, the defendant was sued on grounds of trademark infringement **516 and retained counsel to represent him. Id. at 1166. The parties agreed to extend the time for filing the defendant's answer, but the defendant's counsel failed to sign the stipulation and also failed to file a timely answer. Id. The plaintiff filed for default, only to learn that an answer had been filed one day before, two weeks late. Id. Having not received a copy, the plaintiff telephoned the defendant's counsel, who assured the plaintiff that he would send a copy. Id. However, the defendant's counsel failed to do so. Id. At a subsequent hearing, the magistrate judge ordered the defendant's counsel to serve the answer and to participate in a settlement conference call. Id. at 1167. When the defendant's counsel failed to do either of these things, the plaintiff moved to strike the answer and again asked for a default judgment. Id. The defendant's counsel failed to file a memorandum in opposition and, at a hearing on the plaintiff's motion, still did not provide the plaintiff with a copy of the answer. Id. Therefore, the magistrate judge granted the plaintiff's motions. Id.

¶ 103 During this entire course of events, the defendant's counsel represented to the defendant that the case was proceeding smoothly. Id. It was not until the order of default judgment was mistakenly mailed to the defendant's office that he became aware of his counsel's failures. Id. The defendant promptly retained new counsel and filed a motion to set aside the default judgment pursuant to rule 60(b) of the Federal Rules of Civil Procedure. Id. The district court denied the motion, finding that although counsel's actions were not "excusable" under rule 60(b)(1), those actions were still chargeable to the defendant. Id. at 1167 & n. 6. The court

also found that relief was not warranted due to the defendant's "own 'culpable conduct.' " Id. at 1167.

¶ 104 On appeal, the Ninth Circuit reversed the district court. Id. at 1166. The court held that while an attorney's negligent acts are ordinarily chargeable to the client, a client should not be held liable for the attorney's actions where those actions are grossly negligent. Id. at 1168–69. It also held that grossly negligent conduct constitutes exceptional circumstances that entitle a litigant to relief under rule 60(b)(6). Id. The court then noted that the defendant's counsel had performed in a grossly negligent fashion because his failures were "inexcusable and inexplicable" and that he had "virtually abandoned his client." Id. at 1170. The court also noted that the attorney had deliberately misled his client by repeatedly assuring the client that he "was performing his responsibilities," thereby "depriving him of the opportunity to take action to preserve his rights." Id. at 1171. While the court did note that a litigant's own culpable conduct could serve as grounds for a court to deny a rule 60(b)(6) motion, the court's review of the record did not demonstrate culpable conduct on the part of the defendant. Id. at 1172. Therefore, the court held that the district court had abused its discretion by denying the defendant's rule 60(b)(6) motion. Id.

¶ 105 In this case, the district court abused its discretion by denying Menzies' rule 60(b)(6) motion because Brass' conduct was grossly negligent. As in Tani, Brass repeatedly failed to comply with straightforward procedural requirements and court-ordered deadlines. He took no action to build Menzies' case and allowed the State to obtain a default judgment by failing to respond to discovery. Thus, Brass "virtually abandoned his client." See id. at 1170. He also misled Menzies about the procedural posture of his case, the result being that Menzies was not fully aware of Brass' failures until years after they occurred. This conduct clearly constitutes gross negligence, entitling Menzies to relief under rule 60(b)(6).

¶ 106 Before addressing whether Menzies has met the meritorious defense requirement, it is necessary first to address one additional portion of the district court's 60(b) ruling. The district court found that Menzies was not entitled to 60(b) relief because he "intentionally acquiesced in the delay of his case." In coming to this conclusion, the court relied on our holding in T.S. v. State, 2003 UT 54, 82 P.3d 1104. In that case, we held that "good cause" for extending

the time to file an overdue notice of appeal under rule 4(e) of the Utah Rules of Appellate Procedure encompasses the situation where a litigant's failure to file a timely **\*517** notice of appeal is due to the violation of a statutory right to the effective assistance of counsel. *Id.* ¶ 9. However, we also noted that "a party's own negligent or intentional acts might render rule 4(e) relief inequitable, notwithstanding a showing of ineffective assistance of counsel." *Id.* ¶ 12. Based on this language, the district court found that Menzies was required to "exercise that level of diligence that a reasonably prudent person in his circumstances would exercise." The district court found that Menzies was not reasonably prudent because he retained Brass as his attorney and failed to inform the court about Brass' failures. Thus, the district court denied Menzies 60(b) relief on this basis.

¶ 107 It is true that in considering a rule 60(b) motion, the district court must take into consideration all of the attendant circumstances in order to determine whether rule 60(b) relief is equitable. *See Katz v. Pierce,* 732 P.2d 92, 93 n. 2 (Utah 1986); *Olsen v. Cummings,* 565 P.2d 1123, 1124 (Utah 1977). To the extent that a litigant has acted negligently or intentionally, a court may consider these acts in striking an equitable balance between finality and allowing the litigant a fair hearing, notwithstanding the gross negligence or ineffective assistance of counsel. *See Tani,* 282 F.3d at 1172; *T.S.,* 2003 UT 54, ¶ 12, 82 P.3d 1104. However, a rule 60(b) ruling must be based on adequate findings of fact. *Lund v. Brown,* 2000 UT 75, ¶ 9, 11 P.3d 277. In this case, our review of the record leads us to the conclusion that the district court clearly erred on the record facts in finding that Menzies was negligent. The record indicates that Menzies was unaware of the status of his case during most of the time Brass was representing him. Indeed, he was not aware that a default judgment had been entered until a year after the district court granted summary judgment in favor of the State. When Brass informed Menzies of the default, he also assured Menzies that he was taking steps to have it set aside, and Menzies relied on his representation. Moreover, Menzies was not informed of the reasons for the default judgment and of Brass' multiple discovery failures until Hunt began representing him; prompt steps to set aside the default judgment were then taken. Finally, the record indicates that Menzies kept Brass as his attorney despite his concerns about the progress of his case because Brass and other attorneys repeatedly told Menzies that Brass would provide effective representation. Therefore, we hold that

the district court's findings that Menzies was negligent for keeping Brass as his attorney and for failing to contact the court regarding Brass' failures were clearly erroneous; and we also hold that the district court abused its discretion by denying Menzies rule 60(b) relief on this ground.

*C. Menzies Meets the Meritorious Defense Requirement*

¶ 108 The final inquiry in our rule 60(b) analysis is whether Menzies has alleged a meritorious defense. The purpose of the meritorious defense requirement "is to prevent the necessity of judicial review of questions which, on the face of the pleadings, are frivolous." *Lund v. Brown,* 2000 UT 75, ¶ 28, 11 P.3d 277 (citation and internal quotation marks omitted). Thus, a litigant seeking rule 60(b) relief "must proffer some defense of at least sufficient ostensible merit as would justify a trial on the issue thus raised." *Downey State Bank v. Major–Blakeney Corp.,* 545 P.2d 507, 510 (Utah 1976). This requirement does not set an overly burdensome threshold: "A defense is sufficiently meritorious to have a default judgment set aside if it is entitled to be tried." *Erickson v. Schenkers Int'l Forwarders, Inc.,* 882 P.2d 1147, 1149 (Utah 1994). Thus, "where a party presents a clear and specific proffer of a defense that, if proven, would [warrant relief] by the claimant ... it has adequately shown a nonfrivolous and meritorious defense." *Lund,* 2000 UT 75, ¶ 29, 11 P.3d 277. Even "general denials" that would allow a litigant to prevail if proven are sufficient. *Erickson,* 882 P.2d at 1149.

¶ 109 Menzies easily meets the meritorious defense requirement. In his amended petition, Menzies alleged multiple trial errors that, if proven, would allow Menzies to prevail in his post-conviction proceeding. While the record is far from fully developed **\*518** with regard to Menzies' claims as a direct result of the ineffective assistance of his counsel, Menzies is not required to prove any of his claims or meet an evidentiary threshold in order to demonstrate that his claims have merit. *Lund,* 2000 UT 75, ¶¶ 29, 32, 11 P.3d 277. Because this final requirement of our 60(b) analysis is met, Menzies is entitled to relief under rule 60(b)(6).

¶ 110 Having concluded that Menzies is entitled to rule 60(b) relief, it is necessary also to consider what relief is warranted. Merely setting aside the default judgment would be insufficient, for the sanctions that were imposed by the district court would still preclude Menzies from investigating his claims. Moreover, Brass' ineffective representation extended well beyond the entry of the discovery sanctions because Brass was willfully neglecting Menzies' case long before the sanctions were imposed. Brass' actions pervade the entire course of his representation, for he took no actions to develop Menzies' case even when he was first appointed. Even the second amended petition filed by Brass, the first pleading he filed, did little more than repeat the allegations of the amended petition that had been filed three years previously. In addition, Brass took no action to oppose the State's motion to dismiss, which disposed of many of Menzies' claims. Thus, in order to fully correct the harm of Brass' ineffective assistance, it is necessary to set aside the entire course of his representation and give Menzies an opportunity to properly develop his case. We do not undertake this decision lightly. The post-conviction proceedings in this case have now extended for eleven years, with no resolution apparent in the immediate future. However, as we have noted repeatedly, while finality in judicial proceedings is an important policy, the constitutional guarantees of life and liberty must prevail in this instance. *See* 🚩 *Hurst v. Cook,* 777 P.2d 1029, 1035 (Utah 1989). We simply cannot allow Menzies' sentence to be carried out without allowing him to exercise his right to post-conviction review. In order to ensure that this right is adequately protected, it is necessary that Menzies have the opportunity to investigate his claims and present them to the district court for proper adjudication.

¶ 111 Accordingly, we remand this case to the district court with instructions to set aside the proceedings that took place during the time that Brass was representing Menzies. Menzies should be allowed to investigate his claims in accordance with the pertinent Utah rules and should be given the opportunity to amend his post-conviction petition in the event that it is warranted. We now address Menzies' final claim, relating to the district court's evidentiary rulings during the rule 60(b) proceedings.

## II. THE DISTRICT COURT'S ORDER REGARDING THE DESTRUCTION OF PRIVILEGED DOCUMENTS WAS INSUFFICIENT

¶ 112 Menzies also argues that the district court's order regarding the destruction of documents that were ruled inadmissible at the evidentiary hearing held on January 16, 2004, is insufficient and must be augmented. According to Menzies, the district court erred by ordering that the disputed documents be produced to the State in the first place because the procedure for applying the work product doctrine set forth in *Salt Lake Legal Defender Ass'n v. Uno,* 932 P.2d 589 (Utah 1997), requires the district court to conduct an in-camera review to ensure that the party seeking production meets the *Uno* standard *before* such documents are produced. While Menzies acknowledges that the district court attempted to cure the *Uno* violation by ordering the State to destroy the inadmissible documents, Menzies asserts that the order is insufficient because it does not require the State to identify which documents it had already obtained from independent sources and does not contain any deadline for the documents to be destroyed. We agree with each of Menzies' arguments and therefore order the district court to supplement its order of April 5, 2004, regarding the destruction of the inadmissible documents.

¶ 113 In *Uno,* we considered some of the discovery issues that have pervaded this case since Menzies' post-conviction petition was filed. In that case, LDA had petitioned this court for an extraordinary writ asking that we reverse the district court's denial of its **\*519** motion for a protective order. *Id.* at 589. The State had served LDA with subpoenas duces tecum and requests for the production of all documents relating to LDA's representation of Menzies in the underlying criminal trial in order to challenge Menzies' claims that LDA had rendered ineffective assistance. *Id.* LDA asked the district court for a protective order preventing the disclosure of these documents, asserting the work product immunity doctrine, but the district court denied its request and ordered that the documents be produced. *Id.* We vacated the district court's order, concluding that the order violated the work product immunity doctrine. *Id.* at 591.

¶ 114 In *Uno,* we first recited the rule, contained in rule 26(b)(3) of the Utah Rules of Civil Procedure, that attorney work product—defined as " ' 'documents and tangible things ... prepared in anticipation of litigation' ' " but not including " 'mental impressions, conclusions, opinions, or legal theories of an attorney' ' "—is not discoverable unless " 'the party seeking discovery has substantial need' ' " and cannot obtain the materials elsewhere " 'without undue hardship.' ' " *Id.* at 589–90 (quoting Utah R. Civ. P. 26(b)(3)) (alteration in original). We then noted that while an

attorney's mental impressions are generally not discoverable, there is an exception if those mental impressions are "directly at issue." *Id.* at 590 (citation and internal quotation mark omitted). As we stated in *Uno*, "There is a sense in which the mental impressions, conclusions, and opinions constitute 'the facts' of the case and therefore may be discoverable." *Id.* However, this exception must be applied very carefully in ineffective assistance of counsel cases because a discovery policy whereby counsel's files can be freely accessed in subsequent proceedings has the potential to significantly impair the trial preparation process. *Id.* In order to prevent such a result, we set forth in *Uno* a three-step test that the State must meet when seeking the production of attorney work product in an ineffective assistance case before such documents may be disclosed. *Id.* at 591. For each document sought, the State must demonstrate that (1) "it has 'substantial need' and that it cannot, without 'undue hardship,' obtain the substantial equivalent of the information by other means," as required by rule 26(b)(3); (2) the "at issue" exception applies to the document; and (3) "the document [has been] edited to prevent the disclosure of information not related to the ineffectiveness claims." *Id.* In *Uno,* we suggested that LDA prepare an index of the documents in its file in order to help the State meet its burden and also instructed the district court to conduct an in-camera review of each document for which the State met the first two requirements in order "to ensure that it does not contain extraneous information that should not be revealed to the State." *Id.*

¶ 115 Applying *Uno* to the issue before us, it is clear that the district court failed to comply with *Uno* by ordering Menzies to produce the disputed documents prior to the January 15 hearing. The materials that the State sought to discover were attorney work product, prepared by Menzies' pro bono counsel in anticipation of litigation, and the State was seeking their production in order to oppose Menzies' claims that Brass had provided ineffective assistance of counsel. Accordingly, the State was required to meet the three-part *Uno* test in order to obtain the documents. Under *Uno*, the State was required to meet this test *before* the documents were produced, not afterward. *Id.* Thus, upon receiving Menzies' index of withheld documents, the district court should have required the State to meet the *Uno* test before ordering the documents' production. The district court's order requiring Menzies to produce the documents was therefore a violation of *Uno.*

¶ 116 To the district court's credit, it appears that the court recognized its error after reviewing *Uno* and attempted to rectify it by ruling the documents the State sought to discover

inadmissible and ordering the State to destroy them. However, the court's order did not go far enough. It is clearly a violation of *Uno* and rule 26(b)(3) for the State to have in its possession at this time any documents prepared in anticipation of litigation by Menzies' pro bono counsel or *520 their agents. [14] If there are documents that were included in Menzies' index of withheld documents that are properly discoverable by the State or that were already in the State's possession due to prior legitimate discovery, then the State need not destroy them. However, the State must identify any such documents and destroy all others post haste. Accordingly, on remand, the district court must require the State to demonstrate which documents it is entitled to keep, order the State to immediately destroy all of the remaining documents, [15] and take all other necessary steps to ensure that the *Uno* violation goes no further.

[14]   We note that our holding does not preclude the State from seeking discovery of materials that may be relevant to future litigation in this case, so long as the appropriate tests are met.

[15]   This order should not be confined to the documents themselves, but should include, for example, copies of the documents, notes taken from the documents, and any other materials made from the documents by the State.

## CONCLUSION

¶ 117 Although concluding that errors at the district court level require reversal, we note that the trial court functioned with great diligence and effort under extraordinary difficulties in this case. The procedural and substantive defaults of Brass, the extremely adversarial posture and voluminous pleadings of the parties, the extensive and confusing state of the record, and the multiple contested questions of law all posed a great challenge, and the court was thorough in its attention to the case. We take this occasion, however, to emphasize the role that district courts must play in protecting and preserving the integrity of every aspect of capital proceedings.

¶ 118 We hold that the district court abused its discretion by denying Menzies relief under rule 60(b)(6) of the Utah Rules of Civil Procedure. Menzies is entitled to rule 60(b)(6) relief due to the extraordinary circumstances of Brass' ineffective assistance of counsel and grossly negligent representation. In addition the district court erred in its application of *Salt Lake*

*Legal Defender Ass'n v. Uno,* 932 P.2d 589 (Utah 1997), and its discovery ruling must be supplemented. We reverse and remand for proceedings consistent with this opinion.

¶ 119 Justice Durrant, Justice Parrish, and Justice Nehring concur in Chief Justice Durham's opinion.

WILKINS, Associate Chief Justice, concurring in the result.
¶ 120 I concur in the result reached by my colleagues. Given the facts presented, it is simply impossible to understand, much less justify, Mr. Brass' conduct in this case. Calling his behavior here "ineffective" rather understates the case. That alone is enough to require the district court to give Menzies the benefit of the doubt on seeking to set aside the summary judgment granted primarily as a result of Mr. Brass' failure to represent his client's interests in any meaningful way. A total failure to represent one's clients' interests is always ineffective.

¶ 121 Mr. Brass, a classmate of mine from law school, has, in the past, been a fine lawyer doing an excellent job. His passion about the rights of the accused has resulted in his willingness to be assigned the defense of some truly awful individuals charged with hideous acts. He has been an express believer in the right of all citizens to a vigorous defense against charges of criminal behavior brought by the State. He has, on many occasions, reminded judges and juries of Utah that our joint agreement, embodied in both state and federal constitutions, provides the benefit of the doubt to the accused. Periodically, some of the guilty go free as a result of the high burden we have all imposed upon the State to prove our guilt. This allows us to be more certain that only the guilty are punished.

¶ 122 In cases where the death penalty is possible, we have become increasingly more thorough in our appellate review. The motivation for this increased care comes in part from the ever-changing federal constitutional interpretations of the Supreme Court of the United States. One is left with the impression that in time the death penalty, no matter how painlessly or righteously imposed, will **\*521** be found violative of the United States Constitution by the high Court. Such a decision, if and when it comes, will no doubt be hotly debated on grounds of "original intent" versus the "living constitution" by those deeply concerned with the topic. Although I harbor an opinion on the question, it does not come into play here whatsoever.

¶ 123 I do not subscribe to the general "framework" discussion offered by my colleagues. In this and other death penalty cases, we universally express concern that society is extracting the ultimate penalty from the defendant convicted of a capital crime. I am troubled by the usual absence of any attempt to demonstrate consideration for the truly innocent victims and their loved ones who are selected by death row inmates as targets for their crimes in the first instance. Moreover, I am deeply troubled by the exacting and seemingly endless requirements to review, re-review, analyze, and re-analyze any possible defect in the proceedings by which those found guilty of crimes so hideous that the death penalty is imposed. The death penalty acts as a deterrent to those put to death, for sure. It does not seem to have any realistic application to anyone else. Based on our experience, a sentence of life without parole may not only be as good a deterrent, but also less expensive to the state, more miserable for the guilty, and more certain for the victims and society.

¶ 124 I am not certain that those convicted of death-eligible offenses against the rest of us deserve the extreme level of attention we extend to them in the name of being absolutely certain of their guilt and that their crime warrants death. I think it might be better to abandon the effort and simply impose a life-long removal from society. I suppose an alternative might be to expend the effort and resources instead in training and educating our children to prevent capital crime in the first place.

¶ 125 Nonetheless, this court has once again extended greater protections to those convicted of capital crimes than recognized by the United States Supreme Court, finding a statutory right to effective assistance of counsel in state post-conviction proceedings. In addition, my colleagues rely in part on ABA Death Penalty Guideline 10.15.1, which provides in part that post-conviction counsel "should seek to litigate all issues, whether or not previously presented, that are arguably meritorious" and, further, assume that Menzies' claim of innocence clearly cries out for factual investigation. I agree with none of these propositions.

¶ 126 It is enough that Mr. Brass utterly failed to represent Menzies' interests in the matter. A total failure of counsel, when counsel is provided by law, is sufficient to get another chance at post-conviction relief. No more is needed in this case.

**All Citations**

150 P.3d 480, 567 Utah Adv. Rep. 15, 2006 UT 81

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Addendum E

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   State v. Silva,   Utah,   July 23, 2019

344 P.3d 581
Supreme Court of Utah.

Ralph Leroy MENZIES, Petitioner and Appellant,

v.

STATE of Utah, Respondent and Appellee.

No. 20120290.
|
Sept. 23, 2014.
|
Rehearing Denied Feb. 12, 2015.

**Synopsis**

**Background:** After petitioner's conviction for first-degree murder and sentence to death were affirmed, 889 P.2d 393, petitioner filed post-conviction relief petition. The Third District Court, West Jordan Department, Pat B. Brian, J., dismissed petition. Petitioner appealed. The Supreme Court, Durham, C.J., 150 P.3d 480, reversed and remanded, allowing petitioner to amend his petition. On remand, the trial court, Bruce C. Lubeck, J., granted state summary judgment, denied petitioner's cross-motion for summary judgment, and dismissed fifth amended petition for post-conviction relief. Petitioner appealed.

**Holdings:** The Supreme Court, Durrant, C.J., held that:

Post-Conviction Remedies Act (PCRA) did not violate state or federal constitution;

post-conviction court did not abuse its discretion in denying petitioner's requests for additional funding under PCRA;

state was not required to answer petition before filing summary judgment motion;

post-conviction court did not abuse its discretion in denying petitioner's motion for continuance;

petitioner was not denied effective assistance of counsel during guilt phase of trial;

petitioner was not denied effective assistance of counsel during penalty phase of proceeding; and

petitioner was not denied effective assistance of counsel on appeal.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

**\*588**  Theodore R. Weckel, Jr., Salt Lake City, Craig T. Peterson, Bountiful, for appellant.

Sean D. Reyes, Att'y Gen., Thomas B. Brunker, Asst. Att'y Gen., Erin Riley, Asst. Att'y Gen., Salt Lake City, for appellee.

Chief Justice DURRANT authored the opinion of the Court, in which Associate Chief Justice NEHRING, Justice DURHAM, Justice PARRISH, and Justice LEE joined.

Chief Justice DURRANT, opinion of the Court:

**Introduction**

¶ 1 Nearly twenty-six years ago, a jury convicted Ralph Leroy Menzies of the first degree murder of Maurine Hunsaker. At sentencing, Judge Raymond Uno imposed the death penalty. Since then, we have issued three opinions in Mr. Menzies's case: two from direct appeals [1] and one from a post-conviction appeal. [2] In Mr. Menzies's first post-conviction appeal, *Menzies III,* we reversed the dismissal of his post-conviction petition and allowed him to amend his petition. [3] He availed himself of this opportunity multiple times, culminating in the filing of a Fifth Amended Petition for Relief Under the Utah Post–Conviction Remedies Act (Fifth Amended Petition). On March 23, 2012, the post-conviction court (PCC) [4] issued an order granting the State summary judgment, denying Mr. Menzies's cross-motion for summary judgment, and dismissing the Fifth Amended Petition.

1       *State v. Menzies* (*Menzies II* ), 889 P.2d 393 (Utah 1994), *cert. denied,* 513 U.S. 1115, 115 S.Ct.

910, 130 L.Ed.2d 792 (1995); *State v. Menzies* (*Menzies I* ), 845 P.2d 220 (Utah 1992).

2    🚩 *Menzies v. Galetka* (*Menzies III* ), 2006 UT 81, 150 P.3d 480.

3    *Id.* ¶ 118.

4    Throughout this opinion we refer to the post-conviction court that considered Mr. Menzies's Fifth Amended Petition using the acronym "PCC." We do not use this acronym when referring to another post-conviction court or to post-conviction courts generally.

¶ 2 Mr. Menzies's current post-conviction appeal to this court (his second) raises numerous claims, which can be separated into three general categories. First, he challenges the constitutionality of the Utah Post–Conviction Remedies Act (PCRA), as well as the PCC's application of the PCRA's funding provisions. Second, he claims that the PCC erred in rejecting several of his post-conviction motions, including motions for an answer from the State, a continuance, and an evidentiary hearing. Finally, he claims that his former counsel provided ineffective assistance, including at trial, sentencing, and on appeal. We reject each of Mr. Menzies's claims and affirm the PCC's order dismissing his Fifth Amended Petition. [5]

5    The PCC rejected other claims, but Mr. Menzies does not challenge the rejection of these claims in this appeal. The PCC rejected some of these claims because they were either already raised or could have been raised on direct appeal. They include the following: (1) Mr. Menzies was denied due process because trial transcripts were not available to him, (2) the admission of certain preliminary hearing testimony violated Mr. Menzies's Confrontation Clause rights, and (3) the jury instructions regarding eyewitness identification testimony were unconstitutional. The PCC also rejected several claims that originated in Mr. Menzies's motion for summary judgment. The State argued that the PCC could not consider the claims. The PCC agreed and held that they were procedurally barred because Mr. Menzies did not raise them in his Fifth Amended Petition. They include the following: (1) trial counsel insufficiently involved Mr. Menzies in settlement offers, (2) trial counsel should have

sought a hearing on expert testimony regarding the carpet fibers found on Mrs. Hunsaker and in Mr. Menzies's apartment, and (3) trial counsel should have tried to suppress the results of a search of Mr. Menzies's apartment. Mr. Menzies does not appeal the PCC's rejection of these claims either.

## Background

¶ 3 We have recounted the basic facts of this case in our three previous decisions. [6]  **\*589**  We recite some of those facts here, along with certain other facts, to help give context to the specific issues raised in this appeal. First, we consider the facts relating to the crime and investigation. Next, we outline the procedural history of this case: (1) the guilt phase of the trial, (2) the penalty phase of the trial, (3) the appellate proceedings, and (4) the post-conviction proceedings.

6    *See* 🚩 *Menzies III,* 2006 UT 81, 150 P.3d 480; 🚩🔥 *Menzies II,* 889 P.2d 393 (Utah 1994), *cert. denied,* 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995); *Menzies I,* 845 P.2d 220 (Utah 1992).

### I. The Crime and Investigation

¶ 4 During the evening of Sunday, February 23, 1986, Maurine Hunsaker's husband called the Gas–A–Mat gas station where she worked. Mrs. Hunsaker did not pick up. Concerned, Mr. Hunsaker then went to Gas–A–Mat around 10:10 p.m. that same night. When he arrived he found that Mrs. Hunsaker and her purse were gone. The police arrived at the gas station and accompanied Mr. Hunsaker home. At about 11:05 p.m., Mrs. Hunsaker called the Hunsakers' home phone. She stated that "[t]hey told me to tell you they robbed me and got me and that I am fine and they are going to let me go sometime tonight." Mr. Hunsaker noted that Mrs. Hunsaker sounded upset and scared. An officer also spoke to Mrs. Hunsaker on the phone and asked whether the perpetrators robbed her. Mrs. Hunsaker says yes. She also indicated that the perpetrators planned to release her that night or the following morning. The officer then returned the phone to Mr. Hunsaker. Mrs. Hunsaker asked Mr. Hunsaker what she should do. The telephone line disconnected before he could respond.

¶ 5 Two days later, on Tuesday, February 25, a hiker found Mrs. Hunsaker's body near the Storm Mountain picnic area in

Big Cottonwood Canyon. Her throat was cut, her wrists had marks on them, and the bark of a nearby tree was scuffed, suggesting that she was tethered to the tree. A medical examiner determined that ligature strangulation caused Mrs. Hunsaker's death. The examiner also noted that the cut in her throat contributed to her death and that a variety of different knives could have been used to inflict the wound. The examiner's report indicated that the marks on her wrists could have been caused by wire or cord, but it made no mention of handcuffs.

¶ 6  Meanwhile on February 24, as the police were investigating the events surrounding Mrs. Hunsaker's disappearance, they arrested and booked Mr. Menzies for an unrelated burglary. Mr. Menzies's exact booking time is uncertain. He suggests that the police completed the booking process at 7:59 p.m. He also points out that trial counsel stipulated that he turned over cash to the police around 7:20 p.m. Other evidence in the record suggests that the police began the booking process around 6:40 p.m. During booking, the booking officer asked Mr. Menzies for his possessions. He responded by spinning around, running down a hallway, and ducking into a changing room. He was out of sight for about five to eight seconds. A pursuing officer found Mr. Menzies and saw him "reaching around" to "pull on" his pants. The officer testified that although Mr. Menzies was handcuffed at the time, he could still move his arms. Mr. Menzies explained that he had run and ducked into the changing room because he was looking for a restroom. He did not ask for a restroom again, however, during the hour-and-a-half booking process.

¶ 7  A jailer found four of Mrs. Hunsaker's identification cards in a laundry hamper located in the changing room into which Mr. Menzies ran. [7]  The jailer put the cards in a **\*590** nearby desk drawer. Another officer later discovered the identification cards in the drawer. The officer who found the cards recognized Mrs. Hunsaker's picture from an earlier news report regarding her disappearance.

[7]     To advance his ineffective assistance claims, Mr. Menzies points out that the record is unclear regarding the exact time the jailer found the identification cards in the hamper. The record is not as unclear as he suggests, however. In fact, it strongly indicates that the jailer most likely found the identification cards on Monday, February 24—the same day the police booked Mr. Menzies. First, Detective Dennis Couch stated in an affidavit for a search warrant of Mr. Menzies's apartment that the

jailer found the identification cards on February 24. And second, the jailer testified at trial that he found the cards between 6:30 and 7:00 p.m. on February 24. Mr. Menzies cites to various places in the record to suggest that the jailer in other instances reported finding the identification cards on February 25 and 26. But he appears to misread or misunderstand the record. For instance, in an interview the police asked the jailer when he found the cards. The interview transcript shows that the jailer answered "26th of February." But "26th" is crossed out in the transcript and replaced with "24." Any potential ambiguity can be resolved by reading the answer in context. The interviewing officer followed up the question by asking "[w]ould that be on a Monday." The jailer responded "[y]eah." Mr. Menzies's other record citations are similarly in accord when read in their proper context.

¶ 8  Multiple witnesses alleged they saw Mrs. Hunsaker during the time between her disappearance from the gas station and the finding of her body. First, a witness reportedly saw her at a Denny's restaurant on the night of her disappearance with a man who fit the description of Mr. Menzies's friend, Troy Denter. Second, on February 24, the morning after Mrs. Hunsaker went missing, two high-school students, Tim Larrabee and Beth Brown, saw two people at Storm Mountain who they later said fit the description of Mr. Menzies and Mrs. Hunsaker.

¶ 9  On Tuesday, February 25, the day after Mr. Larrabee and Ms. Brown visited Storm Mountain, Mr. Larrabee watched television and saw a report that a hiker found Mrs. Hunsaker's body near the Storm Mountain picnic area. The next day, Wednesday, February 26, Mr. Larrabee contacted the police and reported that he and Ms. Brown were at Storm Mountain the morning of Monday, February 24. Mr. Larrabee reported twice seeing a man and a woman walking together away from where he and Ms. Brown were located. He noted that the man had a coat slung over his right shoulder and that he could not tell whether the two were holding hands. He stated that nothing unusual appeared to be going on between the two. He further reported that about ten minutes after he saw the two people, he heard a scream and assumed that the woman either slipped or was frightened by an animal. Approximately fifteen to twenty minutes later, Mr. Larrabee saw a man walking alone towards the nearby parking lot. Mr. Larrabee also said he noticed a 1960s cream-colored vehicle in the parking lot similar to a 1968 Buick Riviera.

Appellate Case: 19-4042     Document: 98-2     Date Filed: 12/22/2020     Page: 74

¶ 10 Mr. Larrabee described the man he saw as a white male, twenty-five to thirty years old, 6′1 tall, and approximately 170 pounds. He noted that the man wore a coat that was either blue-grey or blue-white. He also said the man had black curly hair and either a scraggly beard or sideburns. Mr. Larrabee's description of the man ended up being within one inch in height and ten pounds in weight of Mr. Menzies. Mr. Larrabee said he could probably identify the man if he saw a picture, but that he could not identify the woman. Police detective Richard Judd created a composite drawing using Mr. Larrabee's description.

¶ 11 Two days later on Friday, February 28, after comparing the composite drawing with photographs from over two hundred inmates booked between February 23 and February 25, the police selected six photos from that group for Mr. Larrabee to view. Mr. Menzies's picture was one of the photos the police picked from the pool. The police considered Mr. Menzies a suspect by the time they showed the photos to Mr. Larrabee. [8] Detective Judd testified that they tried to make it as hard as possible for Mr. Larrabee to identify Mr. Menzies. The police then showed Mr. Larrabee the array of photos. Mr. Larrabee initially made no positive identification. He asked to see the array again. After further review, he selected Mr. Menzies's photo as looking the most like the man he saw at Storm Mountain.

[8]    The State's brief states that the "[p]olice had not yet identified Menzies as a suspect" during the time they created the photo array. At oral argument the State conceded, however, that its initial position was incorrect and that in fact the police did consider Mr. Menzies a suspect at the time they assembled the photo array.

¶ 12 About three months after Mr. Larrabee viewed the photo array, the police conducted a lineup that included Mr. Menzies. At the lineup, Mr. Larrabee identified someone other than Mr. Menzies as the man he saw at Storm Mountain. Apparently, Mr. Larrabee later felt he made a mistake and asked the prosecutor whether number six in the lineup was the suspect. Mr. Menzies was suspect number six. Later at trial, the court instructed the jury not to consider Mr. Larrabee's **591** testimony regarding his confirmatory request to the prosecutor.

¶ 13 The same day the police showed Mr. Larrabee the photo array, they also interviewed Mr. Menzies's friend Troy Denter. Mr. Denter told them that he loaned his cream-colored 1974

Chevrolet to Mr. Menzies some time during the afternoon of Sunday, February 23. Mr. Menzies apparently told Mr. Denter he planned to return the car around 10:00 p.m. Sunday night. Mr. Menzies did not return the car on time. Mr. Denter called Mr. Menzies's apartment phone number around 10:00 p.m. Mr. Menzies's girlfriend, Nicole Arnold, answered and stated he was not there. Mr. Denter called again around 11:00 p.m., but Mr. Menzies was still away. Mr. Denter called one more time around 1:00 a.m. Mr. Menzies answered and asked if he could keep the car until the next morning because he had "one more order of business to take care of." But Mr. Menzies did not return the car until about noon the next day, Monday, February 24. He used about twelve and one-half gallons of gas during the time he borrowed Mr. Denter's car. After retrieving his car, Mr. Denter found a box labeled "handcuffs" under the driver's seat.

¶ 14 After interviewing Mr. Denter, the police escorted Mr. Larrabee out to a nearby parking terrace to determine whether Mr. Larrabee might be able to identify the car he saw at Storm Mountain. The police had earlier parked the cream-colored 1974 Chevrolet owned by Mr. Denter among the other cars. Mr. Larrabee tentatively identified Mr. Denter's car as looking like the one he saw at Storm Mountain. Ms. Brown also tentatively identified Mr. Denter's car as the car she saw in the Storm Mountain parking lot.

¶ 15 The police questioned Mr. Menzies after hearing Mr. Larrabee's eyewitness account. Mr. Menzies told them that on the night he borrowed Mr. Denter's car, he picked up a woman on State Street and then picked up Ms. Arnold. He drove around with both women until the two began to fight. He dropped off Ms. Arnold and then dropped the other woman off somewhere around 7200 West and 2400 South. He stated that he then went home to talk to Ms. Arnold.

¶ 16 The police discovered numerous pieces of evidence indicating that Mr. Menzies killed Mrs. Hunsaker. They found Mrs. Hunsaker's thumbprint in Mr. Denter's car. They found that approximately $116 was missing from the Gas–A–Mat cash register. [9] This amount was approximately the same amount of money that was later found in Mr. Menzies's apartment. After being booked for the unrelated burglary offense, Mr. Menzies asked Mr. Denter to retrieve $115 from his apartment. Mr. Denter spent about $25. Ms. Arnold's mother later found $90 hidden in Mr. Menzies's apartment. Ms. Arnold's mother also found handcuffs in a maroon and grey parka belonging to Mr. Menzies. The police ordered a chemical analysis comparing fibers of Mr. Menzies's green

shag carpet with green fibers on Mrs. Hunsaker's clothing. That analysis found similarities in the color, diameter, shape, and content of the fibers. The police seized a buck knife from Mr. Menzies's apartment that was capable of causing the wounds on Mrs. Hunsaker's neck. The police also seized a brown suede purse from Mr. Menzies's apartment, and Mr. Hunsaker testified that the purse belonged to Mrs. Hunsaker. Six months after Mr. Menzies's arrest, Ms. Arnold's stepfather found Mrs. Hunsaker's social security card in Ms. Arnold's belongings. Finally, another jail inmate, Walter Britton, testified at Mr. Menzies's preliminary hearing that Mr. Menzies confessed that he killed Mrs. Hunsaker. According to Mr. Britton, Mr. Menzies also stated that slitting her throat was one of the biggest thrills of his life.

9 The record is unclear regarding exactly how much money was missing because of the gas station's loose accounting practices.

## II. Procedural History

¶ 17 Much of this appeal centers on the effectiveness of Mr. Menzies's trial and appellate counsel. In each instance, attorneys from the Salt Lake Legal Defender Association (LDA) represented Mr. Menzies. Below **\*592** we consider Mr. Menzies's claims that his counsel rendered ineffective assistance. [10] We now briefly describe the guilt-phase, penalty-phase, appellate, and post-conviction proceedings to provide some necessary context.

10 *See infra* ¶¶ 71–223.

### A. Guilt–Phase Proceedings

¶ 18 Brooke Wells, currently a federal magistrate judge, acted as lead counsel in Mr. Menzies's case. [11] Frances Palacios acted as co-counsel and second chair in the case. The defense theory advocated by Ms. Wells and Ms. Palacios is described in depth below. In short, they relied on a failure-of-proof defense. [12] This defense consisted of two parts. First, they argued that the State could not prove beyond a reasonable doubt that Mr. Menzies killed Mrs. Hunsaker. And second, they argued that the State could not prove an aggravator that would support a capital conviction. After a month-long trial, a jury rejected the failure-of-proof defense theory and convicted Mr. Menzies of capital homicide and aggravated kidnapping.

11 Throughout this opinion we refer to Judge Brooke Wells as "Ms. Wells" because at the time of her representation of Mr. Menzies she was not a sitting judge. Further, we refer to Ms. Wells and Ms. Palacios collectively as "trial counsel."

12 Mr. Menzies repeatedly asserts that trial counsel did not rely on a failure-of-proof defense. He suggests instead that trial counsel's "principal theory was that the victim ... voluntarily risked losing her job, her marriage, and custody of her children, for a date with a mentally ill stranger because she was clinically depressed." There are statements by trial counsel in the record that suggest as much. But read in context, these statements go to the second part of trial counsel's two-part failure-of-proof strategy—whether the State could prove an aggravator that would support a capital conviction. Trial counsel's defense strategy did not rely solely on the notion that Mrs. Hunsaker left with Mr. Menzies voluntarily. Trial counsel's closing argument summarizes the defense theory as follows: "[w]hat you must do today [is] decide has the State proved beyond a reasonable doubt that this is a first degree homicide.... you then determine if it has been proved beyond a reasonable doubt that Mr. Menzies, the person accused, is the one who committed that offense."

### B. Penalty–Phase Proceedings

¶ 19 Ms. Wells and Ms. Palacios also acted as the lead attorneys during the penalty phase of the proceedings. In that phase, Mr. Menzies waived his right to a jury. During the penalty phase, the State argued that Judge Uno should impose the death penalty. In making this argument, the State relied primarily on the evidence produced during the guilt-phase proceedings and on Mr. Menzies's criminal history. Trial counsel proffered mitigation and background evidence to suggest that Mr. Menzies should not receive a death sentence. After considering trial counsel's mitigation defense, Judge Uno imposed the death penalty.

### C. Appellate Proceedings

¶ 20 After penalty-phase proceedings concluded, Mr. Menzies moved for a new trial and grounded his motion largely on the basis of errors in the trial transcript. The trial court rejected his motion. Mr. Menzies appealed that denial. On appeal, LDA again represented Mr. Menzies. Joan Watt acted as lead appellate counsel. We affirmed the trial court's denial of Mr. Menzies's motion for new trial. [13] Mr. Menzies next brought a direct appeal on the merits and argued that numerous errors occurred at trial. We dismissed that appeal as being "without merit." [14]

13    *Menzies I,* 845 P.2d 220, 242 (Utah 1992).

14    🚩🔶*Menzies II,* 889 P.2d 393, 406 (Utah 1994), *cert. denied,* 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995).

### *D. Post–Conviction Proceedings*

¶ 21 In *Menzies III,* we detailed at length the first decade of Mr. Menzies's post-conviction proceedings. [15] We recite only a small portion of those proceedings here.

15    🔖*Menzies III,* 2006 UT 81, ¶¶ 3–48, 150 P.3d 480.

¶ 22 Mr. Menzies, with the help of pro bono counsel, began post-conviction proceedings by filing a petition for post-conviction relief on April 20, 1995. He then filed an amended petition on May 2, 1995. In 1997, after the PCRA took effect, the state notified **\*593** Mr. Menzies that he might be entitled to receive payment from the state for litigation costs and attorney fees. The next year, Edward Brass began serving as Mr. Menzies's counsel. Mr. Brass filed a two-page second amended petition for post-conviction relief on August 31, 1998. Over approximately the next five years, Mr. Brass "willfully neglect [ed]" Mr. Menzies's case. [16] In late 2003, Elizabeth Hunt replaced Mr. Brass as Mr. Menzies's counsel. Ms. Hunt sought to undo the damage done to Mr. Menzies's case by Mr. Brass and filed a rule 60(b) motion seeking to set aside a default judgment entered against Mr. Menzies. That filing led to our decision in *Menzies III.* There we held that Mr. Menzies had a statutory right to effective assistance of post-conviction counsel under the PCRA. [17] We determined that Mr. Brass's representation constituted ineffective assistance of counsel and ordered that Mr. Menzies be given the opportunity to investigate his claims and file another amended post-conviction petition. [18]

16    *Id.* ¶ 110.

17    *Id.* ¶ 82.

18    *Id.* ¶ 111.

¶ 23 In 2008, the legislature responded to our *Menzies III* decision by amending the PCRA. We have previously recognized that the 2008 amendments were a response to our holding in *Menzies III* that the PCRA granted a right to effective assistance of post-conviction counsel. [19] Under the amended version, the PCRA expressly states it does not confer a right to effective assistance of counsel in post-conviction proceedings. [20]

19    *See Carter v. State,* 2012 UT 69, ¶ 37, 289 P.3d 542 ("In an apparent response to [*Menzies III* ], the legislature amended the PCRA in 2008.").

20    🔖UTAH CODE § 78B–9–202(4) ("Nothing in this chapter shall be construed as creating the right to the effective assistance of postconviction counsel, and relief may not be granted on any claim that postconviction counsel was ineffective.").

¶ 24 On remand, Richard Mauro initially represented Mr. Menzies. He withdrew as counsel, however, after challenging the state's payment schedule. Craig Peterson, Mr. Menzies's current co-counsel, began representing him in early 2009. Theodore Weckel, Mr. Menzies's current lead counsel, also began representing him in 2009. Mr. Weckel and Mr. Peterson filed numerous motions with the PCC seeking additional discovery and investigation. They filed a third amended petition for post-conviction relief on October 12, 2010, a fourth amended petition on January 10, 2011, and a fifth amended petition on March 14, 2011. The Fifth Amended Petition lists twenty-seven claims for relief. The State responded to the Fifth Amended Petition by filing a motion for summary judgment on May 17, 2011. Mr. Menzies filed an opposition to the State's motion along with a cross-motion for summary judgment on August 1, 2011. The State filed a reply on November 1, 2011. In addition to his motion for summary judgment, Mr. Menzies filed motions seeking an evidentiary hearing, a rule 56(f) extension, and to supplement the record, each of which the PCC denied.

¶ 25 On March 23, 2012, the PCC issued an order granting the State's summary judgment motion, denying Mr. Menzies's cross-motion for summary judgment, and dismissing the Fifth

Amended Petition. Mr. Menzies timely appealed the PCC's order by filing a notice of appeal on March 28, 2012. We have jurisdiction pursuant to Utah Code Section 78A–3–102(3)(i).

### Standard of Review

¶ 26 Mr. Menzies raises three categories of claims on appeal: (1) constitutional claims challenging the PCRA, (2) procedural claims that stem from the PCC's pre-judgment rulings, and (3) claims of ineffective assistance of counsel. [21] We assess each of these issues **\*594** under a different standard of review, described below, and also note the overarching standard of review for a grant of summary judgment, which is at issue in this case.

[21]     A significant portion of Mr. Menzies's brief is devoted to showing that the PCC's "de facto findings of fact from the record were erroneous." In reviewing a lower court's findings of fact, "[w]e apply the clearly erroneous standard." *State v. Hutchings,* 2012 UT 50, ¶ 8, 285 P.3d 1183. Mr. Menzies's argument here fails for the simple reason that the PCC made no findings of fact. Several times in its opinion the PCC specifically noted that it was not finding or determining facts. Rather the court stated it was "merely recit[ing] facts] from the record ... to demonstrate the basic factual situation involved in this case." The PCC assumed that "all the facts [Mr. Menzies] alleges are true" and held that even under this assumption Mr. Menzies's claims failed. Other parts of Mr. Menzies's opening brief concede the point that "the PCC did not make findings of fact." Because there are no findings of fact to review, we reject Mr. Menzies's claim that the PCC's findings of fact were clearly erroneous.

¶ 27 First, Mr. Menzies challenges the constitutionality of the PCRA, as well as the PCC's funding decisions under the PCRA. "Constitutional issues ... are questions of law that we review for correctness," [22] but "we will review [a] postconviction court's denial of [a petitioner's] funding request for an abuse of discretion." [23]

[22]     *State v. Martinez,* 2013 UT 23, ¶ 6, 304 P.3d 54 (internal quotation marks omitted).

[23]     *Honie v. State,* 2014 UT 19, ¶ 29, 342 P.3d 182.

¶ 28 Second, Mr. Menzies challenges several of the PCC's procedural rulings. He first claims that due process and rule 65C of the Utah Rules of Civil Procedure required the State to file an answer before moving for summary judgment. Interpretation of a rule and constitutional claims each present a question of law that we review for correctness. [24] Second, he claims that the PCC erred in denying his rule 56(f) motion for a continuance. We review a decision granting or denying a rule 56(f) motion for an abuse of discretion and "will not reverse the district court's decision ... unless it exceeds the limits of reasonableness." [25] Third, he claims that the PCC erred in denying him an evidentiary hearing under rule 43(b) of the Utah Rules of Civil Procedure. We review a decision granting or denying a rule 43(b) motion for an abuse of discretion. [26] With respect to both rule 56(f) and rule 43(b), we recognize that while we review the ultimate determination of whether to grant or deny these motion for an abuse of discretion, a district court may make findings of fact or conclusions of law in reaching that ultimate determination. And as to those decisions we review findings of fact under a "clearly erroneous" standard and conclusions of law under a "de novo" standard. [27]

[24]     *State v. Phong Nguyen,* 2012 UT 80, ¶ 8, 293 P.3d 236 ("Interpretation of a rule presents a question of law that we ... review for correctness."); *Martinez,* 2013 UT 23, ¶ 6, 304 P.3d 54 ("Constitutional issues ... are questions of law that we review for correctness." (internal quotation marks omitted)).

[25]     *Overstock.com, Inc. v. SmartBargains, Inc.,* 2008 UT 55, ¶ 20, 192 P.3d 858 (internal quotation marks omitted).

[26]     *Stan Katz Real Estate, Inc. v. Chavez,* 565 P.2d 1142, 1143 (Utah 1977) ("We recognize, of course, that trial judges have [ ] discretion to hear and determine ordinary motions either on affidavits or oral testimony portraying facts not appearing of record." (internal quotation marks omitted)).

[27]     *Manzanares v. Byington (In re Adoption of Baby B.),* 2012 UT 35, ¶¶ 40–41, 308 P.3d 382 (internal quotation marks omitted).

¶ 29 Third, Mr. Menzies brings claims of ineffective assistance of counsel. "[W]e review a lower court's purely

factual findings for clear error, but [we] review the application of the law to the facts for correctness." [28]

28      *Archuleta v. Galetka,* 2011 UT 73, ¶ 25, 267 P.3d 232, *cert. denied,* —— U.S. ——, 133 S.Ct. 112, 184 L.Ed.2d 52 (2012) (second alteration in original) (internal quotation marks omitted).

¶ 30 Finally, because Mr. Menzies's appeal is from the PCC's grant of summary judgment to the State, our standard of review regarding summary judgment is relevant here. "[W]e review a grant of summary judgment for correctness, granting no deference to the [lower] court. We affirm a grant of summary judgment when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [29] Part III of this opinion further develops the implications of our summary judgment standard in the context of this case.

29      *Ross v. State,* 2012 UT 93, ¶ 18, 293 P.3d 345 (alteration in original) (internal quotation marks omitted).

***595  Analysis**

¶ 31 Mr. Menzies makes numerous post-conviction claims, which can be separated into three general categories. First, he raises several claims relating to the PCRA, including constitutional claims and challenges to the PCC's application of the PCRA's funding provisions. Second, he argues that the PCC erred in rejecting his procedural claims, including that (1) the State must answer his petition for post-conviction relief, (2) he is entitled to a rule 56(f) continuance, and (3) the PCC must hold an evidentiary hearing before ruling on the cross-motions for summary judgment. Third, and last, he raises ineffective assistance of counsel claims stemming from his counsel's performance at the guilt phase, penalty phase, and appellate phase of the proceedings.

¶ 32 Part I of this section discusses Mr. Menzies's challenges to funding under the PCRA. Mr. Menzies first argues that the PCRA's funding provisions violate the United States and Utah constitutions. We reject these claims because Mr. Menzies fails to establish that he has a right to funded post-conviction counsel. Additionally, Mr. Menzies argues that the PCC abused its discretion in denying further funding. We conclude that the PCC did not abuse its discretion in

concluding that the funds given to Mr. Menzies have been more than "reasonable" and that he cannot show that "good cause" justifies further funding.

¶ 33 Part II of this section discusses Mr. Menzies's procedural claims. We affirm the PCC's denial of each of these claims. We first conclude that the State was not required to answer Mr. Menzies's Fifth Amended Petition, because rule 65C of the Utah Rules of Civil Procedure allows the State to respond to a petition for post-conviction relief with a motion for summary judgment. We then examine Mr. Menzies's claim that he is entitled to a rule 56(f) continuance and conclude that the PCC did not abuse its discretion in denying Mr. Menzies a continuance. Next, we address Mr. Menzies's claim that the PCC should have held an evidentiary hearing before ruling on the cross-motions for summary judgment and conclude that the PCC did not abuse its discretion in denying Mr. Menzies an evidentiary hearing.

¶ 34 Finally, in Part III of this section we analyze Mr. Menzies's ineffective assistance of counsel claims. We conclude that all but two of these claims are properly before us because LDA represented Mr. Menzies at both trial and on appeal. [30] As to those claims that are properly before us, we affirm the PCC's decision on each because Mr. Menzies is unable to make a sufficient showing of deficient performance and prejudice under *Strickland v. Washington.* [31]

30      Two of Mr. Menzies's ineffective assistance claims are not properly before us. They include (1) counsel was ineffective by failing to raise a due process challenge based on the jury seeing Mr. Menzies handcuffed, and (2) trial counsel should have advised Mr. Menzies of the option to plead guilty under  *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). As we explain below, *infra* ¶ 72 n. 69, both of these claims are procedurally barred because Mr. Menzies did not raise them in his Fifth Amended Petition.

31      466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

I. Mr. Menzies's PCRA Claims Fail Because He Has not Established that He Has a Constitutional Right to Funded Post–Conviction Counsel and the PCC Did

not Abuse Its Discretion in Holding that the State
Has Provided Mr. Menzies with Reasonable Funds

*A. Mr. Menzies Has not Established that He Has a
Constitutional Right to Funded Post–Conviction Counsel*[32]

[32] Before oral argument, we requested that both
parties prepare to discuss whether the PCRA
applied at all to Mr. Menzies's claims, given that
his initial post-conviction petition was filed before
the effective date of the PCRA. But we decline
to reach this issue in our decision, as we also
declined to do in *Honie v. State,* 2014 UT 19, ¶
84 n. 12, 342 P.3d 182, since neither party has
challenged the applicability of the PCRA to Mr.
Menzies's claims on appeal. In essence, our holding
in *Menzies III* served to wipe the slate clean and
provide Mr. Menzies with an opportunity to file
an amended post-conviction petition, which he did
in 2010. *Menzies III,* 2006 UT 81, ¶ 111, 150
P.3d 480. We therefore assume, for purposes of this
appeal, that the version of the PCRA in force at the
time he filed his Fifth Amended Petition governs,
which includes the funding provisions contained in
the 2008 amendments to the PCRA that provide the
basis for Mr. Menzies's funding challenge.

¶ 35 Mr. Menzies first raises constitutional challenges to the
PCRA: he claims **\*596** that (1) the PCRA violates Utah's
right to counsel since it interferes with counsel's independent
decision-making, (2) the PCRA "facilitates arbitrary death
sentences" because it fails to give adequate resources to
investigate before requiring counsel to prove what he or she
would find in discovery, and (3) the PCRA is inconsistent
with Utah's Due Process Clause. The main contention in each
of these claims is that the PCRA's funding limits restrict his
rights to counsel and due process, since they prevent counsel
from engaging in "vigorous advocacy." In support of each
of these claims, Mr. Menzies cites generally to the Sixth
Amendment and Utah's due process clause. The PCC rejected
Mr. Menzies's constitutional claims. We affirm and reject each
of these claims.

¶ 36 All of Mr. Menzies's constitutional arguments presume
that he has the constitutional right to funded post-conviction
counsel. In fact, all of his arguments, including his due
process argument, specifically turn on whether he has
this right. As a matter of federal constitutional law, this
presumption is clearly incorrect—post-conviction petitioners

are neither entitled to counsel nor funding for counsel.[33] Mr.
Menzies also cites no Utah authority, or any other authority
for that matter, to support the point that the Utah Constitution
affords him these rights.[34] Because Mr. Menzies presumes,
rather than establishes, that he has a right to funding under
both the United States and Utah constitutions, his three
aforementioned constitutional claims fail.

[33] *Coleman v. Thompson,* 501 U.S. 722, 752, 111
S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("There is no
constitutional right to an attorney in state post-
conviction proceedings. Consequently, a petitioner
cannot claim constitutionally ineffective assistance
of counsel in such proceedings." (internal citations
omitted)).

[34] As to his due process argument specifically, Mr.
Menzies cites only to *Menzies III* to support his
contention that the PCRA violates his right to due
process under the Utah Constitution. This argument
is unfounded, as "we [did] not address his federal
and state constitutional claims" in that case—our
holding was limited to the statutory guarantees of
the PCRA. *Menzies III,* 2006 UT 81, ¶ 84, 150
P.3d 480.

*B. The PCC Did not Abuse its Discretion in
Denying Mr. Menzies Further PCRA Funding*

¶ 37 We also conclude that the PCC did not abuse its
discretion in denying Mr. Menzies's requests for additional
funding. The PCRA provides for "reasonable" attorney fees
and litigation costs, with presumptive limits of $60,000
for attorney fees and $20,000 for litigation costs.[35] In
assessing what constitutes "reasonable" fees or whether a
petitioner has demonstrated "good cause," the court examines
two factors: (1) whether further research or investigation
would be duplicative, and (2) whether the outcome of such
research or investigation is "reasonably likely" to support
post-conviction relief.[36]

[35] UTAH CODE § 78B–9–202(3).

[36] *See id.* § 78B–9–202(3)(a), (b), (e).

¶ 38 Mr. Menzies was afforded significant sums both for post-conviction representation and for litigation costs. In fact, his lead counsel was paid over $194,000 and permitted over $60,000 in litigation expenses. Mr. Menzies hired several investigators and experts, and he was also allowed to interview his prior attorneys and numerous witnesses. It was only after the extended discovery period closed that the court began to limit funding and discovery requests, particularly after learning that counsel had been paid well over three times the presumptive limit since 2006. The PCC examined Mr. Menzies's additional requests for discovery, the evidence already uncovered through post-conviction discovery, and the amounts already afforded to counsel, and it determined that further discovery would be unnecessary, speculative, or duplicative.

¶ 39 We agree that Mr. Menzies's additional requests for discovery were speculative and sought evidence that would have been either unnecessary or duplicative. We briefly examine several of his specific requests here to illustrate the general nature of his numerous additional discovery requests.

 **\*597** ¶ 40 To begin, Mr. Menzies requested additional time to interview the identification expert who determined that the fingerprint on Mr. Denter's car belonged to Mrs. Hunsaker. He also sought additional resources to hire his own fingerprint expert. The PCC denied these requests because it found that he "failed to provide the court with any legitimate, common-sense, good-faith basis for believing that investigating the fingerprint evidence will lead to the discovery of facts that would support a finding of prejudice." We agree. Mr. Menzies's request was speculative because he provided no basis for concluding that the original fingerprint expert would testify any differently than he did over twenty years earlier. Further, nothing in the record supports the conclusion that the fingerprint evidence was in any way questionable. His requests were also unnecessary and duplicative given the PCC's finding that he never indicated "what he believes an independent fingerprint expert might say after reviewing the fingerprint evidence." In essence, Mr. Menzies provided the PCC with no basis for granting his request other than his hope that the additional discovery might turn up something favorable to his case.

¶ 41 As another example, Mr. Menzies asked to depose Detective Judd in hopes that he might admit that (1) he planted Mrs. Hunsaker's identification in the laundry hamper, (2) he improperly influenced Mr. Larrabee during the identification process, and (3) the police searched Mr. Menzies's apartment

illegally. These allegations are completely unsupported in the record and are entirely speculative. Mr. Menzies provided the PCC with no reasonable basis for assuming that Detective Judd actually did any of these things or would have admitted such.

¶ 42 Another of Mr. Menzies's discovery requests speculated that Ms. Wells might admit in a second deposition that she never "interviewed Larrabee and Brown, and was unaware of their sexual activity." Even if true, Mr. Menzies does not show how this finding would matter. As discussed more fully below, the jury was fully aware that Mr. Larrabee was distracted at the time he saw the man and woman together at Storm Mountain. [37] Knowing exactly what he and Ms. Brown were doing at the time would have had no impact on the case. Furthermore, this request was duplicative because Mr. Menzies deposed Ms. Wells during post-conviction discovery and did not justify any need to depose her a second time.

[37]    *See infra* ¶ 141.

¶ 43 Based on the evidence before the PCC, we conclude that the court did not abuse its discretion in denying Mr. Menzies's additional discovery requests and concluding that he did not sufficiently demonstrate good cause for additional funds, since the requested discovery would have been either unnecessary, speculative, or duplicative.

II. The PCC Did not Err in Allowing the State to File a Motion for Summary Judgment and in Denying Mr. Menzies's Motions for a Continuance and Evidentiary Hearing

¶ 44 Mr. Menzies makes three procedural claims: (1) the PCC should have required the State to answer his Fifth Amended Petition before allowing it to file a motion for summary judgment, (2) the PCC wrongly denied Mr. Menzies's rule 56(f) motion for a continuance, and (3) the PCC was required to hold an evidentiary hearing before ruling on the parties' summary judgment motions.

¶ 45 First, rule 65C of the Utah Rules of Civil Procedure does not require the State to answer his Menzies's petition before filing a motion for summary judgment. Second, the PCC did not abuse its discretion in denying Mr. Menzies's rule 56(f) motion. And finally, the PCC did not abuse its discretion in declining to hold an evidentiary hearing before ruling on the parties' cross-motions for summary judgment.

Accordingly, we affirm the PCC's rulings on each of Mr. Menzies's procedural claims.

*A. Rule 65C of the Utah Rules of Civil Procedure Allows the State to Respond to a Post–Conviction Petition with a Motion for Summary Judgment Rather than an Answer*

¶ 46 Mr. Menzies contends that the PCC should have required the State to answer **\*598** his Fifth Amended Petition before filing a motion for summary judgment. We disagree. Rule 65C of the Utah Rules of Civil Procedure does not mandate that the State first answer Mr. Menzies's petition before filing a motion for summary judgment.[38]

[38]    It is unclear under which post-conviction procedural rule the parties believe they are operating. Mr. Menzies's brief vacillates on which post-conviction procedural rule applies in his case. At points Mr. Menzies argues that rule 65B applies in this case. At other points, he suggests rule 65C applies. Mr. Menzies's Fifth Amended Petition specifically states that he petitions "pursuant to ... Utah Rule of Civil Procedure 65C." The State, for its part, does not cite either rule in its brief. The PCC concluded that the current version of rule 65C applies in Mr. Menzies's case.

As we note above, *supra* n. 32, both parties agree that the PCRA applies to Mr. Menzies's Fifth Amended Petition. This dictates that rule 65C applies, not rule 65B, because rule 65C's scope includes "proceedings in all petitions for post-conviction relief filed under the Post–Conviction Remedies Act." UTAH R. CIV. P. 65C(a).

¶ 47 Mr. Menzies argues that the language of rule 65C requires a post-conviction court to first assess whether the petition is frivolous; if the court determines it is not frivolous, then the State must file an answer.[39] We reject Mr. Menzies's argument because his reasoning contradicts the text of rule 65C and our prior cases interpreting the rule.

[39]    Mr. Menzies has actually argued that "[r]ule 65B(b) (6)" requires the State to answer his Fifth Amended Petition. As we note above, rule 65B is not the applicable procedural rule in this case because Mr. Menzies's Fifth Amended Petition is governed by the PCRA. But because his argument focuses on language shared by rule 65B(b)(6) and rule 65C(k)—requiring that the respondent "answer or otherwise respond"—we address his argument as it relates to this shared language.

¶ 48 Rule 65C provides that "if any claim in the petition appears frivolous on its face, the court shall forthwith issue an order dismissing the claim."[40] If the claim is not frivolous, then "the respondent shall answer *or otherwise respond* to the portions of the petition that have not been dismissed and shall serve the answer *or other response* upon the petitioner in accordance with Rule 5(b)."[41] The petitioner may then respond "[w]ithin 30 days ... after service of any motion to dismiss *or for summary judgment.*"[42]

[40]    UTAH R. CIV. P. 65C(h)(1).

[41]    *Id.* 65C(k) (emphases added).

[42]    *Id.* (emphasis added).

¶ 49 Mr. Menzies's interpretation of the text of rule 65C(k) focuses on the word "answer" and glosses over the text of the rest of the rule. The words "or otherwise respond" and "or other response" read in conjunction with the sentence giving petitioners thirty days to respond after service of motions "for summary judgment" conclusively establish that summary judgment procedures are appropriate under rule 65C. There is nothing in the text of rule 65C that suggests that the State *must* file an answer before a motion for summary judgment.

¶ 50 In prior decisions we have reached a similar conclusion. In *Archuleta v. Galetka,* we rejected essentially the same argument that Mr. Menzies makes here and noted that "[the] argument that a district court may never render summary judgment in a death penalty case is simply wrong."[43] In that case we affirmed the post-conviction court's grant of summary judgment to the state.[44] Although there we did not decide whether rule 65B or rule 65C governed the petitioner's claims (because the result would have been the same regardless of which rule applied), our opinion stated that summary judgment was appropriate in either case.[45]

[43]    📄 2011 UT 73, ¶ 49, 267 P.3d 232, *cert. denied,* —— U.S. ——, 133 S.Ct. 112, 184 L.Ed.2d 52 (2012).

[44]    *Id.* ¶ 170.

45  *Id.* ¶ 48 (concluding that petitioner's argument that the post-conviction court erred in dismissing his claims on summary judgment "fails whether Archuleta's petition is governed by common law habeas corpus rules or by the PCRA").

¶ 51 Mr. Menzies also argues that due process dictates that the State respond to his post-conviction petition with an answer rather than a motion for summary judgment. We reject this argument because he has provided no applicable authority or justification for this contention. The only authority he points to in this regard is *Rashidi v. Albright,* a case decided by a federal district **\*599** court in Nevada.[46] There the court interpreted Federal Rule of Civil Procedure 56(b), which governs summary judgment, and concluded that the rule did not preclude courts from ruling on a summary judgment motion before a defendant files an answer to the complaint.[47] But the court also noted that "[i]n some instances it may be necessary for a court to order defendants to file a responsive pleading before deciding the motion for summary judgment."[48] The court did not enumerate a precise set of "instances" that would require the filing of a responsive pleading first but noted only that such practice would be helpful "[i]n certain contexts ... to help clarify issues and assist the court in determining whether there are any genuine issues of fact."[49]

46  818 F.Supp. 1354 (D.Nev.1993).

47  *Id.* at 1357.

48  *Id.*

49  *Id.*

¶ 52 *Rashidi* does not support Mr. Menzies's argument that due process required the State to answer his petition. In fact, it does just the opposite by allowing parties to respond to a complaint with a motion for summary judgment. Only "[i]n some instances" should a court order a party to respond with an answer first, and this case is not one of those instances.[50] As the PCC noted, the existing record and Mr. Menzies's evidentiary proffer provided the PCC with ample ability to "provide a meaningful review of the issues." Mr. Menzies points to no other binding or persuasive authority for the contention that rule 65C violates due process.

50  *Id.*

¶ 53 Mr. Menzies's argument that the State must file an answer misreads the text of rule 65C and our decisions interpreting the rule. The PCC correctly held that rule 65C allows the State to file a motion for summary judgment instead of an answer.

*B. The PCC Did not Abuse Its Discretion in Denying Mr. Menzies a Rule 56(f) Continuance or in Denying Him a Rule 43(b) Evidentiary Hearing*

¶ 54 Next, Mr. Menzies claims that the PCC should have granted him a rule 56(f) continuance to conduct additional discovery and that it should have held an evidentiary hearing before ruling on the cross-motions for summary judgment. We conclude that the PCC did not abuse its discretion in denying both requests.

1. The PCC Did not Abuse its Discretion in Denying Mr. Menzies's Motion for a Rule 56(f) Continuance

¶ 55 Mr. Menzies argues that the PCC abused its discretion in denying his motion for a rule 56(f) continuance. He filed his motion for a rule 56(f) continuance in June 2011, which the PCC denied three months later. He then filed several motions for reconsideration and renewals of the motion. In each case, the PCC denied his requests. We affirm.

¶ 56 As we noted above, "[w]e review the denial of a rule 56(f) motion for an abuse of discretion."[51] "Under this standard, we will not reverse unless the decision exceeds the limits of reasonableness."[52] Rule 56(f) allows courts to order a continuance where a party opposing summary judgment is unable to present affidavits that are essential to the party's opposition. In full, rule 56(f) provides as follows:

51  📁 *Overstock.com, Inc. v. SmartBargains, Inc.,* 2008 UT 55, ¶ 20, 192 P.3d 858.

52  📁 *Crossland Sav. v. Hatch,* 877 P.2d 1241, 1243 (Utah 1994) (internal quotation marks omitted).

Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken

or discovery to be had or may make such other order as is just.

In *Overstock.com, Inc. v. SmartBargains, Inc.,* we identified some relevant factors for determining whether a court exceeded the limits of reasonableness in ruling on a rule 56(f) **\*600** motion, including the following: (1) whether the discovery sought in the party's rule 56(f) affidavit "will uncover disputed material facts that will prevent the grant of summary judgment" or whether the request is merely a "fishing expedition," (2) whether the party opposing summary judgment "has had adequate time to conduct discovery and has been conscientious in pursuing such discovery," and (3) whether the moving party has been diligent in responding to discovery requests by the opposing party.[53]

53          2008 UT 55, ¶ 21, 192 P.3d 858 (internal quotation marks omitted).

¶ 57 The first *Overstock.com, Inc.* factor allows us to consider whether the discovery requested in a rule 56(f) motion is merely a "fishing expedition" or will instead produce material facts that will prevent summary judgment. Mr. Menzies argues that further discovery might lead various witnesses to make admissions favorable to his case. First, he argues that prosecutors might admit that Mr. Britton, the jail inmate who testified against Mr. Menzies at the preliminary hearing, was mentally ill and that they knew Mr. Larrabee saw only a side profile of the man's face while at Storm Mountain. Second, he suggests that Detective Judd might admit that (1) he created the composite photo using Mr. Menzies's mug shot, (2) the police told Mr. Larrabee before the lineup that the man he earlier identified was in custody, (3) the police placed Mrs. Hunsaker's identification cards in the laundry hamper, and (4) the police searched Mr. Menzies's home illegally. Finally, he suggests that Ms. Wells might admit that she (1) did not interview Mr. Larrabee and Ms. Brown, and was not aware that the two were engaged in sexual activity while at Storm Mountain, (2) failed to tell Mr. Menzies about the strength of the State's evidence against him, (3) failed to discuss trial strategy alternatives with Mr. Menzies, (4) did not seek Mr. Menzies's help in creating a viable defense theory, and (5) failed to consider Mr. Denter's involvement in the case.

¶ 58 The evidence that Mr. Menzies suggests he might obtain is either unnecessary, speculative, or duplicative. He offers no rational explanation for why he thinks the proposed deponents might admit to the allegations he suggests. While it is possible these people might make favorable admissions, it is far more

likely that they might stick to their trial testimony, which in no way supports his claims.

¶ 59 For instance, Mr. Menzies provides no basis for assuming that the prosecutors in his case would testify that they withheld evidence of Mr. Britton's mental illness. Moreover, even if the prosecutors did admit to the allegations, their testimony would be irrelevant for purposes of proving ineffective assistance because, as we note below, Mr. Menzies has not shown that his trial counsel could have reasonably learned of Mr. Britton's mental illness.[54] And finally, as the PCC noted, any claim based on the testimony would likely be procedurally barred because it could have been brought on direct appeal.

54          *Infra* ¶¶ 131–38.

¶ 60 We have already addressed Mr. Menzies's request to depose Detective Judd.[55] As we note above, Mr. Menzies provides no reason why Detective Judd would make the damning admissions that Mr. Menzies suggests. Faced with bald allegations against Detective Judd, the PCC found it was "not reasonably likely" that he would testify as Mr. Menzies suggests and admit that he lied at trial. For many of the same reasons, the PCC properly denied Mr. Menzies's request to once again depose Ms. Wells.[56] Mr. Menzies provides no evidence to support his assertion that Ms. Wells will change her testimony if a second deposition were conducted. Furthermore, much of what Mr. Menzies suggests he might obtain from a second deposition was already before the PCC from Mr. Menzies's own affidavit, and since the State did not contest his affidavit for purposes of summary judgment, it would have been unnecessarily redundant to depose Ms. Wells a second time.

55          *Supra* ¶ 41.

56          *Supra* ¶ 42.

¶ 61 In any case, Mr. Menzies has failed to show that these "discovery requests[,] ... if answered, would affect the outcome of the **\*601** summary judgment motion."[57] Simply wishing to obtain relevant facts is not enough to justify a rule 56(f) motion and Mr. Menzies does not explain how his requested discovery would produce material facts that could defeat the State's summary judgment motion.[58] Accordingly, we cannot conclude based on this first *Overstock.com, Inc.* factor that it was unreasonable for the PCC to deny a rule 56(f) continuance.

57

*Overstock.com, Inc.,* 2008 UT 55, ¶ 26, 192 P.3d 858; *see also* Salt Lake Cnty. v. W. Dairymen Coop., Inc.,* 2002 UT 39, ¶ 24, 48 P.3d 910 (holding that the district court should have granted a rule 56(f) motion because the motion "requested an opportunity to continue with factual exploration on an issue that could have defeated ... summary judgment").

58

Mr. Menzies cites *Tiffany Fine Arts, Inc. v. United States,* 469 U.S. 310, 321, 105 S.Ct. 725, 83 L.Ed.2d 678 (1985), for the proposition that "seeking relevant information can never be considered a 'fishing expedition.' " The case does not stand for that proposition in the context of a rule 56(f) motion. Instead, the case concerned the Internal Revenue Service's (IRS) summons power. In addressing legislative history that expressed concern over whether the IRS might use its summons power for fishing expeditions, the Court stated that "the IRS is not engaged in a 'fishing expedition' when it seeks information relevant to a legitimate investigation of a particular taxpayer." *Id.* That reasoning is inapplicable to the case before us.

¶ 62 Under the second *Overstock.com, Inc.* factor, we look to whether the party opposing summary judgment has had adequate discovery time and has been diligent in performing discovery. While there is no bright-line test for determining whether a court abused its discretion in ruling on a rule 56(f) motion, our case law suggests that where the party seeking a continuance is dilatory, it is unlikely we will reverse a denial of a rule 56(f) motion. [59] Here, there is no question that Mr. Menzies and his counsel have diligently pursued discovery. In fact, the PCC specifically recognized counsel's diligent pursuit of discovery.

59

*See, e.g.,* W. Dairymen Coop., Inc.,* 2002 UT 39, ¶¶ 28–29, 48 P.3d 910 (holding that the district court abused its discretion in denying a rule 56(f) motion where the party seeking a continuance was not dilatory); *Crossland Sav.,* 877 P.2d at 1243 (holding that the district court did not abuse its discretion in denying a rule 56(f) motion where the

"district court could have concluded" that the party seeking a continuance was dilatory).

¶ 63 But diligently pursuing discovery does not foreclose the possibility that a court may reasonably exercise its discretion and deny a rule 56(f) continuance motion. Here the PCC noted that both parties in this case had ample time to conduct discovery. In fact, Mr. Menzies had approximately five years after our decision in *Menzies III* to conduct investigation and discovery. His current lead counsel filed a proposed case management order on January 20, 2010, that suggested a July 31, 2010 deadline to complete discovery. The PCC extended the discovery period almost two and one-half months, and closed discovery on September 29, 2010. The PCC noted that during the extended discovery period Mr. Menzies did not conduct any additional discovery. And as the State pointed out at oral argument, the PCC allowed Mr. Menzies to take depositions even after discovery closed. The court has paid Mr. Menzies's current post-conviction counsel over $194,000 and authorized over $60,000 in litigation expenses. These amounts far exceed the current PCRA's presumptive limits of $60,000 for attorney fees and $20,000 for litigation costs. [60]

60

UTAH CODE § 78B–9–202(3).

¶ 64 Mr. Menzies argues that the busy schedule of his current lead counsel has not allowed that counsel to adequately investigate this case's voluminous record. Although this is an important consideration, the PCC appears justified in concluding that "[t]his court is simply ruling that such work has been effective and cannot go on without end." We have previously sanctioned denials of rule 56(f) motions where the discovery period was much shorter than here. [61] We **\*602** recognize that the record is likely more extensive than the record in other cases where we have found the discovery time period sufficient, but we cannot say that the PCC unreasonably concluded that Mr. Menzies has had adequate time and resources to conduct discovery.

61

*See* Crossland Sav.,* 877 P.2d at 1243 (affirming a denial of a rule 56(f) motion where the discovery period was approximately four months); Hunt v. Hurst,* 785 P.2d 414, 416 (Utah 1990) (affirming a denial of a rule 56(f) motion where the discovery period was approximately eight months (including a five-month extension)). *Contra* W. Dairymen Coop., Inc.,* 2002 UT 39, ¶ 29, 48 P.3d 910

(reversing a denial of a rule 56(f) motion where the discovery period was approximately two months).

¶ 65 Finally, under the third *Overstock.com, Inc.* factor we consider whether the moving party has been diligent in responding to discovery requests. We find nothing in the record that suggests the State has not been diligent in responding to Mr. Menzies's discovery requests. The only indication suggesting otherwise is a request for discovery sanctions filed by Mr. Menzies. But the PCC denied that request as untimely because Mr. Menzies challenged the State's responses to certain discovery inquiries as inadequate almost a year after receiving the responses. Additionally, the PCC noted that the State's responses could not be considered inadequate merely because the State's references to the record did not include pinpoint record citations. The State's diligence in responding to discovery requests weighs in favor of concluding that the PCC did not abuse its discretion.

¶ 66 In sum, the first and third *Overstock.com, Inc.* factors weigh in favor of concluding that the PCC reasonably denied a continuance. The second factor likely weighs in favor of neither party, and in any event does not favor Mr. Menzies significantly enough for us to hold that the PCC abused its discretion. Accordingly, we conclude that the PCC did not abuse its discretion in denying Mr. Menzies's request for a rule 56(f) continuance.

2. The PCC Did not Abuse Its Discretion in Denying Mr. Menzies an Evidentiary Hearing Before Ruling on the Cross–Motions for Summary Judgment

¶ 67 The PCC also did not abuse its discretion in declining to hold an evidentiary hearing before ruling on the cross-motions for summary judgment. Mr. Menzies argues that the PCC should have granted his motion for an evidentiary hearing under rule 43(b) of the Utah Rules of Civil Procedure before issuing its summary judgment order, but in reality his motion was merely a regurgitation of his previous motions for a rule 56(f) continuance.

¶ 68 Rule 43(b) states that

> [w]hen a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard

wholly or partly on oral testimony or depositions.

Mr. Menzies reads rule 43(b) to require a court to hold an evidentiary hearing before granting summary judgment, and argues that it is an abuse of discretion for a court to deny such a hearing unless "the findings of fact, verdict, or sentence go unchallenged." Furthermore, he argues that it is an abuse of discretion to deny an evidentiary hearing where the affidavits on their face suggest *Strickland* prejudice to any degree. To support his argument, Mr. Menzies cites *Karis v. Calderon* [62] and *Ross v. State,* [63] both of which he misreads. [64]

[62]
    🔖 283 F.3d 1117 (9th Cir.2002).

[63]
    🔖 2012 UT 93, 293 P.3d 345.

[64]

    Mr. Menzies cites *Ross* for the proposition that "[w]here unopposed facts are presented by affidavit which suggest *Strickland* prejudice, a court abuses its discretion when it grants summary judgment without first holding an evidentiary hearing." This misstates *Ross*'s holding. *Ross* reiterated the well-established rule that "genuine issues of material fact preclude summary judgment." *Id.* ¶ 51. In *Ross,* we reversed a grant of summary judgment because the record was ambiguous regarding counsel's actions, and so, we could not conclude whether counsel's action were objectively unreasonable. *Id.* Nothing in our opinion requires a court to delay deciding a motion for summary judgment simply because the petitioner asks for an evidentiary hearing. And our decision in no way *mandates* that courts grant evidentiary hearings before ruling on a motion for summary judgment. Furthermore, the *Karis* case from the Ninth Circuit actually *supports* our conclusion. The court concluded in that case that the district court did not abuse its discretion in denying a habeas petitioner an evidentiary hearing because "even assuming [the petitioner's] allegations to be true, they do not entitle him to habeas relief." 🔖 283 F.3d at 1127. Here, the PCC declined to hold an evidentiary hearing for the same reason. That is, it concluded that none of the evidence Mr. Menzies suggested which might be derived from holding an

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 86

evidentiary hearing would raise a genuine issue of material fact. *Karis* simply does not support Mr. Menzies's argument that "the only basis for denying an evidentiary hearing is if the findings of fact, verdict, or sentence go unchallenged."

**\*603** ¶ 69 At bottom, rule 43(b) does not require courts to grant an evidentiary hearing simply because a petitioner's affidavits suggest that certain deponents may potentially offer favorable testimony. If the affidavits themselves do not raise a genuine issue of material fact, as they did not here, a court does not abuse its discretion in denying further discovery and evidentiary hearings. As noted by the PCC, a court's concern under rule 43(b) is whether the "voluminous record, despite the claims of insufficient discovery [in the petitioner's rule 43(b) motion], present th[e] court with enough facts that the court is able to decide the cross motions for summary judgment without further discovery, affidavits, or an evidentiary hearing."

¶ 70 The PCC denied Mr. Menzies's rule 43(b) motion, recognizing that his requests would not have raised any genuine issue of material fact. It concluded that much of the information Mr. Menzies suggested might be obtained from the hearing would be unnecessary, speculative, or duplicative. We agree with the PCC. Much of the information Mr. Menzies sought overlapped with his repeated discovery requests under rule 56(f) that we address above—none of which would have raised a genuine issue of material fact. [65] For this reason, the PCC concluded that the information he sought at an evidentiary hearing would not "impact what trial counsel did at the time and what trial counsel did not do." Because Mr. Menzies's discovery requests were either unnecessary, speculative, or duplicative, the PCC did not abuse its discretion in declining to hold an evidentiary hearing.

[65]    *Supra* ¶¶ 55–66.

### III. Mr. Menzies Did not Receive Ineffective Assistance of Counsel During the Guilt– Phase, Penalty–Phase, or Appellate Proceedings

¶ 71 The Sixth Amendment to the United States Constitution provides a criminal defendant "the right ... to have the Assistance of Counsel for his defence." [66] A corollary is that "the right to counsel is the right to the effective assistance of counsel." [67]

[66]    U.S. CONST. amend. VI.

[67]    *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (internal quotation marks omitted); *Lafferty v. State,* 2007 UT 73, ¶ 11, 175 P.3d 530 ("Implicit in the Sixth Amendment's guarantee of counsel is the right to effective assistance of counsel.").

¶ 72 Mr. Menzies argues that he received ineffective assistance of counsel both at trial and on appeal. The PCRA allows a post-conviction petitioner to raise ineffective assistance claims where the petitioner had the same counsel at both trial and on appeal. [68] That is the situation here. Because LDA represented Mr. Menzies at trial and on appeal, his ineffective assistance claims, except for two, [69] are properly before us.

[68]    UTAH CODE § 78B–9–104(1)(d) ("Unless precluded by Section 78B–9–106 or 78B–9–107, a person ... may file an action ... for post-conviction relief [on the] grounds [that] ... the petitioner had ineffective assistance of counsel in violation of the United States Constitution or Utah Constitution.").

[69]    Mr. Menzies raises two claims for the first time on appeal, both of which we decline to reach as unpreserved. First, he argues that trial and appellate counsel were ineffective in failing to raise a due process claim based on the fact that the jury prejudicially saw him in handcuffs. The PCC agreed with the State that because the claim was not raised in Mr. Menzies's Fifth Amended Petition, it was procedurally barred. We agree with the PCC that the claim is unpreserved and decline to reach it on appeal because Mr. Menzies does not argue that either exceptional circumstances or plain error justify review. *See* *Kell v. State,* 2012 UT 25, ¶ 36, 285 P.3d 1133 ("[T]he preservation rule applies to every claim, including constitutional questions, unless a defendant can demonstrate that exceptional circumstances exist or plain error occurred." (internal quotation marks omitted)). Second, Mr. Menzies argues that trial counsel should have advised him of the option to plead guilty under *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). We

decline to reach this claim as well, for the same reasons-it is unpreserved, and Mr. Menzies does not argue that either exceptional circumstances or plain error justify review. *See* 🚩 *Kell,* 2012 UT 25, ¶ 36, 285 P.3d 1133.

¶ 73 In his Fifth Amended Petition, Mr. Menzies raised approximately twenty ineffective **\*604** assistance of counsel claims, some of which contained numerous subparts. The PCC granted summary judgment for the State and ordered that Mr. Menzies's Fifth Amended Petition be dismissed. Mr. Menzies appeals the PCC's decision on ten claims and argues that his counsel: (1) failed to use an adequate defense theory, (2) failed to properly impeach testimony from one of Mr. Menzies's fellow inmates, Mr. Britton, (3) inadequately investigated Mr. Larrabee and Ms. Brown's eyewitness testimony and failed to move to suppress their testimony, (4) created a conflict of interest by having him sign a liability waiver, (5) were inadequately qualified and prepared for penalty-phase proceedings, (6) failed to conduct an adequate penalty-phase investigation, (7) failed to present adequate mitigating evidence, (8) hid evidence of trial counsel's errors and Mr. Menzies's alleged organic brain damage, (9) failed to conduct an appellate investigation, and (10) failed to object to the jury instruction regarding the "beyond a reasonable doubt" standard.

¶ 74 We affirm the PCC's decision granting the State summary judgment on each of these claims because, even accepting Mr. Menzies's version of the facts, he is unable to raise a genuine issue of material fact showing that his counsel's performance was deficient and prejudiced his case.

¶ 75 Each of Mr. Menzies's ineffective assistance claims is governed by the two-part test set forth in *Strickland v. Washington,* which requires the defendant to show (1) "that counsel's performance was deficient" and (2) that "the deficient performance prejudiced the defense." [70] In *Archuleta v. Galetka,* we noted that our case law has restated *Strickland* as follows: "[t]o prevail, a defendant must show, first, that his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment and, second, that counsel's performance prejudiced the defendant." [71]

[70]    🚩 466 U.S. at 687, 104 S.Ct. 2052.

[71]    🚩 2011 UT 73, ¶ 38, 267 P.3d 232, *cert. denied,* —— U.S. ——, 133 S.Ct. 112, 184 L.Ed.2d 52 (2012) (internal quotation marks omitted).

¶ 76 The first prong of *Strickland* requires Mr. Menzies to show "that counsel's performance was deficient." [72] In essence, the inquiry into counsel's performance should focus on "whether counsel's assistance was reasonable considering all the circumstances." [73] We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [74] This presumption is only overcome by a demonstration "that the challenged actions cannot be considered sound strategy under the circumstances." [75] Importantly, in assessing whether counsel's performance was deficient, we must look at the facts and law available to counsel at the time of the representation. [76]

[72]    🚩 *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

[73]    🚩 *Id.* at 688, 104 S.Ct. 2052.

[74]    🚩 *Id.* at 689, 104 S.Ct. 2052.

[75]    🚩 *Menzies III,* 2006 UT 81, ¶ 89, 150 P.3d 480.

[76]    *See* 🚩 *Cullen v. Pinholster,* —— U.S. ——, 131 S.Ct. 1388, 1407, 179 L.Ed.2d 557 (2011) (analyzing counsel's performance under "the standard of professional competence in capital cases that prevailed in Los Angeles in 1984"); 🟥 *State v. Dunn,* 850 P.2d 1201, 1228 (Utah 1993) ("To establish a claim of ineffectiveness based on an oversight or misreading of law, a defendant bears the burden of demonstrating why, on the *basis of the law in effect at the time of trial,* his or her trial counsel's performance was deficient." (emphasis added)).

¶ 77 In addition to deficient performance, *Strickland* requires that "any deficiencies in counsel's performance must be prejudicial to the defense." [77] The defendant generally has the obligation to affirmatively prove prejudice and "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [78] Because the exact formulation of

the prejudice standard differs depending on which phase of the proceedings is at issue, we **\*605** describe the relevant prejudice standard at each of the guilt-phase, penalty-phase, and appellate proceedings below.

77        *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052.

78        *Id.* at 694, 104 S.Ct. 2052.

¶ 78 A satisfactory showing of both parts of the *Strickland* test is required for the defendant to prevail.[79] "As a result, it is not necessary for us to address both components of the inquiry if we determine that a defendant has made an insufficient showing on one."[80] Each of Mr. Menzies's ineffective assistance challenges is treated separately below using the *Strickland* framework.

79        *See* *Parsons v. Barnes,* 871 P.2d 516, 522 (Utah 1994) (requiring defendants to "affirmatively prove both prongs of the *Strickland* test to prevail").

80        *Archuleta,* 2011 UT 73, ¶ 41, 267 P.3d 232 (internal quotation marks omitted).

¶ 79 Before examining the merits of Mr. Menzies's ineffective assistance claims, we briefly address two issues that impact each of his claims. First, we discuss how the procedural posture of this case affects our analysis of Mr. Menzies's ineffective assistance claims. Second, we describe the relevance of the American Bar Association (ABA) Standards and other professional standards that Mr. Menzies relies on.

*A. The Effect of the Summary Judgment
Standard and Prevailing Professional Norms
on Mr. Menzies's Ineffective Assistance Claims*

1. The Summary Judgment Standard

¶ 80 Before the PCC, both parties filed motions for summary judgment, and each argued that it is entitled to judgment as a matter of law and that there are no genuine issues of material fact.[81] Each party has also opposed the other party's motion for summary judgment and argued that there are many factual disputes.[82] The PCC rejected Mr. Menzies's ineffective assistance claims and granted the State's motion for summary judgment.

81        It is settled law that "[c]ross-motions for summary judgment do not ipso facto dissipate factual issues, even though both parties contend for the purposes of their motions that they are entitled to prevail because there are no material issues of fact." *Amjacs Interwest, Inc. v. Design Assocs.,* 635 P.2d 53, 55 (Utah 1981).

82        We note that for purposes of its own summary judgment motion the State accepted all of Mr. Menzies's factual allegations to the extent they did not conflict with the existing record.

¶ 81 "The determination of which party must come forward with evidence proving that there is a genuine material dispute of fact depends on which party bears the burden of proof on the underlying legal theory or claim that is the subject of the summary judgment motion."[83] Here, Mr. Menzies bears the burden of proving his underlying legal claims of ineffective assistance of counsel. Accordingly, with respect to the State's motion for summary judgment, the State bears the initial burden of showing that it "is entitled to judgment and that there is no genuine issue of material fact that would preclude summary judgment in [its] favor."[84] Once the State makes that showing, the burden of proof then shifts to the nonmoving party, here Mr. Menzies. And because Mr. Menzies bears the burden of proving ineffective assistance, he "cannot rest on [his] allegations alone, particularly when the parties had an opportunity to conduct discovery."[85] Instead, he "must set forth specific facts showing that there is a genuine issue for trial."[86]

83        *Jones & Trevor Mktg., Inc. v. Lowry,* 2012 UT 39, ¶ 30, 284 P.3d 630.

84        *Id.* ¶ 29.

85        *Id.* ¶ 30 (internal quotation marks omitted).

86        *Id.* (internal quotation marks omitted).

¶ 82 With this background, we next address the relevance of ABA and other professional standards in analyzing Mr. Menzies's ineffective assistance claims.

2. Professional Standards

¶ 83 Several of Mr. Menzies's ineffective assistance arguments rely on ABA standards and National Legal Aid and Defense Association (NLADA) standards. We address his

specific arguments regarding these standards in our analysis of his ineffective assistance claims. It is helpful at the outset, however, to note the weight we give such **\*606** standards in conducting our *Strickland* analysis.

¶ 84 Strickland recognized that ABA standards and other practice norms "are guides to determining what is reasonable." [87] But such standards and norms are "only guides" and "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." [88]

87

    *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

88

    *Id.* at 688–89, 104 S.Ct. 2052; *Menzies III,* 2006 UT 81, ¶ 90, 150 P.3d 480 (noting that "we rely on the ABA Death Penalty Guidelines to the extent they are relevant to our decision").

¶ 85 In *Menzies III,* we addressed Mr. Menzies's ineffective assistance claims regarding his former post-conviction counsel, Edward Brass, by consulting the 2003 version of the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. There it was clear that Mr. Brass "went far beyond" failing to comply with ABA standards. [89] For instance, Guideline 10.15.1(E)(4) requires counsel to "continue an aggressive investigation of all aspects of the case." Mr. Brass's conduct fell well below this standard because he provided "virtually no representation and willfully disregarded nearly every aspect of Menzies' case." [90]

89

    *Menzies III,* 2006 UT 81, ¶ 94, 150 P.3d 480.

90

    *Id.*

¶ 86 More recently, in *Archuleta,* we reaffirmed the relevance of ABA standards in conducting our *Strickland* analysis. There the petitioner relied on the 1989 version of the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. We stated that the "United States Supreme Court has on multiple occasions indicated that the ABA Guidelines extant at the time of challenged attorney performance form the baseline for what constitutes reasonable investigation." [91]

91

    *Archuleta,* 2011 UT 73, ¶ 121 n. 10, 267 P.3d 232; *see also* *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) ("Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)-standards to which we long have referred as 'guides to determining what is reasonable.' " (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052)).

¶ 87 We have also indicated, however, that noncompliance with ABA guidelines does not automatically establish ineffective assistance. In *Lafferty v. State,* [92] the petitioner grounded his post-conviction ineffective assistance claim on trial counsel's alleged noncompliance with ABA guidelines. We rejected the claim and stated that "noncompliance with the ABA guidelines is not, by itself, grounds for reversal." [93]

92

    2007 UT 73, 175 P.3d 530.

93

    *Id.* ¶ 55.

¶ 88 Mr. Menzies relies on several different guidelines in his briefs, including (1) the 1979 ABA Standards for the Defense Function, (2) the 1987 NLADA Standards for Performance of Counsel in Death Penalty Cases, (3) the 1989 and 2003 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, (4) the ABA Model Rules of Professional Conduct and commentary on those rules, and (5) the Utah Rules of Professional Conduct and Utah State Bar ethics advisory opinions applying those rules. Where Mr. Menzies relies on standards that would have been available to counsel we give them appropriate weight. But neither the 2003 nor the 2010 guidelines relied on by Mr. Menzies would have been available to either trial or appellate counsel. Consequently, we give little weight to the arguments made by Mr. Menzies that rely on those standards. [94]

94

    *See* *Archuleta,* 2011 UT 73, ¶ 121 n. 10, 267 P.3d 232 ("[T]he ABA Guidelines extant at the time of challenged attorney performance form the baseline for what constitutes reasonable investigation."). Mr. Menzies cites *Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), for the proposition that courts may apply guidelines not in circulation at the time of the counsel's challenged conduct. *Rompilla* does

not stand for this proposition. There the Supreme Court consulted two versions of an ABA standard, one that existed at the time of trial and one that did not. *Id.* at 387 n. 6, 125 S.Ct. 2456. The court noted, however, that there was "no material difference between" the two. *Id.* at 387 n. 6, 125 S.Ct. 2456.

**\*607** ¶ 89 Below we address each of Mr. Menzies's ineffective assistance claims as they relate to counsel's performance during the guilt-phase, penalty-phase, and appellate proceedings.

*B. Mr. Menzies Has not Raised a Genuine Issue of Material Fact Regarding Trial Counsel's Guilt–Phase Representation*

¶ 90 Mr. Menzies raises four ineffective assistance claims regarding trial counsel's guilt-phase representation. He argues that his trial counsel (1) erroneously pursued a failure-of-proof defense instead of a mental illness defense theory; (2) failed to properly impeach testimony from one of Mr. Menzies's fellow jail inmates, Mr. Britton, concerning an alleged confession by Mr. Menzies; (3) failed to elicit the specific reason that Mr. Larrabee and Ms. Brown were distracted at the time they allegedly saw Mr. Menzies at the scene of the crime, and unreasonably choose to impeach Mr. Larrabee's and Ms. Brown's identification evidence rather than seek suppression of it; and (4) denied Mr. Menzies his right to conflict-free counsel by having him sign a liability waiver.

¶ 91 The *Strickland* two-part test governs claims of ineffectiveness regarding counsel's guilt-phase representation. The prejudice standard in the context of a guilt-phase ineffective assistance claim requires Mr. Menzies to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [95] Further, "[i]t is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." [96] Instead, "[t]he likelihood of a different result must be substantial, not just conceivable." [97]

95

    *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

96

    *Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011) (internal quotation marks omitted).

97

    *Id.* at 792, 131 S.Ct. 770.

¶ 92 For the reasons explained below, we affirm the PCC's ruling and hold that Mr. Menzies has not raised a genuine issue of material fact as to either part of the *Strickland* test concerning trial counsel's guilt-phase representation.

1. Trial Counsel's Decision to Use a Failure–of–Proof Defense Rather than a Mental Illness Defense Was not Unreasonable, and Mr. Menzies Has not Shown Prejudice

¶ 93 Mr. Menzies first argues that trial counsel unreasonably pursued a failure-of-proof defense rather than a mental illness defense. More specifically, he argues that trial counsel could have asserted a diminished mental capacity defense and that this defense would have resulted in a reduction of his conviction to second degree murder. In addition, Mr. Menzies argues that he could have alternatively pled "guilty and mentally ill" under Utah Code section 77–35–21.5 (Supp.1983).

¶ 94 We affirm. In light of the weaknesses in the State's case and Mr. Menzies's insistence that he did not commit the murder, Mr. Menzies fails to raise any genuine issue of material fact concerning counsel's investigation and defense strategy and also fails to establish prejudice. Before addressing the specifics of Mr. Menzies's claim, we recite some additional facts to give context to our analysis.

a. Additional facts relevant to trial counsel's defense strategy

¶ 95 Trial counsel's failure-of-proof defense strategy consisted of two parts. First, trial counsel argued that the State failed to meet its burden to prove that Mr. Menzies killed Mrs. Hunsaker. Second, and in the alternative, trial counsel argued that the State failed to prove the existence of an aggravator that would support a capital homicide conviction.

¶ 96 Before trial, counsel arranged for two different psychological assessments of Mr. Menzies. They first asked clinical psychologist Michael D. DeCaria to evaluate him. In the relevant portion of his report, Dr. DeCaria stated as follows:

**\*608** It is possible that Mrs. Hunsaker did something unwittingly and as innocent as a facial expression or a word or a gesture which stimulated Mr. Menzies' mental illness in the guise of a brief, reactive psychosis during the course of which he took her life. This scenario becomes even more plausible if Mr. Menzies' assertion that he had been using cocaine in the day or days prior to the incident is true.

Mr. Menzies interprets Dr. DeCaria's report to mean that "a 'brief, reactive psychosis' ... caused him to forget killing Hunsaker." Trial counsel did not attempt to use Dr. DeCaria or his report during guilt-phase proceedings. Counsel did, however, use Dr. DeCaria during penalty-phase proceedings.

¶ 97 Second, trial counsel asked Dr. Alan Jeppsen to evaluate Mr. Menzies. Dr. Jeppsen's report describes Mr. Menzies's "history of hostility and other negative aspects," including "that he had a history of alcohol and drug abuse, and that he was explosive and impulsive and could be expected to act out in the future." Dr. Jeppsen diagnosed Mr. Menzies with the following conditions: "(1) major depression with psychotic features manifested by paranoid thinking and hallucinations, (2) history of alcohol and drug abuse, [and] (3) past history of attention deficit disorder." Mr. Menzies's claims in his brief that "Jeppsen also reported extreme mental illness," but nothing in Dr. Jeppsen's report specifically makes that conclusion. As with Dr. DeCaria, trial counsel did not call Dr. Jeppsen as a witness during guilt-phase proceedings.

¶ 98 Mr. Menzies points to several other pieces of evidence to show that trial counsel did not thoroughly investigate the possibility of a mental illness defense. First, in a recent affidavit, Mr. Menzies states that trial counsel never discussed the mental illness defense with him. Second, Mr. Menzies cites a neuropsychological evaluation given by Tim Kockler on September 20, 2010. In his evaluation, Dr. Kockler diagnosed Mr. Menzies with multiple cognitive disorders and concluded that Mr. Menzies "suffered from a neurological/psychiatric condition[ ] at the time of the murder, and most likely impaired his capacity to form a required mental state; however, I understand this is a legal decision to be made by the factfinder." Mr. Menzies also relies on an affidavit obtained

from trial co-counsel Ms. Palacios obtained on October 5, 2010. In her affidavit, Ms. Palacios states as follows:

> Based upon the report by Dr. Michael DeCaria, Mr. Menzies may have suffered a psychotic break during the course of the murder. LDA could have presented either a diminished capacity, or mental illness defense at trial. I believe that a jury could have determined that because of Mr. Menzies's mental illness, that he would have been found guilty of a lesser included offense of aggravated murder.

Mr. Menzies argues that this affidavit "admits *Strickland* prejudice."

¶ 99 Mr. Menzies suggests that he would have considered using a mental illness defense had trial counsel adequately discussed the option with him. In an affidavit given July 20, 2011, Mr. Menzies stated that: "[a]lthough I desired to proceed to trial, and maintained my innocence throughout the trial and direct appeal process, I would have been open to discussing all available defenses with trial counsel, and would have, of course, wanted to know the probabilities of succeeding with all viable defenses, based upon the State's evidence, and based upon the fact uncovered by my attorneys' investigation."

¶ 100 With this additional background in place, we examine the merits of Mr. Menzies's claim in the context of the *Strickland* two-part test.

> b. Mr. Menzies has not met his burden of showing that trial counsel's decision to use a failure-of-proof defense prejudiced his case

¶ 101 Mr. Menzies's claim fails because he has not met his burden of establishing prejudice. Part of his prejudice argument relies on conclusory assertions like "[i]t is *Strickland* prejudice to fail to present a mental illness defense in a capital case if the defense is available." These assertions are plainly insufficient to show that if trial counsel had used a mental illness defense there is a substantial likelihood the result in his case would have been different. In fact, Mr. **\*609**

Menzies does not even claim that he would have agreed to use a mental illness defense if adequately advised. He only claims that he would have *considered* using a mental illness defense. Mr. Menzies's assertion that he would have *considered* using a mental illness defense falls far short of the prejudice burden he bears of showing that "[t]he likelihood of a different result [was] substantial, not just conceivable." [98]

[98]    *Harrington,* 131 S.Ct. at 792.

¶ 102 Further, Mr. Menzies has not refuted the State's argument that trial counsel's use of a mental illness defense would have "corroborated what the circumstantial evidence showed: Menzies killed Maurine." By using a mental illness defense, Mr. Menzies would have at least had to tacitly admit that he killed Mrs. Hunsaker. And all along Mr. Menzies has maintained that he was not at Storm Mountain and did not kill Mrs. Hunsaker.

¶ 103 Mr. Menzies's primary argument regarding prejudice is that trial counsel "could have gotten a second degree murder conviction by using" the defense of diminished mental capacity or by having him plead guilty but mentally ill under section 77–35–21.5. Neither argument has merit.

¶ 104 First, pleading guilty but mentally ill would have had no effect on the outcome of this case. This is because the statute providing for a plea of guilty but mentally ill expressly states that the plea does not alter the defendant's sentence. [99] Mr. Menzies has thus failed to raise a genuine issue of material fact concerning prejudice, since the court could still have imposed the death penalty under the plea statute.

[99]    UTAH CODE § 77–35–21.5(3) (Supp.1983) ("If the defendant is found guilty and mentally ill, the court shall impose any sentence which could be imposed pursuant to law upon a defendant who is convicted of the same offense.").

¶ 105 Second, Mr. Menzies incorrectly asserts that counsel could have obtained a lesser conviction by using a diminished mental capacity defense. We held in *State v. Sessions* that a defendant could successfully assert a defense of diminished mental capacity where the defendant suffered from "a mental disease or defect, not amounting to legal insanity, that impairs a defendant's ability to form the specific intent necessary to prove certain crimes." [100] We noted in *Sessions* that diminished mental capacity differed from the statutory mental illness defense in that diminished mental capacity was not a complete defense because it generally did not absolve the defendant "from all criminal liability." [101] The diminished capacity defense was typically used "in homicide cases to reduce first degree murder to second degree murder or manslaughter." [102]

[100]    645 P.2d 643, 644 (Utah 1982).

[101]    *Id.* at 645.

[102]    *Id.* at 644.

¶ 106 Mr. Menzies suggests that this defense would have been available to him even if trial counsel could not show that a mental illness impaired his ability to form the requisite mens rea. In contrast, the State argues that "when Menzies murdered Maurine, diminished mental capacity would have applied as a defense only if a mental illness prevented Menzies from understanding that he was killing a person." We agree with the State on this point. Under *Sessions*, to successfully assert diminished mental capacity, trial counsel would have had to show that Mr. Menzies had a mental disease or defect that impaired his ability to form the specific intent necessary to be convicted of first degree homicide. [103] In other words, Mr. Menzies would have had to assert that his mental illness impaired his ability to "intentionally **\*610** or knowingly" kill Mrs. Hunsaker. [104] Mr. Menzies is simply incorrect in asserting that trial counsel could have successfully used the defense even if they could not show that Mr. Menzies suffered from a mental illness that negated his ability to form the necessary mens rea.

[103]    *Id.; see also* *State v. Herrera,* 895 P.2d 359, 362 (Utah 1995) (discussing the 1983 amendments to the statutory mental illness defense and noting that "[t]he new law limits the defense to simply that the defendant did not have the requisite mens rea of the alleged crime.... The new law does away with the traditional affirmative insanity defense that the killing was perceived to be justifiable and therefore done with innocent intent."); *State v. Wood,* 648 P.2d 71, 88 n. 18 (Utah 1982) (noting that diminished mental capacity "may also be a partial defense in the guilt phase of a capital case in the sense that, if it negates a necessary specific intent, the crime would be reduced in degree to second degree murder").

104    UTAH CODE § 76–5–202(1) (Supp.1983).

¶ 107 Mr. Menzies's statement that he would have *considered* using a mental illness defense is insufficient to establish a genuine issue of material fact regarding the prejudice prong of *Strickland*. Further, his argument that counsel could have obtained a lesser charge of second degree murder by using the defense of diminished mental capacity fails to demonstrate prejudice because he overlooks the fact that the defense required proof that a mental illness impaired a defendant's ability to form the necessary mens rea. Moreover, his argument that counsel could have obtained a second degree murder conviction by having him plead guilty but mentally ill is insufficient to show prejudice because the applicable statute expressly states that such a plea does not alter a defendant's sentence. For these reasons we affirm the PCC's ruling that Mr. Menzies failed to raise a genuine issue of material fact concerning *Strickland* prejudice.

> c. Trial counsel did not render deficient performance because their investigation and strategy was reasonable given Mr. Menzies's claim of innocence, the weaknesses in the case against him, and the lack of evidence suggesting he was mentally ill

¶ 108 Even if we were to conclude that Mr. Menzies satisfied his burden of showing prejudice, we would still affirm the PCC's ruling since trial counsel conducted an adequate mental illness investigation and reasonably chose to pursue a failure-of-proof strategy. We have stated that an important prevailing professional norm is counsel's "duty to adequately investigate the underlying facts of the case." 105 "This is because investigation sets the foundation for counsel's strategic decisions about how to build the best defense." 106 Trial counsel's performance was not deficient for four principal reasons. First, Mr. Menzies insisted throughout the proceedings that he was innocent. Second, there were weaknesses in the State's case against Mr. Menzies that trial counsel reasonably thought could be exploited. Third, trial counsel could have reasonably concluded based on the available evidence that Mr. Menzies was not mentally ill. And fourth, trial counsel thoroughly investigated Mr. Menzies's case.

105    *State v. Lenkart*, 2011 UT 27, ¶ 27, 262 P.3d 1 (internal quotation marks omitted).

106    *Id.* (internal quotation marks omitted).

¶ 109 To begin, Mr. Menzies's insistence that he did not commit the murder influenced trial counsel's decision to pursue a failure-of-proof strategy. Mr. Menzies argues that trial counsel should have vetoed 107 his claims of innocence and pursued an alternative defense theory, despite our case law to the contrary. In *State v. Wood,* we reasoned that "an attorney acts as an assistant for his client, and not as a master. An attorney who refuses to present such a basic claim as that of innocence acts outside the duties of an attorney, even if the claim of innocence detracts from other defenses presented by counsel." 108 Our reasoning in *Wood* suggests it was not unreasonable for trial counsel to give Mr. Menzies's claim of innocence significant weight in choosing a defense strategy. Additionally, *Strickland* expressly recognized that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." 109

107    The State argues that Mr. Menzies has waived any argument that counsel should have vetoed his claims of innocence. But the veto theory advocated by Mr. Menzies is not really a separate claim. Rather, it is instead part-and-parcel of his overall claim that trial counsel should have used a mental illness defense, which is properly before us.

108    648 P.2d 71, 91 (Utah 1982); *see* *State v. Maestas,* 2012 UT 46, ¶ 242, 299 P.3d 892 ("[T]he Sixth Amendment does not mandate that defense counsel present mitigating evidence over the wishes of a represented defendant.").

109    466 U.S. at 691, 104 S.Ct. 2052.

**\*611** ¶ 110 Despite his unwavering insistence throughout the trial that he was innocent, he now argues that counsel should have vetoed his claims of innocence because the evidence, taken as a whole, overwhelmingly suggested that he committed the murder. He argues that, given this evidence, it was per se unreasonable for trial counsel to pursue a failure-of-proof defense. For this proposition, Mr. Menzies relies on a Ninth Circuit case, *Johnson v. Baldwin,* 110 and a Second Circuit case, *DeLuca v. Lord.* 111 But these cases are unpersuasive here. In *Johnson,* the defendant's involvement in the crime was so factually undeniable that "[t]he jury obviously concluded that he was not telling the truth when he denied that he was present at the scene." 112 And in *DeLuca* counsel failed to pursue an extreme emotional

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 94

disturbance defense even though "upon a realistic appraisal of the strength of the People's case, and of the other defenses contemplated by [counsel], [an extreme emotional disturbance defense] offered the only realistic escape."[113] Neither situation applies here.

110
    114 F.3d 835 (9th Cir.1997).

111
    77 F.3d 578 (2d Cir.1996).

112
    *Johnson,* 114 F.3d at 838–39. We note that in *Johnson,* the Ninth Circuit did not even need to address the deficient performance part of *Strickland* because the State did not challenge the lower court's finding of deficient performance.

    *Id.* at 838.

113
    *DeLuca,* 77 F.3d at 585.

¶ 111 In contrast to *Johnson,* trial counsel here could have reasonably believed that Mr. Menzies's claim of innocence could be supported. For instance, trial counsel highlighted the timeline of events on the date Mrs. Hunsaker disappeared to show that Mr. Menzies could not have been the person to kidnap her. Specifically, counsel noted that a witness reportedly saw Mrs. Hunsaker at Denny's between 11:00 and 11:30 p.m. with someone other than Mr. Menzies, and that Mr. Menzies arrived at his girlfriend's mother's home, located "some distance" from Denny's, between 11:30 p.m. and midnight. Mr. Menzies spoke on the telephone with three different individuals between 12:10 a.m. and 1:00 a.m., none of whom noted that anything unusual took place on the calls. Additionally, trial counsel noted that Mrs. Hunsaker's neck wound would have forced blood down her body, yet the items found in Mr. Menzies's apartment, such as the parka and handcuffs, had no trace of any blood. Trial counsel pointed out that other individuals used Mr. Denter's car and left belongings in it, suggesting the handcuffs box under the driver's seat may not have been Mr. Menzies's. Further, even if the handcuffs were Mr. Menzies's, the medical examiner's report stated that the marks on Mrs. Hunsaker's hands could have been caused by wire or cord, but made no mention of handcuffs.

¶ 112 Other circumstantial evidence bolstered Mr. Menzies's claim that he was not with Mrs. Hunsaker, such as the fact that the police found hair on Mrs. Hunsaker's clothes that was not his, his neighbors reported no unusual events at his apartment,

and Mr. Larrabee equivocated regarding his identification testimony. In short, the evidence was not, at the time of trial, as clearly unfavorable as Mr. Menzies now suggests. To be sure, a jury could reasonably give little weight to this evidence. But the opposite conclusion is also reasonable. It is not the case here, as it was in *Johnson,* that a claim of innocence was obviously untruthful.

¶ 113 *DeLuca* is also inapposite to Mr. Menzies's case. Even assuming that the mental illness defense would have been useful in Mr. Menzies's defense, it was not "the only realistic escape." As noted above, there were weaknesses in the case against Mr. Menzies that trial counsel reasonably believed could be exploited using the failure-of-proof defense. The PCC correctly observed that the failure-of-proof theory "was far, far superior and extremely reasonable as to conduct by trial counsel."

¶ 114 In addition to Mr. Menzies's insistence that he was innocent and the holes in the State's case, trial counsel also faced evidence that they might have reasonably believed would not be sufficient to establish that Mr. Menzies was mentally ill. The psychologists' reports and Ms. Palacios's affidavit do not help establish that there is a genuine issue of material fact regarding trial **\*612** counsel's performance. Ms. Palacios stated in her affidavit that trial counsel "could have presented either diminished capacity, or mental illness defense at trial." But just because counsel *could* have done so does not mean that using another defense was unreasonable. Further, Dr. Kockler notes in his report that Mr. Menzies suffered from conditions that could have hindered his ability to form the necessary mental state, but this is a conclusory assertion. Nowhere in his report does he specify how those conditions would have affected Mr. Menzies's ability to understand that he was killing a person.

¶ 115 Dr. DeCaria's report also does not conclusively show that a mental illness impaired Mr. Menzies's ability to form the necessary mens rea. Mr. Menzies suggests that the report indicates that he "may have experienced a psychotic break, and may not have remembered killing Hunsaker." Trial counsel reasonably choose not to pursue a mental illness defense based on that statement, however, because under either the statutory mental illness defense or the diminished mental capacity defense, Mr. Menzies simply forgetting that he killed Mrs. Hunsaker would not have sufficed as a defense. Both defenses require that the defendant's mental illness negate or impair the requisite mens rea of the crime.[114] The first degree murder statute in effect at the time of Mr.

Menzies's crime required that "the actor intentionally or knowingly" cause the death of another.[115] Mr. Menzies reads Dr. DeCaria's report to mean that Mr. Menzies's psychosis "caused him to forget killing Hunsaker." That assertion, even if true, would be insufficient to show that his mental illness impaired his ability to either intentionally or knowingly kill Mrs. Hunsaker.

114    *See* UTAH CODE § 76–2–305(1) (Supp.1983) ("It is a defense to a prosecution under any statute or ordinance that the defendant, as a result of mental illness, lacked the mental state required as an element of the offense charged. Mental illness shall not otherwise constitute a defense.");

*Wood,* 648 P.2d at 88 n. 18 (noting that diminished mental capacity "may also be a partial defense ... if it negates a necessary specific intent").

115    UTAH CODE § 76–5–202(1) (1986).

¶ 116 Dr. Jeppsen's report also suggests that Mr. Menzies did not suffer from a mental illness that would rise to the level necessary to assert such a defense. His report cites a variety of Mr. Menzies's illnesses including depression, attention deficit disorder, and substance abuse problems, but nowhere does it assert that Mr. Menzies might have had a mental illness that would have negated the mens rea element of first degree murder. Dr. Jeppsen did diagnose Mr. Menzies with "major depression with psychotic features manifested by paranoid thinking and hallucinations." But Dr. Jeppsen never asserted that Mr. Menzies suffered from those conditions at the time of the murder. Dr. Jeppsen stated only that "[o]n the night of the murder Mr. Menzies was emotionally upset because of conflict with his wife and with a friend."[116] Dr. Jeppsen's report does not sufficiently link Mr. Menzies's "paranoid thinking and hallucinations" to his mental state at the time of the murder. The report merely states that Mr. Menzies was "emotionally upset," which is insufficient to show that a mental illness impaired his ability to form the necessary mens rea.

116    The reference in Dr. Jeppsen's report to Mr. Menzies's "wife" is not a reference to Mr. Menzies's girlfriend at the time of the crime, Ms. Arnold. Rather, it is a reference to a woman he married when he was seventeen years old. The marriage

was annulled before his incarceration for killing Ms. Hunsaker.

¶ 117 In sum, because neither Dr. Jeppsen nor Dr. DeCaria concluded that Mr. Menzies suffered from a mental illness that would have impaired his ability to form the requisite mens rea, it was entirely reasonable for trial counsel to choose not to rely on a mental illness defense. The reasonableness of trial counsel's decision to opt for a failure-of-proof defense was further supported by Mr. Menzies's insistence that he knew where he was at the time Mrs. Hunsaker died and that he did not commit the murder.

¶ 118 Finally, Mr. Menzies's argument fails because trial counsel thoroughly investigated his case and presented a reasonable theory based on their investigation. Mr. Menzies's brief cites numerous ABA standards that require trial counsel to keep the defendant **\*613** informed regarding preparation of the defense,[117] conduct a prompt and thorough investigation of the case,[118] and discuss strategic and tactical decisions with the client.[119] Our decisions have also noted the importance of counsel's duty of investigation. For instance, in *State v. Lenkart,* we held that counsel's performance was deficient where counsel failed to investigate physical evidence that might have corroborated the defendant's testimony that an alleged rape was actually consensual.[120] Counsel's failure came even after his client suggested that counsel look at the evidence.[121] We noted that "[t]rial counsel had no reason to disbelieve [his client] and had little to lose in performing the investigation."[122]

117    ABA STANDARDS FOR THE DEFENSE FUNCTION 4–3.8 (1979) ("The lawyer has a duty to keep the client informed of the developments in the case and the progress of preparing the defense."); *id.* at 4–5.1(a) ( "After informing himself or herself fully on the facts and the law, the lawyer should advise the accused with complete candor concerning all aspects of the case, including a candid estimate of the probable outcome.").

118    *Id.* at 4–4.1 ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.").

119    *Id.* at 4–5.2 (noting that certain decisions exclusively lie with the accused, including (1) what

plea to enter, (2) "whether to waive jury trial," and (3) whether to testify, and that "all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with the client.").

120
⬜ 2011 UT 27, ¶ 29, 262 P.3d 1.

121
*Id.*

122
*Id.* ¶ 35.

¶ 119 The situation here is unlike that in *Lenkart.* Here, it appears that trial counsel considered the possibility that Mr. Menzies might have some sort of mental illness because counsel ordered psychiatric evaluations by both Dr. DeCaria and Dr. Jeppsen. The results of those evaluations suggested that Mr. Menzies did not suffer from a mental illness that would negate or impair mens rea. Further, unlike *Lenkart,* trial counsel never received any indication from Mr. Menzies that he was mentally ill. Rather, he asserted he knew exactly what he was doing the day Mrs. Hunsaker died and that he did not commit the crime. And finally, this case is unlike *Lenkart* in that counsel's reliance on the sliver of evidence suggesting Mr. Menzies might have suffered from a mental illness would have contradicted his repeated testimony that he did not commit the crime. By contrast, in *Lenkart,* counsel's use of the physical evidence the defendant asserted counsel should have investigated would have corroborated, rather than contradicted, the defendant's testimony. Neither the ABA standards cited by Mr. Menzies nor our case law require counsel to pursue a defense after trial counsel has reasonably investigated the defense and found evidence suggesting that it would be unsuccessful and possibly even harmful to the defendant's case.

¶ 120 Based on the record and Mr. Menzies's proffer of evidence, it appears that trial counsel's decision to pursue a failure-of-proof defense was reasonable and did not constitute deficient performance. There were weaknesses in the State's case against Mr. Menzies that trial counsel reasonably tried to exploit. These weaknesses buttressed Mr. Menzies's insistence that he was innocent. Further, trial counsel investigated the possibility that Mr. Menzies was mentally ill and there was little evidence suggesting he suffered from a mental illness that impaired his ability to know that he was killing a person. For these reasons, Mr. Menzies fails to raise a genuine issue of material fact regarding the deficient performance prong of *Strickland.*

2. Trial Counsel Reasonably Challenged Testimony from Mr. Menzies's Fellow Inmate Mr. Britton, and Mr. Menzies Has not Shown Prejudice

¶ 121 Mr. Menzies next argues that trial counsel provided ineffective assistance because they did not discover and use evidence of mental illness to impeach testimony from one of Mr. Menzies's fellow inmates, Walter Britton. Because Mr. Menzies fails to raise any genuine issue of material fact concerning counsel's performance in this respect, or as to whether counsel's performance prejudiced the outcome, we affirm the PCC's grant of **\*614** summary judgment. Again, before addressing Mr. Menzies's claim, we recite additional facts to provide further context.

a. Additional facts relevant to trial counsel's treatment of Mr. Britton's testimony

¶ 122 During Mr. Menzies's preliminary hearing, Mr. Britton testified that while he and Mr. Menzies were in jail together, Mr. Menzies confessed to killing Mrs. Hunsaker and said that slitting her throat was one of the biggest thrills of his life. Mr. Britton refused to testify at trial, but the court agreed to admit his preliminary hearing testimony to the jury.

¶ 123 At that preliminary hearing, trial counsel cross-examined Mr. Britton. Among other things, he admitted that he heard about Mrs. Hunsaker's abduction on the news approximately a week before he told the police about Mr. Menzies's statements. He also testified that he watched the news more frequently after his first conversation with Mr. Menzies. Finally, Mr. Britton admitted that he did not report Mr. Menzies's statements to the police until about a month after Mr. Menzies made them. Ms. Wells pointed out to the jury during closing argument that Mr. Britton's testimony could have been derived from either the news or jail rumors.

¶ 124 Trial counsel also attempted to discredit Mr. Britton's testimony at trial. There, counsel called a jail officer who testified that the details of Mrs. Hunsaker's death were discussed by jail employees and inmates. The officer further testified that she heard several rumors in the jail regarding the crime and repeated those rumors.

¶ 125 Trial counsel also called Mr. Britton's attorney, Bruce Savage, at trial. Mr. Savage represented Mr. Britton in a federal case in which Mr. Britton was charged with bank robbery. Mr. Savage testified that, although Mr. Britton's participation in Mr. Menzies's case was supposed to earn Mr. Britton a sentence reduction, Mr. Britton ended up receiving

no sentence reduction. In closing argument, Ms. Wells noted the possibility of Mr. Britton's bias and highlighted the fact that he refused to testify at trial after learning that he would receive no sentence reduction.

¶ 126 Mr. Menzies bases his claim that Mr. Britton suffered from a mental illness on a mental health evaluation of Mr. Britton conducted in Springfield, Missouri approximately five months before Mr. Menzies's preliminary hearing. In the evaluation report, the evaluator found that Mr. Britton "exaggerated and/or lied in order to present himself as a more interesting, valuable person to others" and that he had "a marked disregard for the truth as indicated by his report lies." Mr. Menzies's current post-conviction counsel obtained the Springfield report in June 2011 under the Freedom of Information Act (FOIA).

¶ 127 Also, Mr. Menzies's post-conviction counsel obtained an affidavit from Mr. Britton where he recants much of his preliminary hearing testimony. In that affidavit Mr. Britton states that he lied about Mr. Menzies saying that cutting Mrs. Hunsaker's throat was the biggest thrill of his life. Mr. Britton also stated that he may have lied about Mr. Menzies's confession to killing Mrs. Hunsaker. Additionally, Mr. Britton suggested that his statements regarding Mr. Menzies could have been inaccurate because he was taking medication at the time.

b. Mr. Menzies fails to show that trial counsel's decision to not impeach Mr. Britton's testimony with evidence of mental illness prejudiced his case

¶ 128 Mr. Menzies's ineffective assistance claim fails because he does not demonstrate that counsel's failure to obtain this report prejudiced the outcome of his trial. All he does in this regard is make conclusory statements. In one instance, Mr. Menzies states that "[f]ailure to review an available court file can be *Strickland* prejudice." He also states "failure to impeach a witness with mental illness evidence is *Strickland* prejudice when evidence reflects on the witness's credibility."

¶ 129 To support these assertions, Mr. Menzies cites two cases, both of which do not support his prejudice claim. The first is **\*615** *Rompilla v. Beard.* [123] Here, Mr. Menzies cites, among other places, the Court's syllabus, which the Supreme Court has held provides no precedential value. [124] At any rate, *Rompilla* provides no help to Mr. Menzies's argument because it involved a case where counsel failed to "look at a file he [knew] the prosecution [would] cull for aggravating

evidence." [125] The Court noted that the file that counsel failed to look at was easily available and that no reasonable lawyer would have ignored it. [126] That is not the case here. The file Mr. Menzies alleges counsel should have used here was apparently held by a federal court that did not respond to the trial investigator's inquiries.

123    545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

124    *See* *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499 (1906).

125    *Rompilla,* 545 U.S. at 389, 125 S.Ct. 2456.

126    *Id.*

¶ 130 The second case is *Virts v. State,* [127] a Texas Court of Criminal Appeals case. This case has nothing to do with ineffective assistance and simply stands for the proposition that "[c]ross-examination of a testifying State's witness to show that the witness has suffered a recent mental illness or disturbance is proper, provided that such mental illness or disturbance is such that it might tend to reflect upon the witness's credibility." [128] This proposition adds nothing to Mr. Menzies's prejudice claim. Mr. Menzies's conclusory statements are insufficient to raise a genuine issue of material fact regarding *Strickland* prejudice.

127    739 S.W.2d 25 (Tex.Ct.Crim.App.1987) (en banc).

128    *Id.* at 30.

c. Mr. Menzies's claim of deficient performance fails because he has not shown that trial counsel had access or could have gained access to the Springfield report

¶ 131 Even if Mr. Menzies could satisfy his burden of showing prejudice, his claim would fail because he has not shown that trial counsel had access to the evidence, or could have obtained access through reasonable diligence. Mr. Menzies's claim instead relies on a variety of unsupported inferences to conclude that trial counsel knew about Mr. Britton's mental illness.

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 98

¶ 132 Counsel's duty to "adequately investigate the underlying facts of the case" is an important one because "investigation sets the foundation for counsel's strategic decisions about how to build the best defense." [129] But counsel's duty is to conduct an "adequate investigation." [130] Mr. Menzies appears to argue that this duty further obligates counsel to present evidence that was not obtained even after an adequate investigation.

129
> *State v. Hales,* 2007 UT 14, ¶ 69, 152 P.3d 321 (internal quotation marks omitted).

130
> *Lenkart,* 2011 UT 27, ¶ 28, 262 P.3d 1.

¶ 133 Here, Mr. Menzies has failed to raise a genuine issue of material fact regarding trial counsel's investigation into whether Mr. Britton had a mental illness. Trial counsel's investigator testified that he served the federal court hearing Mr. Britton's case with a subpoena seeking Mr. Britton's psychological records, but received nothing back. Mr. Britton's attorney told trial counsel that the records were not public records and that he could not disclose confidential client information. Ms. Wells testified that the federal court hearing Mr. Britton's case had the only copy of the Springfield report, that she was unsuccessful in procuring the report, and that Mr. Britton's attorney did not have a copy.

¶ 134 Not only did trial counsel investigate Mr. Britton's background, but they also used their findings to impeach his testimony. In Ms. Wells's closing argument, she reminded the jury that Mr. Britton refused to testify after learning he would not get any benefit in his own case from doing so. Mr. Menzies apparently misunderstands trial counsel's purpose for telling this to the jury and states that the jury couldn't infer bias because "Britton did not get a deal." This is precisely the point trial counsel made to the jury. **616** Counsel highlighted the weakness of Mr. Britton's testimony by showing that he was eager to testify against Mr. Menzies when he thought he might benefit by doing so, but he stopped cooperating once he realized that benefit would not materialize.

¶ 135 Mr. Menzies counters the State's assertion that trial counsel's investigation was reasonable by suggesting that the police reports available to trial counsel firmly established that Mr. Britton was mentally ill. But the portion of the report Mr. Menzies cites for this proposition states only that Mr. Britton was "sent out to Springfield, Missouri (inaudible) my attorney tried to get an irresistible impulse plea put on there." This

report merely refers to the report that trial counsel did not have access to—it does not establish some other basis for finding that trial counsel should have searched elsewhere for evidence of Mr. Britton's alleged mental illness.

¶ 136 Additionally, Mr. Menzies makes the sweeping assertion that "Savage spoke to [trial counsel] about Britton prior to the preliminary hearing. Thus, it is reasonable to infer that [trial counsel] was aware of Britton's mental illness because of Savage's contact." Mr. Menzies's citation to the record here merely indicates that Mr. Savage talked to counsel before Mr. Britton testified against Mr. Menzies. There is nothing in the portion of the record cited by Mr. Menzies to support the inference that "[trial counsel] was aware of Britton's mental illness because of Savage's contact."

¶ 137 Finally, Mr. Menzies argues that it is reasonable to infer that trial counsel could have used a FOIA request to obtain the Springfield report because Mr. Menzies's post-conviction counsel was able to obtain a copy of the report in 2011 pursuant to FOIA from the Federal Bureau of Prisons. On this point Mr. Menzies does not explain why this is a reasonable inference or what effect amendments to FOIA during the last twenty years would have on the analysis. Further, Mr. Menzies has not provided any evidence showing that the Federal Bureau of Prisons actually had the Springfield report during the time of trial. Trial counsel and Mr. Britton's attorney both suggested that the federal court hearing Mr. Britton's case had the only copy of the report and therefore the Federal Bureau of Prisons may not have had the report at that time. Trial counsel's investigator served the federal court a subpoena seeking mental health records but received no response. Mr. Menzies has failed to support his suggested inference that trial counsel could have used a FOIA request to obtain the Springfield report.

¶ 138 Mr. Menzies has not proffered sufficient evidence to overcome our "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [131] Accordingly, we hold that Mr. Menzies has not raised a genuine issue of material fact regarding the deficient performance prong of *Strickland.*

131
> *Hales,* 2007 UT 14, ¶ 70, 152 P.3d 321 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

3. Trial Counsel Did not Render Ineffective Assistance Because They Reasonably Challenged Mr. Larrabee's and Ms. Brown's Testimony

¶ 139 Mr. Menzies next argues that trial counsel rendered ineffective assistance by improperly challenging Mr. Larrabee's and Ms. Brown's eye-witness testimony. Mr. Menzies raises two specific challenges in this regard. First, he argues that trial counsel should have elicited the specific reason that Mr. Larrabee and Ms. Brown were distracted at the time they reportedly saw Mr. Menzies and Mrs. Hunsaker. We reject this claim because Mr. Menzies fails to demonstrate deficient performance or prejudice. Second, he argues that trial counsel should have sought suppression of the testimony because it was inherently unreliable. On this point, Mr. Menzies has not shown that the identification procedures used were unnecessarily suggestive. Because he has thus failed to raise any genuine issue of material fact on either point concerning counsel's performance, we affirm the PCC's grant of summary judgment.

a. Trial counsel did not render ineffective assistance by failing to elicit the specific reason Mr. Larrabee and Ms. Brown were distracted

¶ 140 During the most recent discovery period in this case, Mr. Menzies obtained  **617**  four affidavits that all aver the same thing-Mr. Larrabee and Ms. Brown went to Storm Mountain to have an intimate sexual encounter. Mr. Menzies argues that trial counsel performed unreasonably in failing to interview Mr. Larrabee and Ms. Brown, learn about the nature of their distraction, and then use that knowledge at trial to impeach their testimony.

¶ 141 We reject this claim because trial counsel cross-examined Mr. Larrabee and Ms. Brown at trial and highlighted for the jury the weaknesses of their testimony. Mr. Larrabee admitted to the jury that his attention was turned towards Ms. Brown during the time he saw the man and woman walking at Storm Mountain. Mr. Menzies concedes that "Larrabee admitted his inconsistent statements at trial." Mr. Menzies does not explain how the jury knowing that Mr. Larrabee's attention was directed at Ms. Brown *for the purpose of having sexual relations* would have changed the outcome in the case. Further, eliciting the specific reason Ms. Brown and Mr. Larrabee were distracted might have hurt Mr. Menzies's case more than helped it. The jury might have concluded that Mr. Larrabee was so concerned about being caught with Ms. Brown that he was more focused on the man at Storm Mountain than he might otherwise have been.

¶ 142 Further, in his own affidavit, Mr. Larrabee stated only that he and Ms. Brown were "kissing." If Mr. Larrabee is unwilling to admit over twenty-five years after the event that he went to Storm Mountain to engage in sexual actions beyond kissing with Ms. Brown, on what basis are we to conclude now that he would have admitted this information to trial counsel or a jury? Mr. Menzies claims that an affidavit from his current counsel "revealed that ... Larrabee's allusion to kissing Brown was expressed as a euphemism to induce Larrabee to sign it." But the point remains—if Mr. Larrabee is unwilling to admit now that he and Ms. Brown intended to have sex, we cannot presume that he would have admitted the same point to trial counsel or the jury.

¶ 143 In short, trial counsel's failure to elicit the specific reason that Mr. Larrabee and Ms. Brown were distracted was neither unreasonable nor prejudicial, and Mr. Menzies has therefore failed to raise a genuine issue of material fact. Accordingly, we affirm the PCC's grant of summary judgment.

b. Trial counsel's decision to impeach Mr. Larrabee's and Ms. Brown's eyewitness testimony rather than seek suppression was reasonable

¶ 144 Mr. Menzies also claims that the circumstances of Mr. Larrabee's and Ms. Brown's identifications were so suggestive that trial counsel rendered ineffective assistance by not seeking to suppress them. Because Mr. Menzies provides no basis for the conclusion that trial counsel could have had the photo array suppressed, and has thus failed to raise a genuine issue of material fact, we affirm the PCC's grant of summary judgment.

¶ 145 As a general rule regarding the validity of identification procedures, "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary."[132] Courts must "assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.' "[133] In determining whether a photo array is impermissibly suggestive, we have stated that "the main question is whether the photo array emphasized the defendant's photo over the others."[134] Factors that we consider in answering that question include: (1) "whether the words and body language of the police officers who presented the array conveyed an attitude of disinterest," (2) "whether the officers manipulated the photos to indicate their belief that one of the photos

portrayed the perpetrator," and (3) "whether the photos themselves were selected so that **\*618** the defendant's photo stood out from the rest." [135]

132
   *Perry v. New Hampshire,* —— U.S. ——, 132 S.Ct. 716, 724, 181 L.Ed.2d 694 (2012).

133
   *Id.* (quoting *Neil v. Biggers,* 409 U.S. 188, 201, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)).

134
   *State v. Lopez,* 886 P.2d 1105, 1111 (Utah 1994).

135
   *Id.* at 1111–12.

¶ 146 As an initial matter, we note that neither Mr. Larrabee nor Ms. Brown ever made a firm identification of Mr. Menzies. Rather, Mr. Larrabee identified Mr. Menzies's photo as looking the most like the man he saw at Storm Mountain. And later Mr. Larrabee could not identify the man he saw during a lineup. Mr. Larrabee did ask the prosecutor after the lineup whether number six was the suspect and was told that number six was in fact Mr. Menzies. But the trial court struck this part of Mr. Larrabee's testimony. Ms. Brown also never made a firm positive identification of Mr. Menzies.

¶ 147 Even if we assume that Mr. Larrabee's and Ms. Brown's testimony is identification testimony, Mr. Menzies offers no evidence that is relevant to any of the three factors we use to determine whether identification procedures are suggestive. Instead, he offers conclusory assertions. For instance, he states that Mr. Larrabee's identification was unreliable because of "suggestive comments made by the police to Larrabee." But Mr. Menzies does not provide specifics regarding what comments the police made. He merely refers to "the suggestiveness of the mug shots."

¶ 148 Mr. Menzies's other assertions do not support the conclusion that the identification procedures were unduly suggestive, but simply undermine the weight of the identification testimony. For example, Mr. Menzies states that "[Detective] Judd admitted that if Larrabee only saw a profile the composite was inaccurate." He further states that "Larrabee and Brown were grossly distracted, and had no meaningful opportunity to observe or pay attention to the hiker." Even if true, these facts affect only the weight of Mr. Larrabee's identification testimony. They are irrelevant to the

question of whether the identification procedures employed by the police were unnecessary and suggestive.

¶ 149 Finally, other indicia of suggestiveness cited by Mr. Menzies simply have no basis in the record. For instance, Mr. Menzies alleges that "[Officer] Couch used the composite to select [Mr. Menzies's] mug shot to presumably frame [Mr. Menzies]." Mr. Menzies provides no record citation to support this allegation. Further, Mr. Menzies states that during the photo array procedure the "police told Larrabee that he had picked the right man, and that they had [Mr. Menzies] in custody. Then after Mr. Larrabee picked the wrong man because he had a pot belly, the police told him that [Mr. Menzies] had lost 20 pounds." Mr. Menzies provides no citation to the record on this point, either. Our review of the record indicates, as the State suggests, that Mr. Larrabee selected Mr. Menzies's photo as looking most like the man he saw at Storm Mountain *before* the police told him that Mr. Menzies was in custody and mentioned anything about a weight change. Mr. Larrabee stated that at the time he picked Mr. Menzies's picture out of the photo array he did not know that the police had Mr. Menzies in custody. In fact, Mr. Larrabee learned that Mr. Menzies was in custody approximately three months later. At the lineup, Mr. Larrabee identified someone other than Mr. Menzies. It was not until after the lineup that Mr. Larrabee learned about Mr. Menzies's weight change. This is not a case where the police told Mr. Larrabee that he picked the right man or ever implied as much. [136]

136
   Mr. Menzies cites a Ninth Circuit case, *United States v. Simoy,* as being similar to the case here. 998 F.2d 751 (9th Cir.1993). There the government conceded that an identification procedure was suggestive where an officer looked at a sketch drawn using the help of a witness and then "held up a photograph of [the defendant] ... [and] commented that the photo closely matched the sketch and asked [the witness] if the photograph resembled the person he had witnessed the night of the robbery." *Id.* at 752.

¶ 150 Only one fact cited by Mr. Menzies is even potentially relevant to determining suggestiveness. Mr. Menzies claims that "[Detective] Judd did not instruct Larrabee that the hiker may or may not be in the photo array." Mr. Menzies cites a federal district court case where the court recognized that "[s]uch an admonition is extremely important to avoid

suggestiveness in the presentation of a photographic lineup to an adult witness ... [and] is even more critical to avoid suggestiveness **\*619** in the presentation ... to a six-year-old child." [137] But the facts of that case differ in several important ways from the situation here. First, the witness in that case was a six-year-old child, whereas Mr. Larrabee was a high-school student. Second, the police made suggestive statements such as telling the witness that she did an "awesome" and "fantastic" job after identifying the defendant. [138] In contrast, here the police made no such statements. The lone fact that Detective Judd did not tell Mr. Larrabee that the hiker may or may not be in the photo array is not enough for us to conclude that trial counsel acted unreasonably in not seeking to suppress the identification as unnecessarily suggestive.

137
    *Oliva v. Hedgpeth,* 600 F.Supp.2d 1067, 1080 (C.D.Cal.2009) (footnote omitted).

138
    *Id.* at 1081 (internal quotation marks omitted).

¶ 151 Mr. Menzies has not raised a genuine issue of material fact regarding trial counsel's decision to impeach Mr. Larrabee's and Ms. Brown's testimony. Trial counsel acted reasonably in pointing out the flaws in the testimony rather than seeking to suppress it on the ground that the police used unnecessarily suggestive tactics.

¶ 152 Additionally, Mr. Menzies's ineffective assistance claim would fail in any case because he has not made a sufficient showing of prejudice. His only argument regarding prejudice on this claim is that "there is a good chance that had LDA moved to strike the identifications, the motion would have been granted, and the result of the trial would have been different." This merely restates the basic prejudice standard and provides no analysis regarding why it would be the case. For these reasons we affirm the PCC and reject Mr. Menzies's claim that trial counsel was ineffective in dealing with Ms. Brown's and Mr. Larrabee's testimony.

4. Mr. Menzies Has not Shown that the Liability Waiver Denied Him His Right to Conflict–Free Counsel

¶ 153 Mr. Menzies argues that his counsel rendered ineffective assistance because they denied him his right to conflict-free counsel when they had him sign a liability waiver. He also suggests that this initial conflict "tainted" the appellate and post-conviction proceedings. We reject Mr. Menzies's claims because he has not shown that the liability

waiver created an actual conflict of interest. Because Mr. Menzies has not made a threshold showing that a conflict even existed, we do not reach the issue of whether the alleged conflict caused counsel to render deficient performance.

¶ 154 The parties agree that Mr. Menzies signed the liability waiver before trial. The waiver provides:

I, RALPH LEROY MENZIES, defendant in Criminal Case No. CR 86–887 assigned to the Third District Court of the Third Judicial District, Judge Raymond S. Uno presiding, hereby acknowledge that I have refused to provide my counsel, Brooke C. Wells and Frances M. Palacios, with the names of witnesses who may have evidence pertinent to the defense of the above-referenced case.

I hereby waive any and all claims which I might have against Brooke C. Wells and Frances M. Palacios or the Sale Lake Legal Defender Association as a result of the failure of such witnesses to be interviewed or presented as witnesses in any proceeding pertaining to this case, including trial.

¶ 155 There is some uncertainty regarding the preparation of the waiver. Ms. Wells claimed that the form was fully filled out at the time Mr. Menzies signed it. Mr. Menzies alleges that it was blank when he signed it. There is also some uncertainty regarding the scope of the waiver. It provided that counsel would not be liable for Mr. Menzies's failure to provide the names of all "witnesses who may have evidence pertinent to the defense." The parties appear to agree, however, that it was drafted with only one person in mind: Mr. Menzies's girlfriend, Nicole Arnold. Mr. Menzies did not want Ms. Arnold to testify and refused to consent to calling her as a witness. According to Mr. Menzies, Ms. Arnold would have testified, among other things, that Mrs. Hunsaker "was with Mr. Menzies voluntarily on the night of her disappearance." Ultimately, these factual disputes do not create a genuine **\*620** issue of material fact because, even accepting Mr. Menzies's proffer, we conclude that there was no actual conflict of interest.

¶ 156 A criminal defendant has a right to counsel free from conflicts of interest. "[T]he right to counsel is the right to the effective assistance of counsel," [139] and we have held that "[t]he right to counsel includes the right to counsel free from conflicts of interest." [140] "[C]ounsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." [141]

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 102

139

   📄 *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

140

   *Lafferty,* 2007 UT 73, ¶ 62, 175 P.3d 530.

141

   📄 *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

¶ 157 To prevail on an ineffective assistance claim grounded on an alleged conflict of interest, a petitioner "must show that an actual conflict of interest adversely affected his lawyer's performance."[142] To establish an actual conflict, the petitioner "must demonstrate as a threshold matter ... that the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests."[143] There is no need for the petitioner to show prejudice once it is established that counsel had an actual conflict of interest.[144]

142

   📄 *State v. Taylor,* 947 P.2d 681, 686 (Utah 1997) (internal quotation marks omitted); *see also* 📄 *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) ("We hold that the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance."); *United States v. Burney,* 756 F.2d 787, 792 (10th Cir.1985) ("The conflict must be real rather than hypothetical.").

143

   📄 *Taylor,* 947 P.2d at 686 (alteration in original) (internal quotation marks omitted).

144

   *Id.*

¶ 158 Mr. Menzies repeatedly points out that we may presume prejudice where there is an actual conflict of interest. But he fails to clearly articulate his position regarding the threshold inquiry—that is, how the waiver created an actual conflict. He argues that execution of the waiver resulted in a conflict in the following ways (although none of these arguments are developed extensively): (1) it created an inference of a conflict because it violated the Utah Rules of Professional Conduct, (2) it created a conflict by creating an incentive for counsel to use a failure of proof defense in lieu of a mental illness defense, and (3) it led counsel to conduct a "half-baked" investigation. We reject each of these arguments.

¶ 159 First, Mr. Menzies argues that the waiver created a conflict because it violated rule 1.8(h)(1) of the Utah Rules of Professional Conduct, which prohibits counsel from "mak[ing] an agreement prospectively limiting the lawyer's liability to a client for *malpractice.*"[145]

145

   UTAH R. PROF'L CONDUCT R. 1.8(h)(1) (emphasis added).

¶ 160 We disagree with Mr. Menzies's assertion that the waiver is a malpractice liability waiver that violated the Utah Rules of Professional Conduct. It does not purport to be a blanket waiver of any future malpractice claims Mr. Menzies may have against his trial counsel. Rather, it explicitly memorializes the fact that the decision not to interview or present certain witnesses was Mr. Menzies's, not counsel's, so that the decision will not be improperly construed as malpractice. The comments to rule 1.8(h)(1) explain that malpractice liability waivers are forbidden because "they are likely to undermine competent and diligent representation."[146] The liability waiver here offered counsel no protection from malpractice claims generally, so it in no way undermined counsel's competent representation and created no disincentive for counsel to work any less diligently. Counsel would still have been liable for malpractice resulting from their own failures. The liability waiver merely clarified that the decision to not pursue certain witnesses was not counsel's but was instead Mr. Menzies's. If anything the waiver created an incentive for counsel to diligently represent Mr. Menzies because they now had to overcome the limitation Mr. Menzies placed on them.

146

   *Id.* R. 1.8 cmt. [14].

**\*621** ¶ 161 In a related argument, Mr. Menzies also claims that trial counsel created a conflict of interest by failing to comply with a Utah State Bar Ethics Advisory Opinion Committee opinion. The opinion was issued on September 30, 2013, and prohibits counseling a client "to enter into a plea agreement which requires the client to waive the attorney's prospective possible ineffective assistance at sentencing or other postconviction proceedings."[147] This argument is also without merit. First, counsel's actions cannot be evaluated under an ethics opinion issued over twenty years after the representation. And second, the liability waiver here is distinguishable from the type of waiver prohibited by the ethics opinion because it did not waive ineffective assistance claims but instead only waived claims to the extent Mr.

Appellate Case: 19-4042   Document: 98-2   Date Filed: 12/22/2020   Page: 103

Menzies refused to cooperate and identify the names of witnesses.

[147]  UTAH STATE BAR ETHICS ADVISORY OPINION COMMITTEE, Op. 13–04, 1 (Sept. 30, 2013).

¶ 162 Moreover, even if the liability waiver did violate the Utah Rules of Professional Conduct we would still conclude, as the PCC did, that the waiver did not result in an actual conflict. This is because a violation of the Utah Rules of Professional Conduct does not, by itself, constitute ineffective assistance.[148] Instead, Mr. Menzies must show that counsel made "a choice advancing his own interests to the detriment of his client's interest."[149] He must show how a violation of the rules of professional conduct, in connection with counsel's specific actions in this case, created a conflict of interest.

[148]  *United States v. Gallegos,* 39 F.3d 276, 279 (10th Cir.1994) ("It is apparent that some elements [of the rules] bear on" constitutional issues; "a violation of the rules will not in itself constitute a constitutional violation.").

[149]  📄 *Taylor,* 947 P.2d at 686 (internal quotation marks omitted).

¶ 163 Mr. Menzies points to two actions by counsel that he believes evidence such conflict. He first argues that the waiver created an actual conflict because it created an incentive for counsel to pursue a failure-of-proof defense rather than a mental illness defense. He argues that "since [counsel] failed to use a readily available and cogent mental illness defense ... it is reasonable to infer that [counsel's] conflict of interest prejudiced Mr. Menzies." But he has not indicated beyond inference how execution of the waiver actually led to or caused trial counsel to advance a failure-of-proof defense in lieu of a mental illness defense. Further, as we noted above, trial counsel's decision to opt for a failure-of-proof defense instead of a mental illness defense was a reasonable strategic choice. We decline to give credence to this claimed inference as proof of actual conflict.

¶ 164 And second, Mr. Menzies suggests that "the conflict resulted in [counsel] doing a half-baked investigation." This argument fails for two reasons. First, Mr. Menzies has not shown how the waiver led counsel to conduct a deficient investigation. Indeed, as we noted above, if anything the waiver created an incentive for counsel to conduct a more thorough investigation to overcome the hurdles placed in their way by Mr. Menzies. Moreover, counsel reasonably chose to pursue a failure-of-proof defense only after they adequately investigated the possibility that Mr. Menzies suffered from a mental illness.[150] Mr. Menzies's suggestion that counsel conducted a "half-baked investigation" is flatly wrong.

[150]  *Supra* ¶¶ 118–20.

¶ 165 We accordingly reject Mr. Menzies's argument that trial counsel labored under a conflict of interest because he has not established that counsel was required to make a choice advancing their interests to his detriment.

5. Conclusion—Guilt–Phase Ineffective Assistance of Counsel

¶ 166 In conclusion, we hold that Mr. Menzies has not raised a genuine issue of material fact regarding trial counsel's guilt-phase representation. Trial counsel's decision to use a failure-of-proof defense strategy was reasonable and Mr. Menzies has not shown that counsel's failure to use a mental illness defense prejudiced his case. Additionally, trial counsel's treatment of Mr. Britton's testimony **\*622** was reasonable given the facts available to them and Mr. Menzies has not alleged facts that raise a genuine issue as to whether counsel had access to any evidence of Mr. Britton's alleged mental health problems. Further, trial counsel adequately challenged Mr. Larrabee's and Ms. Brown's testimony. Finally, Mr. Menzies is unable to show that signing the liability waiver created an actual conflict of interest such that he was denied his right to conflict-free counsel. Accordingly, we affirm the PCC's grant of summary judgment with respect to each of Mr. Menzies's claims of guilt-phase ineffective assistance.

> *C. Mr. Menzies Has not Raised a Genuine Issue of Material Fact Regarding Trial Counsel's Penalty–Phase Representation*

¶ 167 Before discussing the merits of Mr. Menzies's ineffective assistance of counsel claims at the penalty phase, we first provide additional facts to give context to his three categories of claims: (1) inadequate qualifications and preparation, (2) failure to investigate, and (3) failure to present adequate mitigating evidence. Next, we discuss the relevant standard and applicable ABA guidelines. We ultimately reject Mr. Menzies's ineffective assistance of counsel claims under each category because they are either

raised for the first time on appeal or he fails to demonstrate prejudice. As a final matter, we reach his claim that the PCC improperly struck Judge Uno's affidavit and conclude that the affidavit is immaterial.

1. Additional Facts Relevant to Trial Counsel's Penalty–Phase Representation

¶ 168 During the penalty phase, the State highlighted Mr. Menzies's extensive criminal background. His prior crimes included three robberies. The first occurred on December 21, 1975. On that occasion, Mr. Menzies stole a truck from a dealership and picked up a partner. The two intended to rob someone and steal the person's marijuana. Instead, Mr. Menzies and his partner robbed a 7–11 convenience store. Mr. Menzies threatened the store clerk with a gun, ordered him to a back room, and ran away with money from the cash register. The second robbery occurred five days later. After Mr. Menzies and his partner stole another truck from a different dealership, the two proceeded to rob the same 7–11 store and the same store clerk. But this time, Mr. Menzies insisted the clerk leave the store with him and his partner. Once out of town, the robbers dropped the clerk off, told him to get into a nearby ditch, and said that if he stuck his head out they would blow it off. The third robbery happened after Mr. Menzies escaped from jail in 1978 while serving time for the first two robberies. After escaping, he robbed a cab driver. During that robbery, he pointed a shotgun at the cab driver's head. He took $76 in cab fares and $1 from the cab driver's wallet. When the cab driver attempted to reach for a gun, Mr. Menzies shot him in the right arm. Five surgeries and ten years later at sentencing proceedings, the cab driver still could not write with his right hand.

¶ 169 The State also pointed to acts by Mr. Menzies before trial to show that he could not be rehabilitated. For instance, while Mr. Menzies underwent evaluation by the Utah State Hospital, Ms. Arnold sneaked him a screw driver. The State's brief suggests Mr. Menzies intended to unscrew blocks securing the hospital windows. Additionally, Mr. Menzies kept a sharpened metal dust pan handle under his mattress. During his time in the Salt Lake County Jail, Mr. Menzies told a jail officer that the officer did not know the problems Mr. Menzies could cause. Mr. Menzies threatened to take out a guard or another inmate. Eventually, the jail transferred him to the behavior modification unit. The State argued that Mr. Menzies's criminal history, combined with the circumstances of Mrs. Hunsaker's murder, showed that he posed a continuing threat of violence and could not be rehabilitated.

¶ 170 Ms. Wells and Ms. Palacios called several witnesses to rebut the State's case and argued that Mr. Menzies should not receive the death penalty. Mr. Menzies's aunt and sister testified regarding his family history and circumstances. Their testimonies detailed various abuses Mr. Menzies endured as a child. For instance, they testified **\*623** that his stepfathers abused him daily, raped his mother, belittled him for failing to kill a rabbit, burned the family car to prevent his mother from leaving home, and beat his pregnant mother so severely that her child died shortly after birth. Mr. Menzies's mother often left the family for extended periods of time. She died when he was only fourteen. After his mother's death, Mr. Menzies's stepfathers took everything the mother had and did not provide for Mr. Menzies. Mr. Menzies's family characterized him as giving and compassionate. They stated that they hoped he would receive only a life sentence. Mr. Menzies's sister noted she would feel a tremendous void if the court sentenced Mr. Menzies to death.

¶ 171 Mr. Menzies's family also provided a certificate from Alcoholics Anonymous and poems and letters from Mr. Menzies. Mr. Menzies explained in one letter that he committed the previous robberies because he felt rejected, and that he blamed only himself for those prior crimes.

¶ 172 Douglas Wingleman, an educational psychologist, testified regarding Mr. Menzies's mental state. Dr. Wingleman said Mr. Menzies suffered from mental deficits that prevented him from responding appropriately to his surroundings. He noted, however, that with proper treatment Mr. Menzies might be able to function normally.

¶ 173 Michael DeCaria, a clinical psychologist, also testified. Dr. DeCaria emphasized the turbulent childhood Mr. Menzies was forced to endure and the detrimental effects it had on him. Dr. DeCaria noted that Mr. Menzies's stepfathers hit him, forced him to sleep in a very small room with his sister for three years, denied him dinner, and kept him home from school. Dr. DeCaria further noted that Mr. Menzies's problem with substance abuse resulted from his desire to alter his consciousness and make his world better. Dr. DeCaria stated that Mr. Menzies had no real caretaker growing up because of his stepfathers' abuse, his mother's early death, and his sister's obligation to help care for his sickly younger brother. Dr. DeCaria opined that people raised like Mr. Menzies often do not develop a normal conscience. In Dr. DeCaria's opinion, Mr. Menzies suffered from three distinct personality disorders. Dr. DeCaria testified, however, that Mr. Menzies may still have time to change. He noted that

antisocial behavior tends to decline around age thirty, and Mr. Menzies was twenty-nine at the time. He also suggested that Mr. Menzies had a desire to change his behavior. Finally, he said that Mr. Menzies had the potential to function near a college-student level.

¶ 174 Trial counsel called Laddy Pruett, a prison social worker, to testify. Mr. Pruett testified that, based on Mr. Menzies's criminal history and jail experience, he would be placed on twenty-three hour lockdown. He would be entitled to limited supervised recreation, no work release, and would never be left alone on prison grounds. On the other hand, Mr. Pruett stated that Mr. Menzies took pride as a janitor during a prior prison stint and took pride in his family. Mr. Pruett indicated, that during the time he worked with him, Mr. Menzies did not try to escape or fight with others. In fact, Mr. Menzies had no disciplinary action against him for twenty-two months before being released from prison.

¶ 175 Trial counsel also called Paul Sheffield, the Utah Board of Pardons Administrator, to testify regarding the likelihood of parole in a similar case. Mr. Sheffield outlined the factors the Board of Pardons would consider and concluded that Mr. Menzies would likely serve his entire sentence in prison.

¶ 176 Judge Uno balanced the mitigating and aggravating evidence. In the end, he concluded that the aggravating circumstances outweighed any mitigating evidence and sentenced Mr. Menzies to death.

### 2. Relevant Standard and ABA Guidelines

¶ 177 The *Strickland* standard applies to a claim of penalty—phase ineffective assistance of counsel—that is, to prevail, a defendant must establish both deficient performance and prejudice. [151] The same "strong presumption that trial counsel rendered **\*624** adequate assistance" applies as well. [152] A defendant's burden to prevail on an ineffective assistance of counsel claim at the penalty phase differs slightly, however, from his burden at the guilt phase. First, to show deficient performance at the penalty phase, a defendant must establish that, "under the prevailing professional norms at the time of [the defendant's] trial," [153] counsel failed to adequately investigate [154] and present [155] appropriate background and mitigating evidence. And as discussed, *supra* ¶¶ 83–88, applicable ABA standards are relevant, but not dispositive in our analysis of counsel's performance in this respect.

[151]

*Archuleta,* 2011 UT 73, ¶ 38, 267 P.3d 232.

[152]

*Id.* ¶ 39; *see also* *Cullen,* 131 S.Ct. at 1403 (reaffirming the presumption from *Strickland* in the context of an ineffective assistance of counsel challenge brought to penalty-phase counsel's actions).

[153]

*Porter v. McCollum,* 558 U.S. 30, 39–40, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009).

[154]

*Id.*

[155]

*See* *Williams v. Taylor,* 529 U.S. 362, 393, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

¶ 178 Second, to establish prejudice, a defendant must show both that counsel should have presented the evidence proffered in post-conviction review, and that there was a "reasonable probability the sentence would have been different if the sentencing judge and jury had heard the significant mitigation evidence" that defendant's counsel failed to investigate or present. [156] And "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome"—which "requires a substantial, not just conceivable, likelihood of a different result." [157] Although Mr. Menzies claims that he must only establish "*some* possibility that a life sentence would have been imposed," (emphasis added), this is simply not the standard. A defendant cannot merely present evidence that "would barely have altered the sentencing profile" [158] or that "would likely only have added color to what [a witness] actually did testify to at the penalty phase." [159]

[156]

*Porter,* 558 U.S. at 31, 130 S.Ct. 447.

[157]

*Cullen,* 131 S.Ct. at 1403 (internal quotation marks omitted).

[158]

*Strickland,* 466 U.S. at 700, 104 S.Ct. 2052.

[159]

*Gardner v. Galetka,* 568 F.3d 862, 881 (10th Cir.2009).

¶ 179 Mr. Menzies raises several ineffective assistance of counsel claims with respect to penalty-phase counsel's qualifications, as well as counsel's investigation and

presentation of his case. While we recite the specific ABA/NLADA guidelines in our discussion of each respective claim, it is worth repeating that these guidelines do not set a baseline for counsel's Sixth Amendment constitutional duty of adequate representation. Rather, and as the PCC itself correctly recognized, they only "form some basis of comparison" to evaluate counsel's performance.

### 3. Claims of Inadequate Qualifications and Early Preparation

¶ 180 Mr. Menzies first challenges his counsel's performance by claiming that they lacked any training in how to conduct a capital mitigation investigation. Indeed, co-counsel Ms. Palacios admitted as much. In making this claim, Mr. Menzies cites to NLADA Standard 5.1.I.B.,[160] which covers the qualifications of trial co-counsel; he claims this standard required Ms. Palacios's disqualification. Mr. Menzies also claims that counsel performed ineffectively in failing to initiate the mitigation investigation until *after* the guilt phase had ended. To support this claim, he cites NLADA Standard 11.4.1(a)[161] and ABA Standard 4–4.1.[162] We reject both claims.

[160] The standard requires, among other qualifications, that attorneys have "at least three years litigation experience in the field of criminal defense," NLADA STANDARDS FOR THE APPOINTMENT OF COUNSEL IN DEATH PENALTY CASES 5.1.I.B (ii)(a) (1988), and also "have prior experience as lead counsel or co-counsel in no fewer than three jury trials of serious and complex cases which were tried to completion, at least two of which were trials in which the charge was murder or aggravated murder; or alternatively, of the three jury trials, at least one was a murder or aggravated murder trial and one was a felony jury trial." *Id.* 5.1.I.B(ii)(b).

[161] This standard requires counsel to conduct independent investigations at the guilt and penalty phases and that "[b]oth investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously." *Id.* 11.4.1(a).

[162] This standard requires only that "counsel should conduct a *prompt* investigation." ABA STANDARDS FOR THE DEFENSE FUNCTION 4–4.1 (1979) (emphasis added).

**\*625**  ¶ 181 First, Utah Rule of Criminal Procedure 8, rather than the cited NLADA/ABA standards, sets the "minimum standards for defense counsel in a capital case."[163] In terms of qualifications, rule 8 sets forth the minimum levels of litigation and courtroom experience required of counsel at both trial and on appeal. The rule makes clear, however, that "[m]ere noncompliance with this rule ... shall not of itself be grounds for establishing that appointed counsel ineffectively represented the defendant at trial or on appeal."[164] And as we stated in *Taylor v. Warden,* a "[defendant's] arguments regarding the *experience* of his counsel have no relevance to [defendant's] claim of *ineffective assistance.*"[165] "Instead, we look to counsel's actual performance to determine whether it was adequate."[166] Accordingly, we reject his claim that counsel rendered ineffective assistance merely by virtue of their inadequate qualifications under NLADA Standard 5.1.I.B.

[163] *Taylor v. Warden,* 905 P.2d 277, 282 n. 2 (Utah 1995).

[164] UTAH R.CRIM. P. 8(f).

[165] 905 P.2d at 282.

[166] *Id.*

¶ 182 We turn now to Mr. Menzies's claim that counsel delayed in initiating an investigation. We ultimately affirm the PCC's ruling rejecting this claim because he fails to demonstrate prejudice. The NLADA standard applicable to investigation timing requires only that the mitigation investigation should "begin immediately upon counsel's entry into the case and should be pursued expeditiously."[167] And the relevant ABA standard requires only that "counsel should conduct a *prompt* investigation."[168] The PCC correctly noted that the only "real" factual dispute concerned when the mitigation investigation began. It also ruled that Mr. Menzies's claim failed regardless because he did not show how the late initiation of the investigation prejudiced, in any way, the outcome of the case. We agree. Even if it is true that counsel did not begin the mitigation investigation until *after* the guilt phase, and thus not "immediately upon counsel's entry" as suggested by the NLADA guidelines, Mr. Menzies failed to demonstrate how this prejudiced his case. Furthermore, the evidence actually suggests that counsel *did* initiate the mitigation investigation before the guilt phase

began, since Dr. DeCaria interviewed Mr. Menzies over fourteen months before trial.

167 NLADA STANDARDS FOR THE APPOINTMENT OF COUNSEL IN DEATH PENALTY CASES 11.4.1(a) (1988).

168 ABA STANDARDS FOR THE DEFENSE FUNCTION 4–4.1 (1979) (emphasis added).

### 4. Failure–to–Investigate Claims

¶ 183 As noted above, a defendant can prevail under a failure-to-investigate claim only by demonstrating both that counsel's investigation was deficient under the prevailing professional norms and that the defendant was prejudiced thereby-in other words, that if counsel had presented the information at trial, there would have been a substantial likelihood of a different result. The Sixth Amendment does *not* require counsel to interview every possible relative or acquaintance or to fully investigate every potential lead. Counsel has a duty only " 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' "[169] Still, there must be a reasonable, articulable reason for not interviewing a particular witness or for not following a particular lead. "[F]ailing to investigate because counsel does not think it will help does not constitute a strategic decision, but rather an abdication of advocacy."[170] That said, "[t]he mere fact that other witnesses might have been available or that **\*626** other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel."[171] Indeed, the witnesses who were called may have sufficiently conveyed the necessary mitigating information. And counsel's decision not to investigate is reviewed "for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[172]

169 *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052).

170 *Lenkart,* 2011 UT 27, ¶ 28, 262 P.3d 1 (internal quotation marks omitted).

171 *Waters v. Thomas,* 46 F.3d 1506, 1514 (11th Cir.1995) (internal quotation marks omitted).

172 *Kimmelman,* 477 U.S. at 384, 106 S.Ct. 2574 (internal quotation mark omitted).

¶ 184 Mr. Menzies argues that counsel failed to investigate multiple individuals and related issues, but a number of these arguments are raised for the first time on appeal.[173] As to his arguments that are preserved, he claims that counsel failed to investigate: (1) details of sexual molestation; (2) school records evincing psychological troubles; (3) early mental illness; (4) fetal alcohol syndrome (FAS); (5) neglect and abuse by his step-father, his father, and mother; (6) the amounts and kinds of drugs and alcohol he ingested prior to the murder; and (7) the effect of his parents' divorce.

173 Mr. Menzies raises multiple new failure-to-investigate claims on appeal, including that counsel failed to interview his grandparents or a "wife," and that counsel failed to review a state petition for child neglect and request a pre-sentence report. We therefore disregard them as procedurally barred.

¶ 185 We conclude that counsel's investigation of Mr. Menzies's mental health issues and his background for purposes of mitigation was sufficiently comprehensive and thus did not constitute deficient performance. Mr. Menzies's counsel used three different mental health professionals to evaluate any potential psychological issues. His counsel interviewed his sister and aunt to understand his childhood and background. They investigated the prison conditions and potential for rehabilitation if Mr. Menzies were given life in prison. None of the seven issues Mr. Menzies claims counsel failed to investigate thus survives review.

¶ 186 First, there was no evidence of sexual molestation provided by any of the mental health professionals or Mr. Menzies's sister or aunt. Although Mr. Menzies claims otherwise in his briefing, his own affidavit does not raise this issue, and an affidavit from a mitigation specialist, Marissa Sandall–Barrus, mentions only that "[d]uring my mitigation investigation there was some information provided that indicated [Mr. Menzies] may have been molested by his step-mother." Other than this brief reference, there is nothing to indicate where this "some information" came from or that a reasonable investigation would have uncovered such evidence. Therefore, we reject this claim.

¶ 187 Second, Mr. Menzies claims that counsel failed to investigate school records that detailed his problems in school, including prolonged absences and abuse recognized

by school administrators and teachers. Again, Mr. Menzies's own affidavit does not raise this issue. And Ms. Sandall–Barrus noted in her affidavit that LDA had access to the school records, but that a portion of them were missing and are no longer available. Even if counsel performed deficiently in failing to search for the missing records (years 1986 to 1988), Mr. Menzies has made no showing of prejudice based on what the included education records demonstrated. In fact, the school records that were in the record give evidence only of a very poor track record of attendance—nothing else sustains a conclusion that the un-investigated records, if included, would have impacted the case in any way.

¶ 188 As to Mr. Menzies's third, fourth, and fifth failure-to-investigate claims, we conclude that there *was* adequate investigation. First, Mr. Menzies's counsel hired no less than three mental health professionals to assess him as to any current and prior mental health problems. Second, Mr. Menzies's own brief concedes that there was nothing material to suggest that he suffered from FAS. [174] The fact that his father and grandparents were alcoholics and that his mother was a bar maid do not sustain a conclusion that **\*627** counsel's performance was deficient for failure to investigate the *possibility* of FAS. Finally, there was a host of evidence presented at trial concerning Mr. Menzies's abuse as a child. This was offered through mental health experts, as well as through his sister and aunt.

[174]   His brief states that "[t]here is no direct evidence of this fact"—that he may have suffered from FAS.

¶ 189 Mr. Menzies's sixth and seventh failure-to-investigate claims fail as well, because he has failed to show that counsel's failure to more comprehensively investigate these issues prejudiced his case in any way. Mr. Menzies first claims that counsel did not investigate the amounts and kinds of drugs and alcohol he had consumed at the time of the murder. He argues that ⬦ Utah Code section 76–3–207(2)(d) (1983 Supp.) required counsel to present this information as a mitigating factor. In fact, counsel *did* present mitigating evidence under ⬦ section 76–3–207(2)(d) (1983 Supp.), which suggests counsel present evidence concerning "intoxication, or influence of drugs." At sentencing, counsel questioned Dr. DeCaria, a mental health professional, and asked whether Mr. Menzies was under the influence of drugs or alcohol at the time of the murders. Dr. DeCaria responded that "he was using alcohol and other drugs heavily during the few days before his incarceration." Dr. DeCaria then

went on to talk about the multiple effects of such drug and alcohol use. Because evidence of heavy drug use and alcohol consumption was clearly investigated and presented, we reject this argument.

¶ 190 Finally, Mr. Menzies does not show how an investigation of the effects of the divorce of his parents would have added anything material to the mental health professionals' assessment. As the State points out, counsel presented numerous "gruesome" details concerning Mr. Menzies's abuse and neglect; additional information concerning his parents' divorce would have been unlikely to affect the sentence, given the myriad details that *were* investigated and presented, including the effect of Mr. Menzies's mother's death.

¶ 191 In sum, Mr. Menzies has not overcome the "strong presumption" that counsel's performance was constitutionally compliant. [175] And he has also failed to demonstrate that counsel's performance prejudiced his case. Accordingly, we reject each of his failure-to-investigate claims and affirm the PCC's grant of summary judgment for the State.

[175]   ⬦ *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

5. Presentation of Background Evidence and Organic Brain Evidence

¶ 192 Finally, Mr. Menzies argues that penalty-phase counsel was ineffective for failing to present sufficient background evidence and evidence concerning organic brain evidence. We now address these arguments.

a. Mr. Menzies's counsel presented sufficient background evidence

¶ 193 First, Mr. Menzies claims that his penalty-phase counsel was ineffective for not presenting sufficient background evidence. In particular, he claims that counsel was required, constitutionally, to include a social history report and have a forensic social worker testify as part of the mitigation defense. He claims that Dr. DeCaria gave only a psychological evaluation, which did not constitute a sufficient social history. We reject this claim because counsel did provide a sufficient social history through multiple witnesses. And Mr. Menzies has cited no rule for the proposition that counsel was required to have a mental health professional, specifically, give this social history.

¶ 194 ABA Guideline 11.8.6(B) (1989) suggests that counsel present mitigating evidence of the following: (1) medical and mental health history, including substance abuse; (2) educational history; (3) military service; (4) employment and training history; (5) family and social history, including physical, sexual, or emotional abuse, neighborhood surroundings and peer influence, prior correctional experience and professional intervention; (6) rehabilitation potential; (7) record of prior offenses, especially where there is no record, a short record, or a record of non-violent offenses; and (8) expert testimony concerning any of these seven factors and the resulting impact on the defendant.

 *628  ¶ 195 We conclude, consistent with the PCC's determination, that penalty-phase counsel presented evidence under each of these factors. As noted in our factual sections above, *supra* ¶¶ 19, 168–76, counsel utilized multiple witnesses and professionals to provide a proper mitigation defense. This includes: (1) extensive evidence of Mr. Menzies's social history and mental health, including physical, emotional and psychological abuse, as well as substance abuse; (2) evidence of Mr. Menzies's educational background in elementary and middle school; (3) evidence of Mr. Menzies's prior employment and prior incarcerations, including employment in prison; and (4) Mr. Menzies's rehabilitative potential, that he would likely never be released, and that he would be held under very restrictive conditions. Moreover, counsel presented evidence of how this background affected his mental health and psychological condition through multiple witnesses, including two mental health professionals-Dr. DeCaria and Dr. Wingleman. Counsel also called Mr. Menzies's sister and aunt to provide graphic descriptions of Mr. Menzies's home and social life and abuse.

¶ 196 Mr. Menzies claims that there was *additional* evidence under most of these factors that should have been raised, but we affirm the PCC's determination that the additional evidence and witnesses were unnecessary. For example, he claims that counsel should have called multiple additional witnesses to testify, including his biological father, his step-fathers and step-mother, and his teachers. But as the PCC recognized, each of these witnesses was either inaccessible or would have been unhelpful, if not damaging, to Mr. Menzies's mitigation defense. For instance, his biological father was inaccessible because he had not been seen for twelve years. Furthermore, Mr. Menzies failed to show that his stepfathers were available, and Mr. Menzies's sister and aunt provided information about them in any event. Although Mr. Menzies's stepmother may have been available, she would have presented cumulative evidence that was already provided by Mr. Menzies's sister and aunt. Finally, the PCC concluded, correctly, that calling Mr. Menzies's teachers would have done more harm than good, since even though some of their testimony would have been sympathetic, overall it would have harmed the mitigation strategy by emphasizing Mr. Menzies's poor educational track record. For instance, one teacher noted that Mr. Menzies once stole from him.

¶197 And even though Dr. DeCaria gave extensive testimony at the penalty phase concerning Mr. Menzies's background, Mr. Menzies still claims that Dr. DeCaria failed to inform the jury of specific instances of abuse and neglect, including the fact that his mother abandoned him for multiple days at a time, that his stepfather held his hand over a flame, and that he was forced to beat a rabbit over its head and slit its throat.

¶198 The problem with all of Mr. Menzies's claims here—on everything ranging from failure to call additional witnesses to failure to raise additional specific instances of abuse and other background information through direct examination— is that the Sixth Amendment does not require that counsel present cumulative evidence. Counsel is not ineffective merely because the petitioner alleges that counsel failed to use a potential witness or introduce specific evidence. Counsel need only present a reasonable and complete mitigation defense. It does not need to be cumulative. [176]

[176]

> *See* 📖 *Bobby v. Van Hook,* 558 U.S. 4, 11, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) ("[G]iven all the evidence [counsel] unearthed from those closest to [petitioner's] upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member....").

b. Mr. Menzies's counsel did not perform deficiently by failing to raise evidence of organic brain damage

¶199 Mr. Menzies's final penalty-phase ineffective assistance claim is that counsel failed to introduce evidence of organic brain damage (OBD)—that Mr. Menzies's brain was physically impaired in such a way that it impacted his judgment or constituted a mental disease. Mr. Menzies claims that Utah common law and Utah statutes *required* presentation of OBD and that failure to present such evidence constitutes prejudice.  *629  We reject these claims because

Mr. Menzies misunderstands what is required of counsel under the law, and because introducing evidence of OBD would likely have hurt, rather than helped, Mr. Menzies's case.

¶ 200 First, although Utah statutes do suggest that counsel raise evidence of mental impairment or disease, including the impact of drugs and alcohol, they do not *specifically* require counsel to introduce evidence of OBD. [177] As a preliminary matter, we note that Mr. Menzies's arguments concerning Utah common law and the sentencing statute are unpreserved —they were raised for the first time on appeal. [178] And Mr. Menzies's common-law argument is unsupported by the cases he cites. Though both cases do refer to OBD, neither establishes in any way that trial counsel must present OBD evidence as a matter of effective assistance of counsel. [179] Nor does Utah's sentencing statute require OBD evidence. Counsel need only raise mental illness/mental health concerns that are appropriate under a reasonable mitigation strategy. That was done here.

[177]
> *See* UTAH CODE § 76–3–207(2)(d) (Supp.1983).

[178]
> *See* *State v. Gulbransen,* 2005 UT 7, ¶ 48, 106 P.3d 734.

[179]
> *Gardner v. Holden,* 888 P.2d 608, 619 (Utah 1994) (reversing a trial court's finding of ineffective assistance on the basis that additional time to probe the nature of defendant's OBD would not have impacted the sentencing outcome); *State v. DePlonty,* 749 P.2d 621, 624–27 (Utah 1987) (holding that the trial court's refusal to find a defendant mentally ill was error where the State did not dispute a doctor's report concerning OBD).

¶ 201 At the penalty phase, counsel elicited testimony from two separate mental health experts, both of whom testified that Mr. Menzies's propensity for violence was likely to abate in prison. They also testified to Mr. Menzies's substance abuse and the possibility that it directly affected him at the time of the murder. Although counsel also commissioned a psychiatrist, they did not call the psychiatrist to testify because the testimony would have hurt the mitigation defense —the psychiatrist's report focused on Mr. Menzies's violent nature and that he was unlikely to change. Although Mr. Menzies claims that counsel should have hired an additional

neuropsychological examination to explore OBD and FAS, he makes no showing that counsel was required as a matter of constitutional effectiveness of counsel to explore these additional possibilities.

¶ 202 In fact, the evidence suggests that counsel was unaware of the possibility that Mr. Menzies had OBD or FAS and the experts counsel hired to investigate any such possibility found no supporting evidence in their inquiries. Given that "it is reasonable for counsel to rely on the judgment and recommendations of qualified experts" in developing a mitigation strategy, it was reasonable for counsel not to have explored the possibility of these additional conditions, since the three commissioned mental health experts provided no evidence suggesting to counsel that those conditions were likely to have affected Mr. Menzies's psychological condition. [180] And as the PCC recognized, there was also no direct evidence of OBD.

[180]
> *Archuleta,* 2011 UT 73, ¶ 129, 267 P.3d 232.

¶ 203 Finally, introducing evidence of OBD would have hurt Mr. Menzies's mitigation defense, rather than helped. Because "impulse control [would be] forever and always impaired as a result of that OBD," this would have undercut the mitigation strategy of showing that Mr. Menzies was capable of rehabilitation. Had OBD evidence been introduced, it would have supported the State's position that Mr. Menzies would continue to be violent.

¶ 204 In sum, Mr. Menzies's failure to investigate an OBD evidence claim fails because he has not established both that counsel's performance was deficient and that counsel's performance prejudiced his case. Counsel provided extensive evidence of his background and abuse, as well as his mental and physical health. Furthermore, counsel's failure to present OBD was in no way prejudicial to Mr. Menzies's case, since it would have undercut his position that he was capable of rehabilitation. Critically, Mr. Menzies has failed to make the requisite showing that the additional witnesses and additional information, if presented, would have been **\*630** enough to create a "substantial likelihood" of a sentence less than death. Accordingly, we reject his ineffective assistance of counsel arguments here.

### 6. Judge Uno's Affidavit

¶ 205 A final argument raised by Mr. Menzies as to the penalty phase of his trial relates not to ineffective assistance

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 111

but instead to an affidavit provided by the sentencing judge, Judge Raymond Uno. In his affidavit, Judge Uno stated that he misapplied the heinousness factor under Utah Code section 76–5–202(1)(q) and that he should have imposed a life sentence instead of the death penalty. The PCC struck Judge Uno's affidavit.

¶ 206 We reject Mr. Menzies's argument that the PCC erred in striking the affidavit because Judge Uno's post-hoc reflections on the case in which he served decades ago as the sentencing judge are immaterial in the present case, and even if we were to accept his argument that Judge Uno erred in applying a single aggravating factor, the aggravating factors together would still have supported a sentence of death.

¶ 207 To begin, Judge Uno's reflections are immaterial here. In support of his argument that Judge Uno's assertion should be considered, Mr. Menzies cites *State v. Bobo.* [181] In *Bobo,* the judge filed an affidavit to fill a gap in the record concerning the nature of a defendant's plea. Judge Uno's affidavit is inapposite to the situation in *Bobo* in that it attempts to undo a previous judgment altogether. Furthermore, a judgment "ought never to be overthrown or limited by the oral testimony of a judge ... of what he had in mind at the time of the decision." [182] Indeed, it is "well-settled law that testimony revealing the deliberative thought processes of judges ... is inadmissible." [183] Although Judge Uno's decision at the time of sentencing was determinative of Mr. Menzies's case, his later post-hoc reflections are given no weight.

181    803 P.2d 1268, 1271 (Utah Ct.App.1990).

182    *Fayerweather v. Ritch,* 195 U.S. 276, 307, 25 S.Ct. 58, 49 L.Ed. 193 (1904).

183    *Rubens v. Mason,* 387 F.3d 183, 191 (2d Cir.2004).

¶ 208 And even if Judge Uno did misapply the heinousness factor, we conclude that a sentence of death was still correctly imposed. The heinousness factor is one of many aggravating factors that contribute to a sentence of death. Given the many aggravating factors at issue, and as we previously concluded in *Menzies II* with respect to the sentencing court's application of the heinousness factor, "[any] error was harmless because we can still confidently conclude beyond a reasonable doubt that the remaining aggravating circumstances and factors

outweigh the mitigating factors and that the imposition of the death penalty was justified and appropriate." [184]

184    *Menzies II,* 889 P.2d at 405 (internal quotation mark omitted).

### 7. Conclusion—Penalty–Phase Ineffective Assistance of Counsel

¶ 209 In conclusion, penalty-phase counsel's actions did not constitute ineffective assistance of counsel. Counsel began penalty-phase preparations in sufficient time, conducted a sufficient mitigation investigation, and presented a reasonable and complete mitigation defense. And even if we were to accept any of Mr. Menzies's arguments that penalty-phase counsel provided ineffective assistance, he fails to demonstrate how counsel's decisions or failures prejudiced his mitigation defense. Accordingly, we affirm the PCC's grant of summary judgment on each of Mr. Menzies's penalty-phase ineffective assistance claims. We further affirm the PCC's decision to strike Judge Uno's affidavit because his post-hoc reflections on the case are immaterial.

### D. Mr. Menzies Has Not Raised a Genuine Issue of Material Fact Regarding Appellate Counsel's Representation

¶ 210 Mr. Menzies raises three challenges regarding appellate counsel's representation. **\*631** [185] He argues that appellate counsel rendered ineffective assistance by (1) hiding possible *Strickland* claims, (2) failing to complete an "appellate investigation," and (3) failing to properly challenge the trial court's reasonable doubt jury instruction. We affirm the PCC's decision as to each claim and conclude that Mr. Menzies has not raised a genuine issue of material fact as to either part of the *Strickland* test.

185    One additional challenge regarding appellate counsel's performance is not properly before us. Mr. Menzies argues that appellate counsel should have argued that he was denied due process by being shackled in front of the jury. As explained, *supra* ¶ 72 n. 69, this claim is not properly before us because Mr. Menzies did not raise it in his Fifth Amended Petition.

¶ 211 The test for determining whether appellate counsel rendered ineffective assistance is substantially the same as the test for assessing whether trial counsel rendered ineffective

assistance. [186] That is, the *Strickland* two-part test applies. But we have further held that where a petitioner argues that appellate counsel rendered ineffective assistance by failing to raise a claim, the petitioner "must show that there is a genuine issue of material fact with respect to whether appellate counsel overlooked an issue which is obvious from the trial record and ... which probably would have resulted in reversal on appeal." [187] With this framework established we examine the merits of each of Mr. Menzies's claims of ineffective assistance of appellate counsel.

[186]    *Ross v. State,* 2012 UT 93, ¶ 44, 293 P.3d 345 ("And [a]s is the case in challenges to the effectiveness of trial counsel, to prevail on a claim of ineffective assistance of appellate counsel, a petitioner must prove that appellate counsel's representation fell below an objective standard of reasonable conduct and that the deficient performance prejudiced [him]." (alterations in original) (internal quotation marks omitted)).

[187]    *Lafferty,* 2007 UT 73, ¶ 48, 175 P.3d 530 (alteration in original) (internal quotation marks omitted).

1. Appellate Counsel's Failure to Raise Ineffective Assistance of Trial Counsel Did not Constitute the Hiding of Ineffective Assistance Claims

¶ 212 LDA attorneys represented Mr. Menzies both at trial and on appeal. *Strickland* does not require counsel to raise ineffective assistance of counsel claims on appeal where the same counsel also represented the defendant at trial. [188] Rather, both the common law and the PCRA allow a petitioner who had the same counsel on appeal and at trial to raise ineffective assistance claims for the first time in post-conviction proceedings. [189] We therefore reject Mr. Menzies's argument that appellate counsel's failure to raise possible *Strickland* claims against trial counsel constituted the hiding of ineffective assistance because appellate counsel was under no obligation to raise *Strickland* claims against itself. Appellate counsel cannot be held to have performed deficiently by refusing to make an argument they were not legally required to make. [190] And because attorneys employed by LDA represented Mr. Menzies at both trial and on appeal, appellate counsel was not required to raise a claim that they, themselves, were ineffective. Further, even if we were to characterize any potential ineffective assistance claims against trial counsel as "obvious," Mr. Menzies cannot

show that he was prejudiced because he has been given the opportunity in post-conviction proceedings to argue that his trial counsel and appellate counsel rendered ineffective assistance. For these reasons we reject Mr. Menzies's argument in this regard and proceed to his remaining claims.

[188]    *See* Fernandez v. Cook, 783 P.2d 547, 550 (Utah 1989) (holding that where a petitioner is represented by the same person on appeal and at trial the petitioner may raise ineffective assistance claims for the first time in post-conviction proceedings).

[189]    *Id.;* UTAH CODE § 78B–9–104(1)(d) ("Unless precluded by Section 78B–9–106 or 78B–9–107, a person ... may file an action ... for post-conviction relief [on the] grounds [that] ... the petitioner had ineffective assistance of counsel in violation of the United States Constitution or Utah Constitution....").

[190]    *See* Dunn, 850 P.2d at 1228 (holding that a petitioner's ineffective assistance claim failed because there was no basis in the law in effect at the time of the representation that would have substantiated petitioner's substantive claim).

*632 2. Mr. Menzies Has not Shown that Appellate Counsel Failed to Conduct a Proper Appellate Investigation

¶ 213 We also reject Mr. Menzies's claim that appellate counsel rendered ineffective assistance by failing to conduct a proper appellate investigation. Mr. Menzies's brief on this point is somewhat unclear, but the thrust of his argument is that appellate counsel violated NLADA Standard 11.9.2(b) [191] by failing to (1) learn that Mr. Larrabee and Ms. Brown were engaged in sexual activity, (2) investigate potential ineffective assistance claims against trial counsel, (3) realize that they needed to either obtain informed consent or withdraw from the case because of the conflict of interest created by trial counsel seeking a liability waiver from Mr. Menzies, and (4) interview Judge Uno regarding his willingness to rescind the death sentence given to Mr. Menzies.

[191]    This standard states the following: "Appellate counsel should interview the client, and trial counsel if possible, about the case, including any

relevant matters that do not appear in the record. Counsel should consider whether any potential off-record matters should have an impact on how the appeal is pursued, and whether an investigation of any matter is warranted." NLADA STANDARDS FOR THE APPOINTMENT OF COUNSEL IN DEATH PENALTY CASES 11.9.2(b) (1988).

¶ 214 We have addressed above, *supra* ¶¶ 140–43, Mr. Menzies's substantive arguments regarding the reason Mr. Larrabee and Ms. Brown were distracted at the time they saw Mr. Menzies at Storm Mountain. There we conclude that Mr. Menzies's ineffective assistance claim against trial counsel had no merit. Given this conclusion, it is necessarily the case that the claim was not an obvious one such that appellate counsel should have raised it on appeal. And even assuming that this claim was obvious, Mr. Menzies does not argue—as he must in order to prevail in an ineffective assistance of counsel claim—that asserting this claim would have probably resulted in a reversal on appeal.

¶ 215 Mr. Menzies's argument that appellate counsel should have investigated potential ineffective assistance claims against trial counsel is unfounded for reasons already stated. [192] Appellate counsel is under no obligation to raise its own ineffectiveness where it also represented the defendant at trial.

192     *Supra* ¶ 212.

¶ 216 Mr. Menzies also argues that trial counsel's conflict of interest tainted appellate proceedings and that if appellate counsel would have conducted a proper investigation they would have learned that they needed to withdraw. We discuss Mr. Menzies's conflict of interest claim above, *supra* ¶¶ 153–65, and conclude that there was no conflict of interest because the liability waiver did not create an actual conflict between counsel and Mr. Menzies such that their interests were not aligned. Because there was no conflict at trial, Mr. Menzies's argument that the conflict also permeated the appeal must fail.

¶ 217 Lastly, to hold that appellate counsel rendered ineffective assistance by not interviewing Judge Uno to determine whether he was willing to rescind the death sentence would be an extreme exercise of hindsight. There is no reasonable basis for concluding that appellate counsel should have thought that Judge Uno might be willing to rescind the death sentence he imposed on Mr. Menzies. In fact, it seems quite unreasonable to expect appellate lawyers to seek testimony from a trial judge admitting that the judge

erroneously imposed a sentence. Even assuming that an interview of Judge Uno by Mr. Menzies's appellate counsel would have produced this admission, any potential claim based on the information was hardly obvious from the trial record.

¶ 218 We therefore affirm the PCC's holding that Mr. Menzies has not raised a genuine issue of material fact as to each part of the *Strickland* test regarding whether appellate counsel conducted an appropriate appellate investigation.

3. Appellate Counsel's Failure to Raise a Challenge Regarding the Reasonable Doubt Jury Instruction Did not Constitute Ineffective Assistance Because the Instruction Conformed with Instructions Upheld by the United States Supreme Court

¶ 219 Finally, Mr. Menzies argues that appellate counsel was ineffective in **\*633** failing to challenge the reasonable doubt instruction given to the jury, which Mr. Menzies claims was unconstitutional. The relevant part here instructed the jury that a "reasonable doubt" must be "a real, substantial doubt, and not one that is merely possible or imaginary."

¶ 220 In *Cage v. Louisiana,* the Supreme Court held unconstitutional a jury instruction equating reasonable doubt with "grave uncertainty" and "actual substantial doubt." [193] The Court noted that the words "substantial" and "grave" suggested a "higher degree of doubt than is required for acquittal under the reasonable-doubt standard." [194] This is especially so, the Court reasoned, when the words are considered with a "reference to moral certainty, rather than evidentiary certainty." [195] The Court held in *Sullivan v. Louisiana* that jury instructions with errors like those identified in *Cage* were structural errors. [196]

193     498 U.S. 39, 40–41, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (The reasonable doubt instruction in full read: "If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon

mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty,* raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a *moral certainty.*" (internal quotation marks omitted)).

194    *Id.* at 41, 111 S.Ct. 328.

195    *Id.* (internal quotation marks omitted).

196    508 U.S. 275, 281–82, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

¶ 221 The Court later clarified in *Victor v. Nebraska,* however, that not all definitions of reasonable doubt that use the words "substantial doubt" are unconstitutional. [197] Even though the reasonable doubt instruction at issue in *Victor* used the words "substantial doubt," the Court approved of the instruction because "substantial doubt" was contrasted with terms like "mere possibility" and "bare imagination." [198] The Court noted that this comparison made it clear that "substantial" is "used in the sense of existence, rather than magnitude of the doubt." [199] This satisfied any concern that the jury would interpret the term "substantial doubt" to overstate the doubt necessary to acquit. [200]

197    511 U.S. 1, 19–20, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).

198    *Id.* at 20, 114 S.Ct. 1239.

199    *Id.*

200    *Id.*

¶ 222 The jury instruction at issue here defined reasonable doubt as "a real, substantial doubt, and not one that is merely possible or imaginary." In *Carter v. Galetka,* we held that a very similar instruction was constitutional. [201] The instruction there stated as follows: "[A] reasonable doubt must be a real, substantial doubt and not one that is merely possible or imaginary." [202] The reasonable doubt instruction here, like the instruction in *Carter,* compares a "substantial doubt" with those that are "merely possible or imaginary."

Like *Victor,* the comparison is in "the sense of existence rather than magnitude of the doubt." [203] Any challenge raising the constitutionality of the reasonable doubt instruction given in this case would have surely failed for these reasons. It follows that it would have hardly been obvious to appellate counsel to challenge the instruction. Further, because the merits of the challenge would have been unsuccessful, Mr. Menzies cannot make a sufficient showing that making the claim would have probably resulted in reversal. For these reasons we affirm the PCC's grant of summary judgment, since Mr. Menzies fails to raise any genuine issue of material fact concerning counsel's failure to challenge the beyond a reasonable doubt instruction.

201    2001 UT 96, ¶ 51, 44 P.3d 626.

202    *Id.* (internal quotation marks omitted).

203    *Victor,* 511 U.S. at 20, 114 S.Ct. 1239.

**\*634** 4. Conclusion—Appellate Proceedings Ineffective Assistance of Counsel

¶ 223 We conclude that appellate counsel did not render ineffective assistance of counsel. Appellate counsel had no obligation to raise ineffective assistance claims against themselves. Counsel adequately investigated Mr. Menzies's case. And counsel was not ineffective in failing to challenge the beyond reasonable doubt instruction because the claim would have almost assuredly failed. For these reasons we reject Mr. Menzies's claim that appellate counsel provided ineffective assistance.

**Conclusion**

¶ 224 None of Mr. Menzies's claims have merit. We reject each of his constitutional challenges to the PCRA and further conclude that the PCC did not abuse its discretion in denying further funding under the PCRA. We also reject each of his procedural claims. First, rule 65C of the Utah Rules of Civil Procedure allows the State to move for summary judgment rather than file an answer. Second, the PCC's decision to deny his request for a rule 56(f) continuance was not an abuse of discretion. And third, the PCC did not abuse its discretion in denying him an evidentiary hearing before ruling on the cross-motions for summary judgment. Finally, we conclude that each of his ineffective assistance claims fail because he has not raised a genuine issue of material fact concerning each prong of the *Strickland* test.

¶ 225 In sum, we affirm the PCC's order granting summary judgment to the State and dismissing Mr. Menzies's petition for post-conviction relief.

**All Citations**

344 P.3d 581, 771 Utah Adv. Rep. 4, 2014 UT 40

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Addendum F

136 S.Ct. 55
Supreme Court of the United States

Ralph Leroy MENZIES, petitioner,

v.

UTAH.

No. 14–9724.
|
Oct. 5, 2015.

**Synopsis**

Case below, 344 P.3d 581.

**Opinion**

Petition for writ of certiorari to the Supreme Court of Utah denied.

**All Citations**

577 U.S. 834, 136 S.Ct. 55 (Mem), 193 L.Ed.2d 58, 84 USLW 3166

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Addendum G

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 119

2019 WL 181359
Only the Westlaw citation is currently available.
United States District Court, D. Utah, Central Division.

Ralph Leroy MENZIES, Petitioner,

v.

Scott CROWTHER, Warden of the
Utah State Prison, Respondent.

Case No. 03-CV-0902-CVE-FHM
|
Signed 01/11/2019

**Attorneys and Law Firms**

Jeffrey J. Hunt, Parr Brown Gee & Loveless, Eric Cooper
Zuckerman, Utah Federal Defender Office, Salt Lake City,
UT, Jon M. Sands, Pro Hac Vice, Lindsey Ann Layer, Pro
Hac Vice, Arizona Federal Defender Office, Phoenix, AZ, for
Petitioner.

Andrew F. Peterson, Aaron G. Murphy, Erin Riley,
Utah Attorney General's Office, Salt Lake City, UT, for
Respondent.

**OPINION AND ORDER**

CLAIRE V. EAGAN, UNITED STATES DISTRICT JUDGE

 *1  This matter comes before the Court on a second amended
petition for writ of habeas corpus (Dkt. # 109) filed by Utah
death row inmate, Ralph Leroy Menzies, pursuant to 28
U.S.C. § 2254. Petitioner, who appears through counsel,
challenges his conviction and sentence in the Third District
Court of Salt Lake County, State of Utah, Criminal Case
No. 86-887. Respondent filed a response (Dkt. # 123) to
the second amended petition, and petitioner filed a reply (Dkt. #
127). The state court record has been produced. [1]  The Court
considered all of these materials in reaching its decision. For
the reasons discussed below, the Court concludes the petition
should be denied.

[1]     This Court received nine boxes of documents,
along with five CDs ("disks") that contain copies
of all of the state court records. Notice of submittal
of the disks was filed as Dkt. # 110. Due to
the extensive number of files on those disks,

the disks were placed in permanent storage in
the office of the Clerk of Court. Subsequently,
a supplement to the state court record was filed
containing a sixth disk. Since this disk contained
only one pleading, the Appellant's Opening Brief
Re: Denial of Habeas Relief in the Utah Supreme
Court filed on February 14, 2013, the pleading
was attached in CM/ECF to the supplemental
pleading. See Dkt. # 136-1. Where available,
references to documents and pleadings from the
state trial court proceedings are contained in
the trial record on appeal (ROA) and shall be
referred to as Trial ROA at ____. Where available,
references to documents and pleadings from the
state postconviction proceedings are contained in
the postconviction ROA and shall be referred to
as PC ROA at ____. Where any document is
contained on a disk filed in this case, the Court will
give a second citation as Dkt. # 110, Disk # ____,
Vol. # ____ at ____ (this page number will refer to
the .pdf page number of the document on the disk)
or Dkt. # 136-1, at ____. References to the trial
transcript shall be referred to as "J.T. Tr. [Date] at
____"; references to other hearings held by the trial
court shall be referred to as "Tr. [Date] at ___." In
addition to the hard copies of transcripts, all trial
transcripts are contained on Disk # 1; transcripts of
later proceedings are contained on Disk # 5.

**I.**

**BACKGROUND**

**A. Factual Background**

Historical facts found by the state court are presumed correct,
unless the petitioner rebuts the same by clear and convincing
evidence. 28 U.S.C. § 2254(e)(1). Since petitioner has
failed to rebut the facts, as set forth by the Utah Supreme
Court, this Court hereby adopts the factual findings which the
Utah Supreme Court found were "largely undisputed." [2]

At approximately 9:50 p.m. on Sunday, February 23, 1986,
Salt Lake County Sheriff's deputies were dispatched to the
Gas-A-Mat station located at 3995 West 4700 South. The
deputies found customers waiting to pay, but the cashier's
booth empty and the door locked. The station attendant,
Maurine [3] Hunsaker, was missing, although her coat was
still in the booth and a radio was playing. A preliminary

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 120

accounting indicated that approximately $70 in cash was missing from the register. [4]

 **\*2**  At approximately 11:05 that same night, Maurine telephoned her husband, Jim, at their home. Deputy Scott Gamble was with Jim at the time. Maurine told her husband that she had been robbed and kidnapped, but that her abductor(s) intended to release her sometime that night. Deputy Gamble also spoke with Maurine, and she again indicated that a robbery had occurred. However, Deputy Gamble was unable to get a clear answer regarding the kidnapping. Maurine also refused, or was unable, to answer Gamble's question regarding her location. When Jim again spoke with his wife, she asked him what she should do. The line then went dead.

At approximately 5 p.m. on Tuesday, February 25, 1986, a hiker discovered Maurine Hunsaker's body at the Storm Mountain picnic area in Big Cottonwood Canyon. She had been strangled and her throat cut. Her purse, which had not been found at the gas station, was not with the body or in the immediate area. That same evening, a jailer at the Salt Lake County Jail found several identification cards belonging to Maurine Hunsaker in a desk drawer in one of the jail's changing rooms. He recognized the picture on the driver's license as a woman reported missing the night before on television news.

Detectives later determined how the cards got into the drawer. [Petitioner] had been booked into the jail on unrelated charges at approximately 6:40 p.m. on Monday, February 24, 1986. He left the booking area for a short time without supervision and was found in a changing room. Shortly thereafter, Maurine Hunsaker's identification cards were found in a clothing hamper in that room. Unaware of the kidnapping, the officer who found the cards placed them in the desk drawer where the jailer found them Tuesday night.

Also on Tuesday evening, a high school student named Tim Larrabee was watching the news and learned that a hiker had discovered a woman's body at Storm Mountain. On Wednesday, Larrabee notified deputies that he and his girlfriend, Beth Brown, had skipped school on Monday, February 24th, and were at Storm Mountain. Larrabee had noticed a full-sized, two-door, late-1960s model, cream-colored automobile in the parking lot. He said that the vehicle was similar in appearance to a 1968 Buick Riviera. Larrabee and Brown also saw a man and woman at the site but saw nothing unusual happening between the two. They

later heard a short scream, but Larrabee thought that the woman had slipped or had been frightened by an animal. Approximately fifteen minutes later, Larrabee saw the man walking alone. Neither Larrabee nor Brown saw the woman again.

Larrabee described the suspect as a white male, 25-30 years of age, 6'1″ tall, with a medium build (approximately 170 pounds), black, curly hair, prominent sideburns and a mustache, and wearing wire-rimmed glasses. A detective created a composite drawing of a possible suspect based on the description. After learning that Maurine's identification cards had been found at the jail, sheriff's detectives compared the composite drawing with the photographs of more than two hundred inmates who had been booked into the facility from February 23rd through the 25th. Three photographs were chosen as possible matches, including that of [petitioner].

Detective Jerry Thompson questioned [petitioner] regarding the Hunsaker homicide. [Petitioner] said that on Sunday, February 23rd, he borrowed a car from Troy Denter and picked up a young woman on State Street that evening. He told the detective that while with this woman, he picked up his girlfriend, Nicole Arnold, and drove around until the two women began to argue. [Petitioner] reportedly dropped Nicole and then left the unidentified woman somewhere around 7200 West and 2400 South. According to [petitioner], he then went home, where he talked with Nicole.

 **\*3**  On February 28th, the detectives questioned Denter. He told them he loaned his cream-colored 1974 Chevrolet to [petitioner] on Sunday, February 23rd, sometime in the afternoon. He said that [petitioner] did not return the car until the afternoon of Monday, February 24th. Detectives then took Larrabee and Brown to the jail parking lot, where they identified Denter's car as the one they saw at Storm Mountain. They were also shown a photospread consisting of six photographs. Larrabee indicated that [petitioner] appeared to be the man he saw at Storm Mountain. Several months later, however, Larrabee did not correctly identify [petitioner] in a lineup.

Detectives found Maurine Hunsaker's fingerprint in Denter's car and located her purse in [petitioner's] apartment. [Petitioner] was charged with first degree murder, a capital offense. After the charges were filed, Walter Britton, [petitioner's] cell mate, contacted detectives about the homicide. Britton said that on February 27th,

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 121

[petitioner] told him that he killed Hunsaker to prevent her from testifying against him.

🚩⚠ <u>Menzies II</u>, 889 P.2d at 396-97 (second footnote in original) (citation omitted).

2        🚩⚠ <u>State v. Menzies</u> (<u>Menzies II</u>), 889 P.2d 393, 396 (Utah 1994).

3        Although the victim is referred to as "Maureen" in the charging document and certain trial court documents, the Utah Supreme Court correctly referred to her as "Maurine," as that is her legal name on her social security card. <u>See</u> State's Exhibit # 42 (Dkt. # 110, Disk # 1, Trial/ Exhibits/1988.02.10 Trial).

4        An area manager for Gas-A-Mat later conducted a more thorough accounting and determined that approximately $116 in cash was missing.

**B. Procedural History**
On March 8, 1988, a jury convicted petitioner of criminal homicide, murder in the first degree, a capital offense, and aggravated kidnapping. Trial ROA at 898-99. The jury found petitioner not guilty of aggravated robbery. <u>Id.</u> at 900. The jury specifically found that the homicide was committed while petitioner was engaged in the commission of, and attempt to commit, or flight after committing, or attempting to commit robbery and aggravated kidnapping. <u>Id.</u> at 898. Petitioner waived his right to a jury trial for the penalty phase of the proceedings, and on March 23, 1998, he was sentenced to death. <u>Id.</u> at 1104-07. On May 26, 1988, petitioner filed a docketing statement in the Utah Supreme Court raising twenty-nine issues on appeal. <u>State v. Menzies</u> (<u>Menzies I</u>), 845 P.2d 220, 223 (Utah 1992). On September 5, 1988, the trial transcript was certified. <u>Id.</u> Prior to filing his brief, petitioner "observed that the record contained numerous transcription errors." <u>Id.</u> As a result,

[o]n November 15, 1989, prior to submitting his brief, [petitioner] filed a "motion to set aside judgment and/ or for a new trial" on the ground that the transcription errors rendered the record inadequate for appeal. The trial court referred the matter to [the Utah Supreme Court], and [petitioner] modified his motion to include claims concerning the qualifications of the court reporter.

<u>Id.</u> The matter was remanded "to the trial court to conduct proceedings to correct the record, pursuant to rule 11(h) of the Rules of the Utah Supreme Court." <u>Id.</u> Additionally, the trial court was directed to rule on petitioner's "motion for a new trial and to resolve all issues relating to the qualifications of the court reporter and the adequacy of the transcript." <u>Id.</u> After several hearings, the trial court denied the motion, and the Utah Supreme Court affirmed, ordering petitioner to proceed with the appeal on the merits. <u>Id.</u> at 242.

Thereafter, petitioner raised forty-four issues on appeal. <u>See</u> Brief of Appellant filed on September 14, 1992 (Dkt. # 110, Disk # 1, Related Appeals/Direct Appeal, Dkt. # 100). The Utah Supreme Court's majority opinion addressed only the following claims of error on appeal: (1) failure to remove five jurors for cause; (2) failure to grant a mistrial following "surprise" testimony by Tim Larrabee; (3) admission of preliminary hearing testimony of a jailhouse informant; (4) consideration of a heinousness aggravating circumstance during the penalty phase; (5) admission of victim impact evidence during the penalty phase; and (6) use of the incorrect standard in sentencing petitioner to death. The remaining claims were all denied as being without merit. The Utah Supreme Court affirmed the sentence and conviction.

🚩⚠ <u>Menzies II</u>, 889 P.2d at 406-07.

**\*4** On April 20, 1995, petitioner, who was represented by attorneys acting <u>pro bono</u>, initiated postconviction proceedings in the state district court. Petitioner amended his petition on May 2, 1995, asserting seventy-three separate claims for relief, including claims that his trial counsel provided ineffective assistance. 🚩 <u>Menzies v. Galetka</u> (<u>Menzies III</u>), 150 P.3d 480, 489-90 (2006).

On March 3, 1998, Edward K. Brass was appointed by the state court to represent petitioner in all proceedings before the court. Unfortunately, Brass defaulted petitioner's entire postconviction proceeding, resulting in the dismissal of his case. 🚩 <u>Id.</u> at 489. Following the dismissal, Brass withdrew and new counsel was appointed in state court on November 6, 2003.

On August 12, 2003, petitioner attempted to set aside the dismissal under rule 60(b), Utah Rules of Civil Procedure. [5] On February 26, 2004, the state district court denied the rule 60(b) motion. [6] On December 15, 2006, the Utah Supreme Court found that petitioner was entitled to rule 60(b)(6) relief

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042   Document: 98-2   Date Filed: 12/22/2020   Page: 122

"due to the extraordinary circumstances of Brass' ineffective assistance of counsel and grossly negligent representation" and, therefore, it reversed and remanded the postconviction proceeding. Menzies III, 150 P.3d at 520. [7]

5    Petitioner's new state postconviction counsel filed this federal habeas action on December 17, 2003. Dkt. # 15.

6    On September 14, 2004, counsel filed a motion to stay this action pending exhaustion of petitioner's postconviction remedies (Dkt. # 34), and on October 27, 2004, this action was stayed. Dkt. # 41.

7    While the postconviction proceedings were pending, Utah enacted legislation governing the appointment and payment of counsel in postconviction death penalty proceedings. See Utah Code Ann. § 78-35a-202 (West 2008).

On remand, the trial court granted the state summary judgment, denied petitioner's cross-motion for summary judgment, and on March 23, 2012, dismissed the fifth amended petition for postconviction relief. This was affirmed by the Utah Supreme Court in Menzies v. State (Menzies IV), 344 P.3d 581 (Utah 2014).

On February 25, 2015, petitioner informed this Court that the state court proceedings had concluded. Dkt. # 100. On February 26, 2015, an order (Dkt. # 102) was entered lifting the stay and petitioner was given permission to file an amended petition, which was subsequently filed on March 18, 2015. Dkt. # 103. Thereafter, pursuant to a stipulation and motion of the parties (Dkt. # 105), the Court adopted a new schedule (Dkt. # 106) giving petitioner until August 31, 2015 to file a second amended petition, which was subsequently filed on August 31, 2015. Dkt. # 109. In the second amended petition, petitioner lists forty-three (43) claims for relief in the table of contents. Dkt. # 109. [8] Respondent filed a response (Dkt. # 123) to the second amended petition by and through the Attorney General of the State of Utah, and petitioner filed a reply (Dkt. # 127). Petitioner asserts the following errors entitle him to release from custody: (1) the state court failed to provide him with an adequate transcript of his trial thereby violating his rights to due process and equal protection under the Fourteenth Amendment of the United States Constitution, his right to effective assistance of counsel on appeal under the Sixth and Fourteenth Amendments to the United States Constitution, and his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution; (2) the trial court's refusal to excuse unqualified jurors for cause deprived him of his right to a fair trial by an impartial jury as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution; (3) the state's failure to disclose exculpatory evidence deprived him of his Fourteenth Amendment right to due process of law; (4) the trial court's refusal to declare a mistrial following a hearing regarding the withholding of exculpatory evidence violated his right to due process under the Fourteenth Amendment; (5) the trial court deprived petitioner of his Sixth Amendment right to confront a witness by admitting preliminary hearing testimony of Walter Britton, a jailhouse informant; (6) the trial court denied petitioner's Sixth and Fourteenth Amendment rights when it quashed the subpoena for the prosecutor who testified on behalf of Walter Britton at a hearing to modify his sentence; (7) the trial court's refusal to grant a mistrial after a law enforcement official violated a court order prohibiting testimony about his parole status denied him of his rights to due process as guaranteed by the Sixth and Fourteenth Amendments; (8) the state court's failure to declare a mistrial following alleged prejudicial incidents during the trial violated petitioner's right to an impartial jury as guaranteed by the Sixth and Fourteenth Amendments; (9) petitioner's Fourteenth Amendment right to due process was violated when he was briefly shackled in front of the jury following the fainting of one of the jurors; (10) the state's illegal search of petitioner's home violated his Fourth Amendment rights, and the admission of evidence seized during the illegal search violated his rights to due process and a fair trial under the Sixth and Fourteenth Amendments; (11) petitioner was deprived of his right to due process under the Fourteenth Amendment when he was convicted and sentenced on the basis of inadmissible evidence; (12) petitioner was denied his Fourteenth Amendment right to due process when he was convicted and sentenced without having each and every element of the charges against him established beyond a reasonable doubt; (13) petitioner was denied his Fourteenth Amendment right to due process where a jury instruction allowed a jury to make a finding of guilt based on a degree of proof less than beyond a reasonable doubt; (14) petitioner was denied effective assistance of counsel during the guilt phase of his trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments; (15) the admission of petitioner's prison file during the penalty phase violated his rights to confrontation, to due process of law, and to a reliable capital sentencing hearing, under the Sixth, Eighth, and Fourteenth Amendments; (16) the admission of petitioner's rap sheets during the penalty phase violated petitioner's rights

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042   Document: 98-2   Date Filed: 12/22/2020   Page: 123

to confrontation, to due process of law, and to a reliable capital sentencing hearing, under the Sixth, Eighth, and Fourteenth Amendments; (17) the state's failure to disclose the contents of petitioner's prison file violated his rights to due process under the Fourteenth Amendment and to a reliable capital sentencing proceeding under the Eighth Amendment; (18) the admission of petitioner's prison file violated his rights to be free from self-incrimination under the Fifth Amendment and to due process of law under the Fourteenth Amendment; (19) the admission of three psychiatric evaluations during the penalty phase violated petitioner's right to be free from self-incrimination under the Fifth Amendment, his right of confrontation under the Sixth Amendment, his rights to a fair and reliable capital sentencing proceeding under the Sixth and Fourteenth Amendments, and his right to due process of law under the Fourteenth Amendment; (20) the admission of the testimony of Dr. Patricia Smith violated petitioner's rights to due process under the Fourteenth Amendment and to a reliable capital sentencing proceeding under the Eighth Amendment; (21) withdrawn;[9] (22) withdrawn;[10] (23) the admission of photographs of the corpse violated petitioner's rights to due process under the Fourteenth Amendment and to be free from cruel and unusual punishment under the Eighth Amendment; (24) the admission of victim impact evidence during the penalty phase of his trial deprived petitioner of his Eighth Amendment right to a reliable sentencing; (25) prosecutorial misconduct, by improperly referring to items not in evidence and arguing improper factors in aggravation, deprived petitioner of his rights to due process and to a fair and reliable sentencing hearing in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments; (26) the state court's reliance on uncharged aggravating circumstances denied petitioner of his rights to due process under the Fourteenth Amendment and to a reliable and fair capital sentencing proceeding under the Eighth Amendment; (27) incorporated into 25; (28) the state court's reliance on speculation that petitioner might escape or be paroled violated petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment; (29) petitioner's death sentence violated his right to due process under the Fourteenth Amendment and his right under the Eighth Amendment to a reliable capital sentencing proceeding because the sentencer relied on unconstitutional aggravating factors; (30) incorporated into 26; (31) petitioner was denied effective assistance of counsel during the penalty phase of his capital trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments; (32) withdrawn;[11] (33) the state court's failure to record all proceedings violated petitioner's right to a public trial and his right to appeal and seek collateral review of his conviction

under the Sixth and Fourteenth Amendments; (34) the state denied petitioner's right to due process of law guaranteed by the Fourteenth Amendment by failing to give him the benefit of well-established state law in his direct appeal; (35) a change in state law to include the possibility of a life sentence without parole renders petitioner's sentence cruel and unusual under the Eighth Amendment; (36) the state court erred in its application of the Wood factors in violation of petitioner's rights to due process under the Fourteenth Amendment and to a reliable sentence under the Eighth Amendment; (37) appellate counsel's failure to raise meritorious claims on direct appeal violated petitioner's rights to effective assistance of counsel and due process under the Sixth and Fourteenth Amendments; (38) ineffective assistance of counsel during state postconviction proceedings deprived petitioner of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights; (39) petitioner was sentenced to death under a death penalty scheme which failed to adequately channel the application of the death penalty in violation of the Eighth Amendment; (40) the Utah death penalty statute violates the Fifth and Fourteenth Amendments by creating a presumption of death in sentencing and placing the burden of overcoming the evidence of conviction upon the defendant; (41) it is cruel and unusual punishment to execute petitioner after he has spent twenty-seven years on death row; (42) the death penalty violates the Eighth Amendment's ban on cruel and unusual punishment; and (43) the cumulative effect of all errors during trial, appeal, and postconviction proceedings entitles petitioner to relief.

[8]   In the body of the second amended petition, petitioner has withdrawn claims 21, 22, and 32. Additionally, petitioner has incorporated claim 27 into claim 25 and claim 30 into claim 26. For ease of reference, this court will refer to each claim as it was originally numbered within the table of contents to the second amended petition. See Dkt. # 109, at 2-7. Additionally, page numbers to specific federal court docket entries refer to the page number assigned at the top of the pleading by this Court's CM/ECF system.

[9]   See Dkt. # 109, at 186.

[10]   Id.

[11]   See Dkt. # 109, at 265.

## II.

## GENERAL CONSIDERATIONS

### A. Standard of Review

**\*5** Title 28 U.S.C. § 2254(a) provides:

> ... a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

On April 25, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA made significant changes to federal habeas corpus law, specifically delineating the circumstances under which a federal court may grant habeas relief. Title 28, section 2254(d) now provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court **shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless** the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

The Supreme Court recognizes this is a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011). Moreover, review is limited to the record that was

before the state court that adjudicated the claim on the merits. Id. A habeas petitioner has the burden to establish that the state court applied the clearly established federal law in an objectively unreasonable manner. Woodford v. Visciotti, 537 U.S. 19, 25 (2002). Further, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Williams v. Taylor, 529 U.S. 362, 366 (2000) (italics in original).

AEDPA's standard of review applies to habeas petitions filed after the effective date of AEDPA (as this case was), regardless of whether the crime or state trial occurred prior to the effective date. Gardner v. Galetka, 568 U.S. 862, 879 (10th Cir. 2009) (citing Eze v. Senkowski, 321 F.3d 110, 121 (2d Cir. 2003) ); see also Rogers v. Gibson, 173 F.3d 1278 (10th Cir. 1999) (applying AEDPA to a crime that occurred prior to effective date of AEDPA).

The standard of review applicable to each claim will depend on how the claim was resolved by the state courts. Alverson v. Workman, 595 F.3d 1142, 1146 (10th Cir. 2010) (citing Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007) ). Review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits, Cullen, 563 U.S. at 181, and the state-court decision is measured against Supreme Court holdings, as opposed to the dicta, as of the time of the relevant state-court decision. Williams, 529 U.S. at 412. Thus, the first step in applying AEDPA is to determine whether there was clearly established federal law at the time the conviction became final. § 2254(d) (1). The state court is not required to cite to controlling Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradicts such precedent. Early v. Packer, 537 U.S. 3, 8 (2002). The Supreme Court recognizes that "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, 571 U.S. 12, 19 (2013). AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error ... beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

**\*6** This Court must also review any factual findings of the state court to ascertain whether they are unreasonable in light of the evidence presented at trial. Determinations of factual issues made by state courts are presumed correct and a habeas petitioner must rebut the presumption by clear and convincing evidence. § 2254(e)(1).

Petitioner initially filed a request for appointment of counsel on October 14, 2003, and filed his original petition herein on December 17, 2003. Therefore, this Court finds the provisions of Chapter 153 of AEDPA [12] are applicable to this case. See Lindh v. Murphy, 521 U.S. 320 (1997).

[12]  28 U.S.C. §§ 2241-54.

**B. Exhaustion**
A threshold question this Court must decide is: Has petitioner exhausted the remedies available in state court or is there either an absence of available state corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the applicant? § 2254(b)(1). As a general rule, federal habeas corpus relief is not available to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition. § 2254(b)(1)(A); Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994); see also Wainwright v. Sykes, 433 U.S. 72, 80-81 (1977) (reviewing history of the exhaustion requirement). "States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991) (explaining that the exhaustion requirement is "grounded in principles of comity").

The exhaustion doctrine is designed to protect the state court's role in the enforcement of federal law while preventing the disruption of state judicial proceedings. Rose v. Lundy, 455 U.S. 509, 518 (1982). Since it would be "unseemly" for a federal court to upset a state court conviction without first according the state court an opportunity to correct a constitutional violation, federal courts apply the doctrine of comity and allow the state court the opportunity to correct the constitutional violation. Davila v. Davis, 137 S. Ct. 2058, 2064 (2017). In order for exhaustion to have occurred, a habeas petitioner must have "fairly presented" to the state courts the "substance" of his federal habeas corpus claim. Picard v. Connor, 404 U.S. 270, 275-76 (1971). The exhaustion requirement will not have been met if the prisoner presents new legal theories or factual claims in his federal habeas petition. Anderson v. Harless, 459 U.S. 4, 6-7 (1982). Rather, a federal habeas petitioner must

> provide the state court's [sic] with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim. It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made.

Id. (citations omitted). A state prisoner must "present the state courts with the same claim he urges upon the federal courts." Picard, 404 U.S. at 276; see also Smallwood v. Gibson, 191 F.3d 1257, 1267 (10th Cir. 1999) (finding ineffective assistance of counsel claims unexhausted when petitioner asserted a different basis for his claims in state court than presented in federal habeas petition). Put another way, a federal habeas petitioner must present his claim as a federal constitutional claim in the state court proceedings in order for the claim to be exhausted. See Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam).

**\*7** A habeas petition containing both exhausted and unexhausted claims will, in most cases, be deemed a mixed petition requiring dismissal. See Rose v. Lundy, 455 U.S. 590 (1982). [13] Where it is clear, however, that a procedural bar would be applied by the state court if the claim were now presented, the reviewing habeas court may examine the claim under a procedural bar analysis instead of requiring exhaustion. Coleman, 501 U.S. at 735 n.1. Furthermore, a court has the discretion to ignore the exhaustion requirement altogether and deny the petition on the merits if the claims lack merit. 28 U.S.C. § 2254(b)(2); Moore v. Schoeman, 288 F.3d 1231 (10th Cir. 2002). Respondent contends, and petitioner has admitted, that some of his claims are unexhausted. As a result, the Court will address the threshold question of exhaustion as it arises in each claim.

*Menzies v. Crowther*, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042   Document: 98-2   Date Filed: 12/22/2020   Page: 126

13

In 📄 Rhines v. Weber, 544 U.S. 269 (2005), the Supreme Court, recognizing the interplay between the one-year statute of limitations imposed by AEDPA and Lundy's dismissal requirement, authorized use of a "stay and abeyance" procedure similar to what was done in this case in 2004.

**C. Procedural Bar**

As a general rule, a federal court should dismiss unexhausted claims without prejudice so the petitioner can pursue available state-court remedies. 📄 Demarest v. Price, 130 F.3d 922, 939 (10th Cir. 1997). Dismissal without prejudice for failure to exhaust state remedies, however, is not appropriate if the state would now find those claims procedurally barred on independent and adequate state procedural grounds. 📄 Smallwood, 191 F.3d at 1267 (citing 📄 Coleman, 501 U.S. at 735 n.1).

"When a petitioner fails to properly raise his federal claims in state court, he deprives the state of 'an opportunity to address those claims in the first instance' and frustrates the state's ability to honor his constitutional rights." 📄 Cone v. Bell, 556 U.S. 449, 465 (2009) (citing 📄 Coleman, 501 U.S. at 748). Thus, consistent with the exhaustion requirement, when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, a state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review. Id.

Where a state court's finding is separate and distinct from federal law, it will be considered "independent." See 📄 Ake v. Oklahoma, 470 U.S. 68, 75 (1985); 📄 Duvall v. Reynolds, 139 F.3d 768 (10th Cir. 1998). If the finding is applied "evenhandedly to all similar claims," it will be considered "adequate." 📄 Maes v. Thomas, 46 F.3d 979 (10th Cir. 1995) (citing 📄 Hathorn v. Lovorn, 457 U.S. 255, 263 (1982) ). In cases where the state-law default prevented the state court from reaching the merits of the federal claim, the claim ordinarily cannot be reviewed in the federal courts. 📄 Ylst v. Nunnemaker, 501 U.S. 797 (1991). However, it is up to the reviewing federal habeas court to ascertain whether the state court's judgment rests on independent and adequate state grounds. 📄 Cone, 556 U.S. at 465.

Under Sykes and its progeny, an adequate and independent finding of procedural default will bar federal habeas review, unless the habeas petitioner can show "cause" for the default and "prejudice attributable thereto" or demonstrate that failure to consider the federal claim will result in a "fundamental miscarriage of justice." 📄 Harris v. Reed, 489 U.S. 255, 262 (1989) (citing 📄 Murray v. Carrier, 477 U.S. 478, 485 (1986) ); see also 📄 Breechen v. Reynolds, 41 F.3d 1343, 1353 (10th Cir. 1994), and cases cited therein. " 'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it." 📄 Moore, 288 F.3d at 1233 n.3 (citing ⚠️ Hain v. Gibson, 287 F.3d 1224, 1240 (10th Cir. 2002) ).

**\*8** In 📄 Martinez v. Ryan, 566 U.S. 1 (2012), however, the Supreme Court qualified Coleman "by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 📄 Id. at 9. This narrow exception "applies only to claims of 'ineffective assistance of counsel at trial' and only when, 'under state law,' those claims 'must be raised in an initial-review collateral proceeding.' " 📄 Davila, 137 S. Ct. at 2065-66 (quoting 📄 Martinez, 566 U.S. at 9). A federal habeas court is not allowed to hear substantial, but procedurally defaulted, claims of ineffective assistance of appellate counsel based on the fact that a prisoner's state postconviction counsel provided ineffective assistance by failing to raise those claims. Id. The procedural default rule is not a jurisdiction rule; rather it is based upon the principles of comity and federalism. 📄⚠️ Jackson v. Shanks, 143 F.3d 1313, 1317 (10th Cir. 1998).

**III.**

**CLAIMS FOR RELIEF**

**Claims 1 and 33: Inadequate Transcript of Trial**

In his first claim for relief, petitioner argues he was denied his right to due process and equal protection under the Fourteenth Amendment, his right to the effective assistance of counsel on

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 127

appeal under the Sixth and Fourteenth Amendments, and his right to be free from cruel and unusual punishment under the Eighth Amendment because the state court failed to provide him with an adequate transcript of his trial. This claim was raised in petitioner's direct appeal and, therefore, it has been exhausted. Respondent asserts that petitioner has failed to establish that the Utah Supreme Court's decision was based on an unreasonable determination of the facts. Dkt. # 123, at 76.

In claim 33, petitioner further argues the state court failed to record all proceedings in violation of his right to a public trial and his right to appeal and seek collateral review of his conviction under the Sixth and Fourteenth Amendments. Petitioner admits that claim 33 has not been properly presented to the state court. Dkt. # 109, at 265. Respondent argues that petitioner has procedurally defaulted this claim. Dkt. # 123, at 194.

Petitioner first attacks the competency of the court reporter, arguing that she lacked the requisite skills to perform her duties. Petitioner, however, cites no Supreme Court cases and this court is not aware of any that suggest there is a constitutional right to a court reporter who meets some undefined "minimum qualifications." Rather, in Griffin v. Illinois, 351 U.S. 12 (1956), the Supreme Court refused to hold that the state had to purchase a stenographer's transcript in every case where a defendant could not afford to purchase it. So long as the state affords indigent defendants adequate and effective appellate review based upon the state's rules of procedure and appellate practice in the same manner as defendants who have money to buy a transcript, the system will pass constitutional muster. Id.; see also Eskridge v. Washington State Bd. of Prison Terms and Paroles, 357 U.S. 214 (1958) ("We do not hold that a State must furnish a transcript in every case involving an indigent defendant. But here, as in the Griffin case, we do hold that, '(d)estitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts.' " (citation omitted) ). [14]

[14]    It should be pointed out that no allegations have been made that this court reporter was used solely to record trials where indigent defendants were involved.

Petitioner continues his attack on the record made in his case arguing a

prejudicial defect in appellate proceedings violates the Eighth Amendment guarantee that any punishment imposed must be proportionate and not arbitrary. The use of an unreliable record violates an appellant's Sixth Amendment rights to due process and equal protection, given that other capital appellants have their cases reviewed on the basis of an accurate and complete trial record.

**\*9**  Dkt. # 109, at 63. Again, petitioner cites no Supreme Court cases directly supporting these conclusory allegations.

Finally, petitioner argues in claim 33 that failure to record all proceedings, including multiple bench conferences, arguments in chambers, and other legal proceedings, violated his right to a public trial and his right to appeal and to seek collateral review of his conviction and sentence under the Sixth and Fourteenth Amendments. Respondent argues this claim is procedurally barred. Petitioner asserts his failure to raise this claim can be excused by demonstrating cause and prejudice, and then he argues ineffective assistance of state appellate and postconviction counsel constitutes cause for the default.

The Supreme Court has never held that a verbatim transcript of every court proceeding is required to satisfy due process. To the contrary, the record must only be of "sufficient completeness" to permit proper consideration of a defendant's claims. Draper v. State of Wash., 372 U.S. 487, 499 (1963).

In rejecting petitioner's claim, the Utah Supreme Court made the following findings of fact:

..... the court reporter, Ms. Tauni Lee, was not licensed in the state of Utah. However, evidence was presented that Lee attended Empire Business College in Santa Rosa, California, where she completed a twenty-month course in court reporting. In 1985, Lee passed the California certified shorthand reporter examination and received an overall score of 97 percent. From August 1985 through July 1987, she worked as a certified court reporter in municipal court in Sonoma County and in municipal and superior court

in Marin County. During her tenure in California, Lee completed several transcripts that were used for appeals.

In July 1987, Lee moved to Utah. She stopped paying her California dues because she believed it was no longer necessary to retain her California certification. By reason of nonpayment of dues, her California certification lapsed. Lee, thinking that a national certification was all that was needed to work in Utah, applied for certification from the National Shorthand Reporters Association ("NSRA"). On the basis of her California test scores, Lee obtained a national certification and began paying dues to the NSRA.

In January 1988, Lee was appointed court reporter in the Third Judicial District Court. The administrative office of the courts was aware that Lee was not licensed in Utah. However, on the basis of her qualifications and because she was the only applicant, the office determined that Lee could hold the position until June 1988, when the next Utah examination for certified reporters was scheduled. This determination was based on Utah Code Ann. § 78-56-17, which provides for appointment of unlicensed court reporters on a temporary basis. Lee reported [petitioner's] trial in February and March 1988.

In preparing the transcript of [petitioner's] trial, Lee used a note reader and a proofreader. The note reader would transcribe Lee's shorthand notes and mark any portions of the transcript where she had difficulty reading the notes. Lee would then proofread the portions of the transcript that were marked. The proofreader read over the rest of the transcripts, looking for misspellings and similar errors. It was established in the hearings that certified reporters use note readers in preparing transcripts, and Lee's note reader was considered "excellent." However, it was common practice for the court reporter to proofread all the work prepared by a note reader.

 **\*10**  In November 1990, the trial court denied [petitioner's] motion for a new trial based on Lee's licensure status. The court ruled that Lee was "de facto" qualified because of her "training, testing, and experience." The court also ruled that for a new trial to be granted on the basis of transcription errors, [petitioner] must show that the errors are uncorrectable and prejudicial. After this ruling, the parties continued in their attempts to correct the record.

As part of the procedures to correct the record, Lee read from her shorthand notes while representatives of both parties read from a copy of the original transcript.

Discrepancies between the original version and Lee's notes were noted on this copy of the transcript. Because the process was conducted in California, this copy of the transcript is referred to as the "California version." In addition to the proofreading of the original transcript, several motions and stipulations were filed in an attempt to correct the record. However, in many instances, the parties were unable to agree on what had occurred at trial, and therefore, the record could not be corrected through the procedures of rule 11(h).

Proceedings were also conducted to determine if the errors that existed in the record warrant a new trial. It was established that the trial judge, a member of the prosecutor's staff, and two lawyers representing [petitioner] had read the transcript from cover to cover. After this extensive review, the trial court concluded that none of the transcription errors were prejudicial. On February 20, 1991, the trial court issued its final ruling, denying [petitioner's] motion for a new trial on the ground that "the transcript is sufficiently accurate to afford defendant a full and fair review of his issues on appeal." The court also designated the California version of the transcript, as well as the original version of the transcript, as part of the record on appeal.

Menzies I, 845 P.2d at 223-24.

The Utah Supreme Court went into great detail explaining the requirements of Utah law regarding the court reporter's qualifications and found, under Utah law, that the court reporter was qualified to report the proceedings. After reviewing the transcripts of petitioner's trial, this Court finds a sufficient record was made to allow appellate review of petitioner's trial. Moreover, petitioner has not, after extensive and thorough reviews of the transcript and the reporter's notes, shown that the findings of the Utah Supreme Court were unreasonable in light of the evidence presented on this issue. As a result, this Court holds that petitioner has not established any basis for federal habeas relief under the Sixth Amendment, Eighth Amendment, or the Due Process or Equal Protection Clauses of the Fourteenth Amendment, simply because there were some errors which were identified in subsequent reviews of the transcript.

As to claim 33, because there is no federal constitutional right to have all proceedings recorded, this Court finds that appellate counsel was not ineffective in failing to raise this issue on direct appeal. Further, the record reveals that the trial court allowed counsel to make a record, after off-the-record

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

conferences, where counsel felt it was warranted. See J.T. Tr. of February 18, 1988, at 1069-73 (Dkt. # 110, Disk # 1, Trial/ Transcripts (ROA 1155) at 175-79). Since this Court does not find this claim potentially meritorious, this Court finds that petitioner has failed to establish "good cause" to overcome the procedural default of appellate counsel. As a result, this Court denies claims 1 and 33.

### Claim 2: Impartiality of Jury

 **\*11**  In his second claim for relief, petitioner argues that he was denied the right to a fair trial by an impartial jury in violation of the Sixth and Fourteenth Amendments when the trial court refused to excuse four unqualified jurors for cause. Petitioner raised this claim in his direct appeal and, therefore, it has been exhausted. Since the claim was adjudicated on the merits, respondent asserts that petitioner has failed to establish that the decision of the Utah Supreme Court was based upon an unreasonable determination of the facts.

In Irwin v. Dowd, 366 U.S. 717 (1961), the Supreme Court held that "the right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors," and the "failure to accord an accused a fair hearing violates even the minimal standards of due process." Id. at 722 (citations omitted). In Witherspoon v. Illinois, 391 U.S. 510 (1968), the Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id. at 522. In a footnote, the Supreme Court stated:

> We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty

> would prevent them from making an impartial decision as to the defendant's guilt.

Id. at n.21 (emphasis in original). The main objective of voir dire in this area is to obtain jurors who will follow the law. The Supreme Court again emphasized the need to obtain jurors who are able to follow the law in Boulden v. Holman, 394 U.S. 478 (1969), stating:

> [I]t is entirely possible that a person who has a 'fixed opinion against' or who does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law-to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case.

Id. at 483-84. Thereafter, in Adams v. Texas, 448 U.S. 38 (1980), the Court summarized its cases stating as a general proposition:

> [A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.

Id. at 45.

Further, in Patton v. Yount, 467 U.S. 1025 (1984), the Supreme Court held that the impartiality of a juror is a question of fact. Id. at 1036. A trial judge's factual determination as to a potential juror's bias is accorded a presumption of correctness pursuant to 28 U.S.C. § 2254(d). Wainwright v. Witt, 469 U.S. 412 (1985). Because issues of credibility and demeanor are critical to a

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 130

trial judge's decision regarding removal of a juror, review of such decisions is extremely deferential. Castro v. Ward, 138 F.3d 810, 825 (10th Cir. 1998). Thus, "[a] federal habeas court may reverse a state trial court's findings of juror impartiality only upon a showing of 'manifest error'." Lucero v. Kirby, 133 F.3d 1299, 1308 (10th Cir. 1998) (citations omitted). To establish such a showing, a petitioner "must demonstrate either that the trial resulted in actual prejudice or that it gave rise to a presumption of prejudice because it involved such a probability that prejudice will result that it is deemed inherently lacking in due process." Id. (citations and internal quotation marks omitted).

**\*12** Moreover, in Ross v. Oklahoma, 487 U.S. 81 (1988), the Supreme Court rejected "the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." Id. at 88. "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." Id. (citing Hopt v. Utah, 120 U.S. 430, 436 (1887), and Spies v. Illinois, 123 U.S. 131 (1887) ).

In considering this issue, the Utah Supreme Court, recognizing the holding in Ross, held:

> ... even if the trial court erred in failing to remove those prospective jurors whom [petitioner] found objectionable, that error was harmless. *See* Utah R.Crim.P. 30(a). [Petitioner] has not asserted that he faced a partial or biased jury during the guilt phase of his trial or that the jury was made more likely to convict as a result of "death qualifying" the jury. *Cf.* State v. Young, 853 P.2d 327, 342, 386-95, 414-17 (Utah 1993). Furthermore, while the bulk of [petitioner's] objections to potential jurors revolved around those individuals' views on the death penalty, the penalty phase was tried to the court rather than to the jury.

Menzies II, 889 P.2d at 400.

While petitioner did not argue on direct appeal that he faced a partial or biased jury during the guilt phase of his trial, he did argue, during postconviction proceedings, that trial and appellate counsel were ineffective for failing to strike Juror Rosenkrantz. He claimed that the answers given by her in voir dire show bias as to the penalty phase which, according to petitioner, equates to bias in the guilt phase.[15] The state district court denied the claim and petitioner did not appeal the decision.

[15]   The individual questioning of Juror Rosenkrantz is contained in the J.T. Tr. of February 17, 1988, at 860-73 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1154) at 344-57). The trial court's ruling was made on the totality of the juror's responses and begins on the bottom of page 872 (356). The first seven lines on the top of page 873 (357) are not legible on either the original transcript (which is contained in Addendum 8 of the trial court records) or on the copy of the original transcript. One of the copies of the transcript, however, is legible and reveals that the trial court judge found:

> Based on her responses to the various questions, the court is of the opinion that she would consider all of the evidence and try the case proved [sic] beyond a reasonable doubt aggravating circumstances and only if appropriate that she would impose -- bring back a verdict of death. Otherwise, she would consider mitigating circumstances and bring back a verdict of life in prison.
> So deny the motion for cause.

J.T. Tr. of February 17, 1988, at 860-73 (Add. 23), also contained on Disk # 1.

In this proceeding, petitioner not only argues that he was forced to use four peremptory challenges on jurors who should have been excused for cause, but also argues, in claim 38, that postconviction counsel was ineffective by not buttressing the failure to strike unqualified jurors with a claim that Rosenkrantz was biased.[16] No Supreme Court case has ever held that a juror who may possibly be in favor of the death penalty is necessarily more inclined to convict. A review of the questions asked and the answers given during her individual voir dire does not convince this court that Rosenkrantz was biased during the guilt phase of trial.

*Menzies v. Crowther*, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 131

Rather than showing bias, the questioning reveals that the juror had "never really formed a firm opinion about the death penalty;" was not "irrevocably committed to what penalty a person convicted of first degree murder should receive;" and would follow the court's instructions and vote for the death penalty only if the state proved beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances and that the death penalty was the only appropriate penalty. She also indicated that she could consider a sentence less than death. See J.T. Tr. of February 17, 1988, at 860-73 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1154) at 344-357). Without any evidence to support a claim of juror bias, this Court finds petitioner has failed to establish that the Utah Supreme Court adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, this Court denies claim 2.

16      Claim 38 is addressed separately below.

## Claims 3 and 4: Failure to Disclose Exculpatory Material

**\*13** Petitioner asserts in his third claim that the state violated his right to due process of law under the Fourteenth Amendment by failing to disclose certain irregularities with an eyewitness's identification. Similarly, in his fourth claim, petitioner argues that the failure of the state trial court to grant a mistrial after learning of the state's conduct also violated his right to due process. Petitioner raised both of these claims in his direct appeal and, therefore, the claims have been exhausted. Respondent argues these claims should be denied based upon 28 U.S.C. §§ 2254(d)(1) and (2).

Petitioner alleges that the prosecution failed to disclose a conversation that occurred between the prosecutor and Tim Larrabee following Larrabee's misidentification during a lineup. Specifically, Tim Larrabee, the high school student who saw a man and woman at Storm Mountain on the day of the homicide, participated in a lineup conducted by the sheriff's office approximately three months after describing the suspect to detectives with the sheriff's office. During that lineup, Larrabee identified someone other than petitioner as the person he saw at Storm Mountain. During Larrabee's direct examination, the prosecutor did not ask any questions about the lineup. On cross-examination, however, defense counsel brought up the misidentification. As a result, during redirect, the prosecutor asked Larrabee about a conversation

the two had on the way back to the prosecutor's office following the lineup. According to Larrabee, he asked the prosecutor whether "number 6" was the correct person. "Number 6" was the petitioner. *Menzies II*, 889 P.2d at 400.

Since the prosecution had not disclosed this post-lineup conversation to defense counsel, defense counsel moved to strike "all testimony of Mr. Larrabee made concerning his equivocation of the lineup selection" [17] and requested that the court admonish the jury not to consider any of that testimony. The trial court granted the motion, and ordered: "The testimony in regards to what [Mr. Larrabee] talked about later with the people after the lineup. He indicated that there is some equivocation. That part there should be disregarded and stricken from your notes." [18] Additional witnesses were called before the court took a noon recess. Following this recess, defense counsel moved for a mistrial arguing that "... striking of [Larrabee's equivocation] testimony and admonishment to the jury ..." was not sufficient to cure the harm that resulted from the prosecutor's failure to disclose the conversation to defense counsel. The court denied the motion. [19] On appeal, petitioner argued the trial court erred in denying his motion for mistrial because the failure to disclose the conversation after the lineup with the witness violated rule 16 of the Utah Rules of Criminal Procedure [20] and his right to due process under the U.S. Constitution.

17      J.T. Tr. February 23, 1988, at 1297 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1156) at 61).

18      Id. at 1299, 1304 (63 and 68).

19      Id. at 1314 (78).

20      This Court will not consider violations of state criminal rules. See *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("federal habeas corpus relief does not lie for errors of state law").

In considering the issue on appeal, the Utah Supreme Court found that its disposition of the state rule 16 question obviated the need for a separate due process analysis. *Menzies II*, 889 P.2d at 400. In this proceeding, petitioner argues that the trial court's finding that the state had failed to disclose this conversation made his trial fundamentally unfair because "Larrabee's post-lineup query was critical to the State's case

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 132

since it was the only 'identification' of [petitioner] being in the company of Ms. Hunsaker." Dkt. # 109, at 80.

**\*14** In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. This disclosure duty "encompasses impeachment evidence as well as exculpatory evidence." Strickler v. Greene, 527 U.S. 263, 280 (1999) (citing United States v. Bagley, 473 U.S. 667 (1985) ). Furthermore, in Giglio v. United States, 405 U.S. 150 (1972), the Supreme Court, in discussing the importance of ensuring that juries are not presented with deliberate deceptions stated: "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility fall within" the perimeters of Brady. Id. at 766.

In order to establish a Brady violation sufficient to obtain federal habeas relief, a habeas petitioner must demonstrate: (1) the prosecutor suppressed evidence; (2) that the suppressed evidence was favorable to him, either because it was exculpatory or impeaching; and (3) the suppressed evidence was material. Smith v. Roberts, 115 F.3d 818, 820 (10th Cir. 1997) (citing Fero v. Kerby, 39 F.3d 1462, 1472 (10th Cir. 1994) ).

> The Brady rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial[.]

Bagley, 473 U.S. at 675. Evidence will, however, be material only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. at 682.

Further, as a general rule, the effect of improper evidence may be remedied by admonishing the jury to disregard the evidence. United States v. Laymon, 621 F.2d 1051, 1053 (10th Cir. 1980). How to handle procedural trial problems are uniquely within the discretion of the trial judge. While errors in the admission of evidence can usually be cured by an admonition, there are circumstances where testimony may create such a strong impression in the minds of the jurors that they will be unable to disregard it. Mares v. United States, 409 F.2d 1083, 1084-85 (10th Cir. 1968) (citing Brown v. United States, 380 F.2d 477, 479 (10th Cir. 1967) ).

Petitioner claims the discrepancies in the descriptions by Larrabee were so significant that the testimony that was ordered stricken was the only "identification" of petitioner being in the company of the victim. Thus, petitioner says the predominant means of tying petitioner to the body "was accomplished, primarily, by means of information withheld from defense counsel." Dkt. # 109, at 80. After reviewing the entire trial transcript, this Court finds that petitioner has not shown that the testimony was so critical to the state's case that the jury was likely to consider it despite the court's instructions to disregard it. Larrabee's description of petitioner, within two (2) days of seeing petitioner at Storm Mountain,

> ... was within "one inch in height and ten pounds in weight of [petitioner]. He accurately described [petitioner's] hair, facial hair, and glasses and helped create a composite drawing that was so accurate that detectives were able to select [petitioner's] photograph from among those of 200 inmates. Larrabee also accurately described and identified Denter's car.[21] There was other substantial evidence linking [petitioner] to the homicide,[22] including the victim's fingerprint in Denter's car.

**\*15** Menzies II, 889 P.2d at 401 (footnotes added). Moreover, Larrabee viewed a photographic lineup a few days after helping to create the composite and picked out a photograph of petitioner as the man who "appeared to be most

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 133

like the man [he saw] at Storm Mountain." J.T. Tr. February 19, 1986 at 1213 (Dkt. # 110, Trial/Transcripts (ROA 1155) (Add.11) at 312). Trial counsel did an excellent job of pointing out to the jury the discrepancies in Larrabee's descriptions of both the petitioner and the car driven by petitioner. Therefore, this Court finds there is not a reasonable probability that the result of the proceeding would have been different if the conversation had been disclosed to the defense. Accordingly, claims 3 and 4 are denied.

21    Larrabee further identified the clothes that the victim was wearing as appearing "to be the clothes that I saw the woman wearing." J.T. Tr. February 19, 1986 at 1207 (Dkt. # 110, Trial/Transcripts (Add.11) at 306).

22    The victim's purse was found in petitioner's apartment and carpet fiber similar to the carpet in petitioner's apartment was found on the victim.

**Claim 5: Right of Confrontation**

In his fifth claim for relief, petitioner argues the state court deprived him of his right to confrontation, as guaranteed by the Sixth Amendment, by admitting the preliminary hearing testimony of Walter Britton, a jailhouse informant and petitioner's cellmate. Petitioner raised this claim in his direct appeal and the Utah Supreme Court made a ruling on the merits. Thus, this claim has been exhausted. Petitioner argues the state court decision was based upon an unreasonable determination of fact and an unreasonable application of clearly established federal law. Respondent disputes this argument.

In rejecting petitioner's claim on direct appeal, the Utah Supreme Court considered "whether admission of Britton's testimony has impinged on the values embodied in the Confrontation Clause to such a degree as to rise to the level of a constitutional violation." Menzies II, 889 P.2d at 402 (citations omitted). Relying on Ohio v. Roberts, 448 U.S. 56 (1980), [23] the Utah Supreme Court applied the two-pronged test for ascertaining admissibility of hearsay when a hearsay declarant is not present for cross-examination at trial, i.e., (1) is declarant unavailable, and (2) if so, does the statement bear sufficient "indicia of reliability." Id. at 67. In applying that test, the state court said:

... the record indicates that Britton was physically present at trial, pursuant to a court order, and repeatedly refused to testify despite the judge's order to do so. We conclude that every reasonable effort was made to produce Britton at trial, and the trial court correctly concluded that Britton was unavailable.

Menzies II, 889 P.2d at 402. These findings are subject to a presumption of correctness. See 28 U.S.C. § 2254(e) (1).

23    This Court recognizes that Roberts was abrogated in Crawford v. Washington, 541 U.S. 36 (2004), but that has no effect on this Court's decision herein for the reasons discussed below.

Petitioner does not contest these factual findings. Rather, he acknowledges that "[t]he trial court ordered Britton to testify and he stated that he would refuse." Dkt. # 109, at 85. Additionally, defense counsel admitted, after Britton advised the court he would not testify, that Britton was "technically unavailable" for purposes of the exception to the hearsay rule. J.T. Tr. February 18, 1986, at 961 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1155) (Add. 11) at 68). Petitioner argues, however, that the court erred in making a finding of unavailability without putting Britton on the stand, in front of the jury, and allowing the jury to actually observe his refusal to testify. Additionally, petitioner cites Barber v. Page, 390 U.S. 719 (1968), for his argument that "preliminary hearing testimony could not be a substitute for properly cross-examined testimony in front of the jury." Dkt. # 109, at 86.

**\*16** The Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, guarantees the right of an accused to confront the witnesses against him. There has traditionally been an exception to the confrontation requirement where a witness is unavailable but has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant. Barber, 390 U.S. at 722. While it is true that the Supreme Court overturned the

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 134

use of the preliminary hearing testimony at trial in <u>Barber</u>, the reason for that decision was the "fact that the State made absolutely no effort to obtain the presence of [the witness] at trial other than to ascertain that he was in a federal prison outside Oklahoma." <u>Id.</u> at 723. Under those facts, the Supreme Court held the state had failed to establish that the witness was "unavailable." No Supreme Court case has, however, held that a witness can only be found "unavailable" after that witness takes the stand and refuses to testify in front of a jury. Where, as in this case, the state secured the presence of the witness at trial, only to have the witness refuse at an in camera hearing to testify after being held in contempt of court,[24] this Court finds the state court decision regarding "unavailability" of the witness was not an unreasonable determination of the facts.

[24]    The Tenth Circuit has upheld a finding of "unavailability" where the witness stated at an in camera hearing that he would not testify if called at trial. <u>Jennings v. Maynard</u>, 946 F.2d 1502 (10th Cir. 1991).

Thereafter, the Utah Supreme Court considered "whether Britton's preliminary hearing testimony bore sufficient indicia of reliability to warrant its admission at trial." <u>Menzies II</u>, 889 P.2d at 402. In finding that the testimony contained sufficient indicia of reliability to warrant its admission at trial and, therefore, met the requirements of the Confrontation Clause, the state court found:

> ... the transcript of the preliminary hearing shows that the defense had the opportunity for an effective cross-examination of Britton. While we agree that new evidence obtained after the hearing may have aided an attack on Britton's credibility on cross-examination, the preliminary hearing transcript indicates that the issue was well-explored. Defense counsel brought out Britton's criminal history, including pending charges against him, as well as the fact that Britton might receive more favorable treatment by the courts because of his cooperation with law enforcement officials. Furthermore,

the defense introduced extrinsic evidence related to Britton's credibility at trial and might have introduced other credibility-related evidence as well. For example, the trial transcript indicates that Britton had been incarcerated in a mental health section of the county jail before the preliminary hearing was held.

<u>Id.</u> at 403. The fact that petitioner had the opportunity for cross-examination of Britton at his preliminary hearing satisfies the demands of the confrontation clause. <u>See</u> <u>California v. Green</u>, 399 U.S. 149 (1970) (witness's preliminary hearing statements held admissible at trial since the statements were given under circumstances closely approximating those surrounding a typical trial). Therefore, this Court finds the state court decision did not result in a decision that was contrary to clearly established Supreme Court precedent. Accordingly, claim 5 is denied.

**Claim 6: Compulsory Process**

Petitioner's sixth claim asserts the state court denied his right to compulsory process in violation of the Sixth and Fourteenth Amendments by quashing a subpoena issued to one of the state court prosecutors. Although this claim was raised on direct appeal, the Utah Supreme Court did not specifically address it, but denied it with the statement: "We find [petitioner's] other claims to be without merit." <u>Menzies II</u>, 889 P.2d at 406. Accordingly, the claim has been exhausted. Petitioner now argues the state court's determination of this claim was an unreasonable application of clearly established federal law.

To establish a violation of the right to compulsory process, a defendant must show "more than a mere absence of testimony." <u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858, 867 (1982). Rather, a defendant must "make some plausible showing of how [the] testimony would have been both material and favorable to his defense." <u>Id.</u> The omission of the testimony must be evaluated in the context of the entire record and the absence of the testimony must have rendered the trial fundamentally unfair such that the result of the proceeding would have been different if such evidence had been heard by the jury. <u>See</u> <u>Young v. Workman</u>, 383 F.3d 1233, 1238 (10th Cir. 2004).

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 135

 **\*17**  On May 19, 1986, Britton, the jailhouse informant, testified at the preliminary hearing regarding statements petitioner made to him while they were both incarcerated in the Salt Lake County Jail. See Tr. of Preliminary Hearing on May, 19, 1986, at 150-87. During cross-examination, Britton implied that his testimony in petitioner's case would not be of any benefit to him. [25] In an effort to prevent admission of Britton's preliminary hearing testimony, the defense asserted a Sixth Amendment right to call one of the prosecutors regarding a supposed "deal" that had been cut with Britton for his testimony. If that motion had been granted, the prosecutor would have been required to withdraw from the case. According to the prosecutor, he made it clear to Britton's attorney that he was not appearing as an advocate because throughout the dealing with Britton, the prosecutor had represented to him

> ... that we would do nothing on his behalf in the sense of initiating anything or talking with any federal prosecutors about reducing his sentence or talking to anybody about giving him a better plea bargain, and [Britton] had a clear understanding of that.

J.T. Tr. on February 26, 1988, at 1819 (Dkt. # 110, Trial/Transcripts (ROA 1157) (Add.13) at 227).

25
> Both parties state in their pleadings that Britton denied in the preliminary hearing that his testimony in petitioner's case would be of any benefit to him. Dkt. # 109, at 88; Dkt. # 123, at 88. Britton was never asked specifically if he was going to receive some benefit for testifying on behalf of the state. Rather, he was asked: (1) if he would serve about a third of his ten-year sentence before he would be eligible for any kind of release; (2) whether his release date was dependent on his performance while in the federal institution; and (3) if recommendations from other sources, such as a law enforcement agency, affected his sentence. Britton responded that recommendations did not have any reflection upon one's conduct while in the prison system. See Tr. of Preliminary Hearing

on May 19, 1986, at 158, lines 10-24. Britton also indicated that he had been sentenced in his federal case about a week after speaking with detectives regarding petitioner's case and that he was surprised he had received ten (10) years instead of twenty (20) years. Id. at 169-70. There was also some discussion that his sentence could be reviewed at a Rule 35 hearing; but Britton stated he had not asked for such a review. Id. at 157-59, 170-71.

Outside the presence of the jury, Britton's attorney, J. Bruce Savage, outlined the factual background of this dispute. See J.T. Tr. of March 2, 1998, at 2034-59 (Dkt. # 110, Trial/Transcripts (ROA 1158) (Add. 14) at 136-161). Savage testified that he spoke with one of the prosecutors on May 2, 1986, after learning, from an out of state attorney who represented Britton in another federal case, that Britton was going to testify at petitioner's preliminary hearing. Id. at 2045-48 (147-150). Savage made a note in his file that Britton had, on his own, contacted the Salt Lake County prosecutor's office and volunteered information regarding petitioner's case. Savage's notes reflected that "no deal was demanded" and "no attorney was demanded." Id. at 2038 (140). Additionally, the notes reflected that the prosecutor with whom Savage spoke advised that he would "sign [a] favorable affidavit after test." [26]

26
> Savage testified that "test" was his shorthand for "testimony." Id. at 2039 (141).

On June 12, 1986, Savage filed a Rule 35 motion in federal court. Id. at 2036 (138). Thereafter, on July 3, 1986, a few days prior to the Rule 35 hearing, Savage testified that he contacted the state prosecutor and, after speaking with him, his notes reflected that the prosecutor "will appear voluntarily to testify on [Britton's] behalf." Id. at 2040 (142). Savage further testified that there were no deals made with him on either May 2, 1986 or as late as August 4, 1986, other than the promise to appear and make the federal judge aware of Britton's cooperation. [27] Id. at 2046 (148). According to Savage, the prosecutor represented to him that he would come to federal court and tell the judge that Britton had testified and that, in the prosecutor's opinion, his testimony was truthful. Id. at 2047 (149). At the Rule 35 hearing, the prosecutor appeared and advised the federal court that Britton had

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 136

  **\*18** appeared at the preliminary hearing, that he had testified, and that to [the prosecutor's] knowledge he had testified truthfully based on what we knew, what we thought his testimony would be based on interviews and what we knew about the case.

J.T. Tr. of February 26, 1988, at 1821 (Dkt. # 110, Trial/ Transcripts (ROA 1157) (Add. 13) at 229). The prosecutor never represented to Savage that he would urge the federal court to make a reduction in his federal sentence, id., and, in fact, Britton did not receive any reduction in his sentence following the hearing. J.T. Tr. of March 3, 1998, at 2331 (Dkt. # 110, Trial/Transcripts (ROA 1158) at 18). The prosecutor's only role was that he appeared at the Rule 35 hearing and informed the federal judge of the substance of what had occurred at the preliminary hearing.

27    Britton entered his guilty plea and was originally sentenced in federal court on approximately February 26, 1986, with the judgment being filed on March 26, 1986. Id. at 2049 (151).

After hearing this testimony and reviewing the Rule 35 proceedings, the trial court found that Britton had voluntarily contacted jail personnel and/or the Salt Lake County Attorney's office and given testimony at petitioner's preliminary hearing. Id. at 2030 (132). According to the trial court, this information was then related to the federal court by Savage representing to that court that there were no negotiations for Britton's testimony and, upon request of Savage, the prosecutor appeared and related to the federal court that Britton's testimony is "significant testimony. It is certainly helpful to the state's case against [petitioner]. Mr. Britton appears to be truthful, does not appear to have withheld any information, and he has testified adequately." Id. Later, the trial court stated:

The court is of the opinion that in this situation here based on Mr. Savage's testimony, that he was the one that initiated the contact. Further, that Mr. Britton was the one who initially initiated the contact, and that his testimony apparently would have been no different whether they agreed to do it or not because he indicated he was going to testify and apparently he did testify.

And at the time that the county attorney's office was asked to testify at the Rule 35 hearing, [the prosecutor] testified that [Britton] testified truthfully, helpfully. It was significant, and that is exactly what it was based on, you know, what I can understand of his testimony.

Id. at 2063 (165).

It is clear that the prosecutor's testimony would have mirrored that of Britton, i.e., no deal was made to secure Britton's testimony. If the prosecutor told the jury this, it would have bolstered Britton's testimony as opposed to contradicting it. Moreover, petitioner cannot establish that he lacked the ability to present the facts from another source, since the prosecution agreed to stipulate to the admission of the Rule 35 hearing transcript. See J.T. Tr. of February 26, 1998, at 1830 (Dkt. # 110, Trial/Transcripts (ROA 1157) (Add. 13) at 238). To the extent petitioner has failed to establish how the prosecutor's testimony would have been relevant or material to his defense, or shown that the result of the proceeding would have been different if the jury had heard from the prosecutor, this Court finds he has failed to establish a violation of his right to compulsory process. As a result, this Court finds petitioner has failed to establish that the Utah Supreme Court's decision, that this claim lacked merit, was an unreasonable application of clearly established federal law. Accordingly, claim 6 is denied.

### Claim 7: Failure to Declare Mistrial after Witness Mentions Parole Office

 **\*19** The seventh claim for relief is that the mention of petitioner's statement to law enforcement that he had gone to the parole office around 9:00 o'clock was a violation of his rights to due process and to a fair trial as guaranteed by the Sixth and Fourteenth Amendments. This issue was raised on direct appeal. Again, the Utah Supreme Court did not specifically address the issue, but found it to be without merit.  Menzies II, 889 P.2d at 406. Petitioner now argues that the state court's determination of this claim was an unreasonable application of clearly established federal law. As stated previously, however, a state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of that decision.  Richter, 562 U.S. at 101 (citing  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ).

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 137

On November 18, 1986, defendant filed a motion in limine requesting that the court prohibit introduction at trial of any evidence of or mention of defendant's "status as a prison parolee" and "[t]he circumstances surrounding the existence of an outstanding warrant of a charge of Theft or Defendant's subsequent arrest on February 24, 1986 on a charge of Theft." Trial ROA at 463-64 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 507-08). On February 5, 1988, the trial court entered the following minute order:

> The court, wanting to make the record clear to respective counsel, now further orders that all of the previously argued motions in limine on defendant's prior criminal history and record on burglary, theft and past convictions is hereby granted in favor of the defendant.

Id. at 780 (848) (capitalization removed).

During the trial, the prosecutor asked Detective Jerry Thompson if he had talked to the petitioner about his whereabouts on Sunday evening, February 23, 1986. When the detective answered "yes," the following colloquy occurred:

Q: What did he tell you?

A: He claims that that evening or afternoon that [sic] he went and borrowed a car from a friend of his by the name of Troy Denter somewhere around 6:00 p.m. that evening. While driving down state street somewhere in the area of 2700 South State Street or 38th, he picked up a young female, described her as early 20's, long hair.

Claims the only thing he can remember was she was wearing some levis, doesn't know what kind of shoes, and a purple coat. Claims he had conversations with the girl. They basically talked, drove around. He states about what she was talking about here he states she said how rotten men were, et cetera.

He than [sic] took her to his house somewhere from around 2:00 to 2:30 a.m. While he was there. [sic] He had only been there a few minutes when his girlfriend, Nicole, called him, wanted him to come and pick her up, stating that she had

been at a girlfriend's house in a trailer court behind Mark's Lounge.

He claims he then went there with this girl, picked up Nicole, the three of them drove around in the car for some time. The two girls had an argument or a fight between them, and she got mad at him for having the other girl with him. In fact, he stated that he wanted to go down to Fairview to his folk's place to take the girl there, really got in an argument over that.

He claims he then went back to his house the three of them, somewhere around 3:30 in the morning. Claims then he left there.

[Defense counsel]: I will object to the officer designating the manner or describing without being asked what the demeanor is in terms of "claims." I think he can state what the interview was and what the defendant said, but it's the characterization that is objectionable.

The Court: If you can just stick to what was said.

The Witness: He stated that he had been left with the girl and went somewhere around 7200 West 2400 South. They got stuck in the mud in his car. She got out, in fact, walked in the mud. He then left her there. He then went back home, talked to Nicole a couple of hours, somewhere between 6:30 and 8:30. Then left, went down to the patrol [sic] office about 9:00 o'clock.

**\*20** J.T. Tr. of February 26, 1988, at 1876-77 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) at 284-85).

Defense counsel immediately objected, id. at 1877 (285), and a hearing was held outside the presence of the jury in which counsel moved for a mistrial. Id. at 1878-79 (286-87) . The court took the defendant's motion under advisement and the witness was admonished that "no reference should ever be made in regards to the status of the defendant." Id. at 1880 (288). The jury was returned to the courtroom and testimony from the witness continued. Thereafter, stipulations were made regarding what additional witnesses would testify to if they were called to the stand. Id. at 1886-89 (294-97). One additional witness was called, on an entirely different subject matter, before the court recessed for a long weekend. Id. at 1890-98 (299-306).

Following the long recess, the court allowed the parties to argue the motion for a mistrial. J.T. Tr. of March 1, 1988,

at 1904-58 (Dkt. # 110, Trial/Transcripts (ROA 1158) at 6-60). [28] The court discussed, in chambers, with counsel,

> ... the matter of curing the statement by the court making an admonition before further testimony was to be made, and the discussion I think ended in that if the admonition were made, it would be more prejudicial because it would recall more forcibly the statement than if it were left alone.

Id. at 1945 (47); [29] see also id. at 1950-51, 1956 (52-53, 58). The court indicated there was no dispute that an error had been made, but denied the motion for mistrial. In denying the motion, the court recognized that any errors had to be considered in light of the entire proceedings and indicated the matter could be reurged at the conclusion of trial. Id. at 1947 (49). The court also made it clear that (1) there was no misconduct by the prosecutor because he had warned the witnesses not to mention the defendant's criminal record; and (2) no evidentiary harpoon was involved, as this was inadvertent because the detective was simply relaying what the defendant had said when he was questioned by the police. Id. at 1947-48 (49-50). At the conclusion of all the evidence, defense counsel again moved for a mistrial. J.T. Tr. of March 7, 1988, at 2586 (Disk # 1, Trial/Transcripts (ROA 1160) (Add. 16) at 69). The court again denied the motion for mistrial. Id. at 2600 (83).

[28]  Based upon the arguments in the motion for mistrial hearing, it appears that the officer actually said "parole office." While petitioner asserts that "[d]uring proceedings to attempt to correct the transcript, the parties stipulated that Detective Thompson actually said "parole office," Dkt. # 109, at 91 n.20, no citation is made to that stipulation in the record, and the response brief does not admit that there was such a stipulation. See Dkt. # 123, at 93. Notes written on the J.T. Tr. of February 25-26, 1988 at 1877, however, indicate the court reporter had keyed "Parol" and she "can't understand how got patrol." See Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 85) at 283. Additionally, Add. 27 at 283 shows the correction as "parole office." Id.

[29]  It appears from the transcript that the court first made the suggestion to admonish the jury before the long recess and defense counsel opposed an immediate admonition. Id. at 1950 (52). After the recess, the court said: "... the court can cure by giving the instruction. You know you'll have to take the consequences. We don't know what the jury will do. The court can advise the jury that 'you are to disregard it. That is not to be any part of your considerations or deliberations' ...." Id. at 1956 (58).

*21  This Court's responsibility is to ensure that petitioner was afforded the protections of due process, not to exercise supervisory powers over the Utah state courts. Nichols v. Sullivan, 867 F.2d 1250, 1253 (10th Cir. 1989) (citing Donnelly v. DeChristoforo, 416 U.S. 637 (1974) ). In Donnelly, the Supreme Court was clear in stating "... not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.' " Id. at 642 (quoting Lisenba v. California, 314 U.S. 219, 236 (1941) ). Thus, evidentiary and procedural rulings regarding a witness may not be questioned in this action unless the remark by the witness was so prejudicial in the context of the proceedings as a whole that petitioner was deprived of the fundamental fairness essential to the concept of due process. Nichols, 867 F.2d at 1253; see also Brinlee v. Crisp, 608 F.2d 839, 850 (10th Cir. 1979); Batten v. Scurr, 649 F.2d 564, 569 (10th Cir. 1981). In this case, there is no question that the jury knew the defendant was in jail on an unrelated charge; the matter of parole had been brought up in voir dire; and the witness did not state that the defendant was going to see his parole officer, but only that he was going to the parole office. While the jury was not admonished to disregard the testimony, defense counsel adamantly objected to such admonishment. Based on the facts and a thorough review of the entire record, this Court finds that petitioner has failed to establish that the decision of the state court, to deny the motion for mistrial based upon one witness saying petitioner told him he "went down to the parole office," was an unreasonable application of clearly established federal law. Accordingly, claim 7 is denied.

**Claim 8: Prejudicial Incidents during Trial**

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 139

In his eighth claim for relief, petitioner complains that the state court violated his right to a fair trial by an impartial jury guaranteed by the Sixth and Fourteenth Amendments by failing to declare a mistrial after the jury was exposed to what he terms a "pattern of prejudicial incidents" during his trial. Specifically, petitioner identifies four instances that he argues, both individually and cumulatively, denied him a fair trial. These include: (1) Juror Eaton fainted during the medical examiner's testimony; (2) the court reporter became distraught and could not continue reporting; (3) Juror Adams advised the court that he had received an anonymous phone call from a person stating that petitioner had robbed and killed a cabdriver; and (4) Juror Gass suffered an emotional breakdown during the trial and had to be excused. The trial court denied a mistrial based on the cumulative effect of these four incidents. This claim was raised during petitioner's direct appeal, but was denied because the Utah Supreme Court found no merit to the claim. Menzies II, 889 P.2d at 406.

On February 25, 1988, Juror Eaton fainted during the testimony of the medical examiner.[30] The jury was immediately removed from the courtroom and a recess was taken. According to petitioner, he was "abruptly shackled and forcibly removed from the courtroom in view of the jurors." Dkt. # 109, at 94.[31] Following the incident and a lunch break, the judge called the juror into the courtroom, outside the presence of the other jurors, and asked her how she felt. The juror relayed that her fainting spell had been caused by a combination of hearing the medical examiner's testimony and skipping breakfast. After eating lunch, however, the juror felt well enough to continue and no objection was made by defense counsel. J.T. Tr. of February 25, 1988, at 1634-36 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 42-44).

[30]    J.T. Tr. of February 25, 1988, at 1621-22 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 29-30).

[31]    While most cases of "shackling" involve use of leg irons, handcuffs, and a belly chain, petitioner was handcuffed during the pandemonium that ensued as deputies scrambled to provide the juror with aid. See PC ROA at 0012208, ¶ 8, Exhibit A to Petitioner's Fifth Amended [Postconviction] Petition (Dkt. # 110, Disk # 3, Vol. 33 at 53).

Also, during the medical examiner's testimony, petitioner asserts "the court reporter became distraught in the presence of the jury and was unable to continue transcribing." Dkt. # 109, at 94. The transcript of trial reveals that the following colloquy with the court reporter occurred, outside the presence of the jury, following the fainting of Juror Eaton:

**\*22**   The Court: Okay. If there is nothing else, we should call the jury in.

[Defense counsel]: Also, perhaps before we do that, would could take up the other matter and Tauni, this is in regards to your state of mind. I know that you were quite upset over the testimony that took place right before the trial, [sic] and I – what I guess we need to know is whether or not you think any of the emotion would have shown while you were making your report.

   (Discussion held off the record.)

The Court: You had some question as to whether she might have started crying before she went to her room.

[Defense counsel]: And perhaps we can just ask you that, did you?

The reporter: No, I didn't.

[Defense counsel]: The only reason for bringing that up, of course, is to -- if something should happen and that would become something that the jurors could observe, then that could present a problem as court personnel.

The suggestion I would have on that is if -- should that happen again, just let's ask or anyone involved ask for a recess.

J.T. Tr. of February 25, 1988, at 1633-34 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 41-42).

In an attempt to attach more significance to this incident, petitioner now says:

> [t]he jurors had to assume that the medical examiner's testimony was extraordinary to cause an emotional response in a member of the court's staff. Though the court reporter denied that it happened in the courtroom, the fact that defense counsel was aware of it and asked about it shows otherwise.

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042   Document: 98-2   Date Filed: 12/22/2020   Page: 140

Dkt. # 109, at 94. Conclusory allegations, however, are insufficient to establish constitutional violations without supporting facts from the record. See 📙 Phillips v. Murphy, 796 F.2d 1303, 1304 (10th Cir. 1986). Here, petitioner has failed to establish that the jury was aware of anything regarding the court reporter's state of mind during the medical examiner's testimony.

Thereafter, on March 4, 1988, Juror Adams sent a note to the court which stated "Last night an anonymous caller telephoned me about [defendant's] prior criminal record." J.T. Tr. of March 4, 1988, at 2367 (Dkt. # 110, Disk # 1, Trial/ Transcripts (ROA 1159) at 153). The court held a hearing outside the presence of the jury and the following colloquy occurred:

> ... what we need to know is exactly what happened, what time it was, and what the circumstances were and so forth.
>
> A Juror: Shortly after 7:30, my wife took a call for me. She said the caller asked for Nathan. I came to the phone. He said, 'Nathan Adams, you're a juror. You're serving jury duty,' something like that. I said, 'What?' I was surprised that anyone would ask me about that. And he said, 'Ralph Menzies was convicted of, I think, robbing and murdering a taxi driver' or something like that, and then I think he hung up.
>
> The Court: It was a male voice?
>
> A Juror: Yes.
>
> The Court: Any questions?
>
> Mr. Jones: Did you discuss this phone call with any of the other jurors?
>
> A Juror: No.
>
> Mr. MacDougall: Do you have any recollection of the voice at all? Was it a familiar voice?
>
> A Juror: Young male, that's all I can say.
>
> The Court: Do you have any questions?
>
> **\*23** Ms. Wells: I don't have any questions.
>
> Ms. Palacios: No.
>
> The Court: Anyone else?

> Don't disclose anything that has taken place here. The fact that you received a phone call, we will have to discuss this further.
>
> A Juror: Sure.
>
> The Court: Thank you.

Id. at 2367-68 (153-54).

Following a discussion regarding the best course of action, the court ruled that the juror had been tainted and should be excused. Id. at 2374 (160). The judge then advised the juror as follows:

> The Court: Now, you have got a feeling why we take so long considering these things. We have gone over this very carefully. We've discussed all pros and cons, and at this time, because of this telephone call, it's the opinion of everybody here that you should be excused.
>
> And so we want to just admonish you, and then we want to request that you not talk about anything you've heard up to this point in the jury trial, and we don't think anyone will contact you again, but if they do, will you just let us know.
>
> And we probably will have an investigator who will contact you to follow through on this and to make an investigation, so if you can cooperate and help them out, we will see what is happening.
>
> You've not discussed this with anyone else?
>
> A Juror: No.

Id. at 2386 (172). Thereafter, the court decided to immediately sequester the jury. Id. at 2394 (180). While sequestration arrangements were being made, it was brought to the attention of the court that another juror, Juror Gass, was having some emotional problems in the jury room in the presence of all of the other jurors. Both sides agreed Ms. Gass should be excused and the court excused her. Id. at 2395-402 (181-88). Defense counsel moved for a mistrial based upon the cumulative effect of these incidents. Id. at 2409-15 (195-201). In denying counsel's request for a mistrial, the court found that these events had not tainted the jury such that they could not reach a fair and impartial verdict. Id. at 2415-19 (201-05).

Thereafter, the court conducted extensive individual voir dire of each remaining juror. The court discussed four things with

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 141

each juror: (1) whether the incident with Juror Gass would prevent them from trying the case in a fair and impartial manner and reaching a verdict based on the merits of the case; (2) whether anyone had contacted them about the case or if they had been exposed to publicity about the case; (3) they were advised they would be sequestered for the remainder of the trial because a juror had been contacted about the case and what that meant; and (4) if they would be satisfied to have their own case tried by a person in their present frame of mind. During the discussion, the jurors were told that the fact some contact had been made should not be attributed to either the prosecution or the defendant. Finally, each juror was advised not to discuss what had occurred in chambers. Id. at 2428-73 (214-59). Based upon the responses of the jurors, the court again denied the motion for mistrial. Id. at 2473 (259).

While each of these events took place within a short time frame, the record reveals that the court invoked a myriad of safeguards to assure the defendant received a fair trial. If anything, these events highlight "the reality of the human fallibility of the participants." United States v. Hastings, 461 U.S. 499, 508 (1983). There is, however, simply "no such thing as an error-free, perfect trial," id., and the Constitution does not guarantee such a trial. Id. at 508-09. It is nothing more than a conclusory allegation that these events had any impact whatsoever upon the actual verdict in this case. As a result, this Court finds that petitioner has failed to establish that he is entitled to relief on claim 8.

**Claim 9: Shackling in Front of Jury**

 **\*24**  Petitioner's ninth claim for relief is that he was "shackled" in front of the jury, which violated his due process rights under the Fourteenth Amendment. Petitioner concedes this claim was not raised in state court either on direct appeal or in his state postconviction proceedings. It is clear that postconviction counsel was aware of this claim as early as October 5, 2010, when trial counsel signed her affidavit that was submitted as Exhibit A to the postconviction petition. Postconviction counsel did not, however, raise this issue in his fifth amended postconviction petition, filed on March 14, 2011. Rather, counsel first attempted to raise this issue in his memorandum in opposition to respondent's motion for summary judgment/and cross motion for summary judgment, filed on August 1, 2011. See PC ROA at 0013270 (Dkt. # 110, Disk # 3, Vol. 35, at 29). In denying relief, the state postconviction court found that the issue was not raised in the postconviction application, but rather in a cross motion which was improper and, thus, the issue was procedurally barred

as it could have been raised on appeal and was not. Id. at 0015492 (id. at Vol. 40 at 474). Thereafter, in his appeal of the postconviction decision, petitioner again tried to raise this issue and the Utah Supreme Court found the issue had not been properly preserved and, therefore, it refused to hear the claim. Menzies IV, 344 P.3d at 603 n.69.

Petitioner states that his failure to raise this claim in earlier state court proceedings was a result of ineffective assistance of both direct appeal and postconviction counsel. It was, however, the failure of postconviction counsel to raise this claim during petitioner's state postconviction proceeding that ultimately resulted in the claim being unpreserved. In Davila, 137 S. Ct. 2058 (2017), the Supreme Court held that ineffective assistance of postconviction counsel does not provide cause to excuse procedural default of ineffective assistance of appellate counsel claims. See also 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.")

Even if this claim were not procedurally barred, this Court finds that petitioner would still not be entitled to habeas relief on this issue. In Deck v. Missouri, 544 U.S. 622 (2005), abrogated on other grounds by Fry v. Pliler, 551 U.S. 112 (2007), the Supreme Court concluded that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." Id. at 629. The Supreme Court recognized, however, that there will be instances where shackling at trial is unavoidable, and noted that "[w]e do not underestimate the need to restrain dangerous defendants to prevent courtroom attacks, or the need to give trial courts latitude in making individualized security determinations." Id. at 632.

According to petitioner, he was "handcuffed in front of the jury" when Juror Eaton passed out. See PC ROA at 0013301, ¶ 40, Exhibit XXX to Petitioner's Memorandum in Opposition to Respondent's Motion for Summary Judgment and Cross Motion for Summary Judgment (Dkt. # 110, Disk # 3, Vol. 35 at 60). There is no indication in the record that this exposure was either aggravated or continuous. Rather, the action was taken because of an emergency medical situation that arose

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042   Document: 98-2   Date Filed: 12/22/2020   Page: 142

during the trial, and no contemporaneous objection was made by defense counsel. The Tenth Circuit has held that "a juror's brief view of a defendant in shackles does not qualify as a due process violation worthy of a new trial." 🟡 United States v. Jones, 468 F.3d 704, 709 (10th Cir. 2006) (citations omitted). In order to violate due process, the defendant must establish prejudice. Id. Since the focus of the jury would have been on Juror Eaton, this Court will not presume prejudice. Where the defendant does not make a contemporaneous objection, courts have refused to find prejudice. United States v. Simpson, 950 F.2d 1519, 1522 (10th Cir. 1991), and cases cited therein. Accordingly, this Court finds no merit to claim 9.

**Claim 10: Search of Petitioner's Apartment**

In his tenth claim, petitioner argues that the state violated his Fourth Amendment rights by conducting an illegal search of his home, and that he was denied due process and a fair trial under the Sixth Amendment and Fourteenth Amendment by admission of evidence seized during the illegal search. Relying upon 🟡 Stone v. Powell, 428 U.S. 465 (1976), respondent argues that this claim should be denied since petitioner had a full and fair opportunity to litigate this issue in state court. In his reply, petitioner claims he did not get a "full and fair opportunity" to litigate this issue in state court because a "fair hearing" would have precluded the admissibility of the evidence. According to petitioner, since the state did not rebut in this federal proceeding his claims that the search was illegal and the evidence was inadmissible, this Court must accept as true his arguments of law and fact contained within his second amended petition.

**\*25** The Supreme Court, however, held in Stone that, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 🟡 Id. at 494. The Tenth Circuit has consistently refused to overturn a state conviction because of a violation of the Fourth Amendment where the petitioner had a full and fair opportunity to litigate the claim. 🟡 Matthews v. Workman, 577 F.3d 1175, 1194 (10th Cir. 2009); Brown v. Sirmons, 515 F.3d 1072, 1082 (10th Cir. 2008); 🟡 Miranda v. Cooper, 967 F.2d 392, 401 (10th Cir. 1992); 🟡 Gamble v. Oklahoma, 583 F.2d 1161, 1165 (10th Cir. 1978).

A review of the state court record reveals that petitioner filed a motion to suppress and a memorandum in support in the trial court on October 24, 1986. Trial ROA at 000335-59 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 372-97). The trial court held a hearing on the motion to suppress. See Pre-Trial Motion to Suppress Transcript dated November 7, 1986. At the beginning of the hearing, defense counsel advised the court that there were additional issues to be explored through the evidence and, after presentation of the evidence, they were given an opportunity to supplement their motion. The amended motion to suppress and a memorandum in support was filed on November 18, 1986. Trial ROA at 000465-508 (id. at 509-52). The trial court heard arguments on the motion on November 21, 1986. See Arguments on Motion to Suppress and Motion to Continue Transcript dated November 20-21, 1986. During the oral arguments, the trial court judge asked questions of counsel. Thereafter, on November 28, 1986, the state filed a memorandum in opposition to the motion to suppress. Trial ROA at 000515-23 (id. at 559-67). On February 12, 1987, the trial court denied the motion to suppress. Id. at 000538. Petitioner raised this issue in his direct appeal. See Brief of Appellant filed on September 14, 1992 at 85-97 (Dkt. # 110, Disk # 1, Related Appeals/Direct Appeal Dkt. # 100, at 110-22). Although the Utah Supreme Court did not specifically address this issue, it denied the claim when it said, "[w]e find [petitioner's] other claims to be without merit." 🔴🔺 Menzies II, 889 P.2d at 406.

Despite the litigation of this claim in a motion to suppress hearing, at trial, and on direct appeal to the Utah Supreme Court, petitioner argues that the evidence seized from his apartment was illegally seized and the state court's admission of the evidence deprived him of due process and a fair trial. Petitioner argues facts based upon his interpretation of the testimony at the suppression hearing. Petitioner claims, based upon that interpretation, that the state court's determination of this claim was an unreasonable application of clearly established federal law. Petitioner does not, however, recognize that the officers obtained not only his girlfriend's consent to enter and search the apartment, but also consent directly from petitioner, as well as a search warrant **before** actually conducting any search of the premises. See Transcript of Pre-Trial Motion to Suppress dated November 7, 1986, at 42, 81-83, 85-87. Further, none of the items that were seized from the home were observed by the affiant who signed the affidavit for a search warrant before a search was conducted pursuant to that warrant. Id. at 45-46. Petitioner's girlfriend had lived in the apartment for four months at the

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 143

time she gave consent to the officers. Id. at 20. Because petitioner's girlfriend did not pay the bills for the apartment, however, the officers chose to get consent from petitioner. While petitioner orally consented to the search, he attempted to place limitations upon the officers when he was presented with a consent to search form. As a result, the officers obtained a search warrant before searching the apartment. Based upon the record at the suppression hearing, this Court finds petitioner had a full and fair opportunity to litigate this issue. Accordingly, petitioner is not entitled to relief on claim 10.

**Claims 11 and 23: Admissibility of Evidence**

A. Guilt phase of trial

**\*26** In his eleventh claim for relief, petitioner asserts that he was denied his right to due process of law under the Fourteenth Amendment because he was convicted and sentenced on the basis of inadmissible evidence. This issue was raised on direct appeal and, therefore, has been exhausted. Menzies II, 889 P.2d at 406. Respondent asserts petitioner is not entitled to relief on this issue because he has failed to establish that the state court's adjudication resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.

According to petitioner, the trial court admitted a number of items that had no relevance to any fact in this case. These items included a gun belonging to witness Troy Denter, three knives, tennis shoes, and a "ten-code" card. Defense counsel, however, raised a specific objection on relevancy grounds only prior to the admission of the gun, see J.T. Tr. of February 23, 1988, at 1412-13 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1156) (Add. 12) at 176-77), and a "chain of custody" objection to only one of the knives. J.T. Tr. of March 1, 1988, at 2001 (id. at (ROA 1158) (Add. 14) at 103).

These claims are nothing more than claims of error under state law. As such, they are not cognizable in this federal habeas court action. Federal courts do not have the authority to decide questions concerning the admissibility of evidence under state law. Estelle v. McGuire, 502 U.S. 62, 67 (1991). This Court's role is to decide "whether a conviction violated the Constitution, laws, or treaties of the United States." Id. at 68. Due process challenges to state evidentiary rulings are reviewed only for fundamental fairness. Matthews v.

Price, 83 F.3d 328, 331 (10th Cir. 1996); see Donnelly, 416 U.S. at 642. In Crane v. Kentucky, 476 U.S. 683 (1986), the Supreme Court acknowledged a "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." Id. at 689. The Constitution gives state court judges "wide latitude" to make these decisions. Id. Federal courts simply may not interfere with state evidentiary rulings unless those rulings rendered "the trial so fundamentally unfair as to constitute a denial of federal constitutional rights." Moore v. Marr, 254 F.3d 1235, 1246 (10th Cir. 2001) (citation omitted); see Hatch v. Oklahoma, 58 F.3d 1447, 1468 (10th Cir. 1995) ("[I]n federal habeas proceedings, we do not question a state court's evidentiary rulings unless the petitioner can show that, as a whole, the court's rulings rendered his trial fundamentally unfair.").

Under Utah law, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Utah R. Evid. 401. Trial counsel objected to the admission of any testimony regarding a firearm because "there was no firearm utilized in the injuries sustained by Miss Hunsaker." J.T. Tr. of February 23, 1988, at 1412-13 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1156) (Add. 12) at 176-77). According to the testimony, however, Troy Denter purchased the gun at petitioner's request approximately three weeks to a month before this crime occurred and petitioner knew the gun was in the car at the time of the robbery/ kidnapping of the victim. Id. at 1417-18 (181-82). Over the objection of defense counsel, the court found "some relevancy in terms of what Denter did in regards to the purchase of the gun and the reason the gun was in the car." Id. at 1416 (180). The court further found that the prejudicial effect of the gun would not outweigh the probative effect of the knowledge of petitioner. Id.

**\*27** Petitioner now argues admission of the gun prejudiced him "by misleading the jury into making a probable and erroneous inference about his dangerousness and violent nature." Dkt. # 109, at 106. Simply because the defendant had access to a gun would not necessarily have led the jury to infer that the defendant was dangerous or had a violent nature. The fact that petitioner did not kill the victim with the gun, however, does not make the gun's presence totally irrelevant to the facts of this case. This is particularly true where, as here, the testimony was that the gun was purchased at petitioner's request about three weeks to a month before

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 144

this crime occurred. J.T. Tr. of February 23, 1988, at 1417-18 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1156) (Add. 12) at 181-82). The facts that the gun was purchased by Denter, at petitioner's request, and that petitioner was aware that the gun was in the vehicle, tend to show how petitioner could have taken the victim from the Gas-O-Mat and held her against her will for twelve hours.

Petitioner argues the knives should not have been admitted because they "were not used in the offense and were only admitted to create the prejudicial inference that [petitioner] was a dangerous person." Dkt. # 109, at 106. With the exception of a chain of custody objection to one of the knives,[32] petitioner did not object at trial to the introduction of the knives. See J.T. Tr. of February 23, 1988, at 1408, 1410 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1156) (Add. 12) at 172, 174). While petitioner now focuses on the fact that the medical examiner[33] testified that two of the knives "could possibly have created the victim's wounds, as could any other knife of similar size," petitioner now claims it was error to admit the knives since they were not used to commit the crime. Dkt. # 109, at 106. What petitioner fails to acknowledge, however, is that defense counsel used the fact that there was no hair or blood on the knives in an attempt to exculpate petitioner. See J.T. Tr. of March 1, 1988, at 1978 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1158) (Add. 14) at 80); J.T. Tr. of March 7, 1988, at 2665-66 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1160) (Add. 16) at 148-49). Additionally, the fact petitioner had access to these knives could have explained how he was able to kidnap and hold the victim against her will.

[32]    See J.T. Tr. of March 1, 1988, at 2001-02 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1158) (Add. 14) at 103-04).

[33]    The medical examiner testified that "the cause of death was strangulation with stab wounds to the neck contributing to the death." (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 47).

Next, petitioner argues that the tennis shoes (Exhibit 75) had no evidentiary value and, therefore, should not have been admitted. The homicide investigator who conducted a search of petitioner's apartment was asked to look at what had been marked as Exhibit 75 and identify that object if he could. J.T. Tr. of February 26, 1988, at 1745 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 153). The witness testified, "This is a pair of blue and white gym shoes, and

these were located in the child's bedroom in a box in the southeast corner of the residence." Id. The witness also stated the shoes had a "lot of mud" on them. Id. at 1768 (176). Thereafter, the parties entered into the following stipulation:

> Stipulation that if Robert Greenman from the state crime lab were called, he would indicate he had a chance to examine the shoes of Maureen Hunsaker and also the tennis shoes that were found at the apartment belonging to [defendant]. His conclusion was that the soil from the shoes of Maureen Hunsaker examined found to be dissimilar in color to the soil from the shoes marked "suspect shoes" which were [defendant's].

Id. at 1889-90 (297-98).

Defense counsel asked Martha Kerr, a serologist, how many pairs of shoes she received for testing for blood and the witness said she had "received a pair of men's tennis shoes, a pair of women's tennis shoes, and then the victim's shoes and the boots." J.T. Tr. of March 1, 1988, at 1981 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1158) (Add. 14) at 83). Defense counsel then asked numerous questions about the tests that were conducted on the shoes, eliciting from the witness that no blood was identified on the men's tennis shoes and that the witness had not tested for the presence of any hair or fiber. Id. at 1991-93 (93-95). Exhibit 74 was admitted by the court immediately prior to the state's request to admit Exhibit 75 and, at that time, defense counsel advised there was no objection. At the time the state moved for admission of the tennis shoes, Exhibit 75, defense counsel stated:

> *28  Your honor, no objection to that. I would point out that Exhibits 74 and 75 have been the subject of previous argument for which the court gave us a continuing objection. So given the court's ruling, that would be the basis for no objection, but we would ask for

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 145

the continuing objection based upon the earlier argument.

Id. March 2, 1988, at 2129 (231).[34] Based upon this evidence, this Court finds the tennis shoes had enough relevance to justify their admission at trial.

[34]    Despite petitioner's assertion that defense counsel entered a "continuing objection" to admission of these shoes, this Court searched the trial transcript in an attempt to ascertain what "earlier argument" counsel was referencing. This Court was unable to find any such objection other than the above quotation, and petitioner has not pointed the Court to any such objection.

Finally, petitioner complains about the admission of a ten-code card (State's Trial Exhibit No. 96) that was seized from his apartment. At the time the state moved for admission of this exhibit, defense counsel simply said: "Subject, again, to the previous objection." Id. To the extent that the police officer who spoke with the victim on the telephone following her kidnapping testified that he heard a police radio in the background,[35] this Court finds that possession of a ten-code card, which would assist in deciphering police jargon, suggested that petitioner had access to a police radio. Therefore, this Court finds that the ten-code card was probative of facts that the jury heard.

[35]    See J.T. Tr. of February 18, 1988, at 1048 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1155) (Add. 11) at 155).

Based upon a careful review of petitioner's arguments, this Court finds that he has failed to establish that admission of these items, either individually or cumulatively, deprived him of a fundamentally fair trial. Accordingly, claim 11 is denied.

### B. Penalty phase of trial

Petitioner argues, in claim 23, that his right to due process under the Fourteenth Amendment to be free from cruel and unusual punishment under the Eighth Amendment was violated when, during the penalty phase of trial, two photographs of the deceased victim were admitted into evidence. Petitioner claims these two photographs were cumulative of the medical examiner's testimony and, therefore, had no probative value.

Petitioner argues that the reason the trial judge gave for admitting the photographs, i.e., those pictures would be helpful in observing what the scene was, was an erroneous finding of fact[36] because the photographs were closeup postmortem photographs of the victim. Additionally, petitioner states that the photographs did not accurately depict the wounds as they had been inflicted.[37] This Court's review, however, is limited to deciding "whether the admission of the photographs rendered the proceedings fundamentally unfair." Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999).

[36]    It should be pointed out that neither party corrected the judge when the judge misidentified what was depicted in these two photographs. J.T. Tr. of March 16, 1988, at 2882-83 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1161) (Add. 17) at 96-97). The judge then indicated that the pictures did not appear to be gruesome, id. at 2883 (97), and this Court agrees with that finding.

[37]    Based upon the testimony of the medical examiner regarding the elasticity of skin and the ligature marks on the neck of the victim, the photographs were not misleading. See J.T. Tr. of February 25, 1988, at 1644-48, 1673-74 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 52-56, 81-82).

**\*29** Once again, the medical examiner testified that "the cause of death was strangulation with stab wounds to the neck contributing to the death." J.T. Tr. of February 25, 1988, at 1639 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1157) (Add. 13) at 47). The photographs, depicting the slashes on the victim's neck and ligature marks, were highly probative of the manner in which the homicide was committed. Moreover, the penalty phase of the case was tried to the judge, the same judge who would have viewed the photographs in determining whether to admit them into evidence. As a result, this Court finds petitioner has not shown that the admission of these two photographs, during the penalty phase of trial, had such an impact in this case that petitioner's trial was fundamentally unfair. Moreover, petitioner has completely failed to establish that the Utah Supreme Court's decision regarding this issue involved an unreasonable application of federal law. Accordingly, claim 23 is denied.

*Menzies v. Crowther*, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042     Document: 98-2     Date Filed: 12/22/2020     Page: 146

## Claim 12: Sufficiency of the Evidence

Petitioner argues, in his twelfth claim for relief, that he was deprived of due process of law under the Fourteenth Amendment when he was convicted without the state having to prove each and every element of the charges against him beyond a reasonable doubt. This claim has been exhausted as it was raised on direct appeal and summarily dismissed. Menzies II, 889 P.2d at 406. [38]

> [38]
>
> In order to establish that this claim is the same as that raised on appeal, petitioner cites to page 113 of his appeal brief. Other than citing Jackson v. Virginia, 443 U.S. 307, 315-18 (1979), in the first paragraph of his insufficiency of evidence proposition, nowhere within the proposition does petitioner specifically argue that he was deprived of due process of law under the Fourteenth Amendment. Because respondent states this claim has been exhausted, however, this Court finds the claim is substantially similar to the claim raised in petitioner's direct appeal and, thus, is exhausted.

Petitioner first complains that there was insufficient evidence to connect him with the homicide because the evidence placing him at the site of the homicide was weak and circumstantial. Dkt. # 109, at 109. The Tenth Circuit has made it abundantly clear that "evidence supporting guilt may be entirely circumstantial." United States v. Henry, 468 F.2d 892, 894 (10th Cir. 1972). "The evidence supporting a conviction must be substantial, raising more than a mere suspicion of guilt, although the evidence can be wholly circumstantial." United States v. Williams, 923 F.2d 1397, 1402 (10th Cir. 1990) (citation omitted). This Court is not asked to decide "whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (citations omitted, italics in original). Rather, this Court must view all the evidence, direct and circumstantial, and all reasonable inferences to be drawn therefrom, in the light most favorable to the prosecution, and must sustain the jury's verdict if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (italics in original). [39] Reiterating this principle in Cavazos v. Smith, 565 U.S. 1 (2011), the Supreme Court stated

> ... it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court may do so only if the state court decision was "objectively unreasonable."

Id. at 2 (citing Renico v. Lett, 559 U.S. 773 (2010) ).

> [39]
>
> A reviewing court considers only this "legal" question. Such a limited review does not intrude on the jury's role "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Musacchio v. United States, 136 S. Ct. 709, 715 (2016) (citations omitted).

**\*30**  Based upon the totality of the evidence presented in petitioner's trial, this Court finds that sufficient evidence was presented at trial to prove that petitioner was guilty of criminal homicide beyond a reasonable doubt. The jury instructions advised the jury that there were three elements which had to be proven beyond a reasonable doubt:

1. That on or about the 24th day of February, 1986, in Salt Lake County, State of Utah, Ralph Leroy Menzies, unlawfully caused the death of Maureen [sic] Hunsaker; and

2. That Ralph Leroy Menzies cause [sic] said death either intentionally or knowingly; and

3. That Ralph Leroy Menzies caused said death under the following circumstances:

>    1) The homicide was committed while the defendant was engaged in the commission of or an attempt to commit,

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 147

or flight after committing, or attempting to commit: Aggravated Robbery and/or Robbery and/or Aggravated Kidnapping and/or Kidnapping[.]

Instruction No. 31, Trial ROA at 000879 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 964). Petitioner does not identify any element of homicide that was not proven beyond a reasonable doubt. Rather, petitioner simply attacks the inconsistencies in eyewitness identification, the line-up, the photo array and the identification of Troy Denter's car, which his trial counsel did an excellent job of pointing out to the jury. The jury, as the trier of fact, was responsible for resolving the issues of fact, including the credibility of the witnesses. The evidence at trial established the facts as found by the Utah Supreme Court and set out verbatim above in this opinion and order. Petitioner's suggestion that the evidence presented at trial was insufficient to support the jury's convictions is nothing more than wishful thinking. Even if some of the evidence that petitioner now argues should have been excluded had not been admitted, this Court finds, in the light most favorable to the prosecution, that the evidence overwhelmingly supported the jury's verdict of criminal homicide, murder in the first degree, beyond a reasonable doubt. Since the facts underlying the Utah Supreme Court's decision are presumed correct, 28 U.S.C. § 2254(e)(1), and petitioner has not rebutted this presumption by clear and convincing evidence, id., this Court finds that petitioner has failed to establish that he is entitled to relief on this issue.

Next, petitioner complains there was insufficient evidence to support the charge of robbery. Dkt. # 109, at 114-17. Petitioner was not, however, charged with robbery. Rather, petitioner was charged with aggravated robbery and aggravated kidnapping, and was acquitted of aggravated robbery. The jury did, however, find that "[t]he Homicide was committed while the defendant was engaged in the commission of, an attempt to commit, or flight after committing, or attempting to commit:" robbery and aggravated kidnapping. Verdict, Trial ROA at 000898 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 983). The following testimony supports the jury's findings. First, the victim was allowed to make a telephone call to her husband in which she said: "They told me to tell you they robbed me and got me and that I am fine and they are going to let me go sometime tonight." J.T. Tr. of February 18, 1988, at 986 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1155) (Add. 11) at 93). The victim's husband described her voice as "very scared, upset, very nervous." Id. Money was missing from

the Gas-A-Mat where the victim worked, J.T. Tr. of February 19, 1988, at 1178 (276), and cash within one dollar of the amount stolen was traced to petitioner. J.T. Tr. of February 23, 1988, at 1423-24, 1484-85 ((ROA 1156) (Add. 12) at 187-88, 248-49); J.T. Tr. of February 25, 1988, at 1746-47 ((ROA 1157) (Add. 13) at 154-155). The victim's purse was found in petitioner's apartment (J.T. Tr. of February 18, 1988, at 989 ((ROA 1155) (Add. 11) at 96), and petitioner was connected to the victim's missing identification (J.T. Tr. of February 24, 1988, at 1551-52, 1561-63, 1572-74 ((ROA 1156) (Add. 12) at 313-14, 323-25, (Add. 26) at 331-33); J.T. Tr. of February 25, 1988, at 1731-32 ((ROA 1157) (Add. 13) at 139-40)). In fact, petitioner was arrested on unrelated charges and, when asked for his belongings, he ran down the hall and ducked into a changing room in which a jail clothing officer later found the victim's identification cards. J.T. Tr. of February 24, 1988, at 1519-22, 1548-50 ((ROA 1156) (Add. 12) at 282-84, 310-12). Additionally, the victim's social security card was found in belongings that were removed from petitioner's apartment. Id. at 1482-83, 1498, 1506-10, 1512-17 (246-47, 262, 268-72, 274-79). The victim's husband testified she normally kept this card in her wallet in the purse that was found in petitioner's apartment. J.T. Tr. of February 18, 1988, at 989 ((ROA 1155) (Add. 11) at 96). Trial counsel cross-examined this testimony extensively. The jury also heard who found each of these items, including the circumstances surrounding when and where they were found.

**\*31** Petitioner argues that the evidence, however, was inconclusive and failed to establish that he personally took the money. Dkt. # 109, at 115. As pointed out by respondent, the evidence need not be viewed in a vacuum. The victim's statements, along with the other direct and circumstantial evidence, viewed in the light most favorable to the prosecution, clearly were sufficient to support the jury's verdict. Petitioner has simply not shown that the state court decision was objectively unreasonable.

Finally, petitioner argues that there was insufficient evidence to support the charge of kidnapping, because the victim's statements over the telephone to her husband and the police were inadmissible hearsay and were unreliable; the victim's absence from the Gas-A-Mat established only that the victim had, in fact, left the Gas-A-Mat; and the handcuff testimony was speculative and therefore of questionable veracity. Dkt. # 109, at 118-19.

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 148

Looking at the totality of the evidence at the trial in the light most favorable to the jury's verdict, this Court finds that there was sufficient evidence to support the verdict of aggravated kidnapping beyond a reasonable doubt. The jury was given a number of instructions regarding kidnapping. First, the jury was instructed as follows:

Under the law of the State of Utah a person commits the crime of kidnapping when he intentionally or knowingly and without authority of law and against the will of the victim:

(a) detains or restrains another for any substantial period; or

(b) detains or restrains another in circumstances exposing him or her to risk of serious bodily injury.

A person commits Aggravated Kidnapping if the person intentionally or knowingly, without authority of law and against the will of the victim, by any means and in any manner seizes, confines, detains, or transports the victim with intent:

(a) to facilitate the commission, attempted commission, or flight after commission or attempted commission of a felony; or

(b) to inflict bodily injury on or to terrorize the victim.

In order to find that the crime of kidnapping has occurred, the State must prove beyond a reasonable doubt that the victim was detained for a substantial period of time and that the victim was forcibly removed a substantial distance from the normal surrounding and naturel sources of aid for the purpose of committing a criminal act.

The term "substantial period" requires a period of detention longer than the minimum inherent in the commission of another crime.

A kidnapping begins when the detention begins to be against the will of the victim.

In order to constitute the crime of kidnapping, detention of the victim requires some circumstances of risk in addition to those inherent in the commission of the homicide.

Instruction Nos. 35-39, Trial ROA at 000883-87 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 968-72).

Additionally, the jury instructions advised the jury that:

Before you can convict the defendant, Ralph LeRoy Menzies, of the crime of Aggravated Kidnapping, as charged in Count II of the Information, you must find from the evidence beyond a reasonable doubt, all of the following elements of that crime:

1. That on or about the 23rd day of February, 1986, in Salt Lake County, State of Utah, Ralph Leroy Menzies, a party to the offense, did intentionally or knowingly by any means and in any manner, restrain, seize, confine, detain, or transport Maureen [sic] Hunsaker.

2. That said seizure, confinement, detention, or transportation was without authority of law and against the will of Maureen [sic] Hunsaker.

 *32  3. That said seizure, confinement, detention, or transportation was with the intent to facilitate the commission of, or the attempted commission of a felony; or flight from a felony, and/or to inflict bodily injury on or to terrorize the victim, Maureen [sic] Hunsaker.

If you believe that the evidence establishes each and all of the essential elements of the offense beyond a reasonable doubt, you must find the defendant guilty of Aggravated Kidnapping. On the other hand, if the evidence has failed to so establish one or more of said elements, then you must find the defendant not guilty of Aggravated Kidnapping.

Instruction No. 41, Trial ROA at 000888 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 973).

As discussed above, the victim was allowed to make a telephone call to her husband, and her statements to him in that call were admissible as hearsay exceptions. The victim sounded very scared and upset when telling her husband that "they told me to tell you that they robbed me and got me and that I am fine and they are going to let me go sometime tonight." J.T. Tr. of February 18, 1988, at 986 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1155) (Add. 11) at 93). This statement could have meant only that she had been kidnapped. Second, the fact that the victim was missing from the Gas-a-Mat was clearly relevant and admissible to help establish that the victim had been kidnapped. It was not, however, the only fact that was used to prove the crime. For example, the testimony of Britton (the jailhouse informant and petitioner's cellmate) about petitioner's alleged confession was relevant and admissible evidence used by the state to prove the charges against the petitioner. Finally, while petitioner argues that the handcuff testimony was questionable, evidence from the

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 149

medical examiner established that the victim had ligature marks around her wrists and that handcuffs could have made the marks on the victim's wrists. J.T. Tr. of February 25, 1988, at 1609, 1615-18 (Dkt. # 110, Disk # 1, Trial/ Transcripts (ROA 1157) (Add. 13) at 17, 23-4). Additionally, a demonstration was utilized at trial to show the marks that handcuffs make on human wrists, the purpose of which was to allow the jury to compare the handcuff marks on the subject's wrists with photographs showing marks on the victim's wrists. J.T. Tr. of February 23, 1988, at 1387-89 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1156) (Add. 12) at 151-53).

Petitioner does not identify any element of aggravating kidnapping that was not proven beyond a reasonable doubt. It was the jury's responsibility to decide what conclusions to draw from the evidence admitted at trial, and this Court cannot set aside that verdict unless the state court decision regarding the sufficiency of evidence was "objectively unreasonable." Cavazos, 565 U.S. at 2. Based upon the totality of evidence in this case, this Court finds the state court decision was not objectively unreasonable. As a result, this Court denies claim 12.

## Claim 13: Jury Instructions

The thirteenth claim for relief asserts that petitioner was deprived of his Fourteenth Amendment right to due process of law by a jury instruction that allowed the jury to make a finding of guilt based upon a degree of proof less than beyond a reasonable doubt. Again, petitioner raised this issue on direct appeal and the Utah Supreme Court summarily dismissed it. Menzies II, 889 P.2d at 406. Thereafter, on appeal from denial of his postconviction petition, petitioner asserted that appellate counsel was ineffective for not raising a challenge to the reasonable doubt jury instruction. In denying petitioner's claim, the Utah Supreme Court held that counsel was not ineffective because the instruction conformed with instructions upheld by the United States Supreme Court. Menzies IV, 344 P.3d at 632-33.

**\*33** As a general rule, improper jury instructions do not form the basis for federal habeas corpus relief. Cupp v. Naughten, 414 U.S. 141, 146 (1973). The conviction will be set aside only if the "errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial." Maes v. Thomas, 46 F.3d 979, 983 (10th Cir. 1995). "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack

on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (footnote omitted). The question in this habeas proceeding is not whether the instruction is "undesirable, erroneous, or even 'universally condemned,' " but whether the instruction so infected the trial that the resulting conviction violates due process. Cupp, 414 U.S. at 146. While the Due Process Clause protects an accused against conviction except upon proof beyond a reasonable doubt, [40] the United States Supreme Court has never held that any particular language must be used to define reasonable doubt. Rather,

> so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.

Victor v. Nebraska, 511 U.S. 1, 5 (1994) (citations omitted). Moreover, the Tenth Circuit has held that the trial court has considerable latitude in instructing juries on reasonable doubt. United States v. Petty, 856 F.3d 1306, 1309 (10th Cir. 2017) (citing United States v. Conway, 73 F.3d 975, 980 (10th Cir. 1995) ).

40    In re Winship, 397 U.S. 358, 364 (1970).

In this proceeding, petitioner argues Instruction No. 12 allowed the jury to find him guilty on a degree of proof less than beyond a reasonable doubt and that the state court's determination of this claim was an unreasonable application of clearly established federal law. The challenged instruction provided, as follows:

> All presumptions of law, independent of evidence, are in favor of innocence, and a defendant is presumed innocent until he is proved guilty beyond a reasonable doubt. And in case of a reasonable doubt as to whether his guilt is satisfactorily shown, he is entitled to an acquittal.

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 150

I have heretofore told you that the burden is upon the State to prove the defendant guilty beyond a reasonable doubt. Now by reasonable doubt is meant a doubt that is based on reason and one which is reasonable in view of all the evidence. Proof beyond a reasonable doubt is that degree of proof which satisfies the mind and convinces the understanding of those who are bound to act conscientiously upon it. A reasonable doubt is a doubt which reasonable men and women would entertain, and it must arise from the evidence or the lack of the evidence in this case.

If after an impartial consideration and comparison of all the evidence in the case you can candidly say that you are not satisfied of the defendant's guilt, you have a reasonable doubt. But if after such impartial consideration and comparison of all the evidence you can truthfully say that you have an abiding conviction of the defendant's guilt such as you will be willing to act upon in the more weighty and important matters relating to your own affairs, you have no reasonable doubt. A reasonable doubt must be a real, substantial doubt and not one that is merely possible or imaginary.

Instruction No. 12, Trial ROA at 000857 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 942). [41]

[41]     The language utilized in this instruction is identical in all material respects to the instruction that was proposed by defense counsel. See Defendant's Requested Instructions to the Jury, Instructions No. 10-11, Trial ROA at 000960-61 (Dkt. # 110, Disk # 1, Trial/Trial Record on Appeal (ROA) at 1048-49).

After reviewing the instructions as a whole and this instruction in particular, this Court finds nothing within the instructions that in any way altered the state's burden to prove the defendant guilty beyond a reasonable doubt. But see Menzies II, 889 P.2d at 407 (dissenting opinion). As a result, this Court finds that petitioner has failed to establish that the state court's determination of this claim was an unreasonable application of clearly established federal law. Therefore, claim 13 is denied.

**Claim 14: Ineffective Assistance of Counsel during the Guilt Phase**

**\*34**  Petitioner asserts, in his fourteenth claim for relief, that he was denied effective assistance of counsel during

the guilt phase of his capital trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. First, petitioner claims all of the issues raised have been exhausted in his state postconviction petition and in his subsequent appeal from the denial of the postconviction petition. Dkt. # 109, at 121. A few sentences later petitioner states, "[t]o the extent any aspect of this claim was not exhausted, that failure is attributable to the ineffective assistance of [his] post-conviction counsel." [42] Id. at 121-22. Petitioner then argues that the state court's rejection of this claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

[42]     This Court will address only the ineffective assistance of counsel claims that were exhausted in state court. See Davila, 137 S. Ct. 2058 (2017). Therefore, this Court will not address claims 14(C), (D), (G), (H), or (I). Claims 14(C) and (D) were raised in petitioner's postconviction petition, but they were not raised on appeal from that proceeding. Therefore, petitioner is barred from raising those claims. Petitioner did not raise claim 14(G) in his state petition, but he attempted to raise it in his cross-motion for summary judgment. The postconviction court and the Utah Supreme Court declined to hear the claim because it was not properly before them. Therefore, claim 14(G) is procedurally barred. Similarly, claims 14(H) and (I) are procedurally barred because petitioner did not raise them in state court.

In a motion to stay this case, petitioner characterized this claim as "partially unexhausted." Dkt. # 139, at 15-24. In his response, respondent asserts that some of petitioner's ineffective assistance of counsel claims "are exhausted because they were raised in his state postconviction petition and in the subsequent appeal. See Menzies IV, 344 P.3d 581 (Utah 2014)." Dkt. # 123, at 122. However, according to respondent, most of the ineffective assistance of counsel claims have been procedurally defaulted either because they were raised in his state postconviction petition, but were not appealed; or they were never raised or addressed at any level of state court. Id.

A. Legal principles applicable

Ineffective assistance of counsel claims are governed by the now familiar two-part test adopted in Strickland v.

*Menzies v. Crowther, Not Reported in Fed. Supp. (2019)*

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 151

*Washington*, 466 U.S. 668 (1984), by the United States Supreme Court.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687. Failure to establish either prong of the *Strickland* standard will result in a denial of petitioner's Sixth Amendment claims. *Id.* at 696.

In order to demonstrate deficient performance, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 688. The focus is on whether counsel's assistance was reasonable considering all of the circumstances in this particular case. *Id.* at 689. While counsel's representation must be assessed against the standards prevailing in the state or the city where the attorney practiced at the time of the defendant's trial,[43] in determining reasonableness, it is important to remember that it is "not what is prudent or appropriate, but only what is constitutionally compelled." *Breechen v. Reynolds*, 41 F.3d 1343, 1365 (10th Cir. 1994). The petitioner is required to establish that counsel made errors so serious that he or she "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Counsel's performance will be not be deemed constitutionally ineffective where it is merely wrong; rather, it must have been completely unreasonable such that it bears no relationship to a possible defense strategy. *Le v. Mullin*, 311 F.3d 1002, 1025 (10th Cir. 2002). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from

best practices or most common custom." *Premo v. Moore*, 562 U.S. 115, 122 (2011).

43    *See* *Pinholster*, 563 U.S. 170 (2011), wherein the majority, in addressing the dissent's questions regarding counsel's penalty phase strategy, points out that no evidence existed to establish that counsel's chosen defense "would have been inconsistent with the standard of professional competence in capital cases that prevailed in Los Angeles in 1984" or "contest that, at that time, the defense bar in California had been using that strategy." *Id.* at 196.

**\*35** In order to establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 689. Where the alleged ineffective assistance occurred during the guilt stage, the question becomes whether "there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 694. If the alleged ineffectiveness occurred during the sentencing phase, the Court must decide whether "there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* In assessing prejudice, this Court must examine the totality of the evidence, not just the evidence helpful to the petitioner. *Boyd v. Ward*, 179 F.3d 904 (10th Cir. 1999). Finally, petitioner will be entitled to relief only if the state court's rejection of his claim of ineffective assistance of counsel was "contrary to, or involved an unreasonable application of" *Strickland*, or it rested "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). Because ineffective assistance claims "can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial," the *Strickland* standard must scrupulously be applied. *Premo*, 562 U.S. at 122. Otherwise, " 'intrusive post-trial inquiry' may threaten the integrity of the very adversary

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 152

process the right to counsel is meant to serve." Id. (citing Strickland, 466 U.S. at 689-90).

Counsel must be given wide latitude in making tactical decisions and will be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690. While ensuring that criminal defendants receive a fair trial, reviewing courts must exercise considerable judicial restraint. As the Supreme Court cautioned in Strickland,

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

Id. at 689. Moreover, every effort must be made to eliminate the distorting effects of hindsight and evaluate the challenged conduct from counsel's perspective at the time. Due to the inherent difficulties of recreating an attorney's thought processes, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. Finally, the benchmark for judging ineffective assistance of counsel claims is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 687.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so. The Strickland standard is a general one, so the

range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Premo, 562 U.S. at 122-23 (internal citations omitted). "The pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. (citing Yarborough, 541 U.S. at 654).

B. Ineffective assistance of trial counsel during guilt stage

1. Conflict of interest

**\*36** Petitioner first claims his attorneys created and performed under a conflict of interest because counsel had him "sign a blank waiver of liability form after informing him that it would only pertain to [his] demand not to call Nicole Arnold [ (petitioner's girlfriend) ] as a witness." Dkt. # 109, at 125. This claim was raised in petitioner's state postconviction proceeding. See Fifth Amended [Postconviction] Petition, filed on March 14, 2011, PC ROA at 0011984-2210, (Dkt. # 110, Disk # 3, Vol. 32 at 355-Vol. 33 at 57). The Utah Supreme Court rejected petitioner's claim that the execution of a liability waiver created an actual conflict of interest. Respondent urges this Court to find that the Utah court's adjudication of this claim was not based upon an unreasonable determination of the facts and it did not involve an unreasonable application of clearly established Supreme Court law.

In Cuyler v. Sullivan, 446 U.S. 335 (1980), the Supreme Court held that "the possibility of a conflict of interest is insufficient to impugn a criminal conviction." Id. at

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 153

350. To demonstrate a violation of the Sixth Amendment, a defendant must establish that an actual conflict of interest adversely affected his attorney's performance. Id.

The liability waiver at issue here was signed before a notary public prior to trial and provided:

> I, RALPH LEROY MENZIES, defendant in Criminal Case No. CR86-887 assigned to the Third District Court of the Third Judicial District, Judge Raymond S. Uno presiding, hereby acknowledge that I have refused to provide my counsel, Brooke C. Wells and Frances M. Palacios, with the name of witnesses who may have evidence pertinent to the defense of the above-referenced case.
>
> I hereby waive any and all claims which I might have against Brooke C. Wells and Frances M. Palacios or the Salt Lake Legal Defender Association as a result of the failure of such witnesses to be interviewed or presented as witnesses in any proceeding pertaining to this case, including trial.

See Exhibit II to the Fifth Amended [Postconviction] Petition, PC ROA at 0012308 (Dkt. # 110, Disk # 3, Vol. 33 at 254). Petitioner's major argument is that the waiver violated the Utah Rules of Professional Conduct. Specifically, petitioner challenges the finding by the Utah Supreme Court that the waiver does not violate those rules, arguing that this finding was an "objectively unreasonable determination of the facts." Dkt. # 109, at 126. It is not, however, the province of this Court to reexamine state-court determinations of state-law questions. Estelle v. McGuire, 502 U.S. 62, 68 (1991). Rather, this Court is limited to deciding whether petitioner's conviction violated the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a).

In deciding that the waiver did not create an actual conflict of interest, the Utah Supreme Court found that the waiver "explicitly memorializes the fact that the decision not to interview or present certain witnesses was [petitioner's], not counsel's ...." Menzies IV, 344 P.3d at 620. One of the bedrock principles of Strickland is that

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based,

quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.

Strickland, 466 U.S. at 691. Simply memorializing the fact that the defendant refused to provide counsel with the names of witnesses who might have evidence pertinent to his defense does not create a conflict of interest. Accordingly, this Court finds that petitioner has failed to establish that the state court decision was based upon an unreasonable application of clearly established federal law.

### 2. Failure to investigate

Petitioner next argues that his counsel did not conduct a reasonable and independent investigation of the facts of the crime and present the same to the jury. Specifically, petitioner claims trial counsel: (1) failed to investigate and present information provided by prospective witness Nicole Arnold (petitioner's girlfriend); (2) failed to investigate and present two witnesses who allegedly saw the victim at a Denny's Restaurant; [44] (3) failed to "properly" investigate and present additional evidence from witness Randy Butters (an ex-boyfriend of the victim and the father of one of her children); [45] and (4) failed to investigate and present evidence from George Benitez (an inmate at the Salt Lake County Jail in February and March, 1986). [46] In the second amended petition in this federal habeas proceeding, petitioner states that this claim was partially raised in his state postconviction petition and, to the extent any portion of the claim was not exhausted, that failure is attributable to ineffective assistance of postconviction counsel. According to respondent, the only parts of this claim that are exhausted are that counsel did not investigate the accounts of Tim Larrabee and Beth Brown (the couple who saw petitioner and Hunsaker at Storm Mountain) and present inconsistencies at trial, and did not investigate and present evidence undermining the account of Walter Britton (the jailhouse informant and petitioner's cellmate). Dkt. # 123, at 129.

[44]
> On March 1, 1986, detectives obtained some information that led them to interview employees at a Denny's Restaurant. The employees were shown a picture of Hunsaker, and a regular customer, Mary Beth Hodges, stated she was positive that the victim was at Denny's on February 23, 1986 between 11:30 p.m. and midnight. She then pointed

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 154

to a booth at which, she stated, Hunsaker and a man were sitting, described the man as male, white, five-ten to six feet, medium build, sandy brown hair with a shaggy "pork chop" beard and mustache. Hodges stated that Hunsaker and the man sat and drank coffee for approximately 30 minutes and left. During the time they were in Denny's, Hodges observed that they were having a normal conversation. When asked, Hodges stated she was sure she could identify the male who was with the victim. On March 3, 1986, Hodges was shown a photo spread containing six photos, including a photo of petitioner. She was not able to identify petitioner. On March 7, 1986, detectives spoke with Nicole Arnold (petitioner's girlfriend) and she stated that she had spoken to a Denny's waitress a few nights earlier, and the waitress had identified petitioner and Hunsaker from a newspaper article. Arnold claimed to have shown the "night waitress" a copy of a newspaper clipping of her "husband" (petitioner), and that the waitress told her that she had seen petitioner and "that girl" in the restaurant drinking coffee for two hours. See Exhibit I to the Fifth Amended [Postconviction] Petition, PC ROA at 0012226-27 (Dkt. # 110, Disk # 3, Vol. 33 at 89-91).

While petitioner argues that his trial counsel did not investigate the potential witnesses at Denny's, trial counsel for petitioner introduced a death certificate for Mary Beth Hodges (the regular customer at Denny's), showing that she died on August 28, 1986. See Defendant's Trial Exhibit ## 103, 104 (Dkt. # 110, Disk # 1, Trial/ Exhibits/1988.02.10 Trial, Ex 103 Def and 104 Def). Thereafter, Hammer (a detective with the Salt Lake County sheriff's office) was called as a witness for petitioner, over the hearsay objection of the prosecutor. See J.T. Tr. of March 3, 1988, at 2244-50 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1159) (Add. 15) at 31-37). Hammer testified that he went to Denny's and took a verbal statement from Mary Beth Hodges, a regular customer of Denny's; that he showed Hodges a photograph of Hunsaker; that she identified the photograph as being the woman she had seen; and that she had seen Hunsaker on the night of February 23, sometime between 11:30 and midnight. Id. at 2246-47 (33-34). Hammer further testified that Hodges

stated that the two people were having a "normal conversation" but she didn't remember anything they said. According to Hammer, Hodges was asked to give a description of the male party and she described that person as "male, white, five-foot ten to six-foot, medium build, sandy brown hair with a shaggy 'pork chop' type beard and mustache." Id. at 2248 (35). Hammer testified that Hodges said she would be able to identify the male that Hunsaker was with, and that Hunsaker and the male were in Denny's for approximately thirty minutes. Id. During cross-examination by the prosecutor, Hammer testified that Hodges was a customer, that he showed the photograph of the victim to the manager and three employees of Denny's, and that none of those employees was able to identify Hunsaker. An affidavit by petitioner's co-counsel at trial, Frances M. Palacios, states that the "waitress at the Denny's Restaurant" to whom Arnold spoke was "referred to as Mrs. Hodges." See Exhibit A to Fifth Amended [Postconviction] Petition, PC ROA at 0012209, ¶ 16 (Dkt. # 110, Disk # 3, Vol. 33 at 55). Nothing but petitioner's conclusory allegations supports his statements that there were "two" witnesses who could establish that the victim was with someone else on the evening of her disappearance. Petitioner did not present to the state court, and has not presented in this Court, any affidavits to substantiate that the person to whom Arnold claimed to have spoken, and Hodges, were in fact two different people. Moreover, most importantly, petitioner refused to consent to calling Arnold as a witness at trial.

See ⚠ Menzies IV, 344 P.3d at 619.

[45]   The evidence petitioner claims should have been presented was contained within a police report of an interview with Butters.

[46]   Nowhere within the fifth amended petition for postconviction relief is George Benitez mentioned. Benitez told law enforcement officers that the defendant confessed that he had killed a woman. Benitez was not, however, called as a witness at trial. On August 8, 2014, Benitez recanted his story. See Dkt. # 109-12, at 35-37. This declaration was never presented to the state court.

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 155

**\*37** A review of petitioner's fifth amended petition for postconviction relief reveals that petitioner argued that counsel was ineffective because they failed "to conduct an effective investigation." See Fifth Amended [Postconviction] Petition, filed March 14, 2011, PC ROA at 0011991-98 (Dkt. # 110, Disk # 3, Vol. 32, at 362-69). In particular, petitioner argued that counsel failed to call Nicole Arnold (petitioner's girlfriend) and Mary Beth Hodges (the Denny's customer), as witnesses at trial. Id. at 0011992-93.

As to Tim Larrabee, petitioner initially claimed only that "[t]rial counsel failed to competently interview" said witness, but later stated he was "prejudiced by trial counsel's failure to [47] interview Larrabee...." Id. at 0011993-94, ¶¶ 41, 43, respectively (id. at 364-65). Thereafter, with regard to Britton (the jailhouse informant and petitioner's cellmate), petitioner argued that counsel "failed to check the public federal court file for Walter Britton prior to the preliminary hearing," failed to use a report in the federal court file "to impeach Mr. Britton at the preliminary hearing," and "failed to contact Mr. Britton's attorney in the federal matter ... prior to the preliminary hearing." Id. at 0011995, ¶¶ 45, 48, 49, respectively (id. at 366-67). Additionally, petitioner argued that counsel failed to elicit information from Butters (the victim's ex-boyfriend) regarding an earlier three-day disappearance of the victim with some military men when Butters and the victim were dating. Finally, petitioner claimed that counsel failed to call Craig Nichols [48] as a witness even though, based upon defense counsel's investigator, Nichols' testimony would not have been helpful to petitioner. See Exhibit RRR to the Fifth Amended [Postconviction] Petition, PC ROA at 0012439 (Dkt. # 110, Disk # 3, Vol. 33, at 515). According to petitioner, all of these failings show that counsel had failed to conduct a proper investigation and, therefore, had provided ineffective assistance of trial counsel.

[47]    Petitioner repeats his claim that trial counsel failed to "competently interview Mr. Larrabee" in ¶ 44 of his fifth amended postconviction petition. Id. at 0011994-95 (id. at 366-67).

[48]    Craig Nichols called police on February 23, 1986, and said that he had picked up Hunsaker as a hitchhiker and that she wanted sex; however, when defense counsel's investigator interviewed Nichols, he changed his story and said that the woman who he had picked up was not Hunsaker and, if called as a witness, he would testify that the woman he had picked up and Hunsaker are not the same person.

a. Procedural bar

On appeal from the postconviction proceeding, petitioner challenged the effectiveness of both his trial and appellate counsel. According to the Utah Supreme Court, in his postconviction petition, petitioner "raised approximately twenty ineffective assistance of counsel claims, some of which contained numerous subparts." Menzies IV, 344 P.3d. at 603-04. Petitioner, however, appealed only ten of those claims. At issue here are the failure to investigate claims that were stated by the Utah Supreme Court as: (1) inadequate investigation of the eyewitness testimony of Larrabee and Brown (the couple who saw petitioner and Hunsaker at Storm Mountain) and (2) failure to adequately impeach Britton (the jailhouse informant). Id. at 604.

Other than the two specific failures to investigate the facts of the crime relating to the eyewitness testimony of Larrabee and Brown and the impeachment of Britton, petitioner did not, during the appeal of his postconviction proceeding, directly attack trial counsel's failure to investigate during the guilt phase of his trial. Dkt. # 136-1, Appellant's Opening Brief re: Denial of Habeas Relief, at 85-88, 88-91.

**\*38** As previously stated, for exhaustion to have occurred, a habeas petitioner must have "fairly presented" to the state courts the "substance" of his federal habeas corpus claim. Picard, 404 U.S. at 275-76. In this particular case, while petitioner included information in his fifth amended petition for postconviction relief to which Nicole Arnold (petitioner's girlfriend) could have testified under a heading of "failure to investigate," no allegation is found within the information relating specifically to Arnold that indicates counsel failed to investigate said information. Rather, all of the facts recited by petitioner indicate trial counsel's error was in failing to call Arnold as a witness at trial to corroborate other information. Nevertheless, petitioner does not challenge the Utah Supreme Court's finding that he "did not want Ms. Arnold to testify and refused to consent to calling her as a witness." See Menzies IV, 344 P.3d at 619; see also Deposition of Brooke Wells, Vol. 2 at 35, lines 12-16 (Dkt. # 110, Disk # 5, Transcripts 2010.07.30 Deposition of Brooke Wells, at 9). Moreover, in his appeal from the denial of his postconviction petition, petitioner did not raise a separate claim that counsel was ineffective for failing to properly investigate and/or

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 156

introduce additional evidence. In challenging the flaws in the trial court's reasoning concerning the alleged conflict of interest, petitioner did state that the Salt Lake Legal Defender Association:

> (1) failed to interview Larrabee and Brown; (2) failed to carefully read their statements to the police; (3) failed to interview a second witness at Denny's (who could have confirmed that Hunsaker was with the man with the Levi jacket when [petitioner] was with Franks); (4) failed to interview the Denny's customer who saw that man with Hunsaker, i.e., Mary Beth Hodges; (5) failed to introduce evidence that

Hunsaker had run off with friends from the military a few years earlier; and, (6) failed to hire expert witnesses to prepare for the fingerprint and carpet fiber evidence. Dkt. # 136-1, Appellant's Opening Brief Re: Denial of Habeas Relief, at 76 (footnotes omitted). [49] This is not the same, however, as bringing a stand-alone claim of ineffective assistance of counsel for failure to investigate. As a result, this Court finds that petitioner has not exhausted his claim as it relates to potential witnesses Nicole Arnold (petitioner's girlfriend), Mary Beth Hodges (the Denny's customer), Randy Butters (the victim's ex-boyfriend), or George Benitz (the inmate at the Salt Lake County Jail).

[49]    It should be noted that in one of the omitted footnotes, petitioner states that the Legal Defender Association "also failed to call an optometrist to challenge Brown's ability to identify the jacket without her glasses and with 20-40 vision...." An affidavit submitted in this proceeding by Elizabeth (Brown) Babinchak, however, indicates while she was not paying close attention, she did recognize the jacket the man had. Dkt. # 109-12, at 20, ¶ 16. Additionally, Babinchak indicates surprise that there were references in the transcript to the fact she was not wearing her glasses or contact lenses that day at Storm Mountain, because "at the time the only glasses I had were reading glasses. I did

not need glasses when I wasn't reading. I've never had contacts." Id. at 21, ¶ 21.

Because Utah law requires ineffective assistance of counsel claims to be raised in an initial postconviction proceeding, petitioner argues that ineffective assistance of postconviction counsel excuses his procedural default. As stated above, in ⬜ Martinez v. Ryan, 566 U.S. 1 (2012), the Supreme Court created a narrow exception to the procedural default rule to allow review of defaulted claims of ineffective assistance of trial counsel where the state collateral proceeding was the initial review proceeding of the defaulted ineffective assistance of counsel claim. Thereafter, in ⬜ Davila, 137 S. Ct. 2058 (2017), the Supreme Court made clear that Martinez will not be extended to claims of ineffective assistance of postconviction counsel for failing to raise the ineffective assistance of appellate counsel claims. Thus, petitioner is procedurally barred from raising anything to do with the failure to investigate Arnold, Hodges, Butters, and Benitez. [50] The Court will address the merits of petitioner's claims of ineffective investigation as it relates to Larrabee and Brown (the couple who saw petitioner and Hunsaker at Storm Mountain), and impeachment of Britton (the jailhouse informant) at his preliminary hearing.

[50]    Petitioner also argues that counsel was ineffective for failing to investigate and present facts showing that someone else committed the offense. Dkt. # 109, at 144-46. Respondent argues that this claim is procedurally defaulted. Dkt. # 123, at 124. Instead of addressing whether or not the claim is procedurally defaulted in his reply, petitioner argues that this Court must accept his "merits arguments" (which, in actuality, are factual statements as opposed to arguments) as uncontroverted because respondent did not respond to the merits of the subclaim. As previously stated, petitioner did not bring a standalone claim of ineffective assistance of counsel for failure to investigate. As a result, this Court finds that this argument is procedurally barred. Even if it were not barred, however, petitioner's arguments are based on his assertion that two potential witnesses reported observing the victim at Denny's on the night of her disappearance. Petitioner has not, however, presented any evidence that establishes that there were, in fact, two separate witnesses who could establish that the victim was with someone

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 157

else on the evening of her disappearance or that someone else committed the offense.

b. Merits of claim

**\*39** In assessing counsel's investigation, this court must conduct "an objective review of their performance, measured for 'reasonableness under prevailing professional norms.'" Wiggins v. Smith, 539 U.S. 510, 523 (2003) (citing Strickland, 466 U.S. at 688). This "includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" Id. As stated previously, this Court must review trial counsel's performance without the "distorting effects of hindsight" and counsel's conduct must be evaluated "from counsel's perspective at the time." Strickland, 466 U.S. at 689.

> Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, ... keeping in mind that there are countless ways to provide effective assistance in any given case.

Id.

### 1. Larrabee and Brown

In this case, petitioner claims he was

> prejudiced by trial counsel's failure to interview Larrabee and Brown because, on cross-examination, Wells failed to elicit information that Larrabee was distracted at the time he observed the hikers because he was engaging in sexual activity with his girlfriend. This additional evidence would have provided information to the jury that Larrabee was unable to accurately determine what the male hiker looked like. Even more

> troubling, counsel's failure to conduct a pre-trial interview of this key State witness prevented counsel from learning that Larrabee questioned his in-person lineup identification and asked whether he should have identified Number 6, [petitioner]. Counsel's failure to discover this fact led counsel to open the door to this testimony at trial and prevented counsel from being adequately prepared to confront the witness and prepare a defense strategy. Failure to properly interview and cross-examine Larrabee was objectively unreasonable, uninformed, and prejudicial.

Dkt. # 109, at 136 (citation to transcript omitted).

At trial, defense counsel got Larrabee to admit that he did not see the hikers faces because his "purpose for being [at Storm Mountain] was to spend time with his girlfriend, that [his] attention was turned more towards her." J.T. Tr. of February 19, 1988, at 1222-23 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1155) (Add. 11) at 321). During postconviction proceedings, petitioner first submitted an affidavit from Larrabee, executed on October 12, 2010, that he and Brown were "kissing on a picnic table" and Brown "was worried that people might see what we were doing." PC ROA at 0011403 at ¶¶ 3, 4, respectively (Dkt. # 110, Disk # 4, PCR Sealed Pleadings/Sealed Vol. 3 at 177). In his effort to prevent summary judgment, petitioner proffered an affidavit, executed on September 7, 2011, from postconviction counsel, which indicated that Larrabee had told him that "at the time he was observing the male hiker, Beth Brown was fondling his penis." Id. at 0013764, ¶ 4 (Dkt. # 110, Disk # 3, Vol. 36 at 74). Postconviction counsel then states that, for "tactical purposes," he "decided to state that Mr. Larrabee was simply kissing Ms. Brown during his observations of the male hiker." Id. ¶ 6 (id.).

Petitioner argued on appeal in his state postconviction proceeding that "trial counsel performed unreasonably in failing to interview Larrabee and Brown, learn about the nature of their distraction, and then use that knowledge at trial to impeach their testimony." Id. at 617. In denying this claim, the Utah Supreme Court said:

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 158

**\*40** We reject this claim because trial counsel cross-examined Mr. Larrabee and Ms. Brown at trial and highlighted for the jury the weaknesses of their testimony. Mr. Larrabee admitted to the jury that his attention was turned towards Ms. Brown during the time he saw the man and woman walking at Storm Mountain. [Petitioner] concedes that 'Larrabee admitted his inconsistent statements at trial.' [Petitioner] does not explain how the jury knowing that Mr. Larrabee's attention was directed at Ms. Brown *for the purpose of having sexual relations* would have changed the outcome in the case. Further, eliciting the specific reason Ms. Brown and Mr. Larrabee were distracted might have hurt [petitioner's] case more than it helped it. The jury might have concluded that Mr. Larrabee was so concerned about being caught with Ms. Brown that he was more focused on the man at Storm Mountain than he might otherwise have been.

\* \* \* \* \*

In short, trial counsel's failure to elicit the specific reason that Mr. Larrabee and Ms. Brown were distracted was neither unreasonable nor prejudicial, and [petitioner] has therefore failed to raise a genuine issue of material fact. Accordingly, we affirm the PCC's grant of summary judgment.

Id. (italics in original).

According to petitioner, since Larrabee admitted in the October 12, 2010 affidavit that he was "focused" on his girlfriend (Brown), the Utah Supreme Court's factual conclusion "that eliciting the nature of Larrabee and Brown's distraction might have hurt [petitioner's] case more than helped because Larrabee may have 'focused more on the man at Storm Mountain' out of a fear of getting caught," Dkt. # 109, at 136, is "not supported by the record and is objectively unreasonable." Id. In Wood v. Carpenter, 907 F.3d 1279 (10th Cir. 2018), the Tenth Circuit stated that "the prejudice inquiry is a 'mixed question of law and fact.' " Id. at 1291. The Circuit explained that the "factual part of the mixed question" is whether the evidence had, in fact, been "presented at trial," while the "legal part" is related to the "strength of the ... evidence." Id. The Utah Supreme Court would have made a factual error if it had concluded Larrabee's focus was not on Brown. But, as can be seen from the state court's decision, that is not what the state court found. Rather, the state court's comment regarding what the jury might have concluded had they known the specific reason for the couple's

distraction, relates to the "legal part" of the prejudice analysis — the strength of the missing reason, and whether it would have affected the proceeding's outcome. Since, however, the factual determination petitioner claims is unreasonable is not a factual determination, § 2254(d)(2) is inapplicable. Id. Accordingly, this Court finds "fairminded jurists could disagree" on the correctness of the state court's decision and, therefore, federal habeas relief is not appropriate.

Additionally, petitioner argues that counsel rendered ineffective assistance of counsel because trial counsel did not object on due process grounds to the identifications made by Larrabee. Dkt. # 109, at 158. In considering this claim, the Utah Supreme Court found that trial counsel's decision to impeach Larrabee's and Brown's eyewitness testimony rather than to seek suppression was reasonable. Menzies IV, 344 P.3d at 617. Petitioner claims that the state court's rejection of this claim involved an unreasonable application of clearly established federal law and constituted an unreasonable determination of facts in light of the evidence presented.

In Perry v. New Hampshire, 565 U.S. 228 (2012), the Supreme Court held that the introduction of eyewitness testimony, without preliminary judicial assessment of its reliability, did not render a defendant's trial fundamentally unfair and that the Due Process Clause did not require preliminary judicial inquiry into the reliability of eyewitness identification that was not procured under unnecessarily suggestive circumstances arranged by law enforcement. In reaching its holding, the Supreme Court acknowledged that its decisions in this area were aimed at deterring police from rigging identification procedures at lineups, showups, or photograph arrays. Id. at 233. Furthermore, the Supreme Court recognized that:

**\*41** The Constitution ... protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit. Constitutional safeguards available to defendants to counter the State's evidence include the Sixth Amendment rights to counsel; compulsory process; and confrontation plus cross-examination of witnesses. Apart from these guarantees, we have recognized, state and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial. Only when

evidence "is so extremely unfair that its admission violates fundamental conceptions of justice," ... have we imposed a constraint tied to the Due Process Clause.

Id. at 237 (citations omitted) (quoting 📙 Dowling v. United States, 493 U.S. 342, 352 (1990) ).

In rejecting petitioner's claim, the state court, citing to Perry, stated the following:

As a general rule regarding the validity of identification procedures, "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." Courts must "assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.' " In determining whether a photo array is impermissibly suggestive, we have stated that "the main question is whether the photo array emphasized the defendant's photo over others." Factors that we consider in answering that question include: (1) "whether the words and body language of the police officers who presented the array conveyed an attitude of disinterest," (2) "whether the officers manipulated the photos to indicate their belief that one of the photos portrayed the perpetrator," and (3) "whether the photos themselves were selected so that the defendant's photo stood out from the rest."

As an initial matter, we note that neither Mr. Larrabee nor Ms. Brown ever made a firm identification of Mr. Menzies. Rather, Mr. Larrabee identified Mr. Menzies's photo as looking the most like the man he saw at Storm Mountain. And later Mr. Larrabee could not identify the man he saw during a lineup. Mr. Larrabee did ask the prosecutor after the lineup whether number six was in fact Mr. Menzies. But the trial court struck this part of Mr. Larrabee's testimony. Ms. Brown also never made a firm positive identification of Mr. Menzies.

Even if we assume that Mr. Larrabee's and Ms. Brown's testimony is identification testimony, Mr. Menzies offers no evidence that is relevant to any of the three factors we use to determine whether identification procedures are suggestive. Instead, he offers conclusory assertions. For instance, he states that Mr. Larrabee's identification was unreliable because of "suggestive comments made by the police to Larrabee." But Mr. Menzies does not provide specifics regarding what comments the police made. He merely refers to "the suggestiveness of the mug shots."

Mr. Menzies's other assertions do not support the conclusion that the identification procedures were unduly suggestive, but simply undermine the weight of the identification testimony. For example, Mr. Menzies states that "[Detective] Judd admitted that if Larrabee only saw a profile the composite was inaccurate." He further states that "Larrabee and Brown were grossly distracted, and had no meaningful opportunity to observe or pay attention to the hiker." Even if true, these facts affect only the weight of Mr. Larrabee's identification testimony. They are irrelevant to the question of whether the identification procedures employed by the police were unnecessary and suggestive.

Finally, other indicia of suggestiveness cited by Mr. Menzies simply have no basis in the record. For instance, Mr. Menzies alleges that "[Officer] Couch used the composite to select [Mr. Menzies's] mug shot to presumably frame [Mr. Menzies]." Mr. Menzies provides no record citation to support this allegation. Further, Mr. Menzies states that during the photo array procedure the "police told Larrabee that he had picked the right man, and that they had [Mr. Menzies] in custody. Then after Mr. Larrabee picked the wrong man because he had a pot belly, the police told him that [Mr. Menzies] had lost 20 pounds." Mr. Menzies provides no citation to the record on this point, either. Our review of the record, indicates, as the State suggests, that Mr. Larrabee selected Mr. Menzies's photo as looking most like the man he saw at Storm Mountain *before* the police told him that Mr. Menzies was in custody and mentioned anything about a weight change. Mr. Larrabee stated that at the time he picked Mr. Menzies's picture out of the photo array he did not know that the police had Mr. Menzies in custody. In fact, Mr. Larrabee learned that Mr. Menzies was in custody approximately three months later. At the lineup, Mr. Larrabee identified someone other than Mr. Menzies. It was not until after the lineup that Mr. Larrabee learned about Mr. Menzies's weight change. This is not a case where the police told Mr. Larrabee that he picked the right man or ever implied as much.

**\*42** Only one fact cited by Mr. Menzies is even potentially relevant to determining suggestiveness. Mr. Menzies claims that "[Detective] Judd did not instruct Larrabee that the hiker may or may not be in the photo array." Mr. Menzies cites a federal district court case where the court recognized that "[s]uch an admonition is extremely important to avoid suggestiveness in the presentation of a photographic lineup to an adult witness ... [and] is even more critical to avoid suggestiveness in

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 160

the presentation ... to a six-year-old child." But the facts of that case differ in several important ways from the situation here. First, the witness in that case was a six-year-old child, whereas Mr. Larrabee was a high-school student. Second, there the police made suggestive statements such as telling the witness that she did an "awesome" and "fantastic" job after identifying the defendant. In contrast, here the police made no such statements. The lone fact that Detective Judd did not tell Mr. Larrabee that the hiker may or may not be in the photo array is not enough for us to conclude that trial counsel acted unreasonably in not seeking to suppress the identification as unnecessarily suggestive.

Mr. Menzies has not raised a genuine issue of material fact regarding trial counsel's decision to impeach Mr. Larrabee's and Ms. Brown's testimony. Trial counsel acted reasonably in pointing out the flaws in the testimony rather than seeking to suppress it on the ground that the police used unnecessarily suggestive tactics.

Additionally, Mr. Menzies's ineffective assistance claim would fail in any case because he has not made a sufficient showing of prejudice. His only argument regarding prejudice on this claim is that "there is a good change that had LDA moved to strike the identifications, the motion would have been granted, and the result of the trial would have been different." This merely restates the basic prejudice standard and provides no analysis regarding why it would be the case. For these reasons we affirm the PCC and reject Mr. Menzies's claim that trial counsel was ineffective in dealing with Ms. Brown's and Mr. Larrabee's testimony.

🔺 Menzies IV, 344 P.3d at 617-19 (footnotes omitted).

In this proceeding, petitioner argues that trial counsel was ineffective because she failed to object to the use of the eyewitness identifications of Larrabee under a due process theory. Petitioner objects not only to the photo identifications that the Utah Supreme Court dealt with at length, but also to Larrabee's statements that Denter's car looked a lot like the car he saw at Storm Mountain and that petitioner's coat was the coat carried by the male hiker at Storm Mountain. All of the cases cited by petitioner deal with eyewitness identifications of a defendant either in photo arrays, lineups, or, as in Perry, a spontaneous identification of the defendant followed by an inability to pick the defendant out of a photo array. Petitioner does not cite to any Supreme Court cases dealing solely with the identification by a witness of objects connected to a crime. The latter two statements of Larrabee

were apparently admissible under state law and, therefore, this Court will review them only for fundamental fairness.[51]

[51]    As stated previously, due process challenges to state evidentiary rulings are reviewed only for fundamental fairness. Matthews, 83 F.3d at 331.

While arguing that the state court's decision was an unreasonable determination of the facts, petitioner does not identify the specific facts to which he is referring. Rather, he cites facts that deal with Larrabee's statements regarding the car and the coat. Since the state court did not even discuss those facts, the state court's decision was not an unreasonable determination of those facts. Moreover, the facts cited by petitioner, in an attempt to overturn the state court's decision, rely upon a declaration that was never submitted to the state court. See Dkt. # 109-12, at 23-30. As previously stated, this Court's review is limited to the record that was before the state court. 📑 Pinholster, 563 U.S. at 181.

After reviewing the state court records herein, this Court finds that petitioner has failed to establish that the state court decision, finding that trial counsel had acted reasonably in pointing out the discrepancies in Larrabee's testimony rather than seeking to suppress the testimony, was based upon an unreasonable determination of the facts or that it involved an unreasonable application of clearly established federal law. Moreover, the introduction of Larrabee's statements that the car in the police parking lot "looked like the car [he] saw" at Storm Mountain and that the coat he was shown by police was "perhaps the coat that [he] had seen the male individual was wearing" did not render petitioner's trial fundamentally unfair. J.T. Tr. of February 23, 1988, at 1272, 1273, respectively (Dkt. # 110, Disk # 1, Trial/Transcripts, ROA 1156 (Add. 12) at 37). Accordingly, habeas relief is not appropriate.

### 2. Walter Britton

**\*43**  During his appeal, petitioner argued that trial counsel failed to impeach Britton (the jailhouse informant and petitioner's cellmate) during the preliminary hearing about his mental illness.[52] In considering petitioner's claim of deficient performance regarding counsel's failure to impeach Britton, the Utah Supreme Court said:

Even if [petitioner] could satisfy his burden of showing prejudice, his claim would fail because he has not shown that trial counsel had access to the evidence, or could have

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 161

obtained access through reasonable diligence. [Petitioner's] claim instead relies on a variety of unsupported inferences to conclude that trial counsel knew about Mr. Britton's mental illness.

Counsel's duty to "adequately investigate the underlying facts of the case" is an important one because "investigation sets the foundation for counsel's strategic decisions about how to build the best defense." But counsel's duty is to conduct an "adequate investigation." [Petitioner] appears to argue this duty further obligates counsel to present evidence that was not obtained even after an adequate investigation.

Here, [petitioner] has failed to raise a genuine issue of material fact regarding trial counsel's investigation into whether Mr. Britton had a mental illness. Trial counsel's investigator testified that he served the federal court hearing Mr. Britton's case with a subpoena seeking Mr. Britton's psychological records, but received nothing back. Mr. Britton's attorney told trial counsel that the records were not public records and that he could not disclose confidential client information. Ms. Wells testified that the federal court hearing Mr. Britton's case had the only copy of the Springfield report, that she was unsuccessful in procuring the report, and that Mr. Britton's attorney did not have a copy.

Not only did trial counsel investigate Mr. Britton's background, but they also used their findings to impeach his testimony. In Ms. Wells's closing argument, she reminded the jury that Mr. Britton refused to testify after learning he would not get any benefit in his own case from doing so. [Petitioner] apparently misunderstands trial counsel's purpose for telling this to the jury and states that the jury couldn't infer bias because "Britton did not get a deal." This is precisely the point trial counsel made to the jury. Counsel highlighted the weakness of Mr. Britton's testimony by showing that he was eager to testify against [petitioner] when he thought he might benefit by doing so, but he stopped cooperating once he realized that benefit would not materialize.

[Petitioner] counters the State's assertion that trial counsel's investigation was reasonable by suggesting that the police reports available to trial counsel firmly established that Mr. Britton was mentally ill. But the portion of the report [petitioner] cites for this proposition states only that Mr. Britton was "sent out to Springfield, Missouri (inaudible) my attorney tried to get an irresistible impulse plea put

on there." This report merely refers to the report that trial counsel did not have access to—it does not establish some other basis for finding that trial counsel should have searched elsewhere for evidence of Mr. Britton's alleged mental illness.

Additionally, [petitioner] makes the sweeping assertion that "Savage spoke to [trial counsel] about Britton prior to the preliminary hearing. Thus, it is reasonable to infer that [trial counsel] was aware of Britton's mental illness because of Savage's contact." [Petitioner's] citation to the record here merely indicates that Mr. Savage talked to counsel before Mr. Britton testified against [petitioner]. There is nothing in the portion of the record cited by [petitioner] to support the inference that "[trial counsel] was aware of Britton's mental illness because of Savage's contact."

**\*44** Finally, [petitioner] argues that it is reasonable to infer that trial counsel could have used a FOIA request to obtain the Springfield report because [petitioner's] post-conviction counsel was able to obtain a copy of the report in 2011 pursuant to FOIA from the Federal Bureau of Prisons. On this point [petitioner] does not explain why this is a reasonable inference or what effect amendments to FOIA during the last twenty years would have on the analysis. Further, [petitioner] has not provided any evidence showing that the Federal Bureau of Prisons actually had the Springfield report during the time of trial. Trial counsel and Mr. Britton's attorney both suggested that the federal court hearing Mr. Britton's case had the only copy of the report and therefore the Federal Bureau of Prisons may not have had the report at that time. Trial counsel's investigator served the federal court a subpoena seeking mental health records but received no response. [Petitioner] has failed to support his suggested inference that trial counsel could have used a FOIA request to obtain the Springfield report.

[Petitioner] has not proffered sufficient evidence to overcome our "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Accordingly, we hold that [petitioner] has not raised a genuine issue of material fact regarding the deficient performance prong of <u>Strickland</u>.

⚠ <u>Menzies IV</u>, 344 P.3d at 615-16.

52 The state trial court considering the postconviction petition made some important observations concerning testimony at a preliminary hearing

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 162

which bear repeating here in light of the actual argument made, i.e., counsel was ineffective for failing to impeach Britton at the preliminary hearing:

> ... impeachment at a trial in front of a fact finding jury is a completely different issue from impeachment at a preliminary hearing. The record contains nothing which indicates anyone knew, at the time of the preliminary hearing, that Britton would not be testifying at trial and would, in the face of a contempt finding, refuse to testify. The burden of proof at a preliminary hearing is so low that impeachment at that hearing as a practical matter is not effective nor worthwhile. The judge at a preliminary hearing, acting as a magistrate, is required to only find a reasonable belief that the offenses were committed by the accused and the evidence must be highly inconsistent and incredible before it is rejected by the magistrate. The magistrate makes only a very limited credibility determination to assure itself the testimony is not wholly incredible or unbelievable. Determinations of credibility are limited to determining that the evidence is not wholly lacking and incapable of reasonable inference. Acting as a magistrate, the judge at a preliminary hearing does not weigh credibility and leaves to the fact finder ultimate judgments of credibility.

PC ROA at 0015434 (citation omitted) (Dkt. # 110, Disk # 3, Vol. 40, at 416). Thus, any claimed failures to impeach at a preliminary hearing are "of a wholly different character from failures to effectively impeach at a trial." Id.

In this case, petitioner claims

> [p]rior to the preliminary hearing, trial counsel failed to check the public federal court file for Walter Britton. Contained in the federal court file was a November 1985 motion for determination of Britton's mental competency filed by the United States attorney prosecuting Britton in an unrelated federal case. The record also contained a letter written by Dr. Breck Lebegue in November of 1985, which indicated that Britton may have been

> suffering from a mental illness at the time of his preliminary hearing testimony. Trial counsel failed to use this information to impeach Britton at the preliminary hearing.

Dkt. # 109, at 137-38 (citations omitted). [53]

[53] Petitioner makes two additional claims regarding trial counsel's failures. First, he claims that counsel failed to present to the jury the fact that Britton's testimony and statements to the police tracked media reports. Dkt. # 109, at 153. The record, however, establishes that during the preliminary hearing, counsel got Britton to admit that "he heard about Mrs. Hunsaker's abduction on the news approximately a week before he told the police about [petitioner's] statement"; that "he watched the news more frequently after his first conversation with [petitioner]"; and "that he did not report [petitioner's] statements to the police until about a month after [petitioner] made them."

Menzies IV, 344 P.3d at 614. Additionally, counsel "pointed out to the jury during closing argument that Mr. Britton's testimony could have been derived from either the news or jail rumors." Id.; see also J.T. Tr. of March 8, 1988, at 2669-72 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1160) (Add. 16) at 152-55). Finally,

> [t]rial counsel also attempted to discredit Mr. Britton's testimony at trial. There, counsel called a jail officer who testified that the details of Ms. Hunsaker's death were discussed by jail employees and inmates. The officer further testified that she heard several rumors in the jail regarding the crime and repeated those rumors.

Menzies IV, 344 P.3d at 614. Therefore, this Court finds this allegation to be without merit.

Second, petitioner argues that counsel failed to elicit testimony about petitioner's drug use at the time of the crime. Dkt. # 109, at 153. This allegation is based upon a police report and a supplementary police report of interviews with Britton in which Britton claims that, during petitioner's confession, petitioner told him he was on high on drugs, see PC ROA at 0012339, Exhibit NN to Fifth Amended Postconviction Petition (Dkt. # 110,

*Menzies v. Crowther, Not Reported in Fed. Supp. (2019)*

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 163

Disk # 3, Vol. 33 at 315), and/or on heroin, see PC ROA at 0012391-92, Exhibit EEE to Fifth Amended Postconviction Petition at 4 (Dkt. # 110, Disk # 3, Vol. 33 at 419-20). Petitioner did not raise this argument on appeal from the denial of his postconviction application. Therefore, this allegation has been procedurally defaulted.

 **\*45**  In order to impeach a witness based upon a mental disorder, the party offering the evidence must first show that "the witness's mental condition is such that it affects the witness's ability to accurately perceive, recall, and relate events." State v. Stewart, 925 P.2d 598, 600 (Utah App. 1996); see also United States v. Lopez, 611 F.2d 44, 45 (4th Cir. 1979) ("[M]any psychiatric problems or fixations which a witness may have had are without any relevancy to the witness'[s] credibility, concerned as it is with whether the witness' mental impairment is related to 'his capacity to observe the event at the time of its occurrence, to communicate his observations accurately and truthfully at trial, or to maintain a clear recollection in the meantime.' " (citations omitted) ). Additionally, the party must "demonstrate that the mental disorder existed either at the time of the event regarding which the witness has been called to testify, or at the time testimony is given." Id.

After reviewing the report written by Breck Lebegue, M.D., it is clear that no mental illness was identified that could have been used at the time of the preliminary hearing to impeach Britton. Rather, Dr. Lebegue indicated he was unable to "derive an opinion as to the defendant's mental state with reasonable medical certainty, because [Britton] refused to speak with me for more than a half hour." PC ROA Sealed Vol. 4, at 0012501-02 (Dkt. # 110, Disk # 4, PCR Sealed Pleadings/Sealed Vol. 4, at 194-95). Moreover, Dr. Lebegue indicated that he believed that Britton had "a rational understanding of the nature of the proceedings against him, and his relationship to those proceedings ...." Id. As a result, no public information existed at the time of the preliminary hearing to suggest Britton actually suffered from a mental illness that affected his ability to accurately perceive, recall, and relate the events about which he was testifying. Further, if trial counsel was unable to access the information at the time of trial with a subpoena, it is unlikely she could have obtained the information any easier prior to the preliminary hearing. Finally, in a Final Psychiatric Evaluation of Britton dated January 14, 1986, the evaluator believed Britton had "no mental disorder." PC ROA at 0013412 (Dkt. # 110, Disk # 3, Vol. #35 at 171). In fact, it was his opinion that Britton was

not suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequence of proceedings against him. He is also able to assist properly in his own defense.... [Britton] is not suffering from a severe mental disease or defect that would substantially impair him to the extent that he was unable to appreciate the nature and quality or the wrongfulness of the alleged offense at the time of the alleged offense.

Id. at 0013413 (172).

Where "some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the habeas corpus writ should be denied." Frost v. Pryor, 749 F.3d 1212, 1125 (10th Cir. 2014). In light of the record herein, this Court finds petitioner has failed to establish the state court's decision was an unreasonable application of Strickland. Clearly, even if counsel's investigation of Britton was deficient, based upon this record, petitioner cannot establish any prejudice whatsoever. As a result, this Court finds petitioner is not entitled to relief on his claim that counsel conducted an ineffective investigation of Britton prior to petitioner's preliminary hearing.

Accordingly, this Court finds petitioner has failed to establish ineffective assistance of counsel during the guilt stage of his trial. Therefore, claim 14 is denied.

### Claims 15, 16, 17, 18 and 19: Admission of Evidence during Penalty Phase

In claims 15 and 16, petitioner argues that admission of his prison file and his rap sheets during the penalty phase of trial violated his rights to confrontation, to due process of law, and to a reliable sentencing hearing, in violation of the Sixth, Eighth, and Fourteenth Amendments. In claim 17, petitioner argues that the state's failure to disclose the contents of his prison file violated his right to due process under the Fourteenth Amendment. Additionally, in claim 18, petitioner argues that admission of his prison file violated his rights

against self-incrimination under the Fifth Amendment and to due process of law under the Fourteenth Amendment, and, in claim 19, petitioner argues that admission of three psychiatric evaluations at the penalty phase of his trial violated his rights to be free from self-incrimination under the Fifth Amendment, to confrontation under the Sixth Amendment, to a fair and reliable capital sentencing under the Sixth Amendment, to a fair and reliable capital sentencing proceeding under the Eighth Amendment, and to due process of law under the Fourteenth Amendment. Each of these claims was raised on direct appeal and, like many others, each was summarily denied by the Utah Supreme Court. Menzies II, 889 P.2d at 406. While petitioner claims that the state court's resolution of each of these claims was an unreasonable determination of the facts, he does not identify any facts that were actually decided in ruling on any of these claims.

A. Confrontation rights

**\*46** In Williams v. New York, 337 U.S. 241 (1949), the United States Supreme Court made it clear that a sentencing judge, even in capital cases, may consider information about a convicted person's past life, health habits, conduct, and mental and moral propensities, even if such information is "obtained outside the courtroom from persons whom a defendant has not been permitted to confront or cross-examine." Id. at 245. In finding that the defendant in Williams had not been denied due process, the Supreme Court recognized that

> [t]ribunals passing on the guilt of a defendant always have been hedged in by strict evidentiary procedural limitations. But both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law. Out-of-court affidavits have been used frequently, and of course in the smaller communities sentencing judges naturally have in mind their knowledge of the personalities and backgrounds of convicted offenders.

Id. at 246 (footnotes omitted). In addressing the historical basis for different evidentiary rules governing trial and sentencing procedures, the Supreme Court stated that "there are sound practical reasons for the distinction." Id. Finally, the Supreme Court concluded: "It is urged, however, that we should draw a constitutional distinction as to the procedure for obtaining information where the death sentence is imposed. We cannot accept the contention." Id. at 251. Thus, Williams makes it clear that the Confrontation Clause does not apply to capital sentencing proceedings. [54] Rather, it "applies through the finding of guilt, but not to sentencing, even when that sentence is the death penalty." Szabo v. Walls, 313 F.3d 392, 398 (7th Cir. 2002).

[54]    In his reply, petitioner argues that, because the Confrontation Clause was not made applicable to the states until the Supreme Court decided Pointer v. Texas, 380 U.S. 400 (1965), Williams could not have addressed the Confrontation Clause. If petitioner's argument is correct, there is no Supreme Court precedent on this issue.

Relying on Gregg v. Georgia, 428 U.S. 153 (1976), and Godfrey v. Georgia, 446 U.S. 420 (1980), petitioner seemingly argues that, since discretion in sentencing "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action," [55] limits must be placed upon the information that a sentencer considers. Petitioner further relies on Gardner v. Florida, 430 U.S. 349 (1977), to argue that he was entitled to "due process of law" at sentencing; but, he concedes that "Gardner did not explicitly address whether the right to confrontation applies in capital sentencing hearings." Dkt. # 109, at 171. Since Gregg and Lockett v. Ohio, 438 U.S. 586 (1978), the law of capital sentencing has changed dramatically. Szabo, 313 F.3d at 398. However, the Supreme Court has never questioned the precise holding of Williams, and this Court is not at liberty to do so in this federal habeas proceeding. See also Green v. Georgia, 442 U.S. 95 (1979) (application of hearsay rule to preclude the defendant from introducing

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 165

mitigating evidence at sentencing in a capital case violates due process).

The Constitution allows the hearsay rules to be relaxed, quite simply, to expand the deposit of information available to the sentencing tribunal. The Supreme Court has summarized this principle: '[a] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.'

**\*47** Del Vecchio v. Illinois, 31 F.3d 1363 (7th Cir. 1994) (en banc) (citing Roberts v. United States, 445 U.S. 552, 556 (1980) ). To the extent Utah statutes allow admission of hearsay evidence for purposes of sentencing, [56] this Court finds there is no Confrontation Clause violation. See Del Vecchio, 31 F.3d at 1388 (holding the penalty phase of a capital trial presents no exception to the general rule that defendants have no confrontation rights during sentencing); Chandler v. Moore, 240 F.3d 907, 918 (11th Cir. 2001) (no Confrontation Clause violation because hearsay evidence is admissible in capital sentencing hearing); Bassette v. Thompson, 915 F.2d 932, 935 (4th Cir. 1990); and United States v. Bustamante, 454 F.3d 1200, 1202-03 (10th Cir. 2006) (no Sixth Amendment Confrontation Clause right at sentencing). Contra United States v. Mills, 446 F.Supp.2d 1115, 1130-31 (C.D. Cal. 2006). Moreover, there is nothing in the record that shows the state did anything to prevent petitioner from rebutting this hearsay evidence. Therefore, petitioner has failed to establish how his sentencing proceeding was fundamentally unfair or unreliable. Since there is no United States Supreme Court precedent that holds that the Confrontation Clause applies in capital sentencing hearings, the state disposition is not contrary to, nor did it involve an unreasonable application of, clearly established federal law. Accordingly, claims 15 and 16 are denied. Additionally, the portion of claim 19 that alleges a violation of petitioner's confrontation rights is also denied.

55

Gregg, 428 U.S. at 189.

56

See State v. Sanwick, 713 P.2d 707, 709 (Utah 1986) ("The rules of evidence in general, and the rules on hearsay exclusions in particular,

are inapplicable in sentencing proceedings. Utah R.Evid. 1101(b)(3).").

**B. Failure to disclose prison file**

Petitioner argues in claim 17 that the state's failure to disclose the contents of his prison file, used during the penalty phase, violated his rights to due process under the Fourteenth Amendment and to a reliable capital sentencing proceeding under the Eighth Amendment. Again, this claim was raised on direct appeal, but summarily denied by the Utah Supreme Court. Menzies II, 889 P.2d at 406. Petitioner claims the state court's decision was an unreasonable determination of fact and an unreasonable application of clearly established federal law.

Even though the state court's decision is unaccompanied by an explanation, petitioner still has the burden to show there was no reasonable basis for the state court to deny relief. Richter, 562 U.S. at 98. Moreover, under AEDPA, this Court is obligated to give the Utah Supreme Court's decision the benefit of the doubt. Burt v. Titlow, 571 U.S. 12, 15 (2013) (citing Pinholster, 563 U.S. at 188). Since the Utah Supreme Court did not explain its decision, this Court must "look through" the state court's decision to the last related state decision that provides a relevant rationale and then presume that the unexplained decision adopted the same reasoning. Wilson v. Sellers, 138 S. Ct. 1188 (2018).

According to the trial transcript, the prosecution notified defense counsel of its intent to introduce the prison file, but defense counsel never requested production of the file. See J.T. Tr. March 16, 1988, at 2897-98 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1161) (Add. 17) at 191-92). Since defense counsel stated they had not seen the prison file, the trial court permitted them to review the file overnight. The next morning, when counsel stated they had not completed their review, the trial court recessed the proceeding in order to allow defense counsel additional time to complete their review before ruling on the admissibility of the entire file. Id. at 3128. Additionally, nothing in the record establishes that petitioner was prevented from challenging any of the information contained in his prison file. To the extent counsel was permitted as much time as needed to review the file before its introduction, this Court finds that petitioner has failed to establish that his right to due process and/or to a reliable capital sentencing proceeding was violated. As a result, this Court finds petitioner has failed to establish that the state court

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 166

decision was based on an unreasonable determination of fact or an unreasonable application of clearly established federal law. Accordingly, claim 17 is denied.

### C. Self-incrimination claims

**\*48**  As stated above, petitioner claims that admission of his prison file and his psychiatric evaluations during the penalty phase of his trial violated his right to be free from self-incrimination. According to respondent, petitioner did not raise any claims of self-incrimination during his trial. In his reply, petitioner suggests the failure to raise the issue at trial is not germane to the claim since the issue was raised on appeal. [57]

[57]    Failure to raise an issue at trial will, as a general rule, prevent a claim, including constitutional claims, from being raised on appeal. Winward v. State, 293 P.3d 259, 262 (Utah 2012) (citing State v. Holgate, 10 P.3d 346 (Utah 2000) ). Certainly failure to raise the issue on appeal would have impacted the way in which the Utah Supreme Court reviewed the issue.

The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend V. In Miranda v. Arizona, 384 U.S. 436 (1966), the Court held:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their

> right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed.

Id. at 445 (footnote omitted).

> The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.

Lefkowitz v. Turley, 414 U.S. 70, 77 (1973). The Fifth Amendment prohibits only "compelled testimony that is incriminating." Hibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty., 542 U.S. 177, 189 (2004).

There is no question that the Fifth Amendment right against self-incrimination is applicable to the penalty phase of a capital murder trial. Estelle v. Smith, 451 U.S. 454 (1981). In Rhode Island v. Innis, 446 U.S. 291 (1980), however, the Supreme Court made it clear that

> ... the special procedural safeguards outlined in Miranda are required not where the suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. 'Interrogation' as

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 167

conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.

Id. at 300 (footnote omitted). The Court continued:

... the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. But, since the police surely cannot be held accountable for the unforeseeable results of their own words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

**\*49**  Id. at 301-02 (italics in original, footnotes omitted). Since it appears petitioner was in custody when each of the complained statements were made, the question becomes whether the statements complained of were compelled and/or were incriminating.

### 1. Admission of prison file

In claim 18, petitioner argues that his

prison file is replete with reports that were made while [he] was in custody, including reports of interviews and evaluations during which [he] was not advised of his right to remain silent or that the information would be used against him in deciding whether he should receive the death penalty.

Dkt. # 109, at 178. Petitioner then identifies approximately 70 pages out of a 360- page exhibit that he is now claiming violated his right against self-incrimination under the Fifth Amendment and to due process of law under the Fourteenth Amendment. These items include a twelve-page presentence report dated September 10, 1976;[58] an eight-page Social Investigation and Study for Hearing on the State's Motion to Certify dated February 26, 1976, which was submitted in accordance with a February 4, 1976 court order;[59] eight pages from petitioner's stays at the Utah state hospital as a juvenile;[60] a four-page initial evaluation by a psychiatric social worker with the Murray-Jordan-Tooele Mental Hygiene Center in Murray, Utah dictated on February 26, 1976, which was completed to assist the court in deciding the state's motion for certification in criminal proceedings;[61] a one-page psychological evaluation dated September 16, 1976;[62] a one page psychological assessment dated July 20, 1979;[63] a one-page psychological assessment dated September 4, 1980;[64] three pages of chronological notes from June 12, 1986 to July 31, 1986;[65] twenty-six (26) pages of chronological notes that are in reverse order from October 17, 1984 to September 15, 1976;[66] and one-page entitled chronological note dated February 7, 1979.[67] It should be noted that several of the pages complained of contain portions that are not legible either due to poor copy quality or due to the way the page numbers were affixed to the individual pages of the exhibit.

58    Sentencing Exhibit 8, at 83 (82-93). The page numbers contained on the actual exhibit are different from the page numbers of the exhibit on Disk # 1. For ease of reference, when referring to this exhibit, this Court will refer to the page numbers on the hard copy of the exhibit followed in

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 168

paranthesis with the page numbers of the exhibit as found on Disk # 1 under Trial/Exhibits/1988.03.15 Sentencing.

59    Id. at 88 (99-106).

60    Id. at 104 (122-29 - petitioner did not object to 129). The first page is a Utah state hospital separation summary that indicates petitioner was involved in a serious AWOL plot on December 7, 1975, after which he discharged from the hospital back to court. The next two pages are a Psychiatric Evaluation dated December 17, 1975. The fourth, fifth, and sixth pages are an interval note dated March 7, 1973 and the seventh page is an assessment conducted on March 16, 1973 by a psychologist. The final page is a letter dated October 1, 1976, from the Nevada Youth Training Center to a clinical psychologist indicating the center had forwarded all information relating to petitioner to the Utah state hospital and to the Parole and Probation Department of the sentencing court.

61    Id. at 108 (130-33).

62    Id. at 108 (136).

63    Id. at 109 (137).

64    Id. at 110 (138).

65    Id. at 160-62 (187-89). Chronological notes are nothing more than periodic notes about the inmate and his behavior in prison including, among other things, disciplinary incidents, inmate attitudes, housing and classification issues, and/or work habits.

66    Id. at 168-93 (195-220). During this approximately eight year span of incarceration, these notes show that petitioner was written up for violations of prison rules approximately eleven times. Some of these violations were deemed minor violations, for things such as tampering with a locking device on October 13, 1976, id. at 193 (220), as well as major violations, such as being involved in gambling activities and being in possession of betting slips on September 18, 1979, id. at 185 (212). At the same time, these notes reflect that petitioner had generally good work habits and at times indicated

that he should be commended for the work he had done.

67    Id. at 246 (273).

**\*50**    Additionally, petitioner claims the prison file also contains numerous statements made by him to prison authorities during various disciplinary proceedings. Petitioner does not, however, identify any specific statements made by him that he claims violated his Fifth Amendment rights. Rather, every citation petitioner provides in support of this claim is nothing more than the individual Miranda warnings that were given to petitioner prior to him offering any statements at these disciplinary hearings. [68] Accordingly, this Court will not search the record to identify statements, if any, that petitioner made during his disciplinary hearings.

68    Id. at 221 (248); 230 (257); 231 (258); 238 (265); 245 (272); 251 (278).


a. Presentence reports

In the case of the presentence reports from one of petitioner's prior convictions, this Court finds that the interview would have been voluntary. Petitioner was not under a court order to submit to the interview with the probation officer, and he could have refused altogether to be interviewed. See United States v. Rogers, 921 F.2d 975 (10th Cir. 1990). Moreover, routine postconviction presentence interviews by a probation officer do not constitute the type of inherently coercive situation and interrogation by the government for which the Miranda rule was designed. Id. at 979. The purpose of a presentence report is neither prosecutorial nor punitive. Rather, it is essentially neutral in those respects. A presentence interview simply cannot be compared to a custodial arrest that "thrusts an individual into 'an unfamiliar atmosphere' or 'an interrogation environment ... created for no purpose other than to subjugate the individual to the will of his examiner.' " Minnesota v. Murphy, 465 U. S. 420, 433 (1984) (quoting Miranda, 384 U.S. at 457). As a result, this Court finds that admission of these reports did not violate petitioner's right against self-incrimination.


b. Psychiatric evaluations

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042     Document: 98-2     Date Filed: 12/22/2020     Page: 169

Unlike the in-custody, court-ordered psychiatric examination to determine competency to stand trial for murder that was the focus in Estelle v. Smith, 451 U.S. 454 (1981), the psychiatric evaluations that petitioner challenges in this proceeding were not compiled as a result of petitioner's custody on the charges arising out of this case. Rather, they were historical documents relating to earlier incarcerations of petitioner in 1973, 1975, 1976, 1979, and 1980. To the extent that the evaluations were conducted years before the murder in this case was committed, this Court finds that petitioner has failed to establish any constitutional error in the admission of these evaluations. Therefore, this Court finds that petitioner has failed to establish that the Utah Supreme Court's decision was an unreasonable application of clearly established federal law. Further, to the extent the defendant's expert witnesses reviewed and referenced previous Utah state hospital evaluations, [69] this Court finds that admission of these evaluations did not violate petitioner's right against self-incrimination.

[69]     See J.T. Tr. dated March 16, 1988, at 2981, 3022 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1161) (Add. 17) at 275, and 316); see also Defendant's Sentencing Exhibits ## 32, 33, 34.

Moreover, the historical information contained in the prison file, including both the previous presentence reports as well as past psychiatric evaluations, is the exact type of evidence that a probation officer would have relied on had a presentence report been prepared in this case. [70] As a result, this Court finds petitioner has failed to establish that the Utah Supreme Court's determination regarding admission of the prison file was based upon an unreasonable application of clearly established federal law. Accordingly, claim 18 is denied.

[70]     J.T. Tr. of March 17, 1988, at 3146-47, 3163 ( (ROA 1162) (Add. 18) at 75-76, and 92).

### 2. Admission of additional psychiatric evaluations

**\*51** In claim 19, petitioner argues that admission of three additional psychiatric evaluations (State's Exhibit 1D) at the penalty phase of his trial violated his rights to be free from self-incrimination under the Fifth Amendment, to confrontation under the Sixth Amendment, [71] to a fair and reliable capital sentencing under the Sixth Amendment, to a fair and reliable capital sentencing proceeding under the

Eighth Amendment, and to due process of law under the Fourteenth Amendment. The petitioner's own expert relied on the three psychiatric evaluations contained in state's exhibit 1D in reaching his conclusions about petitioner's mental health. As a result, the sentencing court was entitled to review and consider reports relied upon by the petitioner's expert, whether or not they contained incriminating statements. Accordingly, this Court finds no merit to the portion of claim 19 that alleges a violation of petitioner's rights against self-incrimination, or his right to a fair and reliable capital sentencing proceeding and/or to due process of law. Therefore, claim 19 is denied in its entirety.

[71]     For the reasons discussed in subparagraph A. above, no confrontation violation occurred by admission of these psychiatric evaluations.

### Claim 20: Admission of Expert Testimony by State

In claim 20, petitioner argues that admission of the testimony of a licensed clinical psychologist, Patricia Smith, Ph. D., regarding his risk of future dangerousness, violated his rights to due process under the Fourteenth Amendment and to a reliable capital sentencing proceeding under the Eighth Amendment. Petitioner states that this claim is related to the prison file admitted as Penalty Phase Exhibit 8 and to the psychiatric and psychological evaluations admitted as Penalty Phase Exhibit 1D. According to petitioner, despite having never met him, Dr. Smith made conclusions about the defendant's future dangerousness based upon her review of the files and records of petitioner, thereby violating his constitutional rights. This issue was raised on direct appeal. The Utah Supreme Court summarily dismissed the claim finding it had no merit. Menzies II, 889 P.2d at 406.

Dr. Smith was called by the state to rebut the testimony of petitioner's experts, Michael DeCaria, Ph. D., and Douglas Wingleman, Ph. D. Dr. Smith testified she was asked to review a psychological report completed by Dr. DeCaria, the prison records of the petitioner, and a psychological report by Dr. Wingleman. J.T. Tr. of March 17, 1988, at 3144 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1162) (Add. 18) at 73). Dr. Smith also indicated that she looked at the portion of the prison file that included three psychological reports, one psychiatric evaluation, and a presentence report. Id. at 3145 (74). Dr. Smith was also provided petitioner's juvenile court record and his adult criminal record, and she read the preliminary hearing transcript from the trial court record in this case. Id. at 3148 (77). Dr. Smith testified the information

in the documentation she reviewed were the kinds of things that would normally be relied upon by experts in the field. Id. at 3149 (78). Dr. Smith pointed out her perceived deficiencies in the methods utilized by Dr. DeCaria. While Dr. Smith testified that she was not able to give a diagnosis of a patient she hadn't evaluated, id. at 3160 (89), she stated that Dr. DeCaria's report did not contain a "differential diagnosis or final diagnosis," id. at 3158-59 (87-88), and she felt his report should have included more background information on the petitioner such as a reference to all past psychological and psychiatric evaluations that had been completed of him, as well as an assessment of intelligence. Id. at 3151 (80). Moreover, Dr. Smith was extremely concerned with petitioner's response to Dr. DeCaria's question regarding what petitioner's goals in life would be; i.e., petitioner stated it would be "to get the son of a bitch who put me here in jail." Id. at 3157 (86). Finally, Dr. Smith testified that an individual with a long-term antisocial personality disorder would not be a suitable "candidate for treatment, even within an institution that was residential." Id. at 3164 (93).

 **\*52** Petitioner's argument regarding Dr. Smith's testimony, both during the trial and in this proceeding, is really that Dr. Smith could not give any opinion on the issue of his future dangerousness or susceptibility to the type of treatment suggested by Dr. DeCaria (that petitioner should receive individual therapy) and Dr. Wingleman (that petitioner could be retaught or retreated to function adequately and to overcome his learning dysfunctions) because she had not personally conducted an examination of petitioner. This argument was specifically rejected in Barefoot v. Estelle, 463 U.S. 880 (1983) (superseded by statute on other grounds, as recognized in Slack v. McDaniel, 529 U.S. 473 (2000) ). In rejecting Barefoot's argument that psychiatric testimony must be based on personal examination of the defendant and could not be given in response to hypothetical questions, the Supreme Court stated: "Expert testimony, whether in the form of an opinion based upon hypothetical questions or otherwise, is commonly admitted as evidence where it might help the factfinder do its assigned job." Id. at 903.

In his reply, petitioner attempts to distinguish his case from Barefoot by arguing that Dr. Smith's opinions "were not 'deduced from facts that are not disputed' or 'the statement of facts proved in the case.' " Dkt. # 127, at 72. The record does not support that argument. Rather, as recognized by the trial court, based upon the evidence in the case, "[i]n 1976, [petitioner] was diagnosed with antisocial

personality disorder severe type. In 1986, ten years later, he was diagnosed, again, antisocial personality disorder." J.T. Tr. of March 17, 1988, at 3163 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1162) (Add. 18) at 92). Clearly, Dr. Smith relied on these past psychological evaluations and other evidence that had been admitted at trial, including statements petitioner made to his own experts, in forming her opinions about the petitioner's susceptibility to treatment and rehabilitation. In light of the evidence at trial, this Court finds that petitioner has failed to establish that the state court's decision was based upon an unreasonable determination of the facts or was an unreasonable application of clearly established federal law. Accordingly, claim 20 is denied.

**Claims 21 and 22: Withdrawn** (see Dkt. # 109, at 186).

**Claim 24: Victim Impact Evidence**
Petitioner asserts, in claim 24, that he was deprived of his Eighth Amendment right to a reliable sentencing hearing by admission of victim impact evidence during the penalty phase of his trial. Petitioner states this claim is exhausted. Dkt. # 109, at 189. Respondent contends the specific claim raised herein has not been exhausted. Dkt. # 123, at 151. In his reply, petitioner states that his "appellate brief shows that the basis for the appeal issue was founded squarely on the application of the Eighth Amendment of the federal constitution to the issue and relies primarily on United States Supreme Court case law." Dkt. # 127, at 74. Further, petitioner claims when "trial counsel objected to the victim impact testimony during the penalty phase, the objection was explicitly that the testimony was in violation of law as dictated by Booth v. Maryland, 482 U.S. 496 (1987)." Id.

"Exhaustion requires that the claim be 'fairly presented' to the state court, which 'means that the petitioner has raised the "substance" of the federal claim in state court.' " Fairchild v. Workman, 579 F.3d 1134, 1151 (10th Cir. 2009) (quoting Bland v. Sirmons, 459 F.3d 999, 1011 (10th Cir. 2006) ). "[T]he crucial inquiry is whether the 'substance' of the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on notice of the federal constitutional claim." Prendergast v. Clements, 699 F.3d 1182, 1184 (10th Cir. 2012) (citing Picard v. Connor, 404 U.S. 270, 278 (1971) ).

[I]n order to be fairly presented, the state court claim must be the "substantial equivalent" of its federal habeas

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 171

counterpart. There is no such substantial equivalency where the claim raised in habeas proceedings is "in a significantly different and stronger posture than it was when the state courts considered it." To satisfy exhaustion, then, the habeas petition's focus—as well as the alleged error that it identifies—cannot depart significantly from what the petitioner had presented to the state court.

**\*53** Grant v. Royal, 886 F.3d 874, 891 (10th Cir. 2018) (internal citations omitted).

After careful review of the arguments presented to the Utah Supreme Court, this Court finds that petitioner did not submit the federal constitutional claim in his direct appeal that he now raises in this proceeding. The focus of petitioner's direct appeal briefing was, as stated in the heading of his proposition, that "the admission of the victim impact evidence violated the Utah constitution." See Brief of Appellant filed on September 14, 1992 at 184 (Dkt. # 110, Disk # 1, Related Appeals/Direct Appeal, Dkt. # 100, at 209). In fact, petitioner's direct appeal brief recognized that Booth v. Maryland, 482 U.S. 496 (1987), applied at the time of petitioner's trial and that, after the trial, the Supreme Court issued its decision in South Carolina v. Gathers, 490 U.S. 805 (1989). The brief advised the Utah Supreme Court that Payne v. Tennessee, 501 U.S. 808 (1991), had reversed both Booth and Gathers, but requested that the Utah Supreme Court find that the victim impact evidence introduced in his case offended Article I, § 9 of the Utah constitution. Brief of Appellant, at 186 (211). Finally, the petitioner concluded his argument to the Utah Supreme Court by stating:

> Despite the holding in Payne, Utah Code Ann. § 76-3-207 and Article I, § 9 of the Utah constitution preclude the use of the victim impact evidence in this case. This Court should adhere to the rationale and holding in Booth, which was in place at the time of this trial, and find that reversible error occurred.

Id. at 188 (213).

Clearly, petitioner did not argue to the Utah Supreme Court that he was deprived of his Eighth Amendment right to a reliable sentencing by admission of the victim impact evidence during the penalty phase of his trial, as he now requests this Court to do. [72] Petitioner's argument that the rationale of Booth should be applied in Utah is not the "substantial equivalent" of his current claim based upon the Eighth Amendment. As a result, this Court finds petitioner did not fairly present this claim to the Utah Supreme Court and, therefore, has failed to exhaust this claim.

[72]     In his reply, petitioner claims "the state supreme court erred in its determination that an objection was not preserved at trial." Dkt. # 127, at 74. Petitioner then states "[t]his failure to accurately read the record entirely taints the Utah Supreme Court decision." Id. at 75. The problem with this argument is that it still has nothing to do with petitioner's current federal constitutional claim.

This claim is, however, subject to an anticipatory procedural bar. "A petitioner is 'procedurally barred' from relief under the [Utah Post-Conviction Remedies Act] if an issue 'could have been raised at trial or on appeal' unless the petitioner can demonstrate that 'the failure to raise that ground was due to ineffective assistance of counsel.' " Benvenuto v. State, 165 P.3d 1195, 1200 (Utah 2007) (internal citations omitted). Furthermore, the statute of limitations precludes postconviction relief unless the petitioner files his petition "within one year after the cause of action has accrued." See Utah Code Ann. § 78B-9-107(1) (West 2012). Petitioner does not make any argument relating to the adequacy of Utah's procedural default rule. Because petitioner does not challenge the adequacy of Utah's procedural rules, this Court concludes that Utah's procedural bar is adequate to preclude this Court from considering petitioner's Eighth Amendment claim regarding the victim impact evidence introduced at his trial. [73] Claim 24 is denied.

[73]     Even if this claim had been properly raised, based on Payne, petitioner would not be entitled to relief.

**Claims 25 (incorporating Claim 27) and 28: Prosecutorial Misconduct**

Petitioner alleges, in claim 25, that the prosecutor committed misconduct by improperly referring to items not in evidence and arguing improper factors in aggravation, thereby depriving petitioner of his right to due process and a fair

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 172

and reliable sentencing hearing in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Petitioner asserts this claim is exhausted, having been raised on direct appeal. Dkt. # 109, at 192. Respondent admits the petitioner "did raise some of the claims of prosecutorial misconduct in his direct appeal," but states he did not raise all of the claims of prosecutorial misconduct that he now asserts. Dkt. # 123, at 154. Respondent advises, however, that "the State has decided not to raise an exhaustion issue because although certain parts of this claim were not specifically raised as claims of prosecutorial misconduct, [petitioner] did assert that the Judge erred by relying on the prosecutor's arguments." Id. at 154-55 (citations omitted).

**\*54** While a state prisoner's federal habeas petition should be dismissed if he has not exhausted available state remedies as to any of his federal claims, [74] the state can waive the exhaustion requirement through an express statement by counsel. 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."); see also Gonzales v. McKune, 279 F.3d 922, 926 & n.8 (10th Cir. 2002) (en banc) (applying § 2254(b)(3) and holding state expressly waived certain issues). Based upon respondent's express waiver of exhaustion as to this claim, the Court will treat this claim as though it has been exhausted.

74     Coleman, 501 U.S. at 731.

### A. Standard for reviewing claims of prosecutorial misconduct

Inflammatory statements, under federal law, pass muster unless the comments were so severe as to have rendered the entire trial fundamentally unfair.

> The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." Id., at 642, 94 S.Ct. at 1871.

Darden v. Wainwright, 477 U.S. 168, 181 (1968). Remarks that would cause reversal of a direct appeal of a federal criminal conviction are not necessarily grounds for reversal when spoken in a state court. Breechen v. Reynolds, 41 F.3d 1343, 1355 (10th Cir. 1994). The inquiry into the fundamental fairness of a trial can be made only after examining the entire proceedings. Donnelly, 416 U.S. at 643; Boyd v. Ward, 179 F.3d 904, 919 (10th Cir. 1999).

Relying on Donnelly, petitioner argues that improper closing argument, during the penalty phase of trial, "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. Petitioner then sets out three general areas that he believes involved prosecutorial misconduct.

### B. Improper argument regarding statutory aggravating factor

First, petitioner claims the prosecutor improperly argued for application of a statutory aggravator that had not been presented to or found by the jury, [75] stating that "the State asked the trial court to admit two photographs of the victim's wounds, [76] 'for the purpose of showing the heinousness of the homicide.' " Dkt. # 109, at 193. When arguing for admission of the photographs, however, the prosecutor stated the "court is entitled to see just how brutal those stab wounds to her throat were, ... the brutal nature of the murder itself." J.T. Tr. of March 15, 1988, at 2834-36 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1161) (Add. 17) at 128-30). On direct appeal, petitioner argued, as he does in claim 26 of his second amended petition, that "the judge improperly considered heinousness as an aggravating circumstance and, therefore, he is entitled to a new penalty phase." Menzies II, 889 P.2d at 404. In considering this issue, the Utah Supreme Court held:

> In its closing argument, the State listed the aggravating factors it wanted the court to consider and stated that one such factor was "the brutal and heinous nature of the murder." The prosecutor, however, did not refer the court to the "heinous" provision in section 76-5-202(1)(q) of the Code. When the trial court enumerated the aggravating and mitigating factors at the time of sentencing, it noted subpart (q). While we think that it would have been error for the court to consider subpart (q) satisfied by the facts

**Menzies v. Crowther, Not Reported in Fed. Supp. (2019)**

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 173

of this case and to use that finding as an aggravating factor, we are not convinced that such an error occurred. The trial judge was certainly aware of our previous decisions limiting capital murder deemed ruthless and brutal to those "involving an aggravated battery or torture." State v. Wood, 648 P.2d 71, 86 (Utah 1981). While we are uncomfortable with the trial judge's referenced to subpart (q), we have no solid reason to believe that the judge thought this was an appropriate situation for reliance on the heinousness factor listed in 76-5-202(1)(q).

**\*55** Furthermore, we note that the judge could have properly considered the nature and circumstances of the crime, including its brutality and what the prosecutor apparently referred to colloquially as heinousness, as an aggravating factor under ⬜ section 76-3-207(2). In this guise, the various facts of the crime that [petitioner] says do not rise to the level of constitutional and statutory heinousness could still have been considered. Therefore, even if we were to assume that the court erred in considering heinousness, we think that the error was harmless because we "can still confidently conclude beyond a reasonable doubt that the remaining aggravating circumstances and factors outweigh the mitigating factors and that the imposition of the death penalty was justified and appropriate." State v. Archuleta, 850 P.2d 1232, 1248 (Utah), cert. denied, 510 U.S. 979, 114 S.Ct. 476, 126 L.Ed.2d 427 (1993).

🔺 Menzies II, 889 P.2d at 405.

75    As mentioned elsewhere in this Opinion and Order, the jury was not presented with this evidence because the penalty phase was tried to the judge.

76    These are the two photographs that were discussed in claim 23, above.

Because the prosecutor was free to argue that the nature and circumstances of the crime justified the death penalty, see ⬜ Utah Code Ann. § 76-3-207(2) (West 1988), this Court finds the prosecutor's comments were not improper. Moreover, the judge, as sentencer, was free to consider any matter which was "relevant to the sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty." Id.; see also Williams, 923 F.2d 982 (10th Cir. 1972); ⬜ State v. Young, 853 P.2d 327 (Utah 1993)

("[statutorily defined aggravating] factors not presented in guilt phase may be presented during the penalty phase"); ⬜ State v. Maestas, 299 P.3d 892, 967-68 (Utah 2012). Regardless, in light of the Utah Supreme Court's willingness to assume an error had occurred, the petitioner has failed to establish that the Utah Supreme Court's reweighing of the aggravating and mitigating factors resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law.

C. Arguments not supported by evidence

Next, petitioner argues that parts of the prosecutor's closing contained arguments unsupported by facts. Specifically, petitioner challenges the prosecutor's argument that

> the only thing that [petitioner] learned in prison from 1976 until 1984 is that the next time he was going to commit a robbery, he was going to eliminate his victim. And that's exactly what he did when he killed Maureen [sic] Hunsaker. [77]

Dkt. # 109, at 193. Thereafter, the prosecutor stated that "the reason for her murder [was] in order to keep her from testifying or identifying [petitioner]." [78] Id. Based upon the evidence, however, this Court finds these statements were either directly supported by, [79] and/or were reasonable inferences to be drawn from, the evidence.

77    J.T. Tr. of March 18, 1988, at 3202 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1162) (Add. 18) at 132).

78    Id. at 3209 (139).

79    See J.T. Tr. of March 2, 1988, at 2085 ( (ROA 1158) (Add. 14) at 187), where Britton (the jailhouse informant) was asked: "At any time in either of the two conversations that you had with [the defendant], did you give - - did he give you a specific reason as to why he had killed the woman?" and he answered: "To keep her from testifying against him and identifying him."

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 174

Petitioner also complains that the prosecutor improperly relied on unsupported speculation to create fear that petitioner might escape or be paroled if he received a life sentence. According to petitioner, there was no evidence to support the prosecutor's assertions and the comments were "baseless speculation to instill fear in the court." Dkt. # 109, at 195. [80] Again, however, the prosecutor's comments were supported by the testimony of defense witness Paul Sheffield, administrator for the Utah State Board of Pardons ("the Board"), who testified about Utah's parole system. Defense called Sheffield to advise the court of the kind of circumstances the Board considers in determining the life sentence of a defendant. J.T. Tr. of March 17, 1988, at 3111 (Dkt. # 110, disk # 1, Trial/Transcripts (ROA 1162) (Add. 18) at 40). Sheffield testified that twenty-four capital homicide inmates had appeared before the Board: of those, six were given natural life sentences and eight received parole dates, id. at 3117, 3123 (46, and 52); the average term served by those receiving parole dates was 20 years, id.; and the shortest term given by the Board was thirteen years, id.

[80]    Petitioner also complains that the evidence regarding his escape risk was "unreliable hearsay." As addressed above, the hearsay rule does not apply at sentencing.

**\*56** Further, Sheffield testified: that it was possible that the defendant could be released from prison in thirteen years if he got a life term, id. at 3124 (53); that he was aware the defendant had been sent to prison on an aggravated robbery, had escaped, and then was convicted of another aggravated robbery and was sent back to the Utah State Prison, id.; and that despite receiving a sentence of one to fifteen years for the escape charge and five years to life on the aggravated robbery charge, he was recommended for parole after serving less than six years on those convictions, id. at 3125 (54).

Based on this testimony, the prosecutor made the following argument:

I suppose this court could say, 'I'm going to impose a life term for you, [petitioner], and I would recommend to the Board of Pardons that you spend the rest of your life in prison, and you never, never be released.'

But, your Honor, you heard Mr. Sheffield testify there are no guarantees that that will happen. This court will always wonder what happens if he escapes from the Utah State Prison as he did in 1978 or as he tried to at the State Hospital in 1986. What if the Board of Pardons decides to

parole him, and they ignore the court's and the prosecution's recommendation.

According to Mr. Sheffield, the average term is 20 years. That means that [petitioner] could be back on the street when he is 49 years old. Keep in mind, your Honor, that Judge Baldwin imposed five to life in 1978, and the [petitioner] was out in less than six years.

Id. at 3110-11 (39-40). Since this argument was directly supported by the evidence at trial, this Court finds no prosecutorial misconduct.

Additionally, in claim 28, petitioner argues that his right to be free from cruel and unusual punishment under the Eighth Amendment was violated by the state court's reliance on speculation, that petitioner might escape or be paroled, as a basis for imposing death. Again, this claim was raised on direct appeal, but was denied as lacking merit. Menzies II, 889 P.2d at 406. In Simmons v. South Carolina, 512 U.S. 154 (1994), the Supreme Court made it clear that "[i]n assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant." Id. at 163. While complaining that the trial court speculated about parole and escape, petitioner's own witness testified there was no guarantee he would not be paroled or escape. Further, as discussed above, the evidence established that petitioner had previously escaped from prison. Accordingly, this Court finds it was not error for the trial court to consider these matters in imposing his sentence.

D. References to petitioner as a "psychopath"

Finally, petitioner claims that the prosecutor's reference to him as a "psychopath," after reading from a book about psychopaths that was not in evidence, and by comparing him to the Yorkshire Ripper, Charles Manson, and the Son of Sam were unprofessional and should not have been tolerated by the court. Trial counsel did not object to any of the statements that petitioner now claims were improper.

Evidence at trial established that a prior judge had characterized petitioner as "psychopathic" based upon a psychological evaluation the prior judge had ordered. [81] To the extent the penalty phase was tried to the court, as opposed to a jury, this Court finds petitioner has failed to establish that any of the comments, individually or cumulatively, rendered his sentencing hearing fundamentally unfair.

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 175

81      See State's Sentencing Exhibit 1A, Order of Certification for Criminal Proceedings, at 2, ¶ 3. (Dkt. # 110, Disk # 1, Trial/Exhibits/1988.03.15 Sentencing, Exh. 1A ST, Order of Certification for Criminal Proceedings, at 2, ¶ 3).

**\*57** Moreover, petitioner has not established that actual prejudice resulted from any of the prosecutor's remarks about which he complains. To do so, petitioner would have to show more than that the remarks "created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982). In this case, the trial court meticulously reviewed petitioner's criminal history and the attempts to rehabilitate him, including citing to a report dated February 26, 1976 in which Lewis L. Boone, Murray Jordan Mental Hygiene Center, indicated petitioner was "psychopathic." See J.T. Tr. of March 18, 1988, at 3248-70 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1162) (Add. 18) at 178-200). The evidence in this case negates any alleged prejudice caused by any of the prosecutor's comments. Furthermore, trial counsel's failure to object to the comments at trial, while not dispositive, is relevant in this Court's assessment of fundamental fairness. See Trice v. Ward, 196 F.3d 1151, 1167 (10th Cir. 1999). Based upon a review of the entire proceedings, this Court finds that petitioner has failed to establish that the state court decision, finding his claims of prosecutorial comments to be without merit, was an unreasonable application of clearly established federal law. Accordingly, claims 25 (incorporating claim 27) and 28 are denied.

## Claims 26 (incorporating Claim 30) and 29: Reliance on Uncharged Aggravating Circumstances

Petitioner argues in claim 26 that his rights to due process under the Fourteenth Amendment and to a reliable and fair capital sentencing proceeding under the Eighth Amendment were denied because the state court relied on uncharged aggravating circumstances. According to petitioner, the state argued for the application of the "heinousness" aggravator and the "preventing a witness from testifying" aggravator, and the trial court found those two aggravators and sua sponte applied the "pecuniary gain" aggravator as well. Since none of these aggravators was charged or found as a fact by the jury, petitioner claims a violation of his constitutional rights. According to petitioner, he did not have "effective notice that the prosecution would argue for application of uncharged statutory aggravators during sentencing," nor was he aware that the trial court would consider these aggravators in imposing a sentence. Dkt. # 109, at 200. Additionally, in claim 29, petitioner argues the "heinousness" aggravator is unconstitutionally broad. [82] Finally, in claim 29, petitioner argues that the trial court's application of the "pecuniary gain" aggravator "double-counted" the robbery, thereby failing to narrow the class of defendants eligible for the death penalty as required by Zant v. Stephens, 462 U.S. 862, 877 (1983). Petitioner raised these arguments in his direct appeal. The Utah Supreme Court denied each of these claims as being without merit. Menzies II, 889 P.2d at 406.

82      This Court previously addressed petitioner's arguments considering the "heinousness" aggravator in Claim 25 above, and does not believe that any further comment on this aggravator is required.

In Andrews v. Shulsen, 802 F.2d 1256 (10th Cir. 1986), the Tenth Circuit stated that "statutory notice of aggravating circumstances satisfies constitutional requirements under the Due Process Clause." Id. at 1263 n.4 (citing Spinkelink v. Wainwright, 578 F.2d 582, 609-10 (5th Cir. 1978) ). Further, in Andrews, the Tenth Circuit found that the Utah death penalty statute met the narrowing requirements of Zant. Id. at 1261. While the language in the statute under which petitioner was convicted was expanded to list seventeen aggravating factors, [83] instead of the eight considered in Andrews, this Court sees no difference in the way these two statutes operate. The statute restricts capital homicides to intentional or knowing murders committed under one of seventeen enumerated circumstances. Since these circumstances are elements of the crime of first degree murder, one or more must be proven beyond a reasonable doubt in the guilt phase of a capital case.

83      See Utah Code Ann. § 76-5-202 (West 1985).

Under Utah law, murder in the first degree was, at the time of petitioner's conviction, punishable by death or life imprisonment. See Utah Code Ann. § 76-2-206(1) (West 1977). Following conviction, a separate hearing was required to determine the defendant's sentence. Id. § 76-3-207 (West 1982). During the sentencing hearing, the parties were allowed to present evidence "as to any matter the court

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 176

[deemed] relevant" to the sentence. Id. § 76-3-207(2). These matters can include, but are not limited to, "the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty." Id. Additionally, the statute enumerated six mitigating circumstances but authorized consideration of any other mitigating factors. Id. In State v. Wood, 648 P.2d 71 (Utah 1982), the Utah Supreme Court held that a

> **\*58** sentencing body must compare the totality of the mitigating against the totality of the aggravating factors, not in terms of the relative numbers of the aggravating and the mitigating factors, but in terms of their respective substantiality and persuasiveness. Basically, what the sentencing authority must decide is how compelling or persuasive the totality of the mitigating factors are when compared against the totality of the aggravating factors. The sentencing body, in making the judgment that aggravating factors "outweigh," or are more compelling than, the mitigating factors, must have no reasonable doubt as to that conclusion, and as to the conclusion that the death penalty is justified and appropriate after considering all the circumstances. This means that upon consideration of all of the circumstances relating to this defendant and this crime the sentencing authority must be convinced beyond a reasonable doubt that the death penalty should be imposed.

Id. at 84.

There is no question that the statute, under which petitioner was convicted, narrowed the class of persons convicted of murder who are eligible for the death penalty as required by Zant. As in Andrews, the Utah statutes, which were in effect at the time of petitioner's trial, limited the class of defendants subject to execution by requiring that a jury find at least one statutory aggravating factor beyond a reasonable doubt in the guilt phase of a first degree murder trial. Moreover, at the sentencing phase, the Utah statutes required the sentencer to be convinced beyond a reasonable doubt that the death penalty was appropriate in this particular case. The U.S. Constitution requires no more of a death penalty scheme than a narrowing of the class of death-eligible murderers and consideration of mitigating circumstances with the exercise of discretion during the sentencing phase. Lowenfield v. Phelps, 484 U.S. 231, 246 (1988). As a result, this Court finds petitioner has failed to establish that the Utah Supreme Court decision was an unreasonable application of clearly established federal law. Accordingly, claims 26 (incorporating claim 30) and 29 are denied.

### Claim 31: Ineffective Assistance of Counsel during the Penalty Phase

In claim 31, petitioner argues that he was denied effective assistance of counsel during the penalty phase of his capital trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. Petitioner indicates this claim was raised "in part in his state post-conviction petition." Dkt. # 109, at 214. Then, petitioner states, "To the extent any aspect of this claim was not exhausted, that failure is attributable to the ineffective assistance of [his] post-conviction counsel." Id. This Court will address only the ineffective assistance of counsel claims that were exhausted in state court. See Davila, 137 S.Ct. 2058 (2017).

Specifically, petitioner argues that the state court made numerous errors in applying clearly established federal law to the evidence. According to petitioner, the Utah Supreme Court's conclusion that counsel's investigation was adequate was based on an objectively unreasonable interpretation of clearly established federal law. Additionally, petitioner claims the state court also unreasonably applied Strickland in its deficient performance analysis when it concluded "that defense counsel may have strategically decided not to present some mitigating evidence, including evidence of organic brain damage, because the information could have hurt [petitioner's] case." Dkt. # 109, at 221. Further, petitioner asserts that the state court's findings were unreasonable because the court failed to assess the sufficiency of the mitigation evidence, as a whole, weighed against the aggravating factors. Respondent counters these claims by

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 177

stating petitioner "has failed to establish that the State court decision unreasonably applied Strickland." Dkt. # 123, at 175.

### 1. Procedural bar

While the respondent concedes the overall claim of denial of effective assistance of counsel during the penalty phase of trial was exhausted, respondent states in a footnote that "[s]ome facts and arguments were not specifically raised in state court." Id. at n.27. As a result, respondent states those specific claims are procedurally defaulted. Id.

**\*59** According to the Utah Supreme Court, petitioner raised numerous failure to investigate claims on appeal. A number of those claims, however, were raised for the first time on appeal from the denial of petitioner's postconviction petition and were, therefore, disregarded as procedurally barred. Menzies IV, 344 P.3d at 626 n.173. The arguments that were preserved include claims that "counsel failed to investigate: (1) details of sexual molestation; (2) school records evincing psychological troubles; (3) early mental illness; (4) fetal alcohol syndrome (FAS); (5) neglect and abuse by his stepfather, his father, and mother; (6) the amounts and kinds of drugs and alcohol he ingested prior to the murder; and (7) the effect of his parent's divorce." Id. at 626. "Although state court prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." Pinholster, 563 U.S. at 186. Accordingly, in considering this claim, this Court will consider only these seven enumerated failures to investigate that were presented to the state court. Failure to raise other allegations of failure to investigate are deemed procedurally barred.

### 2. Legal principles applicable

Just as in the guilt phase of trial, counsel's performance at the sentencing stage of a capital trial is governed by the principles enunciated in Strickland. Thus, in order to prevail on this claim, a defendant must establish both deficient performance and prejudice. Strickland, 466 U.S. at 687. In a capital sentencing proceeding, counsel's role is "to ensure that the adversarial testing process works to produce a just result under the standards governing the decision." Id. at 686. Moreover, the Strickland Court acknowledged that "[t]here are countless ways to provide effective assistance in any given case" and that "[e]ven the best criminal defense attorneys

would not defend a particular client in the same way." Id. at 689.

Further, in deciding what was reasonable, a federal court must base its decision on the "prevailing professional norms" at the time of the trial. Bobby v. Van Hook, 558 U.S. 4, 7 (2009) (holding that it is inappropriate to rely on American Bar Association Guidelines for the Appointment and Performance for Defense Counsel in Death Penalty Cases, which was announced eighteen years after the petitioner's trial). The Supreme Court has emphasized that

> review under § 2254(d)(1) focuses on what a state court knew and did. State-court decisions are measured against this Court's precedents as of "the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). To determine whether a particular decision is "contrary to" then-established law, a federal court must consider whether the decision "applies a rule that contradicts [such] law" and how the decision "confronts [the] set of facts" that were before the state court. Williams v. Taylor, 529 U.S. 362, 405, 406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (Terry Williams). If the state-court decision "identifies the correct governing legal principle" in existence at the time, a federal court must assess whether the decision "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S.Ct. 1495. It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.

Pinholster, 563 U.S. at 182-83 (footnote omitted). This Court may not issue the writ where the state court decision applied clearly established federal law erroneously or incorrectly; rather, the application must also be unreasonable. Thomas v. Gibson, 218 F.3d 1213, 1220 (10th Cir. 2000) (citing Williams, 529 U.S. at 411).

Petitioner has not provided any evidence to establish what the prevailing professional norms were in Salt Lake City in 1988 other than to cite to Standard 4-4.1 of the ABA Standards for the Defense Function (1979), which is entitled "Duty to Investigate." That standard provided:

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 178

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

*60  Id. [84]  In articulating the standard, the commentary provided, in pertinent part:

> The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotions or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to fulfillment of these functions.

Id. (commentary).

[84]  While the ABA standards concerning death penalty cases have changed considerably since petitioner's

trial, these are the standards which were in effect at the time of petitioner's trial.

At the time of petitioner's trial, the term "mitigation specialist" was not routinely mentioned in the case law [85] and counsel would not, in 1988, have had access to the same research capabilities that exist today to locate cases mentioning the term. [86]  In 1985, however, the National Legal Aid and Defender Association Standards (NLADA) utilized the term in its "Counsel Standards." At that time, Standard 11.4.1, titled "Investigation," provided that

> Counsel should attempt to conduct interviews of potential witnesses in the presence of a third person who will be available, if necessary, to testify as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist to conduct the interviews.

NLADA Standard 11.4.1(d)(3)(C). No authority, however, required counsel to hire a "mitigation specialist" to gather mitigating evidence in order to be effective. Rather, as the Supreme Court has stated:

> counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 691.

[85]  See also Ruling and Order dated March 23, 2012, in which the state court postconviction judge found that "mitigation studies were not the norm in 1988 ..." and mitigation specialists were not required in 1988 when this trial occurred. PC ROA

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042     Document: 98-2     Date Filed: 12/22/2020     Page: 179

at 0015454 (Dkt. # 110, Disk # 3, Vol. 40 at 436). Additionally, the case law discussing mitigation studies post-dates petitioner's trial. PC ROA at 0015453 (id. at 435).

86

No Supreme Court cases utilized the term between January 1, 1970 and January 1, 1989. However, the Ohio Public Defender's Office apparently employed a mitigation specialist as early as 1986.

See State v. Landrum, No. 1330, 1989 WL 4244 (Ohio Ct. App. January 12, 1989) (unpublished).

3. Merits of claim

On appeal from his state postconviction proceeding, petitioner raised three categories of claims regarding trial counsel's penalty-phase representation: "(1) inadequate qualifications and preparation, (2) failure to investigate, and (3) failure to present adequate mitigating evidence."

Menzies IV, 344 P.3d at 622. Before considering the merits of these claims, the Utah Supreme Court made the following additional findings of fact that are relevant to trial counsel's penalty-phase representation:

  *61  During the penalty phase, the State highlighted [petitioner's] extensive criminal background. His prior crimes included three robberies. The first occurred on December 21, 1975. On that occasion, [petitioner] stole a truck from a dealership and picked up a partner. The two intended to rob someone and steal the person's marijuana. Instead, [petitioner] and his partner robbed a 7-11 convenience store. [Petitioner] threatened the store clerk with a gun, ordered him to a back room, and ran away with money from the cash register. The second robbery occurred five days later. After [petitioner] and his partner stole another truck from a different dealership, the two proceeded to rob the same 7-11 store and the same store clerk. But this time, [petitioner] insisted the clerk leave the store with him and his partner. Once out of town, the robbers dropped the clerk off, told him to get into a nearby ditch, and said that if he stuck his head out they would blow it off. The third robbery happened after [petitioner] escaped from jail in 1978 while serving time for the first two robberies. After escaping, he robbed a cab driver. During that robbery, he pointed a shotgun at the cab driver's head. He took $76 in cab fares and $1 from the cab driver's wallet. When the cab driver attempted to reach for a gun, [petitioner] shot him in the right arm. Five surgeries and ten years later at sentencing proceedings, the cab driver still could not write with his right hand.

The State also pointed to acts by [petitioner] before trial to show that he could not be rehabilitated. For instance, while [petitioner] underwent evaluation by the Utah State Hospital, Ms. Arnold sneaked him a screw driver. The State's brief suggests [petitioner] intended to unscrew blocks securing the hospital windows. Additionally, [petitioner] kept a sharpened metal dust pan handle under his mattress. During his time in Salt Lake County Jail, [petitioner] told a jail officer that the officer did not know the problems [petitioner] could cause. [Petitioner] threatened to take out a guard or another inmate. Eventually, the jail transferred him to the behavior modification unit. The State argued that [petitioner's] criminal history, combined with the circumstances of Mrs. Hunsaker's murder, showed that he posed a continuing threat of violence and could not be rehabilitated.

Ms. Wells and Ms. Palacios called several witnesses to rebut the State's case and argued that [petitioner] should not receive the death penalty. [Petitioner's] aunt and sister testified regarding his family history and circumstances. Their testimonies detailed various abuses [petitioner] endured as a child. For instance, they testified that his stepfathers abused him daily, raped his mother, belittled him for failing to kill a rabbit, burned the family car to prevent his mother from leaving home, and beat his pregnant mother so severely that her child died shortly after birth. [Petitioner's] mother often left the family for extended periods of time. She died when he was only fourteen. After his mother's death, [petitioner's] stepfathers took everything the mother had and did not provide for [petitioner]. [Petitioner's] family characterized him as giving and compassionate. They stated that they hoped he would receive only a life sentence. [Petitioner's] sister noted she would feel a tremendous void if the court sentenced [petitioner] to death.

[Petitioner's] family also provided a certificate from Alcoholics Anonymous and poems and letters from [petitioner]. [Petitioner] explained in one letter that he committed the previous robberies because he felt rejected and that he blamed only himself for those prior crimes.

Douglas Wingleman, an educational psychologist, testified regarding [petitioner's] mental state. Dr. Wingleman said [petitioner] suffered from mental deficits that prevented him from responding appropriately to his surroundings. He noted, however, that with proper treatment [petitioner] might be able to function normally.

Michael DeCaria, a clinical psychologist, also testified. Dr. DeCaria emphasized the turbulent childhood [petitioner] was forced to endure and the detrimental effects it had on him. Dr. DeCaria noted that [petitioner's] stepfathers hit him, forced him to sleep in a very small room with his sister for three years, denied him dinner, and kept him home from school. Dr. DeCaria further noted that [petitioner's] problem with substance abuse resulted from his desire to alter his consciousness and make his world better. Dr. DeCaria stated that [petitioner] had no real caretaker growing up because of his stepfathers' abuse, his mother's early death, and his sister's obligation to help care for his sickly younger brother. Dr. DeCaria opined that people raised like [petitioner] often do not develop a normal conscience. In Dr. DeCaria's opinion, [petitioner] suffered from three distinct personality disorders. Dr. DeCaria testified, however, that [petitioner] may still have time to change. He noted that antisocial behavior tends to decline around age thirty, and [petitioner] was twenty-nine at the time. He also suggested that [petitioner] had a desire to change his behavior. Finally, he said the [petitioner] had the potential to function near a college-student level.

**\*62** Trial counsel called Laddy Pruett, a prison social worker, to testify. Mr. Pruett testified that, based on [petitioner's] criminal history and jail experience, he would be placed on twenty-three hour lockdown. He would be entitled to limited supervised recreation, no work release, and would never be left alone on prison grounds. On the other hand, Mr. Pruett stated that [petitioner] took pride as a janitor during a prior prison stint and took pride in his family. Mr. Pruett indicated, that during the time he worked with him, [petitioner] did not try to escape or fight with others. In fact, [petitioner] had no disciplinary action against him for twenty-two months before being released from prison.

Trial counsel also called Paul Sheffield, the Utah Board of Pardons Administrator, to testify regarding the likelihood of parole in a similar case. Mr. Sheffield outlined the factors the Board of Pardons would consider and concluded that [petitioner] would likely serve his entire sentence in prison.

Judge Uno balanced the mitigating and aggravating evidence. In the end, he concluded that the aggravating circumstances outweighed any mitigating evidence and sentenced [petitioner] to death.

🔺 Menzies IV, 344 P.3d at 622-23.

Thereafter, in considering petitioner's claim that counsel's investigation was inadequate, the Utah court considered each of the issues that petitioner argued counsel failed to investigate and held that the actions of counsel during the penalty phase did not constitute ineffective assistance of counsel. In so concluding, the court stated:

> Counsel began penalty-phase preparations in sufficient time, conducted a sufficient mitigation investigation, and presented a reasonable and complete mitigation defense. And even if we were to accept any of [petitioner's] arguments that penalty-phase counsel provided ineffective assistance, he fails to demonstrate how counsel's decisions or failures prejudiced his mitigation defense.

Id. at 630. As a result, the Utah Supreme Court affirmed the postconviction court's grant of summary judgment on each of petitioner's penalty-phase ineffective assistance of counsel claims. Id.

A. Unreasonable application of federal law

In challenging the state court's legal conclusions, petitioner challenges the individual comments that the Utah Supreme Court made in rendering its ultimate conclusion. Petitioner first claims the "state court's conclusion that counsel's investigation was adequate because counsel 'hired no less [sic] than three mental health professionals,' was based on an unreasonable application of clearly established federal law." Dkt. # 109, at 217 (citations omitted); see also id. at 219 ("The Utah Supreme Court's conclusion that the investigation was adequate was based on an objectively unreasonable interpretation of clearly established federal law."). While there can be no question that Strickland requires a "reasonable" investigation as opposed to an "adequate" investigation, this Court does not conclude that the terminology utilized by the state court shows that it based its decision on an unreasonable application of Strickland. Rather, in looking at the Utah Supreme Court's decision overall, it is clear that the court considered the actual investigation counsel undertook, as well as the allegations of

what counsel could have done, in deciding whether petitioner had established that counsel's penalty stage investigation was constitutionally unreasonable. Moreover, the state court did not stop with the first prong of Strickland; it continued to the second prong, finding that, even if the investigation was lacking, petitioner failed to establish prejudice. Additionally, the terminology utilized by the Utah Supreme Court appears to be in response to the argument appellant counsel raised, to-wit: "the American common law is replete with cases which found Strickland prejudice, when counsel failed to adequately present mitigation evidence prior to 1988." Dkt. # 136-1, at 100-01 (citations omitted and emphasis added).

**\*63** While the state court utilized the term "adequate"[87] throughout its opinion, the only part of the investigation that the court actually termed "adequate" related to petitioner's third, fourth, and fifth failure to investigate claims, i.e., claims that counsel failed to investigate fetal alcohol syndrome; neglect and abuse by his stepfather, his father, and mother; and the amounts and kinds of drugs and alcohol petitioner ingested prior to the murder. Menzies IV, 344 P.3d at 626. After discussing the heavy burden on a defendant to establish a violation of the Sixth Amendment for failure to investigate, the court stated that

> counsel's investigation of [petitioner's] mental health issues and his background for purposes of mitigation was sufficiently comprehensive and thus did not constitute deficient performance. [Petitioner's] counsel used three different mental health professionals to evaluate any potential psychological issues. His counsel interviewed his sister and aunt to understand his childhood and background. They investigated the prison conditions and potential for rehabilitation if [petitioner] were given life in prison.

Id. A more detailed look at the state court's treatment of these specific claims reveals the court found counsel had hired fewer than three mental health professionals to assess him as to any current **and** prior mental health problems; that, as conceded by petitioner's own brief, there was nothing

material to suggest that petitioner suffered from fetal alcohol syndrome; and the fact that some of petitioner's relatives were alcoholics or that his mother was a bar maid did not sustain a conclusion that counsel's performance was deficient for failing to investigate the possibility of fetal alcohol syndrome. Id. Finally, the court recognized that there was a host of evidence presented at trial concerning petitioner's abuse as a child, offered through mental health experts as well as through his sister and aunt. Id.

[87]    Petitioner's counsel utilizes this same term in discussing counsel's duty of investigation for purposes of the second stage of trial. See Dkt. # 109, at 229.

Petitioner does not contest any of these factual findings. Rather, petitioner contends that counsel's "inadequate" investigation meant that their experts were ill-prepared to address his history of abuse, neglect, and trauma. Petitioner admits that the sentencing judge "heard a truncated version of [his] traumatic childhood,"[88] but claims counsel should have presented more evidence of his childhood and hired an additional mental health expert to perform a neuropsychological evaluation. With the advantage of hindsight, perhaps counsel could have done more. However, this Court is not allowed to rely on the benefit of hindsight, but must assess this case based upon the information known at the time of counsel's decisions. Strickland, 466 U.S. at 680. While the Utah Supreme Court erroneously considered a 1989 ABA guideline that was not in effect at the time of petitioner's trial in considering whether counsel presented appropriate mitigating evidence,[89] petitioner's counsel did, in fact, conduct an investigation into all of the areas suggested by the earlier commentary to Standard 4-4.1 of the ABA Standards for the Defense Function (1979). Specifically, the Utah Supreme Court found, as the record reflects, that counsel provided the sentencing court with

> (1) extensive evidence of [petitioner's] social history and mental health, including physical, emotional and psychological abuse, as well as substance abuse; (2) evidence of [petitioner's] educational background in elementary and middle school; (3) evidence of [petitioner's] prior employment and prior incarcerations,

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 182

including employment in prison; and (4) [petitioner's] rehabilitative potential, that he would likely never be released, and that he would be held under very restrictive conditions. Moreover, counsel presented evidence of how this background affected his mental health and psychological condition through multiple witnesses, including two mental health professionals - Dr. DeCaria and Dr. Wingleman. Counsel also called [petitioner's] sister and aunt to provide graphic descriptions of [petitioner's] home and social life and abuse.

**\*64**  Menzies IV, 344 P.3d at 628; see also J.T. Tr. of March 16, 1988, at 2905-3070 (Dkt. # 110, Disk # 1, Trial/ Transcripts (ROA 1161) (Add. 17) at 199-364); J.T. Tr. of March 17, 1988, at 3076-188 ( (ROA 1162) (Add. 18) at 5-118); J.T. Tr. of March 18, 1988, at 3188-92 (118-122).[90]

88    Dkt. # 109, at 220.

89    See  Van Hook, 558 U.S. at 7-8.

90    The jury trial transcript for both March 17, 1988 and March 18, 1988 contain a page number 3188.

To support his allegations that defense counsel did not do a proper investigation, petitioner submitted, during his postconviction proceeding and this proceeding, an affidavit of Marissa Sandall-Barrus, a capital mitigation specialist. See Exhibit 38 herein and PC ROA at 0012247, Exhibit S to the Fifth Amended [Postconviction] Petition (Dkt. # 110, Disk # 3, Vol. 33, at 131). This specialist admits that the records of trial counsel contained education records, but states that the records were not complete. Id. ¶ 4. However, the specialist had no way to tell if a more complete record existed for 1986-88. Id. In reviewing this claim, the Utah Supreme Court said:

Even if counsel performed deficiently in failing to search for the missing records (years 1986 to 1988), [petitioner] has made no showing of prejudice based on what the included

education records demonstrated. In fact, the school records that were in the record give evidence only of a very poor track record of attendance – nothing else sustains a conclusion that the un-investigated records, if included, would have impacted the case in any way.

 Menzies IV, 344 P.3d at 626. Thus, most of the information contained in this specialist's affidavit is nothing more than speculation, i.e., what could have been testified to if they had found more records[91] and/or reflects an alternative way to present the information that counsel, in fact, possessed. For instance, the specialist admits that information concerning petitioner's biological child was contained in Dr. DeCaria's report; however, she adds "it may have been beneficial and the judge may have shown mercy if they [sic] had known that [petitioner] has a child." Id. ¶ 6. To the extent trial counsel was aware of this information, but chose not to introduce it, a tactical decision was made by counsel that is presumed correct,  Strickland, 466 U.S. at 689, unless it was "completely unreasonable, not merely wrong."  Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir. 2000). Where counsel relies upon the evidence generated by his or her investigation, this Court finds that a decision to omit certain facts is not completely unreasonable. Moreover, in this case, if this evidence had been admitted, it could have opened the door for the state to emphasize that petitioner's child was conceived while petitioner was an escapee from prison in 1978, and that petitioner had no further contact with either this woman or his daughter. See PC ROA at 0012487, Report of Psychological Assessment by Michael D. DeCaria, Ph.D., Clinical Psychologist, Exhibit Y to Fifth Amended [Postconviction] Petition (Dkt. # 110, Disk # 4, PCR Sealed Pleadings, Sealed Vol. 4, at 179). As a result, this Court finds it was not unreasonable for counsel not to introduce this evidence at trial.

91    With the exception of hearsay evidence from petitioner's former stepmother that indicates that petitioner was very protective of his younger half-sister or that petitioner was badly beaten by an older child, the specialist's affidavit adds very little to the evidence that was actually presented during the sentencing proceeding. Rather, it contains only

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 183

hearsay and/or conclusory allegations of what might have been found if further investigation had been conducted or that further investigation "**may** have provided more details." Dkt. # 109-9, at 41-45.

**\*65** Additionally, while the mitigation specialist's affidavit contains hearsay information that claims petitioner's sister "only met with [petitioner's] attorney, Brooke Wells, for a short period of time the day before she was scheduled to testify" and "she was not interviewed by his defense team prior to the penalty phase," Dkt. # 109-9, at 45, ¶ 8, the sister does not make this statement in her declaration. Rather, the sister's declaration states only that if counsel "had spent the time with me," they could have learned more about petitioner's childhood. Dkt. # 109-5, at 84, ¶ 29. Based upon the information that petitioner's sister presented at trial, however, it is clear that either counsel or an investigator had to have spent time interviewing this witness for the sister to know and have an opportunity to retrieve photos of petitioner as a child and bring them with her to trial, as well as a folder of information that petitioner sent to her while he was in prison. See J.T. Tr. of March 16, 1988, at 2905-46 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1161) (Add. 17) at 199-240).

While claiming counsel "failed to present <u>any</u> evidence that [petitioner] was sexually abused as a child," petitioner submits absolutely no evidence to substantiate that he was sexually abused as a child. Rather, the mitigation specialist claims that, during her investigation, "there was some information provided that indicated [petitioner] <u>may</u> have been molested by his step-mother." Dkt. # 109-9, at 43, ¶ 5 (emphasis added). There is no indication of who provided this information and/or when this possible incident occurred. The Utah Supreme Court recognized this, stating: "other than this brief reference, there is nothing to indicate where this 'some information' came from or that a reasonable investigation would have uncovered such evidence." Menzies IV, 344 P.3d at 626. [92] Similarly, petitioner faults counsel for failing to present evidence "that his biological father taught him to steal and asked him to kill a man." Dkt. # 109, at 220. Again, however, the mitigation specialist claims to have been told this, but she does not indicate who the source of this information was and she admits she was not able to verify the information. Dkt. # 109-9, at 43, ¶ 5. Petitioner also argues that counsel failed to present evidence that a petition was filed against his parents for failure to care for him when he was seven years old. Dkt. # 109, at 220. This evidence was, however, presented to the sentencing court as

it was contained in the presentence investigation report dated September 10, 1976. See State's Sentencing Exhibit 8 (Dkt. # 110, Disk # 1 Trial/Exhibits/1988.03.15 Sentencing at 83). Petitioner also complains because counsel did not obtain a neuropsychological evaluation.

[92]     In this proceeding, petitioner also submits a declaration of Victoria Reynolds, Ph. D., that was never submitted to the state courts. Dkt. # 109-13. Dr. Reynolds admits petitioner "denied sexual abuse when asked by mental health professionals in the past." According to Dr. Reynolds, however, "this should not be taken as indicative of the truth without further assessment." Dr. Reynolds, however, supplies no additional evidence that petitioner was ever sexually abused. While recognizing this Court's review is limited to the record before the state courts, Pinholster, 563 U.S. at 186, the Court references this declaration simply to show the conclusory nature of the allegations made in an attempt to overturn the state court's factual findings.

After detailing all of these alleged deficiencies in the mitigation investigation, petitioner argues "[t]he Utah Supreme Court also unreasonably applied <u>Strickland</u> in its deficient performance analysis when it concluded that counsel may have strategically decided not to present some mitigating evidence, including evidence of organic brain damage, because the information could have hurt [petitioner's] case." Dkt. # 109, at 221. Since counsel did not conduct any neurological testing, petitioner claims that a conclusion that failure to present the evidence was strategic is unreasonable. This Court would agree that counsel can not make a strategic decision to omit mitigating evidence without conducting an investigation into such evidence. Petitioner has not, however, presented any evidence to establish that counsel was on notice, either from their interactions with petitioner or the experts that they hired, that they should obtain such an evaluation. [93] Therefore, this Court finds that petitioner has failed to establish deficient performance.

[93]     See Menzies IV, 344 P.3d at 629, which is quoted in detail in sub-paragraph (B) below.

**\*66** Petitioner also claims the state court's findings were unreasonable because "the court failed to assess the sufficiency of the mitigation evidence, as a whole, weighed against the aggravating factors." Dkt. # 109, at 221. This

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042   Document: 98-2   Date Filed: 12/22/2020   Page: 184

Court disagrees. The state trial court considered a motion for summary judgment as to each of the issues raised by petitioner's fifth amended postconviction petition, finding petitioner had failed to establish deficient performance on some issues and had failed to establish prejudice on others. The Utah Supreme Court agreed, holding:

> ... penalty-phase counsel's actions did not constitute ineffective assistance of counsel. Counsel began penalty-phase preparations in sufficient time, conducted a sufficient mitigation investigation, and presented a reasonable and complete mitigation defense. Even if we were to accept any of [petitioner's] arguments that penalty-phase counsel provided ineffective assistance, he fails to demonstrate how counsel's decisions or failures prejudiced his mitigation defense.

Menzies IV, 344 P.3d at 630. To the extent the state court addressed both prongs of Strickland, this Court finds that petitioner has failed to establish how this decision was contrary to or involved an unreasonable application of clearly established federal law.

B. Unreasonable determination of facts

After delineating all of the areas in which petitioner claims the state court unreasonably applied federal law, petitioner repeats most of the arguments that this Court has just addressed. Therefore, this Court will address only those arguments not previously discussed. First, petitioner claims counsel was ineffective because they did not initiate a timely investigation, including waiting "until after [penalty phase of] trial to interview on[e] [of] a few mitigation witnesses." Dkt. # 109, at 223 (citation omitted). In considering this allegation, the Utah Supreme Court rejected this claim because petitioner failed to establish prejudice. Moreover, the state court found that "the evidence actually suggests that counsel *did* initiate the mitigation investigation before the guilt phase began, since Dr. DeCaria interviewed [petitioner] over fourteen months before trial." Menzies IV, 344 P.3d at 625. Petitioner has not cited to, and this Court is

not aware of, any Supreme Court decisions that require counsel to interview all witnesses and complete all discovery prior to the second stage of trial. In many instances, that may be physically impossible. Rather, counsel is required to conduct a reasonable investigation, and whether such an investigation is reasonable depends upon what counsel did or did not do. In this case, as set forth above, counsel's penalty phase investigation included information concerning the defendant's background, education, employment record, mental health issues, and family relationships. As noted by the postconviction court,

> Beyond question there were actions taken and actions omitted and many things could have been done differently.... That is, however, supremely irrelevant. The law does not require that every defendant be found not guilty or receive a life sentence if convicted of aggravated murder. The law requires only imperfect but reasonable counsel.

PC ROA, Ruling and Order dated March 23, 2012, at 0015506. Similarly, in Brown v. United States, 411 U.S. 223 (1973), the Supreme Court acknowledged that a defendant is entitled to a fair trial but not a perfect one, because there are no perfect trials. Id. at 230; see also United States v. Hastings, 461 U.S. 499, 508-09 (1983).

 *67 Next, petitioner claims that the state court's conclusion regarding the mitigation investigation was based on an unreasonable finding "that [petitioner's] biological father, Clifford Menzies, was 'inaccessible' because he had not been seen for 12 years." Dkt. # 109, at 226. Petitioner adds that "[t]he mere fact that Clifford was not in touch with his children does not indicate that he was in any way 'inaccessible.' " Id. Similarly, petitioner argues that there was no evidence in the record that petitioner's stepfather, Clint Stevens, was unavailable. In considering petitioner's claim that there was additional evidence that should have been raised, the Utah Supreme Court affirmed the postconviction court's determination that the additional evidence and witnesses were unnecessary, finding:

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 185

Petitioner claims that there was *additional* evidence under most of these factors that should have been raised .... For example, he claims that counsel should have called multiple additional witnesses to testify, including his biological father, his step-fathers and step-mother, and his teachers. But as the PCC recognized, each of these witnesses was either inaccessible or would have been unhelpful, if not damaging, to [petitioner's] mitigation defense. For instance, his biological father was inaccessible because he had not been seen for twelve years. Furthermore, [petitioner] failed to show that his stepfathers were available, and [petitioner's] sister and aunt provided information about them in any event.

Menzies IV, 344 P.3d at 628 (italics in original).

There is no evidence in the record to establish that either petitioner's father or stepfathers were actually available or willing to testify about their bad acts against petitioner at the time of trial. Rather, at trial, petitioner's sister testified that she had not seen their father for twelve years and did not know whether he was alive. J.T. Tr. of March 16, 1988, at 2907-08 (Dkt. # 110, Disk # 1, Trial/Transcripts (ROA 1161) (Add. 17) at 201-02). Moreover, petitioner has not provided any evidence suggesting he knew where his father or his stepfathers were at the time of trial or how to contact them. Even so, the Utah Supreme Court did not rest its decision on their unavailability. Rather, it found that petitioner's sister and aunt provided information about them, and that testimony was not rebutted. As a result, this Court finds that petitioner has failed to establish that the Utah Supreme Court's finding of fact was unreasonable.

Petitioner also complains that there was no evidence in the record to support the conclusion that evidence of organic brain damage would have hurt his case. In considering this claim, the Utah Supreme Court did not rest its decision solely on how this evidence would have impacted petitioner's case. Rather,

the court considered the claim as it had been presented in the postconviction court, stating:

[Petitioner's] final penalty-phase ineffective assistance claim is that counsel failed to introduce evidence of organic brain damage (OBD)–that [petitioner's] brain was physically impaired in such a way that it impacted his judgment or constituted a mental disease. [Petitioner] claims that Utah common law and Utah statutes *required* presentation of OBD and that failure to present such evidence constitutes prejudice. We reject these claims because [petitioner] misunderstands what is required of counsel under the law, and because introducing evidence of OBD would likely have hurt, rather than helped, [petitioner's] case.

First, although Utah statutes do suggest that counsel raise evidence of mental impairment or disease, including the impact of drugs and alcohol, they do not *specifically* require counsel to introduce evidence of OBD. As a preliminary matter, we note that [petitioner's] arguments concerning Utah common law and the sentencing statute are unpreserved–they were raised for the first time on appeal. And [petitioner's] common-law argument is unsupported by the cases he cites. Though both cases do refer to OBD, neither establishes in any way that trial counsel must present OBD evidence as a matter of effective assistance of counsel. Nor does Utah's sentencing statute require OBD evidence. Counsel need only raise mental illness/mental health concerns that are appropriate under a reasonable mitigation strategy. That was done here.

**\*68** At the penalty phase, counsel elicited testimony from two separate mental health experts, both of whom testified that [petitioner's] propensity for violence was likely to abate in prison. They also testified to [petitioner's] substance abuse and the possibility that it directly affected him at the time of the murder. Although counsel also commissioned a psychiatrist, they did not call the psychiatrist to testify because the testimony would have hurt the mitigation defense–the psychiatrist's report focused on [petitioner's] violent nature and that he was unlikely to change. Although [petitioner] claims that counsel should have hired an additional neuropsychological examination to explore OBD and FAS, he makes no showing that counsel was required as a matter of constitutional effectiveness of counsel to explore these additional possibilities.

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 186

In fact, the evidence suggests that counsel was unaware of the possibility that [petitioner] had OBD or FAS and the experts counsel hired to investigate any such possibility found no supporting evidence in their inquiries. Given that "it is reasonable for counsel to rely on the judgment and recommendations of qualified experts" in developing a mitigating strategy, it was reasonable for counsel not to have explored the possibility of these additional conditions, since the three commissioned mental health experts provided no evidence suggesting to counsel that those conditions were likely to have affected [petitioner's] psychological condition. And as the PCC recognized, there was also no direct evidence of OBD.

Finally, introducing evidence of OBD would have hurt [petitioner's] mitigation defense, rather than helped. Because "impulse control [would be] forever and always impaired as a result of that OBD," this would have undercut the mitigation strategy of showing that [petitioner] was capable of rehabilitation. Had OBD evidence been introduced, it would have supported the State's position that [petitioner] would continue to be violent.

In sum, [petitioner's] failure to investigate an OBD evidence claim fails because he has not established that counsel's performance was deficient and that counsel's performance prejudiced his case.

🔺 Menzies IV, 344 P.3d at 628-9 (italics in original).

After challenging the legal conclusions and findings of fact, petitioner spends approximately twenty-five additional pages trying to convince this Court that defense counsel were "prejudicially deficient in failing to conduct an effective mitigation investigation and present key witnesses related to his abusive and neglectful childhood." Dkt. # 109, at 228-53. In an attempt to provide additional support to his claim, petitioner submits a declaration of Victoria Reynolds, Ph. D., who reviewed juvenile and family records of petitioner and states: "In my opinion, an adequate and detailed trauma assessment with [petitioner] was never conducted at any point in [petitioner's] life." Dkt. # 109-13, at 258, ¶ 8. According to this doctor, such an assessment would "possibly put in context some of the reasons for his increasingly alienated, self-destructive, and violent trajectory that led to his current criminal case." Id. (emphasis added). This declaration was prepared on August 13, 2015, and was, therefore, never submitted to or considered by the state courts. Thereafter, petitioner spends approximately eighteen (18) additional

pages to convince this Court that counsel was ineffective in failing to prepare and present "appropriate expert witnesses" during the penalty phase of trial. Again, this argument is premised upon Dr. Reynolds's declaration, as well as Dr. Kockler's neuropsychological evaluation, neither of which was before the state court. As previously stated, this Court's review is limited to the record that was before the state court.

📄 Pinholster, 563 U.S. at 186.

Based upon the record before the state court as discussed herein, including the fact that counsel conducted an investigation into all of the areas suggested by the commentary to Standard 4-4.1 of the ABA Standards for the Defense Function (1979), i.e., defendant's background, education, employment records, mental and emotional stability, and family relationships, this Court finds "fairminded jurists could disagree" on the correctness of the state court's decision that counsel's performance was not deficient. See Richter, 562 U.S. at 786. Therefore, this Court finds that petitioner simply has not shown that the Utah Supreme Court's decision regarding counsel's performance was unreasonable or that trial counsel's representation amounted to incompetence under the "prevailing professional norms" at the time of petitioner's trial. Petitioner has also not shown that the decision was based upon an unreasonable determination of the facts. Therefore, federal habeas relief is not appropriate on claim 31.

**Claim 32: Withdrawn** (see Dkt. # 109, at 265)

**Claim 34: Denial of Due Process Regarding Change in State Law**

 **\*69**   In claim 34, petitioner asserts that he was deprived of his rights of due process under the Fourteenth Amendment when the state court overruled prior state law during his direct appeal. Petitioner admits this claim has not been exhausted in state court; however, he argues ineffective assistance of postconviction counsel as cause to excuse his procedural default.

In 📄 Davila, 137 S. Ct. 2058 (2017), the Supreme Court refused to extend the holding in Martinez to allow federal courts to hear a substantial, but procedurally defaulted, claim of ineffective assistance of postconviction counsel. Therefore, this Court finds that any errors by state postconviction counsel do not provide cause to overcome petitioner's procedural default of this claim. Accordingly, claim 34 is denied.

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 187

## Claim 35: Change in State Law Allowing Sentence of Life Without Possibility of Parole

Petitioner alleges, in claim 35, that a change in state law to include a new sentence of life without the possibility of parole for a defendant convicted of murder renders his death sentence cruel and unusual. Petitioner raised this claim on direct appeal, but the Utah Supreme Court denied the claim without specifically addressing it. 🚩 🔶 Menzies II, 889 P.2d at 406. Petitioner now claims that this was an unreasonable application of clearly established federal law.

While petitioner's direct appeal was pending, the Utah legislature modified the penalty options for capital cases, adding a third option of life without the possibility of parole. See Utah Code Ann. § 76-3-207.5 (West 1992) (effective April 27, 1992). Moreover, the amended statute expressly stated that the new sentencing option "has no effect on sentences imposed in capital cases prior to April 27, 1992." Id.; see also State v. Andrews, 843 P.2d 1027, 1028-29 (Utah 1992) (new sentencing option has no retroactive application to a defendant whose sentence occurred prior to effective date of statute).

Petitioner does not cite to any Supreme Court decisions that holds that a sentence of death becomes "cruel and unusual" if a state subsequently changes its death penalty scheme to allow for a third sentencing option in all future capital cases. Rather, petitioner relies on the oft-quoted phrase that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 🟨 Gregg v. Georgia, 428 U.S. 153, 173 (1976) (quoting 🟨 Trop v. Dulles, 356 U.S. 86, 101 (1958) ). He argues that the legislative change in sentencing options emphasizes the undue severity of the sentence imposed in this case based upon an unfounded fear that petitioner might one day be paroled. This does not, however, establish that the Utah Supreme Court's decision was an unreasonable application of clearly established federal law. Accordingly, claim 35 is denied.

## Claim 36: Error in Application of Sentencing Standard

In claim 36, petitioner asserts that the Utah Supreme Court's conclusion, that the trial judge appropriately applied the sentencing standard set forth in 🟨 State v. Wood, 648 P.2d 71 (Utah 1982), was an objectively unreasonable finding of fact that violated his rights to due process under the

Fourteenth Amendment and a reliable sentence under the Eighth Amendment. Additionally, petitioner argues that the trial judge failed to make any written findings as required by 🚩 State v. Lafferty, 749 P.2d 1239 (Utah 1998). According to petitioner, because the trial judge did not "thoroughly understand and assess the mitigating evidence," the trial judge's decision did not comport with the individualized sentencing requirements of Zant, 🚩 Woodson v. North Carolina, 428 U.S. 280 (1976), and 🚩 Penry v. Lynaugh, 492 U.S. 302 (1989). Since the sentencing court specifically stated that it had weighed and evaluated the mitigating evidence, respondent urges this Court to find that petitioner has not established that the state-court decision was based on an unreasonable determination of facts.

**\*70** Petitioner raised these issues on direct appeal and the Utah Supreme Court addressed the issue on the merits, holding:

> Finally, [petitioner] argues that the trial court failed to apply the standard set forth in Wood, 648 P.2d at 83-84, in imposing the death penalty. There, we held that in order to impose the death penalty, the sentencing body must find beyond a reasonable doubt that the substantiality or persuasiveness of the aggravating factors outweighs that of the mitigating factors, and must then conclude, also beyond a reasonable doubt, that the death penalty is appropriate. Id.

> [Petitioner] asserts that the trial court failed to properly weigh the aggravating and mitigating factors and then incorrectly concluded that the death penalty was appropriate. We do not agree. The first prong of Wood requires that the sentencing body find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. 648 P.2d at 83-84. While we realize that the trial judge recited a number of factors during the sentencing proceeding, the record indicates that he weighed those factors in the manner required by Wood:

>> The court has, to the best of the court's ability, weighed and evaluated the mitigating circumstances and aggravating circumstances. And the conclusion the court has reached is that based on the aggravating and mitigating circumstances, the court concludes that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt.

> In addition, Wood requires that the sentencing body find that the death penalty is the appropriate penalty beyond

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 188

a reasonable doubt. 648 P.2d at 84. Again, the record indicates that the trial judge properly applied the law:

> Consequently, this court, with the heaviest of hearts, makes the more difficult and trying decision that under the circumstances and beyond a reasonable doubt, the death penalty is the appropriate penalty, and the court so orders.

We therefore find no merit to [petitioner's] claim that the trial judge applied an inappropriate standard when he sentenced [petitioner] to death.

[Petitioner] also points out that the trial judge did not make written findings that the prior bad acts evidenced by material found in his prison file had been proven beyond a reasonable doubt, as required by our decision in State v. Lafferty, 749 P.2d 1239 (Utah 1988), *habeas corpus granted on other grounds*, Lafferty v. Cook, 949 F.2d 1546 (10th Cir. 1992). While we have required written findings regarding unadjudicated bad acts if the sentence is determined by a judge, we have not said that such findings are constitutionally required and that a failure to make such findings mandates reversal. Id. at 1260 n. 16. Rather, we can look to the other evidence before the trial court to be certain that the death sentence would have been imposed even without the improper evidence. Id. Reviewing the record before us, we think that the error was harmless. The prior bad acts referred to are quite minor when compared to the other evidence of aggravating circumstances. We conclude that the facts indicate "beyond a reasonable doubt that the remaining aggravating circumstances and factors outweigh the mitigating factors and that the imposition of the death penalty was justified and appropriate," despite the trial court's consideration of the prison file. See Archuleta, 850 P.2d at 1248. Therefore, any error was harmless. See Lafferty, 749 P.2d at 1261 (citing State v. Hackford, 737 P.2d 200, 204-05 and n. 3 (Utah 1987) ).

**\*71** Menzies II, 889 P.2d at 406.

In this case, petitioner asserts that the sentencing decision was not reliable and, therefore, it resulted in an arbitrary sentencing proceeding. The basis for petitioner's assertion is that, while the sentencing judge stated that he would address the mitigating evidence he considered, his subsequent statements gave very little attention to the mitigating evidence. Dkt. # 109, at 276. Petitioner also complains that,

in recounting the extensive aggravating evidence, the trial judge considered numerous unadjudicated prior bad acts contained in the prison file, as well as inapplicable and uncharged aggravating circumstances.[94] Finally, petitioner argues that the Utah Supreme Court's conclusion, that the sentencing judge appropriately applied Wood, is an objectively unreasonable finding of fact because the sentencing judge failed to thoroughly understand and assess the mitigating evidence.

94    See Claims 26 and 29 above for discussion of petitioner's claim that court relied on uncharged aggravating factors.

A review of the evidence in this case, however, does not support petitioner's arguments. While the Utah Supreme Court did take issue with the trial court's failure to make written findings regarding the prior unadjudicated bad acts contained in the prison file, it made it clear that those acts were "quite minor when compared to the other evidence of aggravating circumstances." Menzies II, 889 P.2d at 406. Petitioner is not actually contesting any of the factual findings made by the Utah Supreme Court; rather, he contests the moral judgment made by both the trial court and the Utah Supreme Court. In Saffle v. Parks, 494 U.S. 484 (1990), the Supreme Court stated that "[t]he decision whether to impose the death penalty represents a moral judgment about the defendant's culpability, not a factual finding." Id. at 506. As a result, this Court finds that petitioner has failed to establish that the state-court decision was based on an unreasonable determination of facts. Further, this Court finds that the sentencing decision in this case met the due process requirements outlined in Zant. Therefore, claim 36 is denied.

**Claim 37: Ineffective Assistance of Appellate Counsel**

Petitioner argues in claim 37 that he received ineffective assistance of appellate counsel for failing to raise meritorious claims on appeal, which include: (1) petitioner's right to due process was violated when he was forcibly shackled in front of the jurors (claims 9 and 14(G) ); (2) petitioner's right to due process, to an adequate and effective appeal, and to a public trial were violated by the court's failure to record significant proceedings in petitioner's case (claims 33 and 14(H) ); and (3) petitioner's rights were violated when he was convicted by a biased jury (claims 38.E.2 and 14.C). To the extent these claims lack merit, appellate counsel was not ineffective for failing to raise them on appeal. Hawkins

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 189

v. Hannigan, 185 F.3d 1146, 1152 (10th Cir. 1999). Further, as discussed above, where claims were raised in petitioner's state postconviction proceeding but were not raised in his appeal from that proceeding, he is barred from raising those claims herein. Accordingly, claim 37 is denied.

### Claim 38: Ineffective Assistance of Postconviction Counsel

**\*72** Petitioner argues in claim 38 that he received ineffective assistance of counsel during his postconviction proceedings. Petitioner does not have a constitutional right to counsel in a postconviction proceeding. As a result, attorney error committed during the course of state postconviction proceedings cannot supply cause to excuse a procedural default that occurs in those proceedings. Davila, 137 S. Ct. at 2065 (citing Murray v. Giarratano, 492 U.S. 1 (1989) ). Accordingly, claim 38 is denied.

### Claims 39 and 40: Constitutionality of Utah Death Penalty Scheme

In claim 39, petitioner argues that he was sentenced to death under a death penalty scheme that fails to adequately channel the application of the death penalty in violation of the Eighth Amendment. As pointed out by respondent, petitioner does not attempt to explain how the Utah death penalty statute that was in effect at time of his sentencing fails to narrow the class of persons eligible for the death penalty.

Additionally, in claim 40, petitioner asserts that the Utah death penalty statute violates the Fifth and Fourteenth Amendments because it imposes a burden on a defendant to overcome the evidence of conviction and creates a presumption of death in sentencing. Although petitioner claims this issue was not raised in his state court proceedings, a review of petitioner's direct appeal brief contradicts this to some extent. Petitioner's appellate brief states:

> [Petitioner] maintains that the Utah death penalty scheme violates the eighth amendment to the United States constitution and Article I, § 9 of the Utah constitution because (1) the lengthy list of aggravating factors in Utah Code Ann. § 76-5-202 allows almost any homicide

to result in a death penalty, thereby failing to narrow the class, (2) the unlimited aggravation language of § 76-3-207 fails to channel the discretion of the sentencer, (3) the statute impermissibly creates a presumption of death in the penalty phase, (4) the Utah death penalty scheme unacceptably reduces evidentiary burdens in the penalty phase, and (5) ....

Brief of Appellant filed on September 24, 1986, at 196 (Dkt. # 110, Disk #1, Related Appeals/Direct Appeal, Dkt. # 100, at 221) (emphasis added). In presenting this claim to the Utah Supreme Court, however, petitioner did not articulate any arguments with respect to these two statements. Rather, petitioner attempted to "adopt and incorporate" arguments made by a different person in a completely different appeal brief. Id. at 196-97 (221-22). Petitioner then concludes:

> Both the federal and Utah constitutions require that the class of murderers eligible for the death penalty be significantly narrowed. The current statutory scheme, with its seventeen statutory aggravating circumstances and allowance for almost unlimited aggravating evidence in the penalty phase, violates both constitutions.

Id. at 198 (223).

Regardless of petitioner's failure to articulate any legal arguments to support these two statements, this Court finds that the claim was raised in his direct appeal brief and, therefore, has been exhausted. The Utah Supreme Court did not, however, specifically address this issue. Rather, it was denied with the statement, "We find [petitioner's] other claims to be without merit." Menzies II, 889 P.2d at 406.

To be valid, a capital punishment statute must prescribe aggravating circumstances or their equivalent that "genuinely narrow the class of persons eligible for the death penalty."

Menzies v. Crowther, Not Reported in Fed. Supp. (2019)

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 190

Zant, 462 U.S. at 877; see also Andrews, 802 F.2d 1256 (10th Cir. 1986) (upholding the constitutionality of an earlier version of the Utah death penalty scheme), and cases cited therein. Utah's capital sentencing statutes were revised following Furman v. Georgia, 408 U.S. 238 (1972), and resemble the Texas system upheld in Jurek v. Texas, 428 U.S. 262 (1976). Andrews v. Shulsen, 600 F. Supp. 408 (D. Utah 1984). The initial revision of these statutes limited capital homicides to intentional and knowing murders committed in eight enumerated circumstances. See Utah Code Ann. § 76-5-202 (West 1973). In 1985, the legislature amended the statute to expand capital homicides to the intentional and knowing murders committed in seventeen enumerated circumstances. See Utah Code Ann. § 76-5-202 (West 1985). This amended statute was the one in effect at the time the homicide was committed in this case. This Court is not aware of, and petitioner does not cite to, any Supreme Court case holding that a state death penalty statutory scheme is unconstitutional if it contains seventeen enumerated circumstances as opposed to eight. Even with seventeen enumerated circumstances, a review of the statute leaves no doubt that this statute has substantially narrowed the class of persons who are eligible for the death penalty. Moreover, the portion of the enumerated circumstance applied to petitioner herein was substantially similar to an enumerated circumstance contained in the 1973 statute. [95] As a result, this Court finds petitioner has failed to show that the decision of the Utah Supreme Court denying claim 39 was an unreasonable application of clearly established federal law.

95

Compare Utah Code Ann. § 76-5-202(1)(d) (West 1973) ("(1) Criminal homicide constitutes murder in the first degree if under circumstances not constituting manslaughter, the actor intentionally or knowingly causes the death of another under any of the following circumstances: ...... (d) The homicide was committed while the actor was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery, rape, forcible sodomy, or aggravated sexual assault or arson, burglary or kidnapping."), with Utah Code Ann. § 76-5-202(1)(d) (West 1985) ("(1) Criminal homicide constitutes murder in the first degree if the actor intentionally or knowingly

causes the death of another under any of the following circumstances: ...... (d) The homicide was committed while the actor was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, aggravated robbery, robbery, rape, rape of a child, object rape, object rape of a child, forcible sodomy, sodomy upon a child, sexual abuse of a child, child abuse of a child under the age of 14 years, as otherwise defined in subsection 76-5-109(2)(a), or aggravated sexual assault, aggravated arson, arson, aggravated burglary, burglary, aggravated kidnaping, kidnaping, or child kidnaping.").

**\*73** Additionally, the standards that guide a sentencing body must focus on the circumstances of the crime, as well as the background and personal characteristics of the defendant. Woodson, 428 U.S. at 304 (citing Pennsylvania ex rel. Sullivan v. Ashe, 302 U.S. 51, 55 (1937) ). While petitioner's argument appears to be that, by allowing the sentencer to consider as aggravating factors the evidence that established the crime in the guilt phase, the Utah statute [96] impermissibly creates a presumption of death or somehow reduces the burden of proof in the penalty phase. The Supreme Court has held, however, that consideration of aggravating circumstances in both the guilt and penalty phases of a capital trial does not de facto shift the burden of proof to the defendant or render the sentencing scheme unconstitutional. See Lowenfield, 484 U.S. at 246. Accordingly, this Court finds that petitioner has failed to establish that the decision of the Utah Supreme Court denying claim 40 was an unreasonable application of clearly established federal law. For the reasons stated, claims 39 and 40 are hereby denied.

96

Utah Code Ann. § 76-3-207(2) (West 1982).

## Claims 41 and 42: Cruel and Unusual Punishment

In claim 41, petitioner argues that, because he has spent twenty-seven (27) years on death row, it would violate his Eighth Amendment right to be free from cruel and unusual punishment for the state to execute him. Petitioner's claim, commonly referred to as a Lackey claim, [97] is premised on two notions—execution of one who has spent so many years on death row does not meaningfully advance the goals of retribution or deterrence and, as it relates to death-row inmates, the severe limitations placed upon these inmates compounds the anxieties normally associated with incarceration, including living with the uncertainty of an

upcoming execution for a substantially long period of time. Further, in claim 42, petitioner asserts that the death penalty is categorically cruel and unusual punishment, in violation of the Eighth Amendment. Petitioner admits that neither of these issues have been exhausted.

97

> See ☐ Lackey v. Texas, 514 U.S. 1045 (1995) (Stevens, J., statement respecting denial of certiorari).

The Supreme Court has never held that execution of a person who has been held on death row for a substantial number of years prior to the execution violates the Constitution. "Although two Supreme court justices have expressed the view that lower federal courts should grapple with this issue, those views do not constitute an endorsement of the legal theory, which has never commanded an affirmative statement by any justice, let alone a majority of the Court." Stafford v. Ward, 59 F.3d 1025, 1028 (10th Cir. 1995). This Court is not aware of any reported federal case that has adopted the position advocated by petitioner. See also Gardner v. State, 234 P.3d 1115, 1142-44 (Utah 2010); ☐ State v. Lafferty, 20 P.3d 342 (Utah 2001); State v. Andrews, 843 P.2d 1027, 1030-31 (Utah 1992). Further, the Supreme Court has "time and again reaffirmed that capital punishment is not per se unconstitutional." ☐ Glossip v. Gross, 135 S. Ct. 2726, 2739 (2015), and cases cited therein. Accordingly, this Court hereby denies claims 41 and 42.

**Claim 43: Cumulative Error**
In claim 43, petitioner asserts that he was denied a fair trial as a result of the cumulative effect of all errors during his trial, appeal, and postconviction proceedings, thereby depriving him of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. Petitioner argues that, if this Court does not find any of his individual claims persuasive, it should grant relief based upon the cumulative effect of all of his alleged constitutional violations. Respondent asserts that this claim has not been exhausted.

As previously stated, before exhaustion will have occurred a habeas petitioner must have "fairly presented" to the state courts the "substance" of his federal habeas corpus claim. ☐ Picard, 404 U.S. at 275-76. While petitioner raised a claim of cumulative error in his direct appeal, that claim included only the individual errors that he claimed on direct appeal. It did not include all of the claims raised in this habeas

proceeding. Petitioner did not raise any claim of cumulative error in his appeal from the denial of his postconviction petition. Because petitioner did not fairly present to the state courts that the cumulative effect of "errors" denied him due process and a fundamentally fair trial, this Court finds he failed to exhaust this claim. ☐ Gonzales v. McKune, 279 F.3d 922, 925 (10th Cir. 2002) (en banc) (rejecting petitioner's argument that exhaustion requires only that the substance of the claim be presented and concluding that the cumulative error argument was unexhausted and procedurally barred because cumulative error claim was never presented to the state court); see also Nickleson v. Stephens, 803 F.3d 748 (5th Cir. 2015) (no circuit court has held that cumulative error claims against state convictions may be reviewed in federal proceedings without exhaustion). Therefore, claims 43 is denied.

IV.

CONCLUSION

**\*74** After a thorough review of the second amended petition for writ of habeas corpus (Dkt. # 109), respondent's response (Dkt. # 123), petitioner's reply (Dkt. # 127), and all of the state court records filed herein, this Court finds that petitioner has failed to establish that he is currently in custody in violation of the Constitution or laws or treaties of the United States, as required by ☐ 28 U.S.C. § 2254(a). Accordingly, the second amended petition for writ of habeas corpus (Dkt. # 109) is **denied**.

Additionally, this Court finds that petitioner failed to develop the factual basis for many of his claims in the state court proceedings, despite having been allowed five opportunities to amend his state postconviction petition, and he has not established by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty of the underlying offense. As a result, petitioner's request for an evidentiary hearing and/or for leave to conduct additional discovery is **denied**. ☐ 28 U.S.C. § 2254(2); Rule 6, Rules Governing ☐ Section 2254 Cases in the United States District Courts. A separate judgment is entered herewith.

*Menzies v. Crowther, Not Reported in Fed. Supp. (2019)*

Appellate Case: 19-4042    Document: 98-2    Date Filed: 12/22/2020    Page: 192

## V.

## CERTIFICATE OF APPEALABILITY

Rule 11, Rules Governing Section 2254 Cases in the United States District Courts, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." The Court recognizes that "review of a death sentence is among the most serious examinations any court of law ever undertakes." Brecheen v. Reynolds. 41 F.3d 1343, 1370 (10th Cir. 1994). To be granted a certificate of appealability, however, petitioner must demonstrate a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists of reason or that the questions deserve further proceedings. Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). "Obviously the petitioner need not show that he should prevail on the merits. He has already failed in that endeavor." Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983) (citations omitted).

The Court reviewed each of petitioner's propositions of error, and found none of the claims merited or warranted habeas relief. However, the Court recognizes that some of petitioner's stated issues relate to the alleged deprivation of one of his constitutional rights, which, if substantiated, could entitle him to habeas relief. In order to ensure that these issues receive the type of review on appeal which should be accorded such serious matters, the Court has carefully considered each issue and finds that the following enumerated issues could

be debated among jurists or could be resolved differently by another court:

Claim 13: improper jury instructions (due to a dissenting opinion in Menzies II, 889 P.2d at 407 (dissenting opinion) );

Claim 14: ineffective assistance of counsel during the guilt stage, i.e., failure to investigate the accounts of Tim Larrabee and Beth Brown and present inconsistencies at trial, and failure to investigate and present evidence undermining the account of Walter Britton;

Claims 15 and 18: admission of the prison file (due to a dissenting opinion in Menzies II, 889 P.2d at 408 (dissenting opinion) ); and

Claim 31: ineffective assistance of counsel during the penalty stage.

Additionally, this Court finds that these same issues are adequate to deserve encouragement to proceed further. See Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citing Barefoot, 463 U.S. at 893).

**\*75**  A certificate of appealability is **granted** as to the claims enumerated above.

**IT IS SO ORDERED** on this 11th day of January, 2019.

### All Citations

Not Reported in Fed. Supp., 2019 WL 181359

---

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that: (1) all required privacy redactions have been made in compliance with 10th Cir. R. 25.5; (2) the ECF submission is an exact copy of the hard copies submitted to the court; and (3) the digital submissions have been scanned for viruses with the most recent version of Windows Defender Antivirus, Version 1.329.885.0, last updated on December 22, 2020, and according to the program are free of viruses.

/s/ Andrew F. Peterson

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2020, I electronically filed the foregoing Addendum to Brief of Appellee Vol I of II using the court's CM/ECF system which will send notification of such filing to the following:

Jon M. Sands
Federal Public Defender
Lindsey Layer
Eric Zuckerman
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
lindsey_layer@fd.org
eric_zuckerman@fd.org

/s/ Andrew F. Peterson